# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| )<br>1. DUANE & VIRGINIA LANIER<br>TRUST, Individually and On<br>Behalf of All Others Similarly<br>Situated,<br><br>Plaintiff,<br><br>v.<br><br>1. SANDRIDGE ENERGY, INC.,<br>2. SANDRIDGE MISSISSIPPIAN<br>TRUST I,<br>3. SANDRIDGE MISSISSIPPIAN<br>TRUST II,<br>4. TOM L. WARD,<br>5. JAMES D. BENNETT,<br>6. MATTHEW K. GRUBB,<br>7. RANDALL D. COOLEY,<br>8. JIM J. BREWER,<br>9. EVERETT R. DOBSON,<br>10. WILLIAM A. GILLILAND,<br>11. DANIEL W. JORDAN,<br>12. ROY T. OLIVER, JR.,<br>13. JEFFREY S. SEROTA,<br>14. D. DWIGHT SCOTT,<br>15. RAYMOND JAMES &<br>ASSOCIATES, INC.,<br>16. MORGAN STANLEY & CO.<br>LLC,<br>17. MERRILL LYNCH, PIERCE,<br>FENNER & SMITH, INC.,<br>18. CITIGROUP GLOBAL<br>MARKETS INC., and<br>19. RBC CAPITAL MARKETS,<br>LLC,<br><br>Defendants. | Civil Action No. CIV-15-634-M<br><br>**CLASS ACTION**<br><br>**COMPLAINT FOR VIOLATIONS OF<br>THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

1

The Duane & Virginia Lanier Trust ("Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against defendants, alleges the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SandRidge Energy, Inc. ("SandRidge" or the "Company"), SandRidge Mississippian Trust I ("Trust I") and SandRidge Mississippian Trust II ("Trust II" and  together with Trust I, the "SandRidge Trusts"), analysts' reports and advisories about the Trusts, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons other than Defendants (defined below) who purchased or otherwise acquired common units of (i) Trust I pursuant or traceable to Trust I's initial public offering on or about April 7, 2011 (the "Trust I Offering"), and/or at other times during the time period between April 7, 2011 and November 8, 2012, both dates inclusive (the "Class Period"); and/or (ii) Trust II pursuant or traceable to Trust II's initial public offering on or about April 17, 2012 (the "Trust II Offering," and together with the Trust I Offering, the "SandRidge Trust Offerings"), and/or at other times during the Class Period, seeking to

recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Section 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.      This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

4.      Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) and 28 U.S.C. §1391(b) because a significant portion of the acts and omissions complained of herein occurred within this Judicial District.

5.      In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.　Plaintiff acquired the common units of Trust I pursuant or traceable to the Trust I Offering as set forth in the attached Certification, which is incorporated by reference herein, and was damaged thereby.

7.　Plaintiff acquired the common units of Trust II pursuant or traceable to the Trust II Offering as set forth in the attached Certification, which is incorporated by reference herein, and was damaged thereby.

8.　Defendant SandRidge is a Delaware corporation headquartered at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma. SandRidge is the sponsor of the SandRidge Trusts. In connection with its role as sponsor, SandRidge was the co-registrant for the SandRidge Trust Offerings.

9.　Defendant Trust I is a Delaware statutory trust formed in December 2010 to own overriding royalty interests to be conveyed to the trust by SandRidge in 37 horizontal wells producing from the Mississippian Formation in Oklahoma and in 123 horizontal development wells to be drilled in the Mississippian Formation in Oklahoma ("Trust I Development Wells"). Its principal executive offices are located in Austin, Texas.

10.　Defendant Trust II is a Delaware statutory trust formed in December 2011 to own overriding royalty interests to be conveyed to the trust by SandRidge in 67 producing horizontal wells in the Mississippian Formation in Oklahoma and Kansas, and overriding royalty interests in 206 horizontal development wells to be drilled in the Mississippian Formation in Oklahoma and Kansas ("Trust II Development Wells"). Its principal executive offices are locates in Austin, Texas.

11.     The Defendants referenced above in ¶¶9-10 are referred to herein as the "Trust Defendants."

12.     Defendant Tom L. Ward ("Ward") founded SandRidge Energy, Inc. ("SandRidge" or the "Company") and served as SandRidge's Chairman of the Board and Chief Executive Officer ("CEO") during the Class Period. Defendant Ward signed the Registration Statements for the Trust Offerings. The Company terminated Defendant Ward in June 2013.

13.     Defendant James D. Bennett ("Bennett") served as SandRidge's Executive Vice President and Chief Financial Officer ("CFO"), as well as the CFO of Trust I and Trust II,  during the Class Period. Defendant Bennett signed or authorized the signing of the Registration Statement for the Miss Trust II Offering.

14.     Defendant Matthew K. Grubb ("Grubb") served as SandRidge's President and Chief Operating Officer ("COO"), as well as the President and COO of Trust I and Trust II, during the Class Period. Collectively, Ward, Bennett and Grub are referred to herein as the "Officer Defendants."

15.     Defendant Randall D. Cooley ("Cooley") served as SandRidge's Senior Vice President – Accounting during the Class Period. Defendant Cooley signed or authorized the signing of the Registration Statements for the Trust Offerings.

16.     Defendant Jim J. Brewer ("Brewer") served as a member of the Board of Directors for SandRidge during the Class Period. Defendant Brewer signed or authorized the signing of the Registration Statement for the Miss Trust II Offering.

17.     Defendant Everett R. Dobson ("Dobson") served as a member of the Boards of Directors for SandRidge during the Class Period. Defendant Dobson signed or authorized the signing of the Registration Statements for the SandRidge Trust Offerings.

18.     Defendant William A. Gilliland ("Gilliland") served as a member of the Boards of Directors for SandRidge during the Class Period. Defendant Gilliland signed or authorized the signing of the Registration Statements for the SandRidge Trust Offerings.

19.     Defendant Daniel W. Jordan ("Jordan") served as a member of the Boards of Directors for SandRidge during the Class Period. Defendant Jordan signed or authorized the signing of the Registration Statements for the SandRidge Trust Offerings.

20.     Defendant Roy T. Oliver, Jr. ("Oliver") served as a member of the Boards of Directors for SandRidge during the Class Period. Defendant Oliver signed or authorized the signing of the Registration Statements of the SandRidge Trust Offerings.

21.     Defendant Jeffrey S. Serota ("Serota") served as a member of the Board of Directors for SandRidge during the Class Period. Defendant Serota signed or authorized the signing of the Registration Statements of the Miss Trust II Offering.

22.     Defendant D. Dwight Scott ("Scott") served as a member of the Board of Directors for the SandRidge at all relevant times until his retirement on February 28, 2011. Defendant Scott signed or authorized the signing of the Registration Statement of the Miss Trust I Offering.

23.     The Defendants referenced above in ¶¶15-22 are referred to herein as the "Director Defendants," and together with the "Officer Defendants," the "Individual Defendants."

24.     Defendant Raymond James & Associates, Inc. ("Raymond James") operates as an investment bank in the United States with its principal executive offices located in St. Petersburg, FL. Raymond James acted as a co-lead underwriter and served as a representative for the underwriters for the SandRidge Trust Offerings and helped to draft and disseminate the Prospectuses for the two Offerings.

25.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a global financial services firm and underwriter with its principal executive offices and world headquarters located in New York, NY. Morgan Stanley acted as a co-lead underwriter and served as a representative for the underwriters for the SandRidge Trust Offerings and helped to draft and disseminate the Prospectuses for the two Offerings.

26.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a global financial services firm and underwriter with its principal executive offices and world headquarters located in New York, NY. Merrill Lynch acted as a co-lead underwriter and served as a representative for the underwriters for the Trust II Offering and helped to draft and disseminate the Prospectus for said Offering.

27.     Defendant Citigroup Global Markets Inc. ("Citigroup") is the US-based brokerage and securities arm of banking behemoth Citigroup Inc. and underwriter with its principal executive offices and world headquarters located in New York, NY. Citigroup acted as a co-lead underwriter and served as a representative for the underwriters for the Trust II Offering and helped to draft and disseminate the Prospectus for said Offering.

28.     The other underwriters for the Trust I Offering include: Wells Fargo Securities, RBC Capital Markets Corporation, Oppenheimer & Co. Inc., Madison Williams

& Co. LLC, Morgan Keenan & Co. Inc., Robert W. Baird & Co. and Wunderlich Securities Inc. The other underwriters for the Trust II Offering include: UBS Securities LLC, Oppenheimer & Co. Inc., Wunderlich Securities, Inc., Sanders Morris Harris Inc., and Johnson Rice & Company L.L.C.

29.     The Defendants referenced above in ¶¶24-27 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants and the entities referenced in ¶28 are collectively referred to herein as the "Underwriters." The Underwriters were paid over $23.5 million in connection with the Trust I Offering and were paid over $37.6 million in connection with the Trust II Offering. In addition, Defendant Raymond James was paid a structuring fee of approximately $1.8 million for evaluation, analysis, and structuring of the Trust I. Defendants Morgan Stanley and Raymond James were paid a structuring fee of approximately $3.1 million for evaluation, analysis, and structuring of the SandRidge Trust Offerings. The Underwriter Defendants failed to perform adequate due diligence in connection with their role as Underwriters for the SandRidge Trust Offerings and were negligent in failing to ensure that the Registration Statements and Prospectuses for both Offerings were prepared properly and accurately. The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

30.     The Trust Defendants, the Individual Defendants, and the Underwriter Defendants are collectively referenced herein as the "Defendants."

## CLASS ACTION ALLEGATIONS

31.     Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b )(3) on behalf of a class consisting of consisting of all purchasers of SandRidge Trusts common units during the Class Period (the "Class"), consisting of the following:

(a)      purchasers of the common units of Trust I in or traceable to the Miss Trust I Offering, and/or at other times during the Class Period; and

(b)      purchasers of the common units of Trust II in or traceable to the Trust II Offering, and/or at other times during the Class Period.

32.     Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

33.     The members of the Class are so numerous that joinder of all members is impracticable. The units of Trust I and Trust II are actively traded on the NYSE. Trust I sold approximately 17.25 million common units during the Trust I Offering, and Trust II sold approximately 26 million common units during the Trust II Offering. The precise number of Class members is unknown to Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the Class members can be ascertained from the books and records of Trust I and Trust II or their transfer agents or the Underwriters to the SandRidge Trust Offerings. Notice can be provided to such record

owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

34.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

35.     Plaintiffs' claims are typical of the claims of the other members of the Class because Plaintiffs' and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants. Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

36.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

37.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts and/or omissions as alleged herein;

(b)     whether the Prospectuses and Registration Statements issued by Defendants to the investing public in connection with each of the SandRidge Trust Offerings negligently omitted and/or misrepresented material facts about SandRidge and its business, including with respect to its Mississippian Lime assets;

(c)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of the Company;

(d)     whether the price of Trust I common units or the Trust II common units were artificially inflated during the Class Period; and

(e)     the extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

### Background

38.     SandRidge, a Delaware corporation headquartered in Oklahoma City, Oklahoma, describes itself as an independent natural gas and oil company in the United States that engages in the exploration, development, and production of oil and gas properties. Its Exploration and Production ("E&P") segment explored for, developed, and produced natural gas and oil reserves with a focus on the Mid-Continent (a/k/a "Mississippian formation" or "Mississippian play") and the Permian Basin, a sedimentary

basin largely contained in the western part of Texas and the southeastern part of New Mexico.

39.     Beginning in early 2011, SandRidge represented that it would "monetize" certain of its assets in order to create cash flow to fund its ongoing lease acquisitions and drilling activities in its core assets in the Mid-Continent and the Permian Basin. Accordingly, among other monetization efforts, SandRidge created royalty trusts to fund its ongoing drilling operations.

40.     On January 5, 2011, Trust I filed a Registration Statement on Form S-1 and SandRidge filed a Registration Statement on Form S-3 with the SEC as co-registrants, and each filed several amendments on Form S-1/A and Form S-3/A thereafter for the Trust I Offering (the "Trust I Registration Statement").

41.     On April 7, 2011, the Prospectus with respect to the Trust I Offering (the "Trust I Prospectus"), which forms part of the Trust I Registration Statement, became effective and 15 million common units – representing an approximately 54% beneficial interest in Trust I – at $21 per unit were sold to the public, thereby raising $315 million.

42.     In addition to the above-referenced 15 million common units, the Trust I Registration Statement included an overallotment option granted to the Underwriters to purchase up to an additional 2.25 million common units, and on or about April 12, 2011 the Underwriters exercised this option. In total, 17.25 million common units were sold in the Trust I Offering at $21 per share, thereby raising approximately $338.7 million.

43.     The 17.25 million common units sold in the offering now represented an approximately 61.6% beneficial interest in Trust I. In addition, Trust I issued to Sandridge

3.750 million common units and 7 million subordinated units convertible into common units, together representing an approximate 38.4% beneficial interest in the Trust.

44.     On January 5, 2012, Trust II filed on a Form S-1 and SandRidge filed on a Form S-3 a Registration Statement with the SEC as co-registrants and each filed several amendments on Form S-1/A and Form S-3/A thereafter for the Trust II Offering (the "Trust II Registration Statement").

45.     On April 17, 2012, the Prospectus with respect to the Trust II Offering (the "Trust II Prospectus"), which forms part of the Trust II Registration Statement, became effective and 26 million common units at $21 per unit were sold to the public, thereby raising $513.2 million.

46.     In addition to the above-referenced 26 million common units, the Trust II Registration Statement included an overallotment option granted to the Underwriters to purchase up to an additional 3.9 million common units, and on or about April 17, 2012 the Underwriters exercised this option. In total, 29.9 million common units were sold in the Trust II Offering at $21 per share, thereby raising approximately $590 million, net of underwriting discounts and commissions.

47.     The 29.9 million common units sold in the offering to the public in the Trust II Offering now represented an approximately 60% beneficial interest in the Trust II. In addition, Trust II issued to Sandridge 7.4 million common units and 12.4 million subordinated units convertible into common units, together representing an approximate 40% beneficial interest in the Trust.

48.     In total, Trust I raised $336.9 million in net proceeds for SandRidge from investors, and Trust II raised $590 million in proceeds for SandRidge from investors.

**Materially False and Misleading Statements During the Class Period**

49.     On April 7, 2011, the Prospectus for the Trust I Offering became effective. The Trust I Prospectus described the Company's "thorough understanding" of the Mississippian region and the "consistency" of the region, stating in pertinent part as follows:

> *Well control and vertical drilling and production history significantly reduce drilling, reserve recovery and production decline risk.* The Mississippian formation's geology is well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s, including 123 vertical wells drilled on the Underlying Properties. With data from the vertical wells that have been drilled, SandRidge and other operators in the region have gained a thorough understanding of how to best identify the location of productive reservoirs and potential horizontal well bore paths, the permeability and porosity of the underlying rock properties and the amount and percentage mix of recoverable oil and gas. With this and other data derived from the vertical history, operators have been able to apply modern drilling technologies to determine more efficient ways to drill, complete and generate production from wells in the formation.

> \* \* \*

> The reserves attributable to the Producing Wells, which cover a wide area of the AMI, and the continuity of the formation over the AMI area classification further supports proved undeveloped classification within close proximity to the Producing Wells. Data from both SandRidge and offset operators with which SandRidge has exchanged technical data demonstrate a consistency in this formation over an area much larger than the AMI. In addition, direct measurement from other producing wells has also been used to confirm consistency in reservoir properties such as porosity, thickness and stratigraphic conformity.

50.     The statements referenced in ¶ 49 above were materially false and misleading when made because Defendants knew, or recklessly disregarded, that (i) the geology of the Mississippian is highly variable and there was very limited horizontal well production

history from which reliable reserve forecasts could be made; (ii) contrary to Defendants' statements, there was not a single type curve across their entire leasehold extending for hundreds of miles; and (iii) there was a risk that areas where SandRidge was drilling horizontal wells may have had partially depleted reservoirs as a result of the vertical wells drilled in the Mississippian since the 1940s. Additionally, contrary to the statements set forth above, there was no "continuity" or "consistency" across the AMI for Trust I. Rather, the formation geology and individual well productivity across the AMI was highly variable. Further, there was limited production history from Mississippian horizontal wells such that projections of estimated recovery were not firmly established.

51. The Trust I Prospectus also emphasized that the reserves associated with Trust I's underlying properties consisted of 48-49% oil and provided other reserve information, stating in pertinent part as follows::

THE UNDERLYING PROPERTIES

The Underlying Properties consist of the working interest owned by SandRidge in the Mississippian formation in Alfalfa, Garfield, Grant, Major and Woods counties in Oklahoma arising under leases and farmout agreements related to properties from which the PDP Royalty Interest and the PUD Royalty Interest will be conveyed. The Underlying Properties consist of approximately 64,200 gross acres (42,900 net acres). There are more than 250 potential drilling locations within the AMI [areas of mutual interest]. As of December 31, 2010 and after giving effect to the conveyance of the PDP Royalty Interest and the PUD Royalty Interest to the trust, *the total reserves estimated to be attributable to the trust were 19,276 MBoe (48% oil). This amount includes 6,860 MBoe attributable to the PDP Royalty Interest and 12,416 MBoe attributable to the PUD Royalty Interest, respectively.* SandRidge is currently the operator of 73% of the wells subject to the PDP Royalty Interest. SandRidge owns an average 56.3% net revenue interest in the wells subject to the PDP Royalty Interest. The reserves attributable to the trust's royalty interests include the reserves that are

expected to be produced from the Mississippian formation during the 20-year period in which the trust owns the royalty interests as well as the residual interest in the reserves that the trust will sell on or shortly following the Termination Date.

\*     \*     \*

| Period | June 30, 2011(1) | September 30, 2011 | December 31, 2011 | March 31, 2012 |
|---|---|---|---|---|
| | | (In thousands, except volumetric and per unit data) | | |
| *Estimated production from trust properties* | | | | |
| Oil sales volumes (MBbl) | 257 | 154 | 146 | 149 |
| Natural gas sales volumes (MMcf) | 1,624 | 959 | 910 | 921 |
| Total sales volumes (MBoe) | 527 | 314 | 298 | 302 |
| % PDP sales volumes | 86% | 69% | 63% | 56% |
| % PUD sales volumes | 14% | 31% | 37% | 44% |
| % Oil volumes | 49% | 49% | 49% | 49% |
| % Natural gas volumes | 51% | 51% | 51% | 51% |
| *Commodity price and derivative contract positions* | | | | |
| NYMEX futures price(2) | | | | |
| Oil ($/Bbl) | $ 94.78 | $ 102.88 | $ 103.59 | $ 103.58 |
| Natural gas ($/MMBtu) | $ 4.17 | $ 4.37 | $ 4.53 | $ 5.00 |
| Assumed realized weighted unhedged price(3) | | | | |
| Oil ($/Bbl) | $ 89.78 | $ 97.88 | $ 98.59 | $ 98.58 |
| Natural gas ($/Mcf) | $ 3.79 | $ 4.00 | $ 4.15 | $ 4.58 |
| Assumed realized weighted hedged price | | | | |
| Oil ($/Bbl) | $ 92.02 | $ 98.44 | $ 98.60 | $ 99.01 |
| Natural gas ($/Mcf) | $ 4.16 | $ 4.27 | $ 4.24 | $ 4.46 |
| Percent of oil volumes hedged(4) | 78% | 79% | 84% | 74% |
| Oil hedged price ($/Bbl) | $ 103.60 | $ 103.60 | $ 103.60 | $ 104.15 |
| Percent of natural gas volumes hedged(4) | 100% | 100% | 100% | 100% |
| Natural gas hedged price ($/MMBtu) | $ 4.61 | $ 4.61 | $ 4.61 | $ 4.90 |
| *Estimated cash available for distribution* | | | | |
| Oil sales revenues | $ 23,040 | $ 15,042 | $ 14,405 | $ 14,678 |
| Natural gas sales revenues | 6,162 | 3,841 | 3,774 | 4,217 |
| Realized gains (losses) from derivative contracts | 1,164 | 339 | 82 | (44) |
| Operating revenues and realized gains (losses) from derivative contracts | $ 30,366 | $ 19,222 | $ 18,260 | $ 18,850 |
| Production taxes | 359 | 222 | 210 | 215 |
| Ad valorem taxes | 144 | 93 | 90 | 93 |
| Trust administrative expenses | 1,460(5) | 225 | 225 | 226 |
| Total trust expenses | 1,963 | 540 | 525 | 534 |
| Cash available for distribution | $ 28,403 | $ 18,682 | $ 17,735 | $ 18,316 |
| Trust units outstanding | 28,000 | 28,000 | 28,000 | 28,000 |
| Target distribution per trust unit | $ 1.01 | $ 0.67 | $ 0.63 | $ 0.65 |
| Subordination threshold per trust unit | $ 0.81 | $ 0.53 | $ 0.51 | $ 0.52 |
| Incentive threshold per trust unit | $ 1.22 | $ 0.80 | $ 0.76 | $ 0.78 |

52.     The statements referenced in ¶51 above were materially false and misleading when made because Defendants knew, or recklessly disregarded, that the Mississippian was much gassier than represented by Defendants. Specifically, production data that SandRidge reported to the Oklahoma Tax Commission showed that SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play, and that the oil production relative to gas production as reported was considerably less than represented by Defendants in the Trust I Prospectus. With the large price premium commanded by the

market for oil versus natural gas, SandRidge's overstatement of the oil percentage in the

Trust I Prospectus misrepresented and greatly overstated the value of the reserves attributed

to Trust I. In particular, the statement that the "total reserves [in the Mississippian]

estimated to be attributable to the trust were 19,276 Mboe (48% oil)" was materially false

and misleading when made because Defendants knew, or recklessly disregarded, based on

production data reported by SandRidge, that its wells produced less than 40% oil during

2011, as opposed to the 48-49% oil represented.

53.    The Trust I Prospectus further stated that:

SandRidge's Reservoir Engineering Department continually monitors asset
performance and makes reserves estimate adjustments, as necessary, to ensure the
most current reservoir information is reflected in reserves estimates.

* * *

Each quarter, the Executive Vice President – Reservoir Engineering presents the
status of SandRidge's reserves, including the reserves associated with the
Underlying Properties, to the Executive Committee, which subsequently approves
all changes. In the event the quarterly updated reserves estimates are disclosed, the
aforementioned review process is evidenced by signatures from the Executive
Vice President – Reservoir Engineering and the Chief Financial Officer.

SandRidge's Reservoir Engineering Department works closely with its
independent petroleum consultants at each fiscal year end to ensure the integrity,
accuracy and timeliness of an annually developed independent reserves estimate.
These independently developed reserves estimates are adopted as SandRidge's
corporate reserves and are reviewed by the Audit Committee, as well as the Chief
Financial Officer, Senior Vice President of Accounting, Vice President of Internal
Audit, Vice President of Financial Reporting, Treasurer and General Counsel. In
addition to reviewing the independently developed reserve reports, the Audit
Committee interviews the third-party engineer at Netherland Sewell primarily
responsible for the reserve report.

54.    Following the Trust I Offering, on a quarterly basis, Trust I reported, among

other things, the amount of distributions payable to holders of Trust I units, and the number

of Development Wells drilled. However, despite continually monitoring the performance of the Trust I's wells and the status of Trust I's reserves, Defendants failed to disclose that, based on production data reported to the Oklahoma Tax Commission, the ratio of oil to gas for many of the Trust I Development Wells was far lower than the ratio that had been represented in the Trust I Prospectus. For example, according to production data, the Trust I Development Well designated Joe 2-34H, which reportedly began production in or about August 2011 in Alfalfa County, Oklahoma, reportedly produced 107,802 MCF of gas by the end of 2011, but did not produce any oil. Similarly, the Trust I Development Well designated Jeffrey 2-27H, which also reportedly began production in August 2011 in Alfalfa County, Oklahoma, reportedly produced 74,966 MCF of gas as of the end of 2011, but had only produced 2,362 barrels of oil by that time – a ratio of oil-to-gas of approximately 16%/84% (since 6 MCF of gas is equivalent energywise to 1 barrel of oil). However, instead of disclosing this material information to investors, Sandridge increased drilling activity in the AMI for Trust I in order to maintain distributions and to mask the low rate of oil production.

55.    On November 11, 2011, Defendants held an earnings conference call for analysts and investors to discuss the financial and operational results and other information for Trust I for the third quarter 2011. In the question and answer portion of the call, the following exchange occurred with respect to the Company's oil and gas production:

**Mario Barazza**- *Tuohy Brothers Investment Research, Inc. – Analyst*

Okay. All right, and then I wanted to confirm with the gas production being higher than anticipated that liquids as a percent of total has remained the same.

**Matt Grubb** - *SandRidge Mississippian Trust I - President, COO*

Yes. That's correct. Gas did out produce our forecast for gas production and our liquids is -- we produced more liquids because overall the well performed better and we drilled higher net revenue interest wells in addition to more wells. However, on a type curve basis the liquids were roughly on trend.

56.     The statements referenced in ¶55 above were materially false and misleading when made because Defendants knew, or recklessly disregarded, that based on production data reported by SandRidge, Trust I's wells were producing a far higher ratio of gas to oil than previously represented in the Trust I Prospectus. In addition, the statement that the Company "produced more liquids because overall the well performed better and we drilled higher net revenue interest wells in addition to more wells" was materially false and misleading when made because the Mississippian wells did not perform better than expected as a higher rate of gas than oil was being produced. The statement that the "type curve" for the Mississippian was "roughly on trend" was false and misleading because the metrics the Company used for its type curve did not reflect the true gas to oil ratio for wells in the Mississippian.

57.     On February 17, 2012, Defendants held an earning conference call for analysts and investors to discuss the financial and operational results of Trust I for the fourth quarter 2011. In the question and answer portion of the call, the following exchange occurred with respect to the Company's oil and gas production:

**Kevin Smith** - *Raymond James & Associates – Analyst*

Okay, great. And the other thing, it seems like your recent wells have had a higher gas waiting than I think 55% is what you're kind of forecast. Are you -- do you agree with that? Is that what you're seeing? Or are you just then maybe drilling in a gassier weighted part of the field? Or how should I think about that?

**Tom Ward** - *SandRidge Energy - Chairman, CEO*

No, you know, we do agree with that. I think the wells overall in the play appears to be gassier than what we initially projected. The important thing is to know that that's not the -- at the expense of oil. The oil is coming in on target. And they're just making more gas.

58.     The statements referenced in above in ¶57 were materially false and misleading when made because Defendants knew, or recklessly disregarded, that based on production data reported by SandRidge, Trust I's wells were producing a far higher ratio of gas to oil than previously represented in the Trust I Prospectus. In addition, the statement that "[t]he oil is coming in on target. And they're just making more gas" was materially false and misleading when made because the higher percentage of gas being produced was in part the result of a lower amount of oil being produced, not a simple increase in gas.

59.     On April 17, 2012, the Prospectus for the Trust II Offering became effective. The Trust II Prospectus described the Company's "understanding" of the Mississippian region:

> The Underlying Properties are located in northern Oklahoma and southern Kansas in the Mississippian formation, which is an expansive carbonate hydrocarbon system located on the Anadarko Shelf. The top of the formation is encountered between 4,000 feet and 7,000 feet and lies stratigraphically between the Pennsylvanian-aged Morrow formation and the Devonian-aged Woodford Shale formation. The Mississippian formation can reach 1,000 feet in gross thickness and the targeted porosity zone is between 50 and 100 feet in thickness. The formation's geology is well understood as a result of the thousands of vertical wells drilled and produced there since the 1940s, including approximately 73 vertical wells drilled on the Underlying Properties, and over 400 horizontal wells drilled in the region in the Mississippian formation.

60.     The statements referenced in ¶59 above were materially false and misleading when made because Defendants knew, or recklessly disregarded, that (i) the geology of the Mississippian is highly variable; and (ii) there was a risk that areas where SandRidge was

drilling horizontal wells may have had partially depleted reservoirs as a result of the vertical wells drilled in the Mississippian since the 1940s. Indeed, based on the production history of the horizontal wells already drilled in the Mississippian for Trust I and Sandridge's own account, Defendants knew, or recklessly disregarded, that the Mississippian was far gassier – and oil production was far poorer -- than was represented to investors in the Trust II Prospectus.

61.    The Trust II Prospectus stressed that the proved reserves in the properties associated with Trust II consisted of 46.8% oil and 53.2% natural gas. Specifically, in the "Summary" Section, the Prospectus states, in pertinent part:

> As of December 31, 2011, the total proved reserves estimated to be attributable to the trust were 26.1 million barrels of oil equivalent ("MMBoe"). This amount includes 10.2 MMBoe attributable to the PDP Royalty Interest and 15.9 MMBoe attributable to the Development Royalty Interest. ***The proved reserves consist of 46.8% oil and 53.2% natural gas.*** In addition, as of December 31, 2011, there were 9.8 MMBoe of probable reserves estimated to be attributable to the trust, all of which were attributable to the Development Royalty Interest. The probable reserves consist of 46.9% oil and 53.1% natural gas. Please see "The Underlying Properties Oil and Natural Gas Reserves" and "The Underlying Properties The Reserve Report" for information about the estimated reserves attributable to the trust.

62.    In addition, in the "Calculation of Target Distributions" section, the Trust II Prospectus includes the following chart showing the estimated % of oil volumes ranging from 47% in the first quarter of 2012 to 51% projected for the fourth quarter of 2012 for the assets associated with Trust II:

| | March 31, 2012[1] | June 30, 2012 | September 30, 2012 | December 31, 2012 |
|---|---|---|---|---|
| | (In thousands, except volumetric and per unit data) | | | |
| *Estimated production from trust properties* | | | | |
| Oil sales volumes (MBbl) | 132 | 206 | 249 | 261 |
| Natural gas sales volumes (MMcf) | 885 | 1,324 | 1,430 | 1,490 |
| Total sales volumes (MBoe) | 279 | 427 | 488 | 509 |
| % Proved developed producing (PDP) sales volumes | 100% | 72% | 71% | 59% |
| % Proved undeveloped (Development) sales volumes | 0% | 28% | 26% | 39% |
| % Probable undeveloped (Development) sales volumes | 0% | 0% | 4% | 3% |
| % Oil volumes | 47% | 48% | 51% | 51% |
| % Natural gas volumes | 53% | 52% | 49% | 49% |
| *Commodity price and derivative contract positions* | | | | |
| NYMEX futures price[2] | | | | |
| Oil ($/Bbl) | $98.85 | $103.03 | $103.99 | $104.86 |
| Natural gas ($/MMBtu) | 3.08 | 2.25 | 2.37 | 2.63 |
| Assumed realized weighted unhedged price[3] | | | | |
| Oil ($/Bbl) | $93.82 | $98.00 | $98.96 | $99.83 |
| Natural gas ($/Mcf) | 3.08 | 2.25 | 2.37 | 2.63 |
| Assumed realized weighted hedged price | | | | |
| Oil ($/Bbl) | $93.82 | $100.01 | $101.74 | $101.70 |
| Percent of oil volumes hedged | 0% | 74% | 92% | 87% |
| Oil hedged price ($/Bbl) | — | $107.00 | $107.00 | $107.00 |
| *Estimated cash available for distribution* | | | | |
| Oil sales revenues | $  12,341 | $  20,208 | $  24,673 | $  26,043 |
| Natural gas sales revenues | 2,725 | 2,982 | 3,390 | 3,913 |
| Realized gains (losses) from derivative contracts | — | 414 | 693 | 489 |
| Operating revenues and realized gains (losses) from derivative contracts | 15,066 | 23,604 | 28,756 | 30,445 |
| Production taxes | (151) | (232) | (250) | (323) |
| Ad valorem taxes | — | — | (154) | (202) |
| Trust administrative expenses | (1,750)[4] | (325) | (325) | (325) |
| Total trust expenses | (1,901) | (557) | (729) | (850) |
| Cash available for distribution | $  13,165 | $  23,047 | $  28,027 | $  29,595 |
| Trust units outstanding | 49,725 | 49,725 | 49,725 | 49,725 |
| Target distribution per trust unit | $.26 | $.46 | $.56 | $.60 |
| Subordination threshold per trust unit | $.21 | $.37 | $.45 | $.48 |
| Incentive threshold per trust unit | $.32 | $.56 | $.68 | $.71 |

(Emphasis added).

63.    The statements referenced in ¶¶61-62 above were materially false and misleading when made because Defendants knew, or recklessly disregarded, that the Mississippian was much gassier than represented by Defendants. Specifically, production data that SandRidge reported to the Oklahoma Tax Commission showed that SandRidge understated the gas to oil ratio for its typical horizontal well in its Mississippian play, and that the oil production relative to gas production as reported was considerably less than represented by Defendants in the Trust II Prospectus. In particular, the statements that "[t]he proved reserves consist of 46.8% oil and 53.2% natural gas" and "[t]he probable

reserves consist of 46.9% oil and 53.1% natural gas" were materially false and misleading

when made because the percentage of oil production for typical Mississippian wells at that

time was considerably less than the 47% oil and 53% gas that the Company represented.

64.     The Trust II Prospectus further stated that:

SandRidge's Reservoir Engineering Department continually monitors asset
performance and makes reserves estimate adjustments, as necessary, to ensure the
most current reservoir information is reflected in reserves estimates. Reserve
information includes production histories as well as other geologic, economic,
ownership and engineering data.

* * *

Each quarter, the Executive Vice President—Reservoir Engineering presents the
status of SandRidge's reserves, including the reserves associated with the
Underlying Properties, to the Executive Committee, which subsequently approves
all changes. In the event the quarterly updated reserves estimates are disclosed, the
aforementioned review process is evidenced by signatures from the Executive
Vice President—Reservoir Engineering and the Chief Financial Officer.

SandRidge's Reservoir Engineering Department works closely with its
independent petroleum consultants at each fiscal year end to ensure the integrity,
accuracy and timeliness of annual independent reserves estimates. These
independently developed reserves estimates are adopted as SandRidge's corporate
reserves and are reviewed by the Audit Committee, as well as the Chief Financial
Officer, Senior Vice President of Accounting, Vice President of Internal Audit,
Vice President of Financial Reporting, Treasurer and General Counsel. In addition
to reviewing the independently developed reserve reports, the Audit Committee
interviews the third-party engineer at Netherland Sewell primarily responsible for
the reserve report.

65.     Following the Trust II Offering, on a quarterly basis, Trust II reported, among

other things, the amount of distributions payable to holders of Trust II units, and the number

of Trust II Development Wells drilled. However, despite continually monitoring the

performance of Trust II's wells and the status of Trust II's reserves, Defendants failed to

disclose that, based on production data reported to the Oklahoma Tax Commission, the

ratio of oil to gas for many of the newly drilled Trust II Development Wells was far lower than the ratio that had been represented in the Trust II Prospectus. However, instead of disclosing this material information, Sandridge increased drilling activity in the AMI for Trust II in order to maintain distributions and mask the low rate of oil production.

66.     On May 11, 2012, Defendants held an earnings conference call for analysts and investors to discuss the financial and operational results of Trust I for 1Q12. On the call, Defendants Ward and Grubb stated in pertinent part as follows:

**Tom Ward** - *SandRidge Mississippian Trust I - Chairman, CEO*

Thank you, James, and welcome to the SandRidge Mississippian Trust I conference call. SDT's fourth period results once again surpassed expectations, and in addition to beating the target distribution, we exceeded the incentive threshold for the period. The successful performance for the period resulted in a distribution slightly under $0.79 per unit which is approximately 20% higher than the $0.65 per unit target distribution. We continue to be very pleased with the Trust performance and the performance of the Mississippian play which in our opinion continues to have the highest rate of return drilling in the United States. Now I will turn the call over to Matt Grubb for a review of SDT's production and drilling results during the period.

**Matt Grubb** - *SandRidge Mississippian Trust I - President, COO*

Thank you, Tom, and good morning to everybody. The Trust production of 413,000 barrels of oil equivalent exceeded expectations for the fourth recording period by about 37% which is 111,000 barrels equivalent more than the target estimate of 300,000 barrels of oil equivalent. This marks the fourth consecutive period that production has come in higher than estimated. Through the first four distribution periods, actual production has exceeded the estimated production levels in the S-1 by roughly 30%. The production beat was due to better than expected well performance, accelerated drilling pace and having drill wells with higher net revenue interest than originally
assumed. The production split for this period was 170,000 barrels of oil and 1.46 Bcf of natural gas. Oil production exceeded targets estimate by roughly 14% and natural gas production exceeded targets estimate by approximately 59%.

67.     The statements referenced above in ¶66 that oil production for Trust I "exceeded expectations" and that it "has come in higher than estimated" and has "exceeded

targets" were materially false and misleading when made because the Company's increased

drilling of new wells for Trust I enabled SandRidge to maintain distributions and mask the

low rate of oil production.

68.     On August 10, 2012, Defendants held a conference call for analysts and

investors to discuss the financial and operational results of Trust I for the period ended

June 31, 2012. The following exchange occurred:

**John Ragozzino** – *RBC Capital Markets – Analyst*

Okay, great. Can you give us a little bit more commentary on just what you're seeing given
the amount of activity that you've done at the parent level in terms of development in the
Mississippian? Just when you think about the play geographically and the layout and the
variances in terms of production split, is there anything that's coming, more of a trend that
you're seeing like whether it's gassier to the north or is that a type of an outlay of the play?

**Matt Grubb** – *SandRidge Mississippian Trust I – President and COO*

I'll just answer that in reference specific to SDT. If you look at our gas to oil cut, if you
look at cumulatively from inception to now, it's run about 42% oil. If you look at our fifth
distribution, it's also about 42% oil. So it's been pretty constant across this program.

69.     The statement in ¶68 above that Trust I's horizontal Mississippian type well

were producing "about 42% oil" was materially false and misleading when made because

the percentage of oil that Trust I's wells were at that time was far lower than the ratio of

gas to oil previously represented in the Trust I Prospectus.

### The Truth Emerges

70.     After the close of trading on November 8, 2012, Defendants issued a press

release disclosing the Company's financial results for the third quarter of 2012 (the

"11/8/12 Press Release"), and reported a "net loss applicable to common stockholders of

$184 million, or $0.39 per diluted share, for third quarter 2012 compared to net income

available to common stockholders of $561 million, or $1.16 per diluted share, in third quarter 2011." Furthermore, the 11/8/12 Press Release stated that SandRidge was "exploring the sale of its assets in the Permian Basin, other than those associated with the SandRidge Permian Trust."

71.     On November 9, 2012, before the opening of the market, Defendants held a conference call for analysts and investors to discuss the financial results and other information set forth in the 11/8/12 Press Release (the "11/9/12 Conf Call"). On the call, Defendant Ward disclosed that the Company's Mississippian Formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe:

> As we continue to grow the Mississippian well count across a larger area, we also are seeing an increase in our natural gas production. ***And this increase has been offset by a lower amount of oil than we anticipated at the beginning of last year.***

(Emphasis added).

72.     During the 11/9/12 Conf Call, an analysts expressed concern over the drop in oil production in the Mississippian and Defendant Ward conceded that the Mississippian Formation assets would produce only 40% oil going forward, rather than 45% as Defendants had been using in their projections throughout the Class Period, with the rest of production comprised of lower margin natural gas:

> Charles Meade – Johnson Rice & Co. – Analyst
>
> …You know, Tom, I recognize that you guys have a lot more -- well, you guys have all the data, or almost -- you know, you guys have half of the whole industry data on the Mississippian. So you have a lot more you can look at and, I guess, draw comfort from, than we will have here.

But I think from our perspective, and a lot of people, you're looking at this from the outside and you see 25% of the per well EUR oil go -- you know, kind of disappear in the Mississippian. It kind of makes you sit up in your chair. And you, you know, you kind of wonder -- is this the right time to be, you know, increasing concentration in the Mississippian play, when the play kind of just shifted on you? And so, can you kind of tell your, you know, your thought process there? Or maybe kind of give some detail on why you have -- you know, what your comfort level is?

Tom Ward – SandRidge Energy, Inc. – Chairman and CEO

Sure. ***We're looking at a well now that has about 40% projected oil in it instead of 45%.*** But the key is the rate of return, whether we're producing oil, water, or anything else, is that we focus on a rate of return. And even at depressed gas prices, we can see 50% rates of return. And I don't know any other plays where you can consistently drill -- 1,100 wells that have been drilled, there are 500 wells -- and have these types of rates of return over such a large area. And so in my opinion, it's a very low-risk area that has very high-rates of return. Whether it's producing oil or natural gas.

73.     As a direct result of Defendants' disclosures set forth above, and a materialization of the undisclosed risk of investing in the SandRidge Trusts, the price of SandRidge Trusts units fell precipitously.

74.     The units of Trust I declined from $18.95 on November 8th to close at $17.54 on November 9th (a 7.4% decline and a 42.5% decline from the Class Period high of $30.46 per share reached on February 9, 2012), and the units of Trust II declined from $19.36 per unit on November 8th to close at $17.70 per unit on November 9th (a decline of more than 8.5% and a 13.6% decline from the Class Period high of $20.48 per share reached on April 27, 2012), all on heavy trading volume. These drops removed the inflation from the price of SandRidge Trusts units, causing real economic loss to investors who had purchased SandRidge Trusts units during the Class Period.

## LOSS CAUSATION/ECONOMIC LOSS

75.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct which artificially inflated the prices of SandRidge Trusts units and operated as a fraud or deceit on Class Period purchasers of SandRidge Trusts units. When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of SandRidge Trusts units fell precipitously as the prior artificial inflation came out. As a result of their purchases of SandRidge Trusts units during the Class Period, Plaintiffs and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.

76.     Defendants' false and misleading statements had the intended effect and caused SandRidge Trusts units to trade at artificially inflated levels throughout the Class Period.

77.     As a direct result of Defendants' disclosures set forth above, and a materialization of the undisclosed risk of investing in SandRidge Trusts units, the prices of SandRidge Trusts units fell precipitously. These drops removed the inflation from the price of SandRidge Trusts units, causing real economic loss to investors who had purchased SandRidge Trusts units during the Class Period.

78.     On November 8, 2012, Defendants issued a press release disclosing the Company's financial results for the third quarter 2012 (the "11/8/12 Press Release"), reporting a loss of $184 million, or 39 cents per share, in the 3Q12, compared with a profit of $561 million, or $1.16 per share, in the 3Q11. During a conference call held with investors the following day before the opening of the market, Defendant Ward disclosed

that the Company's Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe.

79.     The units of Trust I declined from $18.95 on November 8th to close at $17.54 on November 9th (a 7.4% decline and a 42.5% decline from the Class Period high of $30.46 per share reached on February 9, 2012), and the units of Trust II declined from $19.36 per unit on November 8th to close at $17.70 per unit on November 9th (a decline of more than 8.5% and a 13.6% decline from the Class Period high of $20.48 per share reached on April 27, 2012), all on heavy trading volume. These drops removed the inflation from the price of SandRidge Trusts units, causing real economic loss to investors who had purchased SandRidge Trusts units during the Class Period.

80.     The declines in the price of SandRidge Trusts units after the disclosures on November 8th and 9th, 2012, came to light were a direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the price declines in SandRidge Trusts units negates any inference that the loss suffered by Plaintiffs and the other Class members were caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Plaintiffs and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of SandRidge Trusts units and the subsequent significant decline in the value of SandRidge Trusts units when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

81. At all relevant times, the market for SandRidge Trusts units was an efficient market for the following reasons, among others:

(a) SandRidge Trusts units met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b) as a regulated issuer, the SandRidge Trusts filed periodic public reports with the SEC and the NYSE;

(c) the SandRidge Trusts regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) the SandRidge Trusts were followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

82. As a result of the foregoing, the market for SandRidge Trusts units promptly digested current information regarding the SandRidge Trusts from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of SandRidge Trusts units during the Class Period suffered

similar injury through their purchase of SandRidge Trusts units at artificially inflated prices and a presumption of reliance applies.

83.     Additionally, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information from their Class Period statements in violation of a duty to disclose such information, as detailed above.

THE STATUTE OF LIMITATIONS WAS TOLLED

84.     The statutes of limitations and repose for each of the claims alleged herein has been tolled as a result of the filing of these claims in a purported class action in this court titled In re SandRidge Energy, Inc. Securities Litigation, case no. No. 5:12-cv-01341-W (the "SandRidge Energy Action").  Plaintiffs filed the instant class action as soon as reasonably possible after learning that the Lead Plaintiffs in the SandRidge Energy Action had dismissed the claims alleged herein for no consideration.

**COUNT I**

**Violations of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder Against
SandRidge, the Trust Defendants and the Officer Defendants**

85.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

86.     This Count is asserted against SandRidge, the Trust Defendants and the Officer Defendants (Ward, Grubb and Bennett) for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

87.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of the SandRidge Trusts as specified herein.

89.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/ or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of SandRidge Trusts units during the Class Period in an effort to maintain artificially high market prices for SandRidge Trusts units in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The Trust Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

90.     Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company or the SandRidge Trusts during the Class Period and members of the Company's or the SandRidge Trusts' management team or had

control thereof; (ii) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior officer and/or director of the Company or the SandRidge Trusts was privy to and participated in the creation, development and reporting of the Company's or the SandRidge Trusts' internal budgets, plans, and/or projections; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's or the SandRidge Trusts' management team, internal reports and other data and information about the Company's or the SandRidge Trusts' reserves, production, finances, operations, and liabilities at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's or the SandRidge Trusts' dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

91.     Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Trust Defendants and the Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with SandRidge's overstated reserves and supporting the artificially inflated price of SandRidge Trusts units. As demonstrated Defendants' misstatements of the Company's and the SandRidge Trusts' business, operations, and oil and gas reserves during the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in

failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

92.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of SandRidge Trusts units were artificially inflated during the Class Period. In ignorance of the fact that market prices of SandRidge Trusts units were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiffs and the other members of the Class acquired SandRidge Trusts units during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

93.     At the time of said misrepresentations and omissions, the Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by Defendants and the Individual Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired SandRidge Trusts units, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

94.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

95.     As a direct and proximate result of the Trust Defendants and the Individual Defendants' wrongful conduct, the Plaintiffs and the other members of the Class suffered damages in connection with their purchases of SandRidge Trusts units during the Class Period.

96.     This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Officer Defendants

97.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein. This Count is asserted against the Defendants Ward, Grubb, and Bennett for violation of Section 20(a) of the Exchange Act.

98.     Defendants Ward, Grubb and Bennett acted as controlling persons of the SandRidge Trusts within the meaning of Section 20(a) of the Exchange Act.

99.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's or the SandRidge Trusts' operations and/or intimate knowledge of the false and misleading statements filed by the Company or the SandRidge Trusts with the SEC and disseminated to the investing public, the Defendants Ward, Grubb, and Bennett had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the SandRidge Trusts,

including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. Defendants Ward, Grubb, and Bennett were provided with or had unlimited access to copies of the SandRidge Trusts' reports, press releases, public filings and other statements alleged by the Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

100.   As set forth above, SandRidge, the Individual Defendants and the Trust Defendants, each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, Defendants Ward, Grubb, and Bennett are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of SandRidge Trust units during the Class Period.

101.   This action was filed within two years of discovery of the fraud and within five years of Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT III

### Violations of Section 11 of the Securities Act Against
### All Defendants

102.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

103.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against all defendants: SandRidge, the Trust Defendants, the

Individual Defendants and the Underwriter Defendants. Plaintiffs do not claim for purposes of this Count that these Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

104.    The Registration Statements for each of the SandRidge Trust Offerings were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

105.    SandRidge and the Trust Defendants were co-registrants for the SandRidge Trust Offerings. As issuers of the trust units, SandRidge and the Trust Defendants are strictly liable for the materially inaccurate statements contained in the Registration Statements and the failure of the Registration Statements to be complete and accurate.

106.    The Individual Trust Defendants each signed the Registration Statements either personally or through an Attorney-in-Fact and/or caused its issuance. The Individual Trust Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and accuracy of the statements contained in the Registration Statements. They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading and that the documents contained all facts required to be stated therein. In the exercise of reasonable care, the Individual Trust Defendants should have known of the material misstatements and omissions contained in the Registration Statements and also should have known of the omissions of material fact that were necessary to make the statements made therein not

misleading. As such, the Individual Trust Defendants are liable to the Plaintiffs and the Class.

107.    The Underwriter Defendants were each underwriters, as that term is used in Section 11 (a)(5) of the Securities Act, with respect to the SandRidge Trust Offerings and the SandRidge Trusts' securities were sold through the Registration Statements. The Underwriter Defendants were required to investigate with due diligence the representations contained therein to confirm that they did not contain materially misleading statements or omit material facts. None of the Underwriter Defendants made a reasonable investigation or possessed reasonable grounds for the belief that the statements described herein, which were contained in both the Registration Statements, were true, were without omission of any material facts, and/or were not misleading.

108.    By reasons of the conduct herein alleged, each of the Trust Defendants, the Individual Defendants, and the Underwriter Defendants violated Section 11 of the Securities Act.

109.    Plaintiffs and putative Class members acquired units in the SandRidge Trust Offerings, and in reliance on, the Registration Statements and without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the Class sustained damages when the price of the Trust I and Trust II securities declined substantially subsequent to and due to Defendants' violations.

110.    This action was filed within one year of discovery of the fraud and within three years of Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT IV

### Violations of Section 12(a)(2) of the Securities Act Against
### All Defendants

111.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

112.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiffs and the Class, against all defendants: SandRidge, the Trust Defendants, the Individual Defendants, and the Underwriter Defendants. Plaintiffs do not claim for purposes of this Count that these Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

113.    Defendants were sellers and offerers and/or solicitors of purchasers of the securities offered pursuant to the Prospectuses of the SandRidge Trust Offerings. Defendants issued, caused to be issued, and/or signed the Registration Statements in connection with the SandRidge Trust Offerings. The Registration Statements contained Prospectuses which were used to induce investors, such as the Plaintiffs and the other members of the Class, to purchase Sandridge Trusts units.

114.    The Registration Statements for the SandRidge Trust Offerings contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Registration Statements. The Trust Defendants, and the Underwriter Defendants, acting through their employees, agents and others, solicited such

purchases for their personal financial gain through the preparation and dissemination of the Registration Statements.

115.    The Underwriter Defendants participated in the preparation and dissemination of the false and misleading Registration Statements for their own financial benefit. But for their participation in the SandRidge Trust Offerings, including their solicitation as set forth herein, the SandRidge Trust Offerings could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a)    made the decision to conduct the SandRidge Trust Offerings and to do it at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Registration Statements. The Registration Statements were calculated to create interest in the securities of Trust I and Trust II, and were widely distributed by or on behalf of these Defendants for that purpose;

(b)    finalized the Prospectuses and caused them to become effective; and

(c)    conceived and planned the Trust Offerings and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

116.    As set forth more specifically above, the Registration Statements contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

117.    Plaintiffs and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Registration Statements.

118.    The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Registration Statements to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statements were accurate and complete in all material respects. Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

119.    By reason of the conduct alleged herein, these Defendants violated §12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who hold securities of the Trust I or Trust II, purchased in any of the Trust Offerings have the right to rescind and recover the consideration paid for their trust securities and hereby elect to rescind and tender their trust securities to the Defendants sued herein. Plaintiffs and Class members who have sold their trust securities are entitled to rescissory damages.

120.    This action was filed within one year of discovery of the fraud and within three years of Plaintiffs' purchases of securities giving rise to the cause of action.

## COUNT V

### Violations of Section 15 of the Securities Act
### Against the Officer Defendants

121.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

122.   This Count is brought pursuant to Section 15 of the Securities Act against Defendants Ward, Grubb and Bennett. Plaintiffs do not claim for purposes of this Count that these Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

123.   Defendants Ward, Grubb and Bennett acted as controlling persons of Trust I and/or Trust II within the meaning of Section 15 of the Securities Act by virtue of their positions as senior officers of the Company or Trust I and Trust II and/or equity interest in control of the Company. By reason of their senior management positions at the Company or the SandRidge Trusts, as alleged above, Defendants Ward, Grubb and Bennett, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause SandRidge and the SandRidge Trusts to engage in the conduct complained of herein. By reason of such conduct, Defendants Ward, Grubb and Bennett are liable pursuant to Section 15 of the Securities Act.

124.   Defendants Ward, Grubb and Bennett were culpable participants in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts III and IV above, based on their having signed the Registration Statements and having otherwise participated in the process which allowed the Offerings to be successfully completed.

125.   This action was filed within one year of discovery of the fraud and within three years of Plaintiffs' purchases of securities giving rise to the cause of action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.     with respect to Count IV, Ordering that the Trust I Offering and the Trust II Offering be rescinded;

D.     awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: June 9, 2015                              Respectfully submitted,

                                  __s/Nicholas G. Farha_____
                                  Nicholas G. Farha, OBA #21170
                                  **FARHA LAW, PLLC**
                                  6301 Waterford Blvd., Suite 110
                                  Oklahoma City, OK 73118
                                  Phone: (405) 471-2224
                                  Fax: (405) 810-9901
                                  nick@farhalawfirm.com

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827

**WOHL & FRUCHTER LLP**
J. Elazar Fruchter
570 Lexington Avenue, 16th Floor
New York, NY 10022
Telephone:  (212) 758-4000
Facsimile:  (212) 758-4004