**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| IVAN NIBUR, LAWRENCE ROSS, JASE LUNA, MATTHEW WILLENBUCHER, and the DUANE & VIRGINIA LANIER TRUST, Individually and On Behalf of All Others Similarly Situated, | **Civil Action No. 15-cv-00634-M** <br><br> **CLASS ACTION** <br><br> **CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| SANDRIDGE MISSISSIPPIAN TRUST I, SANDRIDGE MISSISSIPPIAN TRUST II, TOM L. WARD, JAMES D. BENNETT, MATTHEW K. GRUBB, RANDALL D. COOLEY, JIM J. BREWER, EVERETT R. DOBSON, WILLIAM A. GILLILAND, DANIEL W. JORDAN, ROY T. OLIVER, JR., JEFFREY S. SEROTA, D. DWIGHT SCOTT, RAYMOND JAMES & ASSOCIATES, INC., MORGAN STANLEY & CO. LLC (F/K/A MORGAN STANLEY & CO INC.), MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., CITIGROUP GLOBAL MARKETS INC., and RBC CAPITAL MARKETS, LLC, | |
| Defendants. | |
| SANDRIDGE ENERGY, INC., | |
| Nominal Defendant. | |

1.     Lead Plaintiffs Ivan Nibur, Lawrence Ross, Jase Luna, Matthew

Willenbucher, and the Duane & Virginia Lanier Trust ("Lead Plaintiffs"), individually and

on behalf of all other persons similarly situated, by their undersigned attorneys, for their Consolidated Amended Complaint for Violations of the Federal Securities Laws ("Complaint") against SandRidge Mississippian Trust I ("Trust I"), SandRidge Mississippian Trust II ("Trust II," and together with Trust I, the "Trusts") and the other defendants named herein (collectively, "Defendants"), allege the following based upon personal knowledge as to their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted their counsel. Lead Plaintiffs believe that further substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

2.     This federal securities class action pursues two independent claims. First, the complaint pursues claims and remedies against Defendants under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act Claims") on behalf of all persons who purchased or otherwise acquired Common Units of: (i) Trust I, pursuant or traceable to Trust I's initial public offering ("Trust I Offering"), declared effective on April 5, 2011; and/or (ii) Trust II, pursuant or traceable to Trust II's initial public offering ("Trust II Offering"), declared effective on April 17, 2012.

3.     Second, the complaint pursues claims and remedies against Defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) ("Exchange Act Claims") on behalf of all persons who purchased or otherwise acquired Common Units of (i) Trust I, between April 5, 2011, and

November 8, 2012, inclusive (the "Class Period"), and/or (ii) Trust II, during the Class Period.

## I. THE SECURITIES ACT CLAIMS

### Summary of the Securities Act Claims

### Trust I

4.     SandRidge is an oil and gas exploration and production company. In 2010, to finance increased capital expenditures planned for 2011, SandRidge decided to "monetize" certain of its existing oil and gas assets in Northern Oklahoma by selling interests in those assets to the public via a royalty trust. To that end, in December 2010, SandRidge formed Trust I as a Delaware statutory trust, and conveyed royalty interests to Trust I consisting of a share of SandRidge's revenue from: (i) 37 existing horizontal oil and gas wells ("Trust I Producing Wells") at locations in five Northern Oklahoma counties (Alfalfa, Garfield, Grant, Major and Woods) referred to collectively as the "Area of Mutual Interest" ("Trust I AMI"); and (ii) 123 horizontal oil and gas wells ("Trust I Development Wells") to be drilled in the future across the Trust I AMI.

5.     To compensate SandRidge for the royalty interests, Trust I committed to sell Common Units to investors in an initial public offering ("IPO") scheduled for April 2011, and transfer the net proceeds of the IPO to SandRidge.

6.     The registration statement for the IPO indicated that Trust I would pay quarterly cash distributions to investors from the sale of oil and gas produced by the Trust I Producing and Development Wells ("Trust I Wells"). Since oil commanded a

significantly higher market price than gas at the time, oil sales were projected to contribute nearly 80% of that revenue.

7.     In preparation for the IPO, SandRidge collaborated with an independent petroleum engineering consultant to prepare a report that estimated the total oil and gas production expected from all the Trust I Wells over the 20-year lifetime of Trust I. The analysis involved several steps.

8.     First, the report estimated the total production of the Trust I Producing Wells by extrapolating their past production history into the future. Second, it was determined that the geology across the Trust I AMI was uniform, and therefore the total production of future Trust I Development Wells drilled near existing wells in the Trust I AMI could be accurately estimated with a high degree of confidence. Third, using production data from the Trust I Producing Wells, a graph known as a Type Curve was developed to estimate the total future production of the Trust I Development Wells.

9.     Based on the above analysis, the report estimated that (i) the future Trust I Development Wells would produce more oil, and less gas, in the aggregate than the Trust I Producing Wells, and (ii) the ratio of oil-to-gas produced by all the Trust I Wells in the aggregate would be approximately 48.4% oil to 51.6% gas.

10.     The Trust I registration statement contained several statements to the effect that the report's high degree of confidence in the accuracy of the production estimate for the Trust I Development Wells was supported by consistent levels of past production from Trust I Producing Wells covering "a wide area" of the Trust I AMI. These statements were misleading for two reasons.

11.     First, the Trust I registration statement negligently failed to disclose that the production data that would have had the strongest influence on the estimate (because it was generated by wells with longer production histories) came almost exclusively from Trust I Producing Wells operated in Woods county by a third party, Chesapeake Operating Inc. ("Chesapeake"). In contrast, the Trust I Development Wells were to be drilled primarily by SandRidge across the Trust I AMI (and not only in Woods county). Since the production data that would have had the strongest influence on the estimate came almost entirely from Trust I Producing Wells with attributes that differed from those of the Trust I Development Wells in terms of both location and operator, the risk that the estimate was inaccurate was materially greater than disclosed to investors.

12.     Second, the Trust I registration statement negligently failed to disclose that the Chesapeake-operated Producing Wells in Woods county had been producing significantly greater quantities of more valuable oil, and smaller amounts of less valuable gas, than the Trust I Producing Wells operated by SandRidge. Since, as noted, the production data from the Chesapeake-operated Producing Wells would have had the strongest influence on the production estimate for the Trust I Development Wells, the relatively higher oil production of the Chesapeake-operated Producing Wells would have skewed that estimate towards higher oil production, and thus — unbeknownst to investors — further heightened the risk that the estimate was inaccurate (because, as noted, of the different attributes in terms of location and operator).

13.     Separately, the Trust I registration statement also advised that SandRidge's plan to operate a majority of the Trust I Development Wells was a positive consideration

supporting investment in Trust I due to SandRidge's purported experience as an operator of horizontal wells in the Trust I AMI. This statement was misleading since the registration statement negligently failed to disclose that, as noted, the SandRidge-operated Producing Wells had produced smaller quantities of more valuable oil, and larger amounts of less valuable gas than the Chesapeake-operated Producing Wells. Therefore, a reasonable investor could have considered it a negative for SandRidge (rather than Chesapeake) to operate the majority of the Trust I Development Wells.

**Between the Trust I IPO and the Trust II IPO**

14.     In April 2011, based on its misleading registration statement, Trust I consummated the Trust I Offering, and delivered $338.7 million in net proceeds to SandRidge.

15.     After the consummation of the IPO, SandRidge began drilling the Trust I Development Wells. By the end of February 2012 (the end of Trust I's fourth reporting period), two trends had unmistakably emerged.

16.     First, the Trust I Development Wells drilled primarily at locations in Alfalfa, Grant and Woods counties were producing considerably *less* oil, and considerably *more* gas than the Trust I Producing Wells — precisely the opposite of the result that had been forecast in the Trust I registration statement. In turn, these negative production trends caused the percentage of oil produced by the Trust I Wells to first drop below the percentage of oil forecast in the Trust I registration statement, and then continue to steadily decline thereafter.

17.     Second, nine "pairs" of Trust I Wells drilled near each other in Alfalfa county produced materially divergent percentages of oil and gas. For example, Trust I Producing Well Parr 1-36H — which commenced gas production in August 2010 and oil production in January 2011 — produced an average of 75.9% oil during its first 8 months of oil and gas production. In contrast, the Trust I Development Well Parr 2-36H — which was drilled in the same land unit in Alfalfa County as Parr 1-36H, and commenced both gas and oil production in August 2011 — produced an average of only 46.5% oil during its first 8 months of production. Such divergent production data between proximate Trust I Wells demonstrated a lack of geological uniformity in Alfalfa county, and thus indicated that the oil and gas production of new horizontal wells drilled in Alfalfa county could not be accurately estimated with a high degree of confidence.

18.     Given that oil sales were expected to contribute nearly 80% of the revenue from which quarterly distributions would be paid to Trust I Unitholders, the two negative trends above signaling lower and more unpredictable oil production threatened to reduce quarterly distributions below the estimates in the Trust I registration statement. However, SandRidge accelerated the drilling of the Trust I Development Wells, which boosted aggregate oil and gas production, and enabled Trust I to beat the quarterly distribution estimates in the Trust I registration statement during its first five reporting periods after the Trust I Offering.

**Trust II**

19.     In late 2011, SandRidge decided to undertake the IPO of a second royalty trust to raise additional funds to finance increasing capital expenditures. To that end, in

December 2011, SandRidge formed Trust II as a Delaware statutory trust, and conveyed royalty interests to Trust II consisting of a share of SandRidge's revenue from: (i) 67 existing horizontal wells ("Trust II Producing Wells") at locations in nine counties in Northern Oklahoma and Kansas (including Alfalfa, Grant and Woods counties), referred to collectively as the "Area of Mutual Interest" ("Trust II AMI"); and (ii) 206 horizontal oil and gas wells ("Trust II Development Wells") to be drilled in the future across the Trust II AMI.

20.    As with Trust I, to compensate SandRidge for the royalty interests, Trust I committed to sell Common Units to the public in an initial public offering ("IPO") scheduled for April 2012, and transfer the net proceeds of the IPO to SandRidge.

21.    Notably, *all* of the Trust II Producing Wells were located in the same three counties — Alfalfa, Grant and Woods ("Three Overlapping Counties") — where the majority of the Trust I Wells had been drilled. Additionally, 122 (approximately 60%) of the Trust II Development Wells were slated to be drilled in the Three Overlapping Counties. Finally, 60% of the Trust II Producing Wells were located in Alfalfa county, and thus a significant percentage of the Trust II Development Wells would be drilled in Alfalfa county as well. In light of these facts, several statements in the Trust II registration statement were misleading.

22.    First, using the same methodology described in the Trust I registration statement, the Trust II registration statement estimated the future production of the Trust II Development Wells across the Trust II AMI with a high degree of confidence based on the conclusion that geological uniformity existed across the Trust II AMI. The Trust II

registration statement negligently failed to disclose, however, that the divergent production data of proximate Trust I Wells drilled in Alfalfa county had already demonstrated — several months prior to the Trust II IPO in April 2012 — that geological uniformity did not exist in Alfalfa county. That data constituted evidence directly contradicting the statement in the Trust II registration statement that geological uniformity existed *across the Trust II AMI* (which included Alfalfa county).

23.     Second, the Trust II registration statement touted that quarterly distributions to Trust I Unitholders had exceeded the estimates in the Trust I registration statement during Trust I's first three reporting periods. The implication was that investors could expect Trust II to also be successful. The Trust II registration statement negligently failed to disclose, however, that the Trust I Development Wells drilled primarily in the Three Overlapping Counties were *not* meeting expectations in terms of oil production, and therefore the only reason quarterly distributions to Trust I Unitholders had not missed estimates was due to the accelerated drilling of the Trust I Development Wells.

24.     In April 2012, based on its misleading registration statement, Trust II consummated the Trust II Offering, and delivered $590.2 million in net proceeds to SandRidge.

**The Risks Concealed by the Material Omissions in the Trust I and II Registration Statements and Prospectuses Materializes**

25.     The risks to Trust I and II Unitholders concealed by the material omissions from the Trusts' registration statements described began to materialize on November 9, 2012, when SandRidge held a conference call before the markets opened to discuss its third

quarter 2012 earnings. On the call, SandRidge disclosed that oil production in the same regions of Oklahoma and Kansas where the Trust Wells were located had declined more steeply than expected, and therefore SandRidge was reducing its expected recovery of oil from those regions by approximately 25%. Over the next four trading days, the price of Trust I units fell by $4.14, or 21.8%, while the price of Trust II Units fell by $4.00, or 20.7%.

26.     On January 31, 2013, after markets closed, Trusts I and II issued press releases announcing that the quarterly distribution to their Unitholders for the September-November 2012 production period had missed the estimates in their respective registration statements, which was attributed to "lower oil production". On February 1, 2013, the price of Trust I Units fells by $0.56, or 2.9%, while the price of Trust II Units fell by $2.73, or 14.4%.

27.     On February 6, 2013, before markets opened, RBC Capital Markets, LLC ("RBC") downgraded Trust I to "Underperform," citing "the wide variability of results" and "lack of predictability inherent in the development" of the regions in Oklahoma and Kansas where the Trust I Wells were located. The news was notable because RBC had underwritten the Trust I Offering. That day, the price of Trust I Units fell by $1.86, or 8.21%.

28.     Also on February 6, 2013, before the markets opened, RBC downgraded Trust II from "Outperform" to "Sector Perform" citing "significant deterioration in well performance." RBC had also underwritten the Trust II Offering. That day, the price of Trust II Units dropped by $0.48, or 3.1%.

29. On March 5, 2013, before markets opened, Wunderlich downgraded both Trusts, citing (among other factors) "an adjusted production mix that includes more natural gas," and "a higher [production] decline rate." Wunderlich had underwritten both of the Trusts' Offerings. That day, the price of Trust I units fell by $1.67, or 11.5%, while the price of Trust II Units fell by $0.45, or 3.5%.

## JURISDICTION AND VENUE

30. The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o], Section 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

31. This Court has jurisdiction over the subject matter of this action pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

32. Venue is proper in this Judicial District pursuant to Section 22 of the Securities Act (15 U.S.C. §77v) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)) and 28 U.S.C. §1391(b) because a significant portion of the acts and omissions complained of herein occurred within this Judicial District.

33. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

**Lead Plaintiffs**

34.      As set forth in their Certifications previously filed with the Court and incorporated by reference, Lead Plaintiffs Lawrence Ross, Ivan Nibur, and the Duane & Virginia Lanier Trust purchased Trust I Units pursuant or traceable to the Trust I Offering, and/or during the Class Period, and were damaged by Defendants' violations of the Securities Act and the Exchange Act.

35.      As set forth in their Certifications previously filed with the Court and incorporated by reference, Lead Plaintiffs Luna Jase, Matthew Willenbucher, and the Duane & Virginia Lanier Trust purchased Trust II Units pursuant or traceable to the Trust II Offering, and/or during the Class Period, and were damaged by Defendants' violations of the Securities Act and the Exchange Act.

**SandRidge**

36.      Defendant SandRidge is a Delaware corporation headquartered at 123 Robert S. Kerr Avenue, Oklahoma City, Oklahoma engaged in the exploration, development and operation of oil and gas properties. SandRidge was the sponsor of the Trusts. In connection with its role as sponsor, SandRidge was the co-registrant for the SandRidge Trust Offerings.

37.      SandRidge recently reorganized under Chapter 11 of the Bankruptcy Code, and emerged from Chapter 11 bankruptcy under a Plan of Reorganization confirmed by the United States Bankruptcy Court for the Southern District of Texas by order dated September 20, 2016 ("Confirmation Order").

38.     Paragraph 146 of the Confirmation Order (i) provides that neither the Plan nor the Confirmation Order discharged or released any claims asserted in this Action against any non-debtor parties, (ii) authorizes the Lead Plaintiffs to continue this Action against any non-debtors, and (iii) authorizes the Lead Plaintiffs to name SandRidge and any other Debtors as nominal defendants in this Action solely to the extent necessary to recover on any claims against such Debtors from available remaining coverage under any applicable insurance policy. Accordingly, Plaintiffs sue SandRidge as a nominal defendant solely to the extent of available insurance.

**Trust Defendants**

39.     Defendant Trust I is a Delaware statutory trust formed in December 2010 to own royalty interests conveyed by SandRidge in the 37 Trust I Producing Wells, and 123 Trust I Development Wells. It has no employees, but is administered from the offices of its trustee ("Trustee"), The Bank of New York Mellon Trust Company, N.A. ("BNY") in Austin, Texas.

40.     Defendant Trust II (with Trust I, the "Trust Defendants") is a Delaware statutory trust formed in December 2011 to own royalty interests conveyed by SandRidge in the 67 Trust II Producing Wells, and 206 Trust II Development Wells. It has no employees, but is administered from the offices of the Trustee in Austin, Texas.

**Officer Defendants**

41.     Defendant Tom L. Ward founded SandRidge Energy, Inc. ("SandRidge" or the "Company") and served as SandRidge's Chairman of the Board and CEO during the

Class Period. Defendant Ward signed the Trusts' Registration Statements. The Company terminated Defendant Ward in June 2013.

42.     Defendant James D. Bennett served as SandRidge's Executive Vice President and CFO from January 2011 to June 2013, and has served as its CEO since then. Defendant Bennett signed the Trusts' Registration Statements.

43.     Defendant Matthew K. Grubb served as SandRidge's President beginning January 2011 and its COO beginning June 2007, resigning both positions in March 2013.

44.     Defendants Grubb, Bennett, and Ward are the "Officer Defendants."

**Defendant Cooley**

45.     Defendant Randall D. Cooley served as SandRidge's Senior Vice President - Accounting, and was SandRidge's Principal Accounting Officer, between November 2009 and March 2016. Defendant Cooley signed the Trusts' Registration Statements.

**Director Defendants**

46.     Defendant Jim J. Brewer served as a SandRidge Director between at least May 2011 and the present. Defendant Brewer is a geologist with over 30 years' experience in the oil and gas field. Defendant Brewer signed the Registration Statement for the Trust II Offering.

47.     Defendant Everett R. Dobson ("Dobson") has served as a SandRidge Director since 2009, and as a member of its audit committee since 2010. Dobson signed the Trusts' Registration Statements.

48.     Defendant William A. Gilliland ("Gilliland") served as a SandRidge Director between 2006 and December 2014, and as a member of its Audit Committee. Defendant

Gilliland is the Managing Partner of Gillco Energy LP. Gilliland signed the Trusts' Registration Statements.

49.     Defendant Daniel W. Jordan ("Jordan") served as a SandRidge Director between 2005 and 2013. Defendant Jordan is the Founder of Jordan Drilling Fluids, which was at the time he sold it in 2005 the largest privately held domestic drilling fluids firm. Defendant Jordan signed the Trusts' Registration Statements.

50.     Defendant Roy T. Oliver, Jr. ("Oliver") served as a SandRidge Director between 2006 and February 2015. Defendant Oliver signed the Trusts' Registration Statements.

51.     Defendant Jeffrey S. Serota ("Serota") has served as a SandRidge Director since 2006, and served on various subcommittees thereof. Defendant Serota is a director of EXCO Resources, Inc., an energy exploration and production company. Defendant Serota signed the Registration Statement for the Trust II Offering.

52.     Defendants Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota are collectively referenced as the "Director Defendants."

53.     The Officer Defendants, Defendant Cooley and the Director Defendants are collectively referred to herein as the "Individual Defendants."

**Underwriter Defendants**

54.     Defendant Raymond James & Associates, Inc. ("Raymond James") is an investment bank in the United States with its principal executive offices located in St. Petersburg, FL. Raymond James acted as a co-lead underwriter and served as a

representative for the underwriters for the SandRidge Trust Offerings and helped to draft and disseminate the Prospectuses for the two Offerings.

55.     Defendant Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co., LLC) ("Morgan Stanley") is a global financial services firm and underwriter with its principal executive offices and world headquarters located in New York, NY. Morgan Stanley acted as a co-lead underwriter and served as a representative for the underwriters for the SandRidge Trust Offerings and helped to draft and disseminate the Prospectuses for the two Offerings.

56.     Defendant Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") is a global financial services firm and underwriter with its principal executive offices and world headquarters located in New York, NY. Merrill Lynch acted as a co-lead underwriter and served as a representative for the underwriters for the Trust II Offering and helped to draft and disseminate the Prospectus for said Offering.

57.     RBC Capital Markets, LLC ("RBC") is the New York-based investment banking arm of international bank Royal Bank of Canada. RBC served as an underwriter for the Trust Offerings and helped to draft and disseminate the Prospectuses for said Offerings.

58.     Defendant Citigroup Global Markets Inc. ("Citigroup") is the US-based brokerage and securities arm of banking behemoth Citigroup Inc. with its principal executive offices located in New York, NY. Citigroup served as an underwriter for the Trust Offerings and helped to draft and disseminate the Prospectuses for said Offerings

59.     The other underwriters for the Trust I Offering include: Wells Fargo Securities, LLC; Oppenheimer & Co. Inc.; Madison Williams & Company, LLC; Morgan Keegan & Company, Inc., Robert W. Baird & Co. Incorporated; and Wunderlich Securities Inc. Each of these underwriters helped to draft and disseminate the Prospectus for the Trust I Offering.

60.     The other underwriters for the Trust II Offering include: Citigroup Global Markets, Inc.; UBS Securities LLC; Oppenheimer & Co. Inc.; Wunderlich Securities, Inc.; Sanders Morris Harris Inc., and Johnson Rice & Company L.L.C. Each of these underwriters helped to draft and disseminate the Prospectus for the Trust I Offering.

61.     The Defendants referenced above in ¶¶ 54-58 are referred to herein as the "Underwriter Defendants." The Underwriter Defendants and the entities referenced in ¶¶59-60 are collectively referred to herein as the "Underwriters." The Underwriters were paid over (i) $23.5 million in connection with the Trust I Offering, and (ii) $37.6 million in connection with the Trust II Offering. In addition, Defendant Raymond James was paid a structuring fee of approximately $1.8 million for evaluation, analysis, and structuring of Trust I. Defendants Morgan Stanley and Raymond James were paid a structuring fee of approximately $3.1 million for evaluation, analysis, and structuring of Trust II.

62.     SandRidge, the Trust Defendants, the Officer Defendants, Defendant Cooley, the Director Defendants, and the Underwriter Defendants are collectively referenced herein as the "Defendants."

**FORMER EMPLOYEES**

63.     As part of their investigation into the facts underlying this action, counsel for Lead Plaintiffs interviewed several confidential witnesses who were former employees of SandRidge. The allegations made herein are supported by the knowledge of three former employees ("FEs").

64.     Former Employee No. 1 ("FE 1") served as an Executive Vice President at SandRidge from 2006 to 2013, and in that capacity was one of the top five executives at SandRidge, and reported directly to Defendants Ward and/or Grubb.

65.     Former Employee No. 2 ("FE 2") worked as a Senior Geologist at SandRidge for approximately 3 years until departing in December 2010. FE 2's work focused on the regions in Oklahoma where the Trust Wells were later drilled, and in particular two counties (Woods and Garfield). His responsibilities included mapping the permeability and porosity of specific acreage potentially suitable for drilling. FE 2 reported to George Davis who in turn reported to FE 1.

66.     Former Employee No. 3 ("FE 3") worked at SandRidge as a geologist from 2009 through 2010. FE 3's work focused on Woods county in Oklahoma, and involved, among other tasks, mapping acreage. FE 3 reported his findings to Mike Brown and FE 1.

67.     The Former Employees report that Defendants closely monitored the production of all of SandRidge's Mississippian wells via weekly senior management meetings at which the performance of individual wells was discussed. FE 1, FE 2, and FE 3 all attended these senior management meetings during the time that they were employed by SandRidge.

68.     According to FE 1, engineers gave presentations at the senior management meetings to him, Defendants Ward and Grubb and other senior SandRidge executives concerning the oil and gas production performance of individual SandRidge wells (including the Trust Wells, after the Trust Offerings).

69.     FE 2 reports that these senior management meetings were typically led by FE 1 or Defendant Grubb. During the weekly senior management meetings, FE 2 and other employees would update senior management on well performance, including reviewing well reports and discussing which wells were doing better than others.

70.     FE 3 also reports that the weekly senior management meetings were attended by Defendant Ward and other senior executives, and that engineers gave presentations to those senior executives at the meetings.

71.     Investors in SandRidge's common stock have filed a class action complaint charging certain Defendants herein (including Defendants Ward and Grubb) with violations of the federal securities laws. *In re SandRidge Energy, Inc. Sec. Litig.*, 12-cv-1341-LRW (W.D. Okla.). The plaintiffs' Third Consolidated Amended Complaint For Violations of Federal Securities Laws, dkt. # 225 (the "SandRidge TAC") cites conversations with confidential witnesses who were former employees of SandRidge. These include a Senior Geologist employed between 2007 and approximately November 2010 ("SandRidge CW 1"), who worked in the regions in Oklahoma where the Trust Wells were later drilled, and a Geologist who worked at SandRidge between at least February 2011 and November 2012 ("SandRidge CW 2"). SandRidge TAC ¶¶22-23.

72.     SandRidge CW 1 and 2 likewise report that SandRidge held weekly senior management meetings that were attended by FE 1, and Defendants Ward and Grubb, and at which the performance of individual wells was discussed. SandRidge CW 1 and 2 add that the meetings took place on the 28th floor of SandRidge's headquarters and lasted one to two hours. SandRidge TAC ¶123. SandRidge CW 1 and 2 report that during the meetings, the status of drilling and production would be discussed, with production data provided by county or township, and individual wells that were either performing well or that needed improvement were highlighted. SandRidge TAC ¶124.

73.     FE 1 confirms that the declining oil production of the Trust I Wells after the Trust I Offering, and the unpredictability of the performance of individual Trust I Wells after the Trust I Offering, was discussed at the weekly senior management meetings, and therefore, by virtue of their attendance at such meetings, Defendants Ward and Grubb would have had knowledge of such trends.

74.     FE 2's work focused on wells in Woods and Garfield counties prior to the Trust I Offering, and he and his team presented on these wells at the senior management meetings. Thus, by virtue of their attendance at such meetings, Defendants Ward and Grubb would have had knowledge of the stronger oil production of the Chesapeake-operated Producing Wells in Woods county prior to the Trust I Offering.

75.     Finally, according to SandRidge CW 2, Drilling and Completion Reports were circulated on a daily basis Company-wide, including to Defendant Ward and other senior SandRidge executives. SandRidge TAC ¶129. According to SandRidge CW 1, these

Reports contained the same information discussed during the weekly senior management meetings. *Id.*

## GLOSSARY OF OIL AND GAS INDUSTRY TERMS

### Capitalized Terms Defined by SEC Regulation S-X

76.   The following capitalized terms used in the Amended Complaint are defined in SEC Regulation S-X Section 210.4-10(a) (17 CFR 201.4-10) as set forth below.

77.   **Developed Reserves.** Developed oil and gas reserves are reserves of any category (e.g., Proved, Probable) that can be expected to be recovered:

(i)   Through existing wells with existing equipment and operating methods or in which the cost of the required equipment is relatively minor compared to the cost of a new well; and

(ii)   Through installed extraction equipment and infrastructure operational at the time of the reserves estimate if the extraction is by means not involving a well.

78.   **Economically Producible.** The term economically producible, as it relates to a resource, means a resource which generates revenue that exceeds, or is reasonably expected to exceed, the costs of the operation.

79.   **Estimated Ultimate Recovery (EUR).** Estimated ultimate recovery is the sum of reserves remaining as of a given date and cumulative production as of that date.

80.   **Probable Reserves.** Probable reserves are those additional reserves that are less certain to be recovered than proved reserves but which, together with proved reserves, are as likely as not to be recovered.

(i)     When deterministic methods are used, it is as likely as not that actual remaining quantities recovered will exceed the sum of estimated proved plus probable reserves. When probabilistic methods are used, there should be at least a 50% probability that the actual quantities recovered will equal or exceed the proved plus probable reserves estimates.

(ii)    Probable reserves may be assigned to areas of a reservoir adjacent to proved reserves where data control or interpretations of available data are less certain, even if the interpreted reservoir continuity of structure or productivity does not meet the reasonable certainty criterion. Probable reserves may be assigned to areas that are structurally higher than the proved area if these areas are in communication with the proved reservoir.

(iii)   Probable reserves estimates also include potential incremental quantities associated with a greater percentage recovery of the hydrocarbons in place than assumed for proved reserves.

81.     **Proved Reserves.** Proved oil and gas reserves are those quantities of oil and gas, which, by analysis of geoscience and engineering data, can be estimated with reasonable certainty to be economically producible—from a given date forward, from known reservoirs, and under existing economic conditions, operating methods, and government regulations—prior to the time at which contracts providing the right to operate expire, unless evidence indicates that renewal is reasonably certain, regardless of whether deterministic or probabilistic methods are used for the estimation. The project to extract

the hydrocarbons must have commenced or the operator must be reasonably certain that it will commence the project within a reasonable time.

82.  **Reasonable Certainty.** If deterministic methods are used, reasonable certainty means a high degree of confidence that the quantities will be recovered. If probabilistic methods are used, there should be at least a 90% probability that the quantities actually recovered will equal or exceed the estimate. A high degree of confidence exists if the quantity is much more likely to be achieved than not, and, as changes due to increased availability of geoscience (geological, geophysical, and geochemical), engineering, and economic data are made to estimated ultimate recovery (EUR) with time, ***reasonably certain EUR is much more likely to increase or remain constant than to decrease***.[1]

83.  **Reserves.** Reserves are estimated remaining quantities of oil and gas and related substances anticipated to be economically producible, as of a given date, by application of development projects to known accumulations. In addition, there must exist, or there must be a reasonable expectation that there will exist, the legal right to produce or a revenue interest in the production, installed means of delivering oil and gas or related substances to market, and all permits and financing required to implement the project.

84.  **Undeveloped Reserves.** Undeveloped oil and gas reserves are reserves of any category (i.e., Proved, Probable) that are expected to be recovered from new wells on undrilled acreage, or from existing wells where a relatively major expenditure is required for recompletion.

---

[1] All bold and italicized emphases are added.

(i)    Reserves on undrilled acreage shall be limited to those directly offsetting development spacing areas that are reasonably certain of production when drilled, unless evidence using reliable technology exists that establishes reasonable certainty of economic producibility at greater distances.

(ii)    Undrilled locations can be classified as having undeveloped reserves only if a development plan has been adopted indicating that they are scheduled to be drilled within five years, unless the specific circumstances, justify a longer time.

**Other Capitalized Terms**

85.    **Area of Mutual Interest ("AMI").** A geographic location in which more than one oil and/or natural gas company has a stake.

86.    **Decline Curve Analysis.** Decline curve analysis is a graphical tool for estimating the recoverable reserves of a well based on past production history. Past production of oil and gas is plotted for consecutive time periods, and then a decline (or "type") curve is fit to the production data points and extrapolated to predict future performance. The underlying assumption is that whatever causes controlled the trend of the curve in the past will continue to govern its trend in the future in a uniform manner. The accuracy of the analysis depends on the availability of sufficient past production.

87.    **Mississippian Formation.** The Mississippian Formation is a geological formation located in northern Oklahoma and south-central Kansas into which the Trust Wells were drilled. Beginning in the 1940's, oil and gas companies drilled over 1,200 vertical wells into the Mississippian Formation. Beginning in 2007, companies began

drilling horizontal wells into the Mississippian Formation with the aim of extracting additional oil and gas from existing vertical well locations by applying multi-stage hydraulic fracturing treatments.

88.    **Oil and gas quantities.**

    a.    **BBL.** Barrels of oil

    b.    **Barrel of Oil Equivalent ("BOE").** A barrel of oil equivalent (BOE) is a unit of energy based on the approximate energy released by burning one barrel (42 U.S. gallons) of crude oil. BOE is used by oil and gas companies in their financial statements as a way of combining oil and natural gas reserves and production into a single uniform measure, although this energy equivalence does not take into account the lower financial value of energy in the form of gas. The Trusts' financial statements assumed six thousand cubic feet (6 MCF) of natural gas is equal to one barrel of oil.

    c.    **MBBL.** A thousand barrels of oil.

    d.    **MBOE.** A thousand barrels of oil equivalent.

    e.    **MCF.** A thousand cubic feet of gas. 6 MCF equals 1 BOE.

    f.    **MMCF.** A million cubic feet of gas. 6 MMCF equals 1 MBOE.

89.    **Township-Range-Section, or T-R-S.** Oil and gas properties in Northern Oklahoma and South-Central Kansas are surveyed using the Township and Range System. The basic unit of the system is the Section, which is a square tract of land one mile by one mile containing 640 acres. A Township is comprised of 36 Sections arranged in a 6 by 6

system, measuring 6 miles by 6 miles. Sections are numbered beginning with the northeast-most section, proceeding west to 6, then south along the west edge of the township and to the east. A Range is an east-west measurement assigned to a Township. Thus, for example, the proximate Trust I wells designated as Jeffrey 1-27H and Jeffrey 2-27H are located at Township 29N, Range 10W, and Section 27 (designated as 29N-10W-27).

90.     **Type Curve.** A Type Curve is a graphical curve derived from a Decline Curve Analysis that can be used to forecast the expected average performance of a group of wells in a particular geological formation.

91.     **Type Well.** A Type Well is a hypothetical well representing the forecasted EUR for a group of wells in a particular geological formation.

## SECURITIES ACT CLAIMS ALLEGATIONS AND COUNTS

### The Trust I Oil and Gas Wells

92.     In its Form 10-K for the year ended December 30, 2010 ("2010 SandRidge 10-K"), filed with the SEC on February 28, 2011, SandRidge advised investors that the "oil and natural gas industry is capital intensive," and that it had made and would continue to make "substantial capital expenditures" for the "exploration, development, production and acquisition of oil and natural gas reserves." The 2010 SandRidge 10-K disclosed that SandRidge had spent approximately $1.1 billion on capital expenditures in 2010, and budgeted $1.3 billion for capital expenditures in 2011.

93.     One of SandRidge's "core operating" areas for oil and gas exploration and production was the Mississippian Formation in Northern Oklahoma and Southern Kansas. Among its assets in the Mississippian Formation, SandRidge had revenue interests in

certain oil and gas properties ("Trust I Underlying Properties") located within the Trust I

AMI consisting of approximately 64,200 gross acres in Alfalfa, Garfield, Grant, Major and

Woods counties in Northern Oklahoma.

94.     As of December 31, 2010, SandRidge's long term debt was $2.9 billion

(nearly double the Company's equity of $1.5 billion). To reduce its reliance on debt as a

source of capital to fund its continued acquisition and development of oil and gas

properties, SandRidge decided to monetize the Trust I Underlying Properties by selling a

percentage of its revenue interests in those Properties to the public, and using the proceeds

of the public offering to repay debt and for general corporate purposes.

95.     To that end, in December 2010, SandRidge formed Trust I as a Delaware

statutory trust with BNY as Trustee. SandRidge then conveyed royalty interests ("Trust I

Royalty Interests") to Trust I consisting of: (i) 90% of SandRidge's revenue from the 37

Trust I Producing Wells in the Trust I AMI, and (ii) 50% of SandRidge's revenue from the

123 Trust I Development Wells to be drilled in the Trust I AMI. SandRidge committed to

drill the Trust I Development Wells (either by itself or using third party operators) by

December 31, 2014 (or in the event of delays, no later than December 31, 2015).

96.     The Trust I Prospectus estimated that SandRidge would fulfill its drilling

commitment by December 31, 2014, by drilling approximately 7-8 Trust I Development

Wells per quarter, or 31 Trust I Development Wells per year (retroactive to January 2011).

97.     As per Oklahoma land records, and oil and gas production data ("OTC

Production Data") provided by SandRidge to the Oklahoma Tax Commission ("OTC"),

and confirmed by Lead Plaintiffs in a private database, Lasserdata.com, annexed hereto as

(i) Exhibit A is a list of the Trust I Producing Wells, and (ii) Exhibit B is a list of the Trust I Development Wells drilled and producing gas and oil as November 2012.

98.     All of the Trust I Producing Wells were located in Alfalfa, Woods and Grant counties. Other than 5 Trust I Development Wells in Garfield county, all the Trust I Development Wells that were drilled and began producing as of November 2012 were located in Alfalfa, Woods and Grant counties.

99.     The size of SandRidge's aggregate revenue interest in any particular Trust I well depended on whether SandRidge or a third party operator drilled and operated the relevant well.  According to the Trust I Registration Statement and Prospectus, SandRidge (i) had drilled and was operating 73% of the Trust I Producing Wells, and (ii) expected to drill and operate approximately 75% of the Trust I Development Wells. Further, based on SandRidge's drilling arrangements with third parties, SandRidge owned or would own, on average, (i) a 56.3% revenue interest in the Trust I Producing Wells, and (ii) a 57% revenue interest in the Development Wells. It was from these revenue interests that the Trust I Royalty Interest was conveyed.

**The Trust I Royalty Interests**

100.    The Trust I Royalty Interests were conveyed to Trust I for a 20-year period beginning on January 1, 2011, and ending on December 31, 2030. After the Trust I termination date, Trust I will dissolve and liquidate with 50% of the Trust I Royalty Interests reverting automatically to SandRidge, and 50% of the Trust I Royalty Interests sold (with SandRidge having a right of first refusal), and the proceeds distributed to investors in Trust I.

101. To compensate SandRidge for the Trust I Royalty Interests, Trust I committed to (i) issue 6,000,000 Common Units, and 7,000,000 "subordinated" Trust I Units ("Subordinated Units") to SandRidge, and (ii) undertake an IPO under which it would sell 15,000,000 Common Units to public investors, and transfer the net proceeds to SandRidge.

102. The following chart from the Trust I Prospectus summarizes the arrangements described above:



### The Trust I Reserve Report

103. The Trust I Offering was intended to appeal to public investors looking for investment income. To that end, Trust I projected making quarterly cash distributions to Trust I Unit holders of substantially all of the cash flow generated by the Trust I Royalty Interests over the lifetime of the Trust (after deducting certain specified costs and expenses).

104. As the holder of a royalty interest in the Trust I wells, Trust I was not responsible for any of the costs associated with drilling and operating those wells (except for taxes and certain post-production costs related to storing and marketing the oil and gas produced). Accordingly, the quarterly cash receipts available for distribution to Trust I Unit holders would depend primarily on two key variables: (1) the Reserves (i.e., oil and gas production) of the Trust I Wells allocable to Trust I, and (2) the prices received for that oil and natural gas production (i.e., the market value of the production).

105. SandRidge's petroleum engineering consultant — Netherland Sewell & Associates, Inc. ("Netherland Sewell") — estimated the Reserves of the Trust I Wells allocable to Trust I in a report dated January 5, 2011 (the "Trust I Reserve Report"), a copy of which was attached to the Trust I Registration Statement as Annex A.

106. According to the Trust I Prospectus, while Netherland Sewell authored the Trust I Reserve Report, SandRidge's senior management reviewed and approved it. The executive at SandRidge to whom Netherland Sewell addressed the Trust I Reserve Report — Rodney Johnson, SandRidge's Executive Vice President, Reservoir Engineering — possessed (i) a Bachelor of Science degree in Mechanical Engineering; (ii) 30 years of practical industry experience, including 25 years of estimating and evaluating reserve information; (iii) certification as a professional engineer in the state of Oklahoma since 1988; and (iv) membership in the Society of Petroleum Engineers since 1980.

107. The Trust I Prospectus further represented that SandRidge management and employees were intimately involved in the collection, review and analysis of the data used to prepare the Trust I Reserve Report:

The process to review and estimate the reserves began with a staff reservoir engineer collecting and verifying all pertinent data, including but not limited to well test data, production data, historical pricing, cost information, property ownership interests, reservoir data, and geosciences data. This data was reviewed by various levels of SandRidge management for accuracy, before consultation with Netherland Sewell. These individuals consulted regularly with Netherland Sewell during the reserve estimation process to review properties, assumptions, and any new data available. Internal reserve estimates and methodologies were compared to Netherland Sewell to test the reserve estimates and conclusions before the reserve estimates were included in this registration statement. Additionally, SandRidge's senior management reviewed and approved the reserve report contained herein.

108.    The Trust I Reserve Report itself stated: "The data used in our estimates were obtained from SandRidge Energy, Inc. and the nonconfidential files of Netherland, Sewell & Associates, Inc. [] and were accepted as accurate."

109.    In general, according to the Trust I Prospectus, SandRidge closely monitored the oil and gas production of its wells, which included the Trust I Producing Wells:

SandRidge's Reservoir Engineering Department continually monitors asset performance and makes reserves estimate adjustments, as necessary, to ensure the most current reservoir information is reflected in reserves estimates. Reserve information includes production histories as well as other geologic, economic, ownership and engineering data . . . Each quarter, the Executive Vice President – Reservoir Engineering presents the status of SandRidge's reserves, including the reserves associated with the Underlying Properties, to the Executive Committee, which subsequently approves all changes.

110.    Further, as noted above, former SandRidge employees report that Defendants Ward and Grubb attended weekly senior management meetings before the Trust I Offering and throughout the Class period at which the performance of individual wells in the Mississippian Formation, including the Trust Wells, was discussed.

**Methodology Used to Estimate the Reserves of the Trust I Wells**

111.    As described in the Trust I Prospectus — and in a subsequent (i) March 1, 2013 conference call related to Trust II (the "March 2013 Trust II Conference Call"), and (ii) letter, dated October 11, 2013, from the Trustee to the SEC concerning Trust I's 2012 Form 10-K ("October 2013 Trust I SEC Letter") — the analysis undertaken to estimate the Proved Reserves of the Trust I Wells involved several steps.

112.    First, a Decline Curve Analysis of past oil and gas production from the Trust I Producing Wells was used to estimate their Proved Reserves. Second, it was then established — based on analysis of the geological properties of the Trust I AMI, and production data from (i) 37 *horizontal* wells (including the Trust I Producing Wells), and (ii) over 1,200 *vertical* wells drilled across the Mississippian Formation in northern Oklahoma and south-central Kansas since the 1940's (including 123 vertical wells drilled at locations across the Trust I AMI) — that geological uniformity existed in the Mississippian Formation across the Trust I AMI.

113.    Based on that geological uniformity, it was then determined that a Reasonable Certainty existed with respect to the Reserves that could expected from Trust I Development Wells drilled in close proximity to (i.e., within the same T-R-S as) either (i) Trust I Producing Wells, or (ii) existing vertical wells across the Trust I AMI. Therefore, the Reserves of such Trust I Development Wells could be classified as "Proved" Reserves.

114.    As the Trust I Prospectus explained:

After estimating the reserves of each proved developed well, ***it was determined that a reasonable level of certainty exists with respect to the reserves that can be expected from close offset undeveloped wells in the field***. The continuity of the

formation across the AMI area was established by reviewing electric well logs, geologically mapping the analogous reservoir and reviewing extensive production data from more than 1,200 vertical and 40 horizontal wells. ***The reserves attributable to the Producing Wells, which cover a wide area of the AMI, and the continuity of the formation over the AMI area classification further supports proved undeveloped classification within close proximity to the Producing Wells***. Data from both SandRidge and offset operators with which SandRidge has exchanged technical data demonstrate a consistency in this formation over an area much larger than the AMI. In addition, direct measurement from other producing wells has also been used to confirm consistency in reservoir properties such as porosity, thickness and stratigraphic conformity.

While vertical well control exists across all of the AMI most of the existing producing horizontal wells were drilled without benefit of a direct offset producing lateral section. These wells all encountered proven reserves in the Mississippian formation. ***The proven undeveloped locations within the AMI are generally all offsets to the horizontal wells drilled and producing to date, or are offset by proven vertical production along the well bore path of the proved undeveloped location***. Of the proved undeveloped drilling locations identified in the reserve report, only approximately 12% are not offsets of other historically producing wells. Those approximately 12% proved undeveloped drilling locations are generally characterized by the second offset interior to known production.

* * *

During the years ended December 31, 2009 and 2010, SandRidge drilled or participated in the drilling of 5 and 32 [Producing Wells], respectively, from which a portion of royalty interests conveyed to the Trust will be derived. ***These wells demonstrated consistent levels of production and provided reasonable certainty that wells to be drilled within the acreage qualified for Proved Undeveloped classification***.[2]

115.   As subsequently disclosed in the March 2013 Trust II Conference Call, and

the October 2013 Trust I SEC Letter, the final step in the process was an analysis of the 37

Trust I Producing Wells, and over 1,200 vertical wells, to develop a Type Curve

---

[2] While the Trust I Prospectus states that 40 horizontal wells were analyzed in connection with calculation of the Trust I Reserves, the March 2013 Trust II Conference Call, and October 2013 Trust I SEC Letter confirm that the Type Curve used to forecast production for the Trust I AMI, as well as the entire Mississippian Formation, included only 37 horizontal wells.

("Mississippian Type Curve") for not just the Trust I AMI, but the entire Mississippian Formation being developed by SandRidge. The Mississippian Type Curve was then used to forecast the Reserves of the Trust I Development Wells.

116. Using the methodology described above, the Trust I Reserve Report estimated that the aggregate Proved Reserves of the Trust I Wells attributable to Trust I over its lifetime were 9,335 MBBLs of oil, and 9,941 MBOE of gas — an aggregate ratio of 48.4% oil to 51.6% gas. The Trust I Prospectus further broke down the aggregate Trust I Reserves between the Trust I Producing Wells and Trust I Development Wells, with approximately 1/3 of the aggregate Trust I Reserves attributable to the Producing Wells, and approximately 2/3 of the aggregate Trust I Reserves attributable to the Development Wells:

| Trust I Proved Reserves | | | |
|---|---|---|---|
| | Oil (MBBL) | Gas (MBOE) | Total (MBOE) |
| **Producing Wells** | 2,913 (42.5% oil) | 3,947 (57.5% gas) | 6,860 |
| **Development Wells** | 6,422 (51.7% oil) | 5,994 (48.3% gas) | 12,416 |
| Total | 9,335 (48.4% oil) | 9,941 (51.6% gas) | 19,276 |

117. Based on the table above, the Trust I Registration Statement and Prospectus estimated that the average Proved Reserves per Trust I Development Well was 101 MBOE (i.e., 12,416 Total MBOE/123 Development Wells).

118. The Trust I Prospectus advised that "[p]roved reserve quantities attributable to the royalty interests [were] calculated by multiplying the ***gross reserves*** for each property by the royalty interest assigned to the trust in each property." Thus, the Gross

Reserves of the Trust I Wells at the time of the Trust I Reserve Report can be calculated by dividing the Reserves of such Wells attributable to the Trust I Royalty Interest by Trust I's average interest in such Wells:

| | Oil (in MBBL) | Gas (in MBOE) | Total MBOE |
|---|---|---|---|
| **Trust I Producing Wells** | | | |
| A. Reserves of Producing Wells attributable to Trust I | 2,913 | 3,947 | 6,860 |
| B. Avg. interest of Trust I in Producing Wells[3] | 0.507 | 0.507 | 0.507 |
| C. Gross Reserves of Producing Wells (A/B) | 5,749 | 7,790 | 13,539 |
| **Gross Reserves per Producing Well (37 wells)** | **155** | **211** | **366** |
| **Trust I Development Wells** | | | |
| A. Reserves of Development Wells attributable to Trust I | 6,422 | 5,994 | 12,416 |
| B. Avg. interest of Trust I in Development Wells[4] | 0.285 | 0.285 | 0.285 |
| C. Gross Reserves of Development Wells (A/B) | 22,533 | 21,032 | 43,565 |
| **Gross Reserves per Development Well (123 wells)** | **183** | **171** | **354** |

---

[3] SandRidge will have, on average a 56.3% interest in the Trust I Producing Wells, while Trust I's Royalty Interest is 90% of SandRidge's total interest, meaning that Trust I's average interest in Trust I Producing Wells is 50.7% (56.3%*0.9).

[4] SandRidge will have, on average a 57% interest in the Trust I Development Wells, while Trust I's Royalty Interest is 50% of SandRidge's total interest, meaning that Trust I's average interest in Trust I Development Wells is 28.5% (57%*0.5)

119.     Thus, over the lifetime of Trust I, the average Trust I Development Well was expected to produce (i) 18% *more* oil than the average Trust I Producing Well (183 MBBL vs. 155 MBBL on a gross basis), and (ii) 19% *less* gas than the average Trust I Producing Well (171 MBOE vs. 211 MBOE on a gross basis).

**Estimating Revenue to Trust I from the Trust I Wells**

120.     While the Aggregate Trust I Ratio was projected to be 48.4% oil versus 51.6% gas, the projected *revenue* from that production would consist primarily of oil sales since, at the time of the Trust I Offering, a barrel of oil commanded a significantly higher price than an energy-equivalent quantity of gas (it was for this very reason that SandRidge had shifted its focus from gas to oil, noting in its 2010 10-K that oil is "a significantly more valuable commodity.").

121.     For example, the forecast in the Trust I Prospectus of cash distributions to Trust I Unit holders during the first full quarter of production after the Trust I Offering (i.e., through June 30, 2011) (Q2 2011), assumed a price of \$92.02/barrel for oil, and \$4.16/MCF for gas. Since a barrel of oil is equal to approximately 6 MCF of gas on a BOE basis, and 6 MCF would be valued at \$24.96 (i.e., \$4.16/MCF x 6), the Trust I Prospectus assumed that a barrel of oil would be 3.68x more valuable than an energy-equivalent quantity of gas (i.e., \$92.02/\$24.96) during Q2 2011.

122.     Further, the Trust I Prospectus represented that over the lifetime of Trust I, oil would be worth, on average, at least 3X as much as gas.[5]

---

[5] Based on an assumed average price of \$74.60 per barrel of oil and \$4.08 per MCF of gas (or \$24.45 for 6 MCF gas) over the lifetime of Trust I.

123.    As a result of the premium price commanded by oil, the Trust I Prospectus projected that 78-79% of the revenue generated for Trust I during the first 4 quarters of production after the Trust I Offering (i.e., through March 31, 2012) would result from oil production:

| Period | June 30, 2011(1) | September 30, 2011 | December 31, 2011 | March 31, 2012 |
|---|---|---|---|---|
| | | (In thousands, except volumetric and per unit data) | | |
| *Estimated production from trust properties* | | | | |
| Oil sales volumes (MBbl) | 257 | 154 | 146 | 149 |
| Natural gas sales volumes (MMcf) | 1,624 | 959 | 910 | 921 |
| Total sales volumes (MBoe) | 527 | 314 | 298 | 302 |
| % PDP sales volumes | 86% | 69% | 63% | 56% |
| % PUD sales volumes | 14% | 31% | 37% | 44% |
| % Oil volumes | 49% | 49% | 49% | 49% |
| % Natural gas volumes | 51% | 51% | 51% | 51% |
| *Commodity price and derivative contract positions* | | | | |
| NYMEX futures price(2) | | | | |
| Oil ($/Bbl) | $ 94.78 | $ 102.88 | $ 103.59 | $ 103.58 |
| Natural gas ($/MMBtu) | $ 4.17 | $ 4.37 | $ 4.53 | $ 5.00 |
| Assumed realized weighted unhedged price(3) | | | | |
| Oil ($/Bbl) | $ 89.78 | $ 97.88 | $ 98.59 | $ 98.58 |
| Natural gas ($/Mcf) | $ 3.79 | $ 4.00 | $ 4.15 | $ 4.58 |
| Assumed realized weighted hedged price | | | | |
| Oil ($/Bbl) | $ 92.02 | $ 98.44 | $ 98.60 | $ 99.01 |
| Natural gas ($/Mcf) | $ 4.16 | $ 4.27 | $ 4.24 | $ 4.46 |
| Percent of oil volumes hedged(4) | 78% | 79% | 84% | 74% |
| Oil hedged price ($/Bbl) | $ 103.60 | $ 103.60 | $ 103.60 | $ 104.15 |
| Percent of natural gas volumes hedged(4) | 100% | 100% | 100% | 100% |
| Natural gas hedged price ($/MMBtu) | $ 4.61 | $ 4.61 | $ 4.61 | $ 4.90 |
| *Estimated cash available for distribution* | | | | |
| Oil sales revenues | $ 23,040 | $ 15,042 | $ 14,405 | $ 14,678 |
| Natural gas sales revenues | 6,162 | 3,841 | 3,774 | 4,217 |
| Realized gains (losses) from derivative contracts | 1,164 | 339 | 82 | (44) |
| Operating revenues and realized gains (losses) from derivative contracts | $ 30,366 | $ 19,222 | $ 18,260 | $ 18,850 |
| Production taxes | 359 | 222 | 210 | 215 |
| Ad valorem taxes | 144 | 93 | 90 | 93 |
| Trust administrative expenses | 1,460(5) | 225 | 225 | 226 |
| Total trust expenses | 1,963 | 540 | 525 | 534 |
| Cash available for distribution | $ 28,403 | $ 18,682 | $ 17,735 | $ 18,316 |
| Trust units outstanding | 28,000 | 28,000 | 28,000 | 28,000 |
| Target distribution per trust unit | $ 1.01 | $ 0.67 | $ 0.63 | $ 0.65 |
| Subordination threshold per trust unit | $ 0.81 | $ 0.53 | $ 0.51 | $ 0.52 |

124.    In sum, given the premium price commanded by oil relative to natural gas, the amount of the quarterly cash distributions to Trust I Unit holders, and the overall economic value of the Trust I Royalty Interest depended heavily on the oil production of the Trust I Wells.

**Targeted Quarterly Cash Distributions**

125.    Based on the forecasted Proved Reserves in the Trust I Report, and assumptions concerning the future price of oil and gas, the Trust I Prospectus targeted specific quarterly cash distribution amounts on a per unit basis:

**Calculation of Target Distributions**

**Quarterly Target Distributions**

| Quarters 2011-2022 | | | | Quarters 2021-2031 | |
| --- | --- | --- | --- | --- | --- |
| Quarter Ending | Subordination Threshold | Target Cash Distribution Quarterly | Incentive Threshold(1) | Quarter Ending | Target Cash Distribution Quarterly |
| June 30, 2011(2) | $ 0.812 | $ 1.014 | $ 1.217 | March 31, 2021 | $ 0.401 |
| September 30, 2011 | $ 0.534 | $ 0.667 | $ 0.801 | June 30, 2021 | $ 0.396 |
| December 31, 2011 | $ 0.507 | $ 0.633 | $ 0.760 | September 30, 2021 | $ 0.391 |
| March 31, 2012 | $ 0.523 | $ 0.654 | $ 0.785 | December 31, 2021 | $ 0.386 |
| June 30, 2012 | $ 0.560 | $ 0.700 | $ 0.840 | March 31, 2022 | $ 0.380 |
| September 30, 2012 | $ 0.590 | $ 0.737 | $ 0.884 | June 30, 2022 | $ 0.374 |
| December 31, 2012 | $ 0.581 | $ 0.727 | $ 0.872 | September 30, 2022 | $ 0.369 |
| March 31, 2013 | $ 0.591 | $ 0.738 | $ 0.886 | December 31, 2022 | $ 0.363 |
| June 30, 2013 | $ 0.612 | $ 0.764 | $ 0.917 | March 31, 2023 | $ 0.357 |
| September 30, 2013 | $ 0.613 | $ 0.766 | $ 0.919 | June 30, 2023 | $ 0.352 |
| December 31, 2013 | $ 0.609 | $ 0.761 | $ 0.913 | September 30, 2023 | $ 0.346 |
| March 31, 2014 | $ 0.621 | $ 0.777 | $ 0.932 | December 31, 2023 | $ 0.341 |
| June 30, 2014 | $ 0.659 | $ 0.823 | $ 0.988 | March 31, 2024 | $ 0.336 |
| September 30, 2014 | $ 0.695 | $ 0.869 | $ 1.043 | June 30, 2024 | $ 0.331 |
| December 31, 2014 | $ 0.716 | $ 0.894 | $ 1.073 | September 30, 2024 | $ 0.327 |
| March 31, 2015 | $ 0.675 | $ 0.843 | $ 1.012 | December 31, 2024 | $ 0.322 |
| June 30, 2015 | $ 0.618 | $ 0.773 | $ 0.928 | March 31, 2025 | $ 0.317 |
| September 30, 2015 | $ 0.575 | $ 0.719 | $ 0.863 | June 30, 2025 | $ 0.313 |
| December 31, 2015 | $ 0.541 | $ 0.676 | $ 0.811 | September 30, 2025 | $ 0.309 |
| March 31, 2016 | $ 0.522 | $ 0.653 | $ 0.783 | December 31, 2025 | $ 0.304 |
| June 30, 2016 | $ 0.499 | $ 0.623 | $ 0.748 | March 31, 2026 | $ 0.300 |
| September 30, 2016 | $ 0.478 | $ 0.598 | $ 0.717 | June 30, 2026 | $ 0.296 |
| December 31, 2016 | $ 0.461 | $ 0.576 | $ 0.691 | September 30, 2026 | $ 0.292 |
| March 31, 2017 | | $ 0.556 | | December 31, 2026 | $ 0.288 |
| June 30, 2017 | | $ 0.538 | | March 31, 2027 | $ 0.284 |
| September 30, 2017 | | $ 0.522 | | June 30, 2027 | $ 0.280 |
| December 31, 2017 | | $ 0.508 | | September 30, 2027 | $ 0.276 |
| March 31, 2018 | | $ 0.495 | | December 31, 2027 | $ 0.273 |
| June 30, 2018 | | $ 0.482 | | March 31, 2028 | $ 0.269 |
| September 30, 2018 | | $ 0.470 | | June 30, 2028 | $ 0.265 |
| December 31, 2018 | | $ 0.459 | | September 30, 2028 | $ 0.262 |
| March 31, 2019 | | $ 0.450 | | December 31, 2028 | $ 0.258 |
| June 30, 2019 | | $ 0.443 | | March 31, 2029 | $ 0.255 |
| September 30, 2019 | | $ 0.435 | | June 30, 2029 | $ 0.251 |
| December 31, 2019 | | $ 0.429 | | September 30, 2029 | $ 0.248 |
| March 31, 2020 | | $ 0.423 | | December 31, 2029 | $ 0.244 |
| June 30, 2020 | | $ 0.417 | | March 31, 2030 | $ 0.241 |
| September 30, 2020 | | $ 0.411 | | June 30, 2030 | $ 0.238 |
| | | | | September 30, 2030 | $ 0.235 |

126. The table above, Annex B to the Trust I Prospectus, "reflects that while target distributions initially increase as SandRidge completes its drilling obligation and

production increases, over time target distributions decline as a result of the depletion of the reserves in the Underlying Properties." The Trust I Prospectus further explained that the Trust I Royalty Interests were depleting assets since oil and gas production from Trust I Wells would decline over time once SandRidge fulfilled the Trust I drilling commitment in December 2014 (as depicted in the following chart from the Trust I Prospectus):



**The Trust I Offering**

127.    On January 5, 2011, as co-registrants in connection with the Trust I Offering, Trust I and SandRidge filed the Trust I Registration Statement, which included a preliminary draft of the Trust I Prospectus. Trust I and SandRidge subsequently filed several amendments to the Trust I Registration Statement on Forms S-1/A and S-3/A. The Trust I Registration Statement and all amendments thereto were signed by Defendants Ward, Bennett, Cooley, Dobson, Gilliland, Jordan, and Oliver.

128.    The Trust I Registration Statement was declared effective on April 5, 2011, and on April 12, 2011, Trust I completed the sale of 17.25 million Common Units

(including 2.25 million Common Units from the Underwriters' exercise of their overallotment option) at $21 per Common Unit, thereby generating net proceeds of $338.7 million (after Underwriters' commissions).

129.    After the Trust I Offering, SandRidge held 3 million Units and 7 million Subordinated Units, representing a 38.4% ownership of Trust I. Trust I and SandRidge entered into a Registration Rights Agreement to facilitate the sale of SandRidge's retained Units to the public beginning within 180 days after the Trust I Offering. Pursuant to that Agreement, after the Trust I Offering, SandRidge sold over 85% of its 3,750,000 Trust I Units to Morgan Stanley & Co LLC, and, by the end of the Class Period, held only 528,063 Trust I Units:

| Sale Date | Common Units Sold | Sales Price per Unit | Proceeds | Common Units Remaining |
|---|---|---|---|---|
| February 21, 2012 | 1,583,937 | $33.05 | $52.3 million | 2,166,063 |
| June 15, 2012 | 950,000 | $26.00 | $24.7 million | 1,216,063 |
| October 2, 2012 | 688,000 | $22.98 | $15.8 million | 528,063 |

**The Trust I Registration Statement Negligently Omitted the Material Facts That Virtually All of the Trust  I Production Wells With Production of One Year or More Prior to the Trust I Offering Were Located in Woods County and Operated by Chesapeake**

130.    As alleged in paragraph 114 above, the Trust I Registration Statement and Prospectus stated that a Reasonable Certainty existed with respect to the Reserves that could be expected from Trust I Development Wells drilled in close proximity to Trust I

Producing Wells based on the conclusion that geological uniformity existed across the Trust I AMI (consisting of acreage in *five* Oklahoma counties – Alfalfa, Grant, Woods, Garfield and Major).

131.    The Trust I Registration Statement and Prospectus cautioned, however, that "[a]ctual reserves and future production may be less than current estimates" for the following reasons:

> *Reserve estimates for fields that do not have a lengthy production history are less reliable than estimates for fields with lengthy production histories.* A lack of production history may contribute to inaccuracy in estimates of proved reserves, future production rates and the timing of development expenditures. *Most of the Producing Wells have been operational for less than one year* and estimated total reserves vary substantially from well to well and are not directly correlated to perforated lateral length or completion technique. Although SandRidge and Netherland Sewell analyzed historical production data from vertical wells drilled in the AMI since the 1940s, there can be no assurance that this data can accurately predict future production from horizontal wells. *The lack of operational history for horizontal wells in the Mississippian formation may also contribute to the inaccuracy of estimates of proved reserves.* A material and adverse variance of actual production, revenues and expenditures from those underlying reserve estimates, would have a material adverse effect on the financial condition, results of operations and cash flows of the trust and would reduce cash distributions to trust unitholders.

132.    In stating that "[m]ost of the Producing Wells have been operational for less than one year," the Trust I Registration Statement and Prospectus negligently failed to disclose that the Trust I Producing Wells with production for *one year or more* prior to the Trust I Offering — i.e., the Trust I Producing Wells with the most reliable production data — were nearly all operated by Chesapeake in Woods county. Specifically, as per OTC Production Data, 8 out of the 9 Trust I Producing Wells with oil production for *one year*

*or more* prior to the Trust I Offering (i.e., through March 2011) were operated by Chesapeake in Woods county.

| Chart 1: Trust I Producing Wells With Oil Production for 12 months or more prior to Trust I Offering | | | |
|---|---|---|---|
| Well Name | Operator | County | Initial Oil Production Date |
| Peacemaker 1-10H | Chesapeake | Woods | May-09 |
| Harmony 1-11H | Chesapeake | Woods | Jun-09 |
| Juggernaut 1-20H | Chesapeake | Woods | Jul-09 |
| Almond 1-22H | Chesapeake | Woods | Jul-09 |
| Gypsy 1-32H | Chesapeake | Woods | Oct-09 |
| Pitcher 1-11H | Chesapeake | Woods | Feb-10 |
| Sundance 1-14H | Chesapeake | Woods | Mar-10 |
| Meyer Trust 1-10H | Chesapeake | Woods | Apr-10 |
| Jeffrey 1-27H | Sandridge | Alfalfa | Apr-10 |

133.    Further, according to OTC Production Data, 8 out of the 10 Trust I Producing Wells with gas production for one year or more prior to the Trust I Offering were also operated by Chesapeake in Woods County:

| Chart 2: Trust I Producing Wells With Gas Production for 12 months or more prior to Trust I Offering | | | |
|---|---|---|---|
| Well Name | Operator | County | Initial Gas Production Date |
| Peacemaker 1-10H | Chesapeake | Woods | Apr-09 |
| Juggernaut 1-20H | Chesapeake | Woods | Jun-09 |
| Harmony 1-11H | Chesapeake | Woods | Jun-09 |
| Almond 1-22H | Chesapeake | Woods | Jul-09 |
| Gypsy 1-32H | Chesapeake | Woods | Sep-09 |
| Pitcher 1-11H | Chesapeake | Woods | Mar-10 |
| Sundance 1-14H | Chesapeake | Woods | Mar-10 |
| Intruder 1-12H | Sandridge | Woods | Apr-10 |
| Meyer Trust 1-10H | Chesapeake | Woods | Apr-10 |
| Jeffrey 1-27H | Sandridge | Alfalfa | Mar-10 |

**The Trust I Registration Statement Negligently Omitted the Material Fact That the Chesapeake-Operated Producing Wells Produced Considerably Higher Quantities of Oil Than SandRidge-Operated Producing Wells**

134.    The Trust I Registration Statement and Prospectus also negligently failed to disclose that the 10 Trust I Producing Wells operated by Chesapeake in Woods county prior to the Trust I Offering produced on average considerably *more* oil, and *less* gas, than the Trust I Producing Wells operated by SandRidge at locations in Alfalfa, Grant and Woods counties prior to the Trust I Offering.[6]

135.    Specifically, the Chesapeake-operated Producing Wells produced on average — during their first 6 months of oil or gas production — considerably *more* oil, and *less* gas, than the 16 SandRidge-operated Producing Wells in Alfalfa (13) and Woods (3) counties with at least 6 months of oil or gas production prior to the Trust I Offering did during their first 6 months of operation:[7]

| Average Monthly Oil Production During First 6 Months of Production of Producing Wells with at least 6-Months of Oil Production Prior to the Trust I Offering | | |
|---|---|---|
| | **No. of Wells** | **Oil (BBL)** |
| **SandRidge-operated Producing Wells** | 8 | 2,196 |

---

[6] It is not unusual for certain operators to obtain better results than others. Some operators employ better techniques, have better skilled employees, or use better equipment, among other reasons. For example, a study of production from horizontal wells in the Bakken area up to 2012 found that "certain operators consistently achieve superior results as compared to other operators in the same area." Julianna Sipeki & Timothy Hower, *Impact of Operator's Best Practices, Completion Design, and Well Density on Projected Ultimate Recoveries of Horizontal Bakken Wells in Williams County, North Dakota*, at 1 (Unconventional Resources Technology Conference, 2013). In this case, the data suggested that SandRidge achieved worse results than Chesapeake.

[7] While, as per the Trust I Registration Statement and Prospectus, production histories of less than one year are less reliable, since, as noted above, there was (i) only one SandRidge-operated Producing Well with at least one year of oil production prior to the Trust I Offering, and (ii) only two SandRidge-operated Producing Wells with at least one year of gas production prior to the Trust I Offering, Lead Plaintiffs used a 6-month comparison to provide a more reliable data set.

| Chesapeake-operated Producing Wells | 10 | 3,857 |

| Average Monthly Gas Production During First 6 Months of Production of Producing Wells with at least 6-Months of Gas Production Prior to the Trust I Offering | | |
|---|---|---|
| | No. of Wells | Gas (BOE) |
| SandRidge-operated Producing Wells | 16 | 2,478 |
| Chesapeake-operated Producing Wells | 10 | 1,423 |

136.    Further, based on OTC Production Data, as a result of their stronger oil production, the Chesapeake-Operated Producing Wells had produced in the aggregate 67.50% oil vs. 32.5% gas as of March 2011 — *far above* the aggregate Trust I ratio in the Trust I Prospectus of 48.4% oil to 51.6% gas for the lifetime of Trust I — while the SandRidge-operated Producing Wells produced only 39.7% oil vs. 60.3% gas in the aggregate as of March 2011 — *far below* the aggregate Trust I ratio.

137.    In sum, the Trust I Registration Statement and Prospectus negligently omitted to disclose that (i) virtually all of the Trust I Producing Wells with production for one year or more prior to the Trust I Offering were Chesapeake-operated Producing Wells in Woods county, and (ii) the Chesapeake-operated Producing Wells in Woods county produced considerably more valuable oil than the SandRidge-operated Producing Wells (throughout the AMI).

138.    The above omitted material facts rendered several statements in the Trust I Registration Statement and Prospectus materially misleading. The Trust I Offering Documents stated that "[t]he reserves attributable to the Producing Wells, *which cover a wide area of the AMI*," supported classifying the Reserves of Trust I Development Wells drilled in close proximity to Trust I Producing Wells as "*Proved* Undeveloped Reserves."

139.    The Trust I Registration Statement and Prospectus further stated that "[w]hile vertical well control exists *across all of the AMI* most of the *existing producing horizontal wells* were drilled without benefit of a direct offset producing lateral section. *These wells all encountered proven reserves in the Mississippian formation*." In a similar vein, the Trust I Prospectus stated:

> During the years ended December 31, 2009 and 2010, SandRidge drilled or participated in the drilling of 5 and 32 wells, respectively, from which a portion of royalty interests conveyed to the Trust will be derived. *These wells demonstrated consistent levels of production and provided reasonable certainty that wells to be drilled within the acreage qualified for Proved Undeveloped classification*.

140.    The negligent failure to disclose the omitted material facts above rendered the statements above misleading because those statements suggested that Trust I Producing Wells *across the Trust I AMI* supported classification of the Trust I Development Wells as "Proved" (rather than "Probable"). In fact, unbeknownst to investors, the production data that would have most heavily influenced the shape of the Mississippian Type Curve used to estimate the Reserves of the Trust I Development Wells (because it was generated by wells with longer production histories) came almost exclusively Chesapeake-operated Producing Wells in Woods county. In contrast, the Trust I Development Wells were to be drilled primarily by SandRidge across the Trust I AMI (and not only in Woods county).

Since the production data that would have had the strongest influence on the Reserve estimate came almost entirely from Trust I Producing Wells with attributes that differed from those of the Trust I Development Wells in terms of both location and operator, the risk that the Reserve estimate was inaccurate was materially greater than disclosed to investors. [8]

141.    Moreover, the Chesapeake-operated Producing Wells in Woods county had been producing significantly greater quantities of more valuable oil than the Trust I Producing Wells operated by SandRidge. Therefore, the heavier influence of the data from the Chesapeake-operated Producing Wells would have skewed the Mississippian Type Curve towards higher oil production, and thus — unbeknownst to investors — further heightened the risk that the estimate was inaccurate (because, as noted, of the different attributes in terms of location and operator).

142.    Finally, the Trust I Registration Statement and Prospectus touted as a "Key Investment Consideration" supporting investment in the Trust I Common Units

---

[8] The extent to which data from Producing Wells with longer production histories would have more heavily influenced the shape of the Mississippian Type Curve would depend on the methodology used to prepare the Curve. One common methodology for preparing a Type Curve is to have software plot all analogous wells together, adjusting so that they are all starting at the same time. In this methodology, wells with minimal history affect the starting point equally as compared to wells with longer histories, but only wells with longer histories provide data for the subsequent shape of the type curve (i.e., later time periods).

Another acceptable methodology for building a Type Curve is to analyze the production history of each analogous well individually, and extract various Type Curve parameters, which are then averaged to obtain the Type Curve. Using this methodology, data from wells with longer history whould be weighted more heavily.

SandRidge's experience as a well operator in the Mississippian Formation, and its intent to operate 73% of the Trust I Producing Wells and 75% of the Trust I Development Wells:

> *SandRidge's experience as an operator in the Mississippian formation.* Since 2009, SandRidge has drilled, as operator, 52 horizontal wells throughout the Mississippian formation in northern Oklahoma and southern Kansas, 39 of which are completed and the remaining 13 of which are awaiting completion and expected to be productive. The majority of the horizontal wells drilled in the Mississippian in Oklahoma have been drilled in Alfalfa, Garfield, Grant, Major and Woods counties, the location of the Underlying Properties. **SandRidge operates 73% of the Producing Wells. SandRidge owns a majority working interest in approximately 75% of the locations on which it expects to drill the PUD Wells**, and it expects to operate such wells during the subordination period, allowing SandRidge to control the timing and amount of discretionary expenditures for operational and development activities with respect to the majority of the PUD Wells.

143.    The failure to disclose the omitted material facts above rendered the statements above misleading because those statements suggested that SandRidge's operation of a majority of the Trust I Wells was a *positive* factor supporting investment in the Trust I Common Units. In fact, unbeknownst to investors, the SandRidge-Operated Producing Wells had produced considerably less oil than the Chesapeake-operated Producing Wells, and thus — given the premium price commanded by oil — the fact that SandRidge would operate a majority of the Trust I Wells could be deemed by reasonable investors as a *negative* consideration.

**Item 503 of Regulation S-K Required the Omitted Material Facts to be Disclosed in the Trust I Registration Statement and Prospectus**

144.    Pursuant to Item 3 of Form S-1, the Trust I Registration Statement filed in connection with the Trust I Offering, was required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative." The

Trust I Registration Statement did not comply with Item 503 by failing to disclose that the most reliable production histories underlying the estimate of the Reserves for Trust I Development Wells — to be located across *all five counties* and operated primarily (i.e., approximately 75%) by SandRidge — derived almost exclusively from Trust I Producing Wells with exceptionally strong oil production that were operated by Chesapeake in a *single* county (Woods). These omitted facts were a significant risk factor that should have been disclosed because the heavy influence of data on the shape of the Mississippian Type Curve used to estimate the Reserves of the Trust I Development Wells from Producing Wells that were not representative of the Trust I Development Wells in terms of location and operator meant that the risk of an inaccurate estimate was materially greater than disclosed.

## EVENTS AFTER THE TRUST I OFFERING

**SandRidge's Officers and Employees Exercised Control Over the Financial Reporting of Trust I and Management of the Trust I Wells After the Trust I Offering**

145.    After the Trust I Offering, substantially all of the Trustee's functions with respect to Trust I were ministerial in nature (e.g., collecting cash proceeds attributable to the Trust I Royalty Interests; paying Trust I's expenses, charges and obligations from Trust assets; making cash distributions to Trust I Unitholders; and making all required SEC filings for Trust I).

146.    Trust I had no employees. The Registration Statement estimated that the Trustee's annual fee – its sole compensation – would be about $150,000. Consequently, to enable the Trustee to fulfill basic business functions with respect to Trust I, Trust I entered

into an Administrative Services Agreement with SandRidge under which, for an annual fee, SandRidge provided Trust I with certain accounting, tax preparation, bookkeeping and informational services related to the Trust I Royalty Interests. Through SandRidge's provision of such services, the Trustee obtained the data necessary to prepare the SEC filings that it filed on behalf of Trust I.

147.    Additionally, SandRidge, through its employees or under contracts with third parties such as Chesapeake, operated the Trust I Wells in which Trust I held the Trust I Royalty Interest.

148.    According to its SEC filings, Trust I also had no principal executive officer, principal financial officer, board of directors, or other individuals performing similar functions. Instead, during the Class Period, the Officer Defendants served as the "de facto" officers of Trust I by exercising ultimate management authority over Trust I's sole asset (i.e., the Trust I Royalty Interest in the Trust I Wells), including the nature, scope and timing of the disclosures to the public concerning the performance of the Trust I Wells.

149.    In particular, while the Trustee filed five quarterly Form 10-Q's and one annual Form 10-K with the SEC on behalf of Trust I during the Class Period, in press releases preceding the first five of those filings, the Trustee announced that "SandRidge Energy, Inc., the sponsor of the SandRidge Mississippian Trust I" would host a conference call to discuss Trust I's operating and financial results.

150.    During the Class Period, Defendants Ward, Grubb and Bennett participated in five conference calls to discuss Trust I's operating and financial results (on August 12, 2011, November 11, 2011, February 17, 2012, May 11, 2012, and August 10, 2012) ("Trust

I Conference Calls"). In contrast, Mike Ulrich, the Vice President of the Trustee, joined only one of the Trust I Conference Calls (on November 11, 2011), and did not speak at all on the call.

151.   At the beginning of each of the Trust I Conference Calls, Defendant Bennett explained that Trust I had no employees or officers, and SandRidge, as the sponsor of Trust I, was responsible for operating Trust I's assets. Thereafter, during each of the Trust I Conference Calls, following Defendant Bennett's introductory comments, Defendants Ward and Grubb summarized Trust I's operational and financial results during the relevant SEC reporting period, and then responded to questions from analysts concerning those results. During the Trust I Conference Calls, Defendants Ward and Grubb demonstrated an intimate familiarity with the production of the Trust I Wells during the relevant reporting periods.

**SandRidge Closely Monitored the Trust I Wells**

152.   Trust I's Form 10-K for the year ended December 31, 2011 ("2011 Trust I 10-K"), filed with the SEC on March 26, 2012, reassured investors that SandRidge continued to closely monitor the oil and gas production of all of its wells, which included the Trust I and II Wells:

> SandRidge's Reservoir Engineering Department continually monitors asset performance, making reserves estimate adjustments, as necessary, to ensure the most current reservoir information is reflected in reserves estimates. Reserve information includes production histories as well as other geologic, economic, ownership and engineering data.

153.   In fact, in its internal operations and in communications with investors, SandRidge did not distinguish between Trust Wells and other SandRidge wells, and treated

the Trust Wells like all other wells in which SandRidge had an interest. For example, on slide 19 of a presentation delivered on June 14, 2011 (the "June 2011 Presentation"), SandRidge highlighted State 1-36H — a Trust I Development Well:



154.   On slide 20 of the June 2011 Presentation, SandRidge highlighted the following Trust I Well locations: Barnard; Kilian; Peffly; Sundance (a Chesapeake-operated Trust I Well location in Woods County); Victor; and Wiley:



**The Oil Production of the Trust I Wells After the Trust I Offering But Before the Trust II Offering Did Not Meet Expectations**

155.    OTC Production Data shows that the Trust I Development Wells drilled after the Trust I Offering — primarily in Alfalfa, Grant and Woods counties — did not meet production targets in terms of the more lucrative oil production. In fact, by February 2012, the end of the final reporting period for Trust I before the April 2012 Trust II Offering, the average oil production of those Trust I Development Wells was more than 20% *lower* than the average oil production of the Trust I Producing Wells. At the same time, the *gas*

production of the Trust I Development Wells drilled after the Trust I Offering was considerably higher than the gas production of the Trust I Producing Wells.

**Trust I Development Well Production Through August 2011**

156.    According to OTC Production Data, Trust I Development Wells drilled almost exclusively in Alfalfa and Grant counties with at least 6 months of oil or gas production by the end of Trust I's second reporting period in August 2011 produced, on average, during their first 6 months of production (i) the same amount of oil per month, and (ii) 6.2% less gas per month, as did the Trust I Producing Wells with at least 6 months of oil or gas production as of August 2011 during their first 6 months of production:

| Average Monthly Oil Production During First 6 Months of Production Of Wells With At Least 6 Months of Oil Production Through August 2011 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Oil Production (BBL) |
| Trust I Development Wells | 4 | 3,081 |
| Trust I Producing Wells | 33 | 3,080 |

| Average Monthly Gas Production During First 6 Months of Production Of Wells With At Least 6 Months of Gas Production Through August 2011 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Gas Production (BOE) |
| Trust I Development Wells | 5 | 2,204 |
| Trust I Producing Wells | 34 | 2,349 |

**Trust I Development Well Production Through November 2011**

157.    According to OTC Production Data, 20 Trust I Development Wells drilled almost exclusively in Alfalfa, Grant and Woods counties (with the exception of one well drilled in Garfield county) with at least 6 months of oil or gas production by the end of Trust I's third reporting period in November 2011 produced, on average, during their first 6 months of production: (i) virtually the same amount of oil per month, and (ii) nearly 90% *more* gas per month, as did the 34 Trust I Producing Wells with at least 6 months of oil or gas production as of November 2011 during their first 6 months of production:

| Average Monthly Oil Production During First 6 Months of Production Of Wells With At Least 6 Months of Oil Production Through November 2011 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Oil Production (BBL) |
| Trust I Development Wells | 13 | 3,090 |
| Trust I Producing Wells | 33 | 3,080 |

| Average Monthly Gas Production During First 6 Months of Production Of Wells With At Least 6 Months of Gas Production Through November 2011 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Gas Production (BOE) |
| Trust I Development Wells | 20 | 4,450 |
| Trust I Producing Wells | 34 | 2,349 |

**Trust I Development Well Production Through February 2012**

158.    According to OTC Production Data, 35 Trust I Development Wells drilled primarily in Alfalfa, Grant and Woods counties (with the exception of 3 wells drilled in Garfield county) with at least 6 months of oil or gas production by the end of Trust I's

fourth reporting period in February 2012 produced, on average, during their first 6 months of production: (i) 20% *less* oil per month, and (ii) nearly 70% *more* gas per month, than the 35 Trust I Producing Wells with at least 6 months of oil or gas production as of February 2012 during their first 6 months of production.:

| Average Monthly Oil Production During First 6 Months of Production Of Wells With At Least 6 Months of Oil Production Through February 2012 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Oil Production (BBL) |
| Trust I Development Wells | 21 | 2,464 |
| Trust I Producing Wells | 33 | 3,080 |

| Average Monthly Gas Production During First 6 Months of Production Of Wells With At Least 6 Months of Gas Production Through February 2012 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Gas Production (BOE) |
| Trust I Development Wells | 35 | 3,910 |
| Trust I Producing Wells | 35 | 2,307 |

**The Trust I Development Well Production Through May 2012**

159.    According to OTC Production Data, 43 Trust I Development Wells drilled primarily in Alfalfa, Grant and Woods counties (with the exception of 5 wells drilled in Garfield county) with at least 6 months of oil or gas production by the end of Trust I's fifth reporting period in May 2012 produced, on average, during their first 6 months of production: (i) 23% *less* oil per month, and (ii) nearly 57% *more* gas per month, as did the

37 Trust I Producing Wells with at least 6 months of oil or gas production as of May 2012 during their first 6 months of production.

| Average Monthly Oil Production During First 6 Months of Production Of Wells With At Least 6 Months of Oil Production Through May 2012 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Oil Production (BBL) |
| Trust I Development Wells | 33 | 2,301 |
| Trust I Producing Wells | 34 | 2,994 |

| Average Monthly Gas Production During First 6 Months of Production Of Wells With At Least 6 Months of Gas Production Through May 2012 | | |
|---|---|---|
| | No. of Wells | Avg. Monthly Gas Production (BOE) |
| Trust I Development Wells | 43 | 3,590 |
| Trust I Producing Wells | 37 | 2,283 |

160.    The declining oil production and "gassier" production profile of the Trust I Development Wells (the "Negative Trust I Oil Production Trends") caused the aggregate percentage of oil versus gas produced by the Trust I Wells after the Trust I Offering to quickly drop below the aggregate Trust I ratio set out in the Trust I Registration Statement of 48.4% oil to 51.6% gas projected, and thereafter steadily decline prior to the Trust II Offering:

| Month | % Oil | % Gas |
|-------|-------|-------|
| May 2011 | 51.3% | 48.7% |
| June 2011 | 49.7% | 50.3% |
| July 2011 | 47.5% | 52.5% |
| Aug 2011 | 46.8% | 53.2% |
| Sept 2011 | 45.5% | 54.5% |
| Oct 2011 | 44.7% | 55.3% |
| Nov 2011 | 43.9% | 56.1% |
| Dec 2011 | 43.5% | 56.5% |
| Jan 2012 | 43.4% | 56.6% |
| Feb 2012 | 43.2% | 56.8% |
| March 2012 | 42% | 58% |

161.    Since aggregate Trust I ratio in the Trust I Registration Statement and Prospectus was for *the lifetime* of Trust I, and the Trust I Wells were concededly depleting assets, the decline of the ratio of oil-to-gas below the ratio within *only 3 months* after the Trust I Offering (i.e., by July 2011), and continued steady decline thereafter indicated that the Trust I Wells would not meet the aggregate Trust I ratio projected in the Trust I Registration Statement and Prospectus for the lifetime of Trust I.

162.    Given that the Registration Statement represented that oil sales were expected to account for nearly 80% of the revenue from which the distributions to Trust I Unit holders would be paid, the Negative Trust I Oil Production Trends would have caused

Trust I to miss the quarterly cash distribution estimates in the Trust I Registration Statement and Prospectus.

163.    However, SandRidge accelerated the drilling schedule of the Trust I Development Wells so that instead of drilling 31 Development Wells in 2011 (as projected in the Trust I Prospectus), SandRidge drilled 53 Development Wells during 2011 (as per Trust I's SEC filings), and then 13 new Development Wells per quarter in 2012 (ultimately fulfilling the Trust I Drilling Commitment in May 2013 – over 18  months ahead of schedule):

| Relevant Timeframe from Trust I SEC Filings | Drilled | Remaining | Projected remaining in the Registration Statement |
|---|---|---|---|
| Jan-March 2011 | 7 | 116 | 116 |
| April–June 2011 | 15 | 101 | 104 |
| July–Sept 2011 | 20 | 81 | 96 |
| Oct–Dec 2011 | 11 | 70 | 88 |
| Jan-March 2012 | 13 | 57 | 81 |
| April-June 2012 | 13 | 44 | 73 |
| July-Sept 2012 | 15 | 29 | 65 |
| Oct-Dec 2012 | 13 | 16 | 57 |
| Jan-March 2013 | 13 | 3 | 50 |
| **April-June 2013** | **4** | **0** | **42** |

164.    Drilling the Trust I Development Wells at an accelerated pace boosted more lucrative oil production during Trust I's first five reporting periods running from January 2011 (reported on 7/22/11) through May 2012 (reported on 7/26/12), and resulted in quarterly cash distributions exceeding the targeted quarterly distribution set out in the Trust I Prospectus during that timeframe:

| SDT Quarterly Oil Production (BBL) | | | | |
|---|---|---|---|---|
| Production Period | Report Date | Projected | Actual | +Beat/-Miss |
| Jan-May 2011 | 7/22/2011 | 257,000 | 264,000 | 2.7% |
| June-Aug 2011 | 10/28/2011 | 154,000 | 180,000 | 16.9% |
| Sept-Nov 2011 | 2/2/2012 | 146,000 | 185,000 | 26.7% |
| Dec 2011-Feb 2012 | 4/30/12 | 149,000 | 170,000 | 14.1% |
| March-May 2012 | 7/26/12 | Not provided | 157,000 | NA |

| SDT Quarterly Gas Production (CF) | | | | |
|---|---|---|---|---|
| Production Period | Report Date | Projected | Actual | +Beat/-Miss |
| Jan-May 2011 | 7/22/2011 | 1,624,000 | 1,830,000 | 12.7% |
| June-Aug 2011 | 10/28/2011 | 959,000 | 1,560,000 | 62.7% |
| Sept-Nov 2011 | 2/2/2012 | 910,000 | 1,570,000 | 72.5% |
| Dec 2011-Feb 2012 | 4/30/12 | 921,000 | 1,460,000 | 58.5% |
| March-May 2012 | 7/26/12 | Not provided | 1,320,000 | NA |

| SDT Quarterly Cash Distributions Per Unit | | | | |
|---|---|---|---|---|
| Production Period | Report Date | Targeted | Actual | +Beat/-Miss |
| Jan-May 2011 | 7/22/2011 | $1.01 | $1.07 | 5.9% |
| June-Aug 2011 | 10/28/2011 | $0.67 | $0.82 | 22.4% |
| Sept-Nov 2011 | 2/2/2012 | $0.63 | $0.79 | 25.4% |
| Dec 2011-Feb 2012 | 4/30/12 | $0.65 | $0.79 | 21.5% |
| March-May 2012 | 7/26/12 | $0.70 | $0.73 | 4.3% |

165.    However, as the Trust I Development Wells began to comprise a greater percentage of the actively producing Trust I Wells, their poor oil production began to cause quarterly distributions to fall below estimates, notwithstanding the accelerated drilling

schedule, and by the sixth distribution period, the quarterly cash distribution had already

fallen below the cash distribution target:

| SDT Quarterly Cash Distributions Per Unit | | | | |
|---|---|---|---|---|
| **Production Period** | **Report Date** | **Targeted** | **Actual** | **+Beat/-Miss** |
| June-Aug 2012 | 11/1/2012 | $0.74 | $0.68 | -8.1% |
| Sep-Nov 2012 | 1/31/2013 | $0.73 | $0.65 | -11.0% |
| Dec 2012-Feb 2013 | 4/25/2013 | $0.74 | $0.59 | -20.3% |
| March-May 2013 | 7/25/13 | $0.76 | $0.61 | -19.7% |

**The Production Characteristics of the Trust I Development Wells Drilled After the Trust I Offering But Before the Trust II Offering Consistently Demonstrated a Lack of Geological Consistency Within Alfalfa County**

166.    The Trust I Registration Statement and Prospectus stated that, assuming

geological consistency across the Trust I AMI, "a reasonable level of certainty exists with

respect to the Reserves that can be expected from" Trust I Development Wells drilled in

close proximity to Trust I Producing Wells, and therefore such Trust I Developments Wells

could be classified as "Proved Undeveloped."

167.    Alfalfa, Grant and Woods were the 3 counties in the Trust I AMI in which

all of the Trust I Producing Wells, and over 90% of the Trust I Development Wells drilled

prior to the Trust II Offering, were located. Of those 3 counties, the most active county in

terms of the number of Trust I Wells drilled was Alfalfa, in which was located nearly 50%

of the Trust I Producing Wells, and nearly 50% of the Trust I Development Wells drilled

prior to the Trust II Offering.

168.    Alfalfa county was also the most active county in terms of SandRidge's

overall drilling activity in the Mississippian Formation with over 50% of wells drilled, as

per slide 16 of a March 26, 2012 presentation by SandRidge:



169.   OTC Production Data shows, however, that the ratio of oil-to-gas produced by proximate horizontal Trust I Development and Producing Wells (i.e., located within the same T-R-S) in Alfalfa County diverged significantly – demonstrating that there was no geological uniformity in Alfalfa county.

170.   To illustrate the divergent production profiles of horizontal Trust I Development and Producing Wells in the same T-R-S in Alfalfa county, annexed hereto as **Exhibit C** is a table depicting every "pair" of Trust I Producing and Development Wells drilled in the same T-R-S in Alfalfa county where each Well in the pair had begun

producing both oil and gas as of March 2012 (i.e., the final full month of production prior to the Trust II Offering in April 2012).

171.    Exhibit C shows that, as of March 2012, nearly all new horizontal Trust I Development Wells (with one exception) were producing quantities of oil and gas that diverged sharply from the percentages of oil and gas produced by horizontal Trust I Producing Wells within the same T-R-S. This indicated a lack of geological uniformity in Alfalfa county.

172.    For example, the Trust I Development Well Jeffrey 2-27H located at T-R-S 29N-10W-27 in Alfalfa County, which commenced gas production in August 2011 and oil production in December 2011, produced an average of 591 BBL of oil per month and 2,387 BOE of gas per month during its first 4 months of production prior to the Trust II Offering (i.e., through March 2012) — equal to 19.8% oil. In contrast, the Trust I Producing Well Jeffrey 1-27H also located at T-R-S 29N-10W-27, which commenced gas production in March 2010 and oil production in April 2010, produced an average of 1,720 BBL of oil per month and 628 BOE of gas per month during its first 4 months of production — equal to 73.3% oil:[9]

---

[9] Since the Trust I Development Well Jeffrey 2-27H only started producing oil as of December 2011 — 4 months prior to the Trust II Offering — the comparison uses 4-month production rates to enable an "apples-to-apples" comparison.

| Location:<br>T-R-S 29N-10W-27 | Gas Production Started | Avg. Gas Production (BOE) (first 4 months) | Oil Production Started | Avg. Oil Production (BBL) (first 4 months) | % Oil |
|---|---|---|---|---|---|
| Jeffrey 2-27H (Dev Well) | Aug 2011 | 2,387 | Dec 2011 | 591 | **19.8%** |
| Jeffrey 1-27H (Producing Well) | March 2010 | 628 | April 2010 | 1,720 | **73.3%** |

173.   Additionally, as per the table annexed hereto as **Exhibit D**, there were three "pairs" of two Trust I Development Wells that were drilled within the same T-R-S in Alfalfa county *after* the Trust I Offering where each Well in the pair had begun producing both oil and gas as of March 2012. In all three instances, the oil and gas production mix of the two proximate Trust I Development Wells diverged sharply, thus further corroborating a lack of geological uniformity within Alfalfa county.

174.   In sum, the substantially divergent production profiles of proximate Trust I Producing and Development Wells producing oil and gas in Alfalfa county prior to the Trust II Offering in April 2012 demonstrated an absence of geological uniformity within Alfalfa county — SandRidge's most active county in terms of drilling activity both with respect to Trust I (and the Mississippian Formation in general). In turn, an absence of geological uniformity in Alfalfa County meant that SandRidge could no longer predict with a Reasonable Certainty the production that could be expected from new horizontal wells drilled in Alfalfa county proximate to existing horizontal wells.

175.   Notably, SandRidge subsequently admitted that there was an absence of geological uniformity *across the entire Mississippian Formation*. As John-Paul Hanson, a

managing director and senior partner at Houlihan Lokey (SandRidge's financial advisor and investment banker in its Chapter 11 bankruptcy case), testified at the September 6, 2016 hearing to confirm SandRidge's Chapter 11 Plan ("SandRidge Confirmation Hearing"):

> [I]n the Mississippian [Lime] *there is not a uniformity of geology, it's not a homogeneous geology*. *You can have reserves that even though they are developed right next to each other from a well bore basis, they produce very differently*. They produce in terms of quantity of hydrocarbons, they produce at different pressures, they produce different water and – and that, therefore, has a significantly higher cost component to it. *So from a predictability standpoint the Mississippian [Lime] assets are not a predictable resource*.

176.    Similarly, after being asked at the SandRidge Confirmation Hearing to describe the challenges of the geological formations in which SandRidge presently operates, Julian Bott, SandRidge's current Chief Financial Officer and Executive Vice President, testified:

> SandRidge's biggest exposure is to the Mississippian Lime and I think, you know, that is a -- that is a play that is not as -- well, it's certainly not as ubiquitous as a resource play. So it is a highly fragmented fractured carbonate and so there are -- there are challenges. There are very good wells and there are less good wells. There's always not -- *it's not uniform.*

## THE TRUST II OFFERING

### The Trust II Oil and Gas Wells

177.    On August 4, 2011, SandRidge announced that, in connection with new acquisitions and increased drilling activity in the Mississippian Formation, it was increasing its 2011 capital expenditure budget nearly 40% to $1.8 billion, and establishing a 2012 capital budget of $1.8 billion. To help finance these increased capital expenditures, SandRidge decided in late 2011 to undertake the initial public offering ("Trust II Offering")

of a second royalty trust (i.e., Trust II) for the purpose of monetizing a second, even larger collection of oil and gas properties located within the Trust II AMI consisting of approximately 81,200 gross acres located in 9 counties in Oklahoma and Kansas, including Alfalfa, Grant, and Woods counties (the "Trust II AMI"). As with the Trust I Offering, the Trust II Offering contemplated selling a percentage of SandRidge's revenue interests in the Trust II Underlying Properties to the public via a Delaware statutory trust.

178.    To that end, in December 2011, SandRidge formed Trust II as a Delaware statutory trust, with the same Trustee as Trust I. SandRidge then conveyed royalty interests ("Trust II Royalty Interests") to Trust II consisting of: (i) 80% of SandRidge's revenue from the 67 Trust II Producing Wells in the Trust II AMI, and (ii) 70% of SandRidge's revenue from the 206 Trust II Development Wells. SandRidge committed to drill on the Trust II Underlying Properties (either by itself or using third party operators) by December 31, 2015 (or in the event of delays, no later than December 31, 2016) by drilling approximately 49 Trust II Development Wells per year.

179.    As per Oklahoma land records, and OTC Production Data, annexed hereto as (i) **Exhibit E** is a list of the Trust II Producing Wells, and (ii) **Exhibit F** is a list of the Trust II Development Wells drilled and producing gas and oil as of the end of the Class Period (i.e., November 2012).

180.    Notably, *all* of the Trust II Producing Wells were located in Alfalfa (58.7%), Grant (27%) and Woods (14.3%) counties in Oklahoma — the same 3 counties ("Overlapping Counties") in which were located (i) *all* of the Trust I Producing Wells, and

(ii) over 90% of the Trust I Development Wells producing oil and/or gas prior to the Trust II Offering.

181.    As with Trust I, the size of SandRidge's aggregate revenue interest in any particular Trust II Well depended on whether SandRidge or a third party operator drilled and operated the relevant Well. According to the Trust II Registration Statement and Prospectus, SandRidge (i) had drilled and was operating 79% of the Trust II Producing Wells, and (ii) expected to drill and operate approximately 67% of the Trust II Development Wells. The Trust II Prospectus further stated that, based on its drilling arrangements with third parties, SandRidge owned or would own on average (i) a 53.6% revenue interest in the Trust II Producing Wells, and (ii) a 47.4% revenue interest in the Development Wells to  be drilled. It was from these revenue interests that the Trust II Royalty Interest was conveyed.

**The Trust II Royalty Interests**

182.    The Trust II Royalty Interests were conveyed to Trust II for a 20-year period beginning on January 1, 2012, and ending on December 31, 2031. After then, Trust II will dissolve and liquidate with 50% of the Trust I Royalty Interests reverting automatically to SandRidge, and 50% of the Trust I Royalty Interests sold (with SandRidge having a right of first refusal), and the proceeds distributed to Trust II Unit holders.

183.    To compensate SandRidge for the Trust II Royalty Interests, Trust II committed to (i) issue 11,293,750 Common Units, and 12,431,250 Subordinated Units to SandRidge, and (ii) undertake an IPO under which it would sell 26,000,000 Common Units

to public investors and transfer the net proceeds of the IPO to SandRidge. The following

chart summarizes the arrangements described above:



### The Trust II Reserve Report

184.   Like Trust I, Trust II was also intended to appeal to public investors looking

for investment income, and thus also projected making quarterly cash distributions to Trust

II Unitholders of substantially all of the cash flow generated by the Trust II Royalty

Interests over the lifetime of Trust II (after deducting certain specified costs and expenses).

185.   Netherland Sewell (the same petroleum engineering consultant that prepared

the Trust I Reserve Report) estimated the Reserves of the Trust II Wells allocable to Trust

II in a report dated January 3, 2012 (the "Trust II Reserve Report"), a copy of which was

attached to the Trust I Prospectus as Annex A.

186.   As with Trust I, while Netherland Sewell authored the Trust II Reserve

Report, SandRidge management and employees were intimately involved in the collection,

review and analysis of the data used to prepare the Trust II Reserve Report, and reviewed

and approved the Trust II Reserve Report:

The process to review and estimate the reserves began with a SandRidge staff reservoir engineer collecting and verifying all pertinent data, including but not limited to well test data, production data, historical pricing, cost information, property ownership interests, reservoir data, geosciences data and non-confidential production data of relevant wells and operations in the area. This data was reviewed by various levels of SandRidge management for accuracy, before consultation with Netherland Sewell. These individuals consulted regularly with Netherland Sewell during the reserve estimation process to review properties, assumptions, and any new data available. Internal reserve estimates and methodologies were compared to those prepared by Netherland Sewell to test the reserve estimates and conclusions before the reserve estimates were included in this prospectus. Additionally, SandRidge's senior management reviewed and approved the reserve report contained herein.

187.    Similarly, as with Trust I, the Trust II Reserve Report stated: "The data used in our estimates were obtained from SandRidge and the nonconfidential files of Netherland, Sewell & Associates, Inc. [] and were accepted as accurate."

188.    As with Trust I, the Trust II Registration Statement and Prospectus further stated that SandRidge continued to closely monitored the oil and gas production of its wells, which included the Trust II Producing Wells:

SandRidge's Reservoir Engineering Department continually monitors asset performance and makes reserves estimate adjustments, as necessary, to ensure the most current reservoir information is reflected in reserves estimates. Reserve information includes production histories as well as other geologic, economic, ownership and engineering data . . . Each quarter, the Executive Vice President— Reservoir Engineering presents the status of SandRidge's reserves, including the reserves associated with the Underlying Properties, to the Executive Committee, which subsequently approves all changes.

## Methodology Used to the Reserves Trust II Wells

189.    As described in the Trust II Prospectus — and in (i) the March 2013 Trust II Conference Call and (ii) a subsequent letter, dated October 11, 2013 from the Trustee to the SEC concerning Trust II's 2012 Form 10-K ("October 2013 Trust II SEC Letter") —

the analysis undertaken to estimate of the Reserves of the Trust II Wells involved essentially the same steps as followed in calculating the Trust I Reserves.

190.   First, a Decline Curve Analysis of past oil and gas production from the Trust II Producing Wells was used to estimate their Proved Reserves. Second, it was then established — based on analysis of the geological properties of the Trust II AMI, and production data from (i) 145 existing *horizontal* wells drilled across the Mississippian Formation (including the Trust I and II Producing Wells), and (ii) over 1,200 *vertical* wells drilled across the Mississippian Formation in northern Oklahoma and south-central Kansas since the 1940's (including 73 vertical wells drilled in the Trust II AMI) — that geological continuity and consistency existed in the Mississippian Formation across the Trust II AMI.

191.   Based on that geological continuity and consistency, it was then determined that a Reasonable Certainty existed with respect to the Reserves that can be expected from the 122 Trust II Development Wells to be drilled proximate to Trust II Producing Wells or existing Trust I wells ("Proximate Trust II Development Wells") across the Trust II AMI, and therefore the Reserves of such Proximate Trust II Development Wells could presently be classified as "Proved Reserves."

192.   As the Trust II Prospectus stated:

After estimating the reserves of each proved developed well, ***it was determined that a reasonable level of certainty exists with respect to the reserves that can be expected from close offset undeveloped wells in the field.*** The continuity of the formation across the AMI was established by reviewing electric well logs, geologically mapping the analogous reservoir and reviewing extensive production data from more than 1,200 vertical and 145 horizontal wells. ***The reserves attributable to the Producing Wells, which cover a wide area of the AMI, and the continuity of the formation over the AMI classification further supports proved undeveloped classification within close proximity to the Producing Wells***. Data

70

from both SandRidge and offset operators with which SandRidge has exchanged technical data demonstrate a consistency in this formation and the in situ fluids over an area much larger than the AMI. In addition, direct measurement from other producing wells was also used to confirm consistency in reservoir properties such as porosity, thickness and stratigraphic conformity.

While vertical well control exists across all of the AMI most of the existing producing horizontal wells were drilled without benefit of a direct offset producing lateral section. These wells all encountered proven reserves in the Mississippian formation. ***The proved undeveloped locations within the AMI are generally direct parallel offsets to the horizontal wells drilled and producing to date.*** Of the proved undeveloped drilling locations identified in the reserve report, only approximately 16% are not direct offsets of other historically producing wells. Those approximately 16% proved undeveloped drilling locations are generally characterized as the second parallel offset and are interior to developed wells with commercial representative production.

* * *

During the year ended December 31, 2011, SandRidge drilled 167 wells on its acreage in the Mississippian formation, including wells from which a portion of royalty interests conveyed to the Trust will be derived. ***These wells demonstrated consistent levels of production and provided reasonable certainty that wells to be drilled within the acreage qualified for Proved Undeveloped classification***.

193.   Unlike the Trust I Reserve Report, however, the Trust II Reserve Report did *not* conclude that the Reserves of Trust II Development Wells to be drilled in close proximity to *existing vertical wells* could be classified as "Proved" Reserves. Instead, the Trust II Prospectus advised that the Reserves of Trust II Development Wells *not* drilled proximate to Trust II Producing Wells ("Non-Proximate Trust II Development Wells") — a total of 84, or roughly 40% of the total Trust II Development Wells — were classified as "Probable" instead of "Proved":

With respect to the Underlying Properties, the proved reserves are limited to the productive units and proved units that are reasonably certain of economic production when drilled, within the productive limits of the reservoir. ***The probable reserve locations do not meet the reasonable certainty criteria because they are***

71

*not direct offsets to producing horizontal wells and are perimeter to developed wells, even though extensive geological and engineering data demonstrates a continuity of the formation*. However, the probable reserves, together with proved reserves, are at least as likely as not to be recovered when drilled. *The locations of proved undeveloped reserves and probable reserves were estimated using analogy to the representative proved developed wells. This analogy is based on 145 producing wells which provide the estimated reserves and production profile for the proved and probable undeveloped wells.* There are 67 Producing Wells and 122 Development Well locations attributable to PUD reserves . . . There are 84 Development Well locations attributable to probable reserves or 1.3 Development Well locations attributable to probable reserves for every Producing Well.

194.    In other words, the conclusion in the *Trust I* Reserve Report that the Reserves of Non-Proximate Development Wells could be estimated with Reasonable Certainty was deemed not valid, and therefore — unlike the *Trust I* Reserve Report — the *Trust II* Reserve Report concluded that the Reserves of Non-Proximate Trust II Development Wells could only be classified as "Probable."

195.    This unexplained shift to a more conservative classification of the Reserves of Non-Proximate Development Wells as "Probable" instead of "Proved" in the Trust II Reserve Report by the same engineering firm that had prepared the Trust I Reserve Report — Netherland Sewell — was a "red flag" that should have prompted the Underwriter Defendants to inquire further with SandRidge and Netherland Sewell regarding the basis for changing the classification of the 84 Non-Proximate Development Wells.

196.    Such a change in classification likely resulted from Netherland Sewell's review of ongoing production data from, among other wells, the Trust I Wells in the 3 Overlapping Counties. Had the Underwriter Defendants inquired into the reasons for the change in classification, they would have learned of the Negative Trust I Oil Production

Trends – including that oil production had fallen significantly since the Trust I Offering – and that Alfalfa county was not geologically consistent.

197.    Finally, as with Trust I, Trust II subsequently disclosed in the March 2013 Trust II Conference Call and October 2013 Trust II SEC Letter that the final step in estimating the Reserves of the Trust I Development Wells was "an analysis of 145 horizontal Mississippian wells and the production decline characteristics of over 1,200 vertical wells with more than 30 years of performance history" to develop a new Type Curve for the Trust II AMI. The Type Curve was then used to forecast the Reserves of the Trust II Development Wells.

198.    Using the methodology described above, the Trust II Reserve Report estimated the aggregate Reserves of the Trust II Wells attributable to Trust II over its lifetime as consisting of: (i) Proved Reserves of 12,209 MBBL's of oil and 13,895 MBOE of gas (a ratio of 46.8% oil to 53.2% gas), and (ii) Probable Reserves of 4,579 MBBLs of oil, and 5,179 MBOE of gas (a ratio of 46.9% oil to 53.1% gas) (the "Aggregate Trust II Ratio").

199.    The Trust II Prospectus broke down the Proved Reserves of Trust II between the Trust II Producing Wells and Trust II Development Wells, with approximately 39% of the aggregate Proved Reserves being attributable to the Trust II Producing Wells, and approximately 61% of the aggregate Proved Reserves being attributable to the Proximate Trust II Development Wells:

| Trust II Proved Reserves | | | |
|---|---|---|---|
| | Oil (MBBL) | Gas (MBOE) | Total (MBOE) |
| **Producing Wells** | 4,793 (46.9% oil) | 5,430 (53.1% gas) | 10,223 |
| **Proximate Development Wells** | 7,416 (46.7% oil) | 8,465 (53.3% gas) | 15,881 |
| | 12,209 (46.8% oil) | 13,895 (53.2% gas) | 26,104 |

200.    Based on the table above, the Trust II Registration Statement and Prospectus estimated that the average Proved Reserves per Proximate Trust II Development Well was 130 MBOE (i.e., 15,881 Total MBOE/122 Proximate Trust II Development Wells).

**Estimating Revenue to Trust II from the Trust II Wells**

201.    While the Trust II Aggregate Ratio was projected to be 46.8% oil to 53.2% gas, the projected *revenue* from that production would consist primarily of oil sales since, at the time of the Trust II Offering, a barrel of oil commanded a significantly higher price than an energy-equivalent quantity of gas.

202.    For example, the presentation in the Trust II Prospectus of targeted distributions to Trust II Unitholders during the first full quarter of production after the Trust II Offering (i.e., through June 30, 2012), assumed a price of $103.03/barrel for oil, and $2.25/MCF for gas. Since a barrel of oil is equal to approximately 6 MCF of gas on a BOE basis, and 6 MCF would be valued at $13.50 (i.e., $2.25/MCF x 6), the Trust II Prospectus assumed that a barrel of oil would be 7.6x more valuable than an energy-equivalent quantity of gas (i.e., $103.03/$13.50) during Q1 2011.  Further, over the lifetime of Trust

II, it was assumed in the Trust II Prospectus that oil would be worth, on average, at least 3.68X more than gas.[10]

203.    As a result of the premium price commanded by oil, the Trust II Prospectus projected that approximately 87% of the revenue generated for Trust II by the Trust II Wells during the first 4 quarters of production after the Trust II Offering (i.e., through December 31, 2012) would result from oil production:

---

[10] Based on an assumed average price of $91.21 per barrel of oil and $4.12 per MCF of gas (or $24.72 for 6 MCF gas) over the lifetime of Trust II.

| | March 31, 2012 (a) | June 30, 2012 | September 30, 2012 | December 31, 2012 |
|---|---|---|---|---|
| | | (In thousands, except volumetric and per unit data) | | |
| *Estimated production from trust properties* | | | | |
| Oil sales volumes (MBbl) | 132 | 206 | 246 | 261 |
| Natural gas sales volumes (MMcf) | 885 | 1,324 | 1,430 | 1,490 |
| Total sales volumes (MBoe) | 279 | 427 | 488 | 509 |
| % Proved developed producing (PDP) sales volumes | 100% | 72% | 71% | 59% |
| % Proved undeveloped (Development) sales volumes | 0% | 28% | 26% | 39% |
| % Probable undeveloped (Development) sales volumes | 0% | 0% | 4% | 3% |
| % Oil volumes | 47% | 48% | 51% | 51% |
| % Natural gas volumes | 53% | 52% | 49% | 49% |
| *Commodity price and derivative contract positions* | | | | |
| NYMEX futures price (a) | | | | |
| Oil ($/Bbl) | $98.85 | $103.03 | $103.99 | $104.86 |
| Natural gas ($/MMBtu) | 3.08 | 2.25 | 2.37 | 2.63 |
| Assumed realized weighted unhedged price (a) | | | | |
| Oil ($/Bbl) | $93.82 | $98.00 | $98.96 | $99.83 |
| Natural gas ($/Mcf) | 3.08 | 2.25 | 2.37 | 2.63 |
| Assumed realized weighted hedged price | | | | |
| Oil ($/Bbl) | $93.82 | $100.01 | $101.74 | $101.70 |
| Percent of oil volumes hedged | 0% | 74% | 92% | 87% |
| Oil hedged price ($/Bbl) | — | $107.00 | $107.00 | $107.00 |
| *Estimated cash available for distribution* | | | | |
| Oil sales revenues | $   12,341 | $   20,208 | $   24,673 | $   26,043 |
| Natural gas sales revenues | 2,725 | 2,982 | 3,390 | 3,913 |
| Production taxes | (151) | (232) | (250) | (323) |
| Ad valorem taxes | — | — | (154) | (202) |
| Trust administrative expenses | (1,750)(a) | (325) | (325) | (325) |
| Total trust expenses | (1,901) | (557) | (729) | (850) |
| Cash available for distribution | $   13,165 | $   23,047 | $   28,027 | $   29,595 |
| Trust units outstanding | 49,725 | 49,725 | 49,725 | 49,725 |
| Target distribution per trust unit | $.26 | $.46 | $.56 | $.60 |
| Subordination threshold per trust unit | $.21 | $.37 | $.45 | $.48 |
| Incentive threshold per trust unit | $.32 | $.56 | $.68 | $.71 |

RGY INC. 424B1, April 18, 2012
Powered by Morningstar D
herein may not be copied, adapted or distributed and is not warranted to be accurate, complete or timely. The user assumes all risks for any damages or lo
ept to the extent such damages or losses cannot be limited or excluded by applicable law. Past financial performance is no guarantee of future results.

204.    In sum, given the premium price commanded by oil relative to natural gas, the amount of the quarterly cash distributions to Trust II Unit holders, the overall economic value of the Trust II Royalty Interest depended heavily on the oil production of the Trust II wells.

**Targeted Quarterly Cash Distributions**

205.    Based the forecasted Reserves in the Trust II Report, and assumptions concerning the future price of oil and gas, the Trust II Prospectus projected quarterly cash distributions on a per unit basis:

## Quarterly Target Distributions

| Quarter Ending | Subordination Threshold [a] | Target Cash Distribution | Incentive Threshold [a] | Quarter Ending | Target Cash Distribution |
|---|---|---|---|---|---|
| March 31, 2012 [a] | $ .21 | $ .26 | $.32 | March 31, 2022 | $.38 |
| June 30, 2012 | .37 | .46 | .56 | June 30, 2022 | .37 |
| September 30, 2012 | .45 | .56 | .68 | September 30, 2022 | .37 |
| December 31, 2012 | .48 | .60 | .71 | December 31, 2022 | .37 |
| March 31, 2013 | .52 | .65 | .78 | March 31, 2023 | .36 |
| June 30, 2013 | .55 | .69 | .83 | June 30, 2023 | .36 |
| September 30, 2013 | .54 | .67 | .81 | September 30, 2023 | .35 |
| December 31, 2013 | .56 | .71 | .85 | December 31, 2023 | .35 |
| March 31, 2014 | .58 | .72 | .86 | March 31, 2024 | .34 |
| June 30, 2014 | .60 | .74 | .89 | June 30, 2024 | .34 |
| September 30, 2014 | .60 | .75 | .90 | September 30, 2024 | .33 |
| December 31, 2014 | .58 | .72 | .87 | December 31, 2024 | .33 |
| March 31, 2015 | .63 | .79 | .95 | March 31, 2025 | .33 |
| June 30, 2015 | .64 | .81 | .97 | June 30, 2025 | .32 |
| September 30, 2015 | .64 | .80 | .96 | September 30, 2025 | .32 |
| December 31, 2015 | .64 | .80 | .96 | December 31, 2025 | .32 |
| March 31, 2016 | .67 | .84 | 1.00 | March 31, 2026 | .31 |
| June 30, 2016 | .64 | .80 | .96 | June 30, 2026 | .31 |
| September 30, 2016 | .58 | .73 | .87 | September 30, 2026 | .31 |
| December 31, 2016 | .54 | .68 | .81 | December 31, 2026 | .30 |
| March 31, 2017 | .51 | .64 | .77 | March 31, 2027 | .30 |
| June 30, 2017 | .48 | .60 | .73 | June 30, 2027 | .30 |
| September 30, 2017 | .46 | .58 | .69 | September 30, 2027 | .29 |
| December 31, 2017 | .44 | .55 | .66 | December 31, 2027 | .29 |
| March 31, 2018 | | .53 | | March 31, 2028 | .29 |
| June 30, 2018 | | .51 | | June 30, 2028 | .28 |
| September 30, 2018 | | .50 | | September 30, 2028 | .28 |
| December 31, 2018 | | .48 | | December 31, 2028 | .28 |
| March 31, 2019 | | .47 | | March 31, 2029 | .27 |
| June 30, 2019 | | .46 | | June 30, 2029 | .27 |
| September 30, 2019 | | .45 | | September 30, 2029 | .27 |
| December 31, 2019 | | .44 | | December 31, 2029 | .27 |
| March 31, 2020 | | .43 | | March 31, 2030 | .26 |
| June 30, 2020 | | .42 | | June 30, 2030 | .26 |
| September 30, 2020 | | .41 | | September 30, 2030 | .26 |
| December 31, 2020 | | .41 | | December 31, 2030 | .26 |
| March 31, 2021 | | .40 | | March 31, 2031 | .25 |
| June 30, 2021 | | .39 | | June 30, 2031 | .25 |
| September 30, 2021 | | .39 | | September 30, 2031 | .25 |
| December 31, 2021 | | .38 | | December 31, 2031 | .25 |
| | | | | Remaining | 3.93 |

206.   The table above, Annex B to the Trust II Prospectus, "reflects that while target distributions initially increase as SandRidge completes its drilling obligation and production increases, over time target distributions decline as the rate of production decreases over the life of each well as a result of the depletion of the reserves in the Underlying Properties." The Trust II Prospectus further explained that the Trust II Royalty Interests were depleting assets since oil and gas production from Trust II wells would decline over time once SandRidge fulfilled the its drilling commitment in December 2015 (as depicted in the following chart from the Trust I Prospectus):



## The Trust II Offering

207.   On January 5, 2012, as co-registrants in connection with the Trust II Offering, Trust II and SandRidge filed the Trust II Registration Statement, which include a preliminary draft of the Trust II Prospectus. Trust II and SandRidge subsequently filed

several amendments to the Trust II Registration Statement on Form S-1/A and Form S-3/A.

208.    The Trust II Registration Statement and all amendments were signed by Defendants Ward, Bennett, Cooley, Brewer, Dobson, Gilliland, Jordan, Oliver, and Serota.

209.    The Trust II Registration Statement was declared effective on April 17, 2012, and on April 23, 2012, Trust II completed the sale of 29.9 million Units (including 3.9 million Units from the Underwriters' exercise of their overallotment option) at $21/Unit, thereby generating net proceeds of $590.2 million (after Underwriters' commissions).

210.    Following the completion of the Trust II Offering, SandRidge was left holding 7,393,750 million Common Units and 12,431,250 million Subordinated Units (representing an approximately 39.9% beneficial interest in Trust II).

**The Trust II Registration Statement Negligently Omitted Data from the Trust II Registration Statement and Prospectus Demonstrating That Geological Consistency Did Not Exist Across the Trust II AMI**

211.    The Trust II Registration Statement and Prospectus stated that production, geological and other data had established that geological uniformity existed across the Trust II AMI, and therefore (i) a Reasonable Certainty existed concerning the production that could be expected from the 122 Proximate Trust II Development Wells (i.e., Trust II Development Wells to be drilled proximate to existing Trust II Producing Wells in the same T-R-S), and (ii) the Reserves of those Proximate Trust II Development Wells could presently be classified as "Proved":

> After estimating the reserves of each proved developed well, *it was determined that a reasonable level of certainty exists with respect to the reserves that can be expected from close offset undeveloped wells in the field. The continuity of the*

*formation across the AMI* was established by reviewing electric well logs, geologically mapping the analogous reservoir and reviewing extensive production data from more than 1,200 vertical and 145 horizontal wells. *The reserves attributable to the Producing Wells, which cover a wide area of the AMI, and the continuity of the formation over the AMI classification further supports proved undeveloped classification within close proximity to the Producing Wells*. Data from both SandRidge and offset operators with which SandRidge has exchanged technical data demonstrate a consistency in this formation and the in situ fluids over an area much larger than the AMI. In addition, direct measurement from other producing wells was also used to confirm consistency in reservoir properties such as porosity, thickness and stratigraphic conformity.

212.    However, as more fully alleged in paragraphs 170-74 above, the divergent production profiles of proximate Trust I Wells located within the same T-R-S in Alfalfa county ("Alfalfa County Pair Data") had already demonstrated — prior to the Trust II Offering — an absence of geological uniformity within Alfalfa county, which was the county in which nearly 60% of the Trust II Producing Wells were located, and hence in which a majority of the Proximate Trust II Development Wells would be drilled (in fact, a majority of the Proximate Trust II Development Wells ultimately drilled during the Class Period after the Trust II Offering were drilled in Alfalfa county).

213.    The Alfalfa County Pair Data thus constituted evidence in the possession of SandRidge and Trust II at the time the Trust II Registration Statement and Prospectus was filed that contradicted the statements in the Trust II Registration Statement and Prospectus set forth above that (i) geological uniformity presently existed *across the Trust II AMI* (which included Alfalfa county), and therefore (ii) the Reserves of *all* 122 of the Proximate Trust II Development Wells could properly be classified as "Proved." Therefore, the failure to disclose the Alfalfa County Pair Data in the Trust II Registration Statement and Prospectus constituted the omission of a material fact necessary to make statements in the

Trust I Registration Statement and Prospectus (i.e., concerning geological uniformity across the Trust II AMI, and classification of the Reserves of *all* 122 of the Proximate Trust II Development Wells as "Proved") not misleading.

**The Trust II Registration Statement Negligently Omitted the Negative Trust I Oil Production Trends From the Trust II Registration Statement and Prospectus**

214.    The Trust II Prospectus touted the "success" of the Trust I Offering by highlighting how recent quarterly cash distributions to Trust I Unitholders had exceeded the target distributions for those quarters:

**SandRidge's Experience With Other Royalty Trusts**

SandRidge is the sponsor of two other royalty trusts, SandRidge Mississippian Trust I and SandRidge Permian Trust. These trusts have many of the same terms as SandRidge Mississippian Trust II. Summary information about each of these two trusts follows.

* * *

SandRidge Mississippian Trust I makes quarterly cash distributions of substantially all of its cash receipts, after deducting the trust's administrative expenses, on or about 60 days following the completion of each quarter through (and including) the quarter ending December 31, 2030. On July 22, 2011, SandRidge Mississippian Trust I declared a cash distribution of approximately $1.068 per unit covering production for the period from January 1, 2011 to May 31, 2011 for record holders as of August 15, 2011. The distribution was paid on August 30, 2011. ***This distribution exceeded the target distribution for such period of $1.014 per unit.*** On October 28, 2011, SandRidge Mississippian Trust I announced a cash distribution of approximately $.816 per unit covering production for the period from June 1, 2011 through August 31, 2011. SandRidge Mississippian Trust I made this distribution on November 30, 2011 to unitholders of record as of November 15, 2011. ***This distribution exceeded the target distribution for such period of $.667 per unit.*** On February 2, 2012, SandRidge Mississippian Trust I announced a cash distribution of approximately $.791 per unit covering production for the period from September 1, 2011 through November 30, 2011. This distribution was paid on February 29, 2012 to unitholders of record on February 14, 2012. ***This distribution exceeds the target distribution for such period of $.633 per unit.***

215.    The statements in the Trust II Registration Statement and Prospectus concerning the Trust I Offering thus created the misleading impression that the Trust I wells were exceeding expectations. However, as per the Negative Trust I Oil Production Trends alleged in paragraphs 155-60 above, the Trust I Wells — which were located primarily in the 3 Overlapping Counties — were *not* meeting expectations, and — absent drilling of the Trust I Development Wells (primarily in the 3 Overlapping Counties) on an accelerated basis — this would have caused Trust I to miss the Targeted Quarterly Distribution Estimates.

216.    All of the Trust II Producing Wells were located in the 3 Overlapping Counties, and thus all of the 122 Proximate Trust II Development Wells would also necessarily be drilled in the 3 Overlapping Counties. Therefore, the negligent failure to disclose the Negative Trust I Oil Production Trends was a material omission that concealed from investors the poor oil production in the 3 Overlapping Counties in which most of the Trust II Wells would be drilled.

**Item 303 of Regulation S-K Required the Alfalfa County Pair Data and Negative Trust I Oil Production Trends to be Disclosed in the Trust II Registration Statement**

217.    Pursuant to Item 11 of Form S-1, the Trust II Registration Statements filed in connection with the Trust II Offering was required to furnish the information required under Item 303 of Regulation S-K [17 C.F.R. §229.303], including any known trends, events or uncertainties that have caused or are reasonably likely to cause the registrant's financial information not to be indicative of future operating results.

218.    The following were trends known at the time of the Trust II Offering that were reasonably likely to cause the financial information in the Trust II Offering Documents not to be indicative of the future operational results of Trust II for the reasons explained in paragraphs 211-216 above, and therefore were required by Item 303 to be disclosed by Defendants in the Trust II Registration Statement and Prospectus, but were not: (i) the Alfalfa County Pair Data which demonstrated the lack of geological uniformity in Alfalfa county, and (ii) the Negative Trust I Oil Production Trends demonstrating the poor oil production in the 3 Overlapping Counties.

219.    The Alfalfa County Pair Data were reasonably likely to cause the financial information in the Trust II Offering Documents not to be indicative of the future operational results of Trust II since (i) the Alfalfa County Pair Data demonstrated that Alfalfa county was not geologically uniform, (ii) nearly 60% of the Trust II Producing Wells were located in Alfalfa county, and therefore a majority of the Proximate Trust II Development Wells would be drilled in Alfalfa county, and (iii) the Reserves of all 122 of the Proximate Trust II Development Wells were classified as "Proved" based on the conclusion that geological uniformity existed *across the Trust II AMI* (which included drilling locations in Alfalfa county). If Alfalfa county was not geologically uniform, then the oil production of the Proximate Trust II Development Wells in Alfalfa county would not be predictable, and might fall short of forecasts, which would negatively impact the quarterly distributions payable to Trust II.

220.    The Negative Trust I Oil Production Trends with respect to Trust I Wells drilled primarily in the 3 Overlapping Counties was reasonably likely to cause the financial

information in the Trust II Offering Documents not to be indicative of the future operational results of Trust II since the 122 Proximate Trust II Development Wells (constituting nearly 60% of the Trust II Development Wells) would be drilled in the 3 Overlapping Counties. Given that oil production was projected to supply approximately 87% of the revenue from which quarterly cash distributions would be paid to Trust II Unitholders, diminished oil production from the Proximate Trust II Development Wells in the 3 Overlapping Counties due to poor oil production could cause quarterly distributions to fall substantially below estimates in the Trust II Registration Statement and Prospectus.

**Item 503 of Regulation S-K Required the Alfalfa County Pair Data and the Negative Trust I Oil Production Trends to be Disclosed in the Trust II Offering Documents**

221.    Pursuant to Item 3 of Form S-1, the Trust II Registration Statement filed in connection with the Trust II Offering, was required to furnish the information pursuant to Item 503 of Regulation S-K [17 C.F.R. §229.303], including, among other things, a "discussion of the most significant factors that make the offering risky or speculative."

222.    The following significant factors likely to make the Trust II Offering risky or speculative were known at the time of the Trust II Offering, and therefore were required by Item 503 to be disclosed by Defendants in the Trust II Registration Statement and Prospectus, but were not: (i) the Alfalfa County Pair Data demonstrating the lack of geological uniformity in Alfalfa county, and (ii) the Negative Trust I Oil Production Trends demonstrating the poor oil production in the 3 Overlapping Counties.

223.    The Alfalfa County Pair Data were a significant factor that make the Trust II Offering risky or speculative since (i) the Alfalfa County Pair Data consistently

demonstrated an absence of geological uniformity in Alfalfa county, (ii) nearly 60% of the Trust II Producing Wells were located in Alfalfa county, and therefore a majority of the proximate Trust II Development Wells would be drilled in Alfalfa county, and (iii) the Reserves of all 122 of the Proximate Trust II Development Wells were classified as "Proved" based on the conclusion that geological uniformity existed *across the Trust II AMI* (which included drilling locations in Alfalfa county). If geological uniformity did not exist in Alfalfa county, there was a significant risk that the oil production of the proximate Trust II Development Wells in Alfalfa county was unpredictable and might fall short of forecasts, and thus negatively impact the quarterly distributions payable to Trust II.

224.   The Negative Trust I Oil Production Trends prior to the Trust II Offering with respect to Trust I Wells drilled primarily in the 3 Overlapping Counties was a significant factor that made the Trust II Offering risky or speculative since the 122 Proximate Trust II Development Wells (constituting nearly 60% of the Trust II Development Wells) would be drilled in the 3 Overlapping Counties, Given that oil production was projected to supply approximately 87% of the revenue from which quarterly cash distributions would be paid to Trust II Unitholders, the Negative Trust I Oil Production Trends in the 3 Overlapping Counties materially increased the risk that the oil production of the Proximate Trust II Development Wells in the 3 Overlapping Counties would fall short of forecasts, and negatively impact the quarterly distributions payable to Trust II.

## EVENTS AFTER THE TRUST II OFFERING

225.    After the Trust II Offering, SandRidge accelerated the drilling schedule of the Trust II Development Wells so that instead of drilling approximately 49 Trust II Development Wells in 2012 (as projected in the Trust II Prospectus), SandRidge drilled 107 Trust II Development Wells during 2012, including 83 after the Trust II Offering in April 2012:

| Relevant Timeframe from Trust II SEC Filings | Drilled | Remaining | Projected remaining in the Registration Statement |
| --- | --- | --- | --- |
| Jan-April 23, 2012 | 24 | 182 | 182 |
| April 23, 2012- June 2012 | 27 | 155 | 169 |
| July-Sept 2012 | 26 | 129 | 157 |
| Oct-Dec 2012 | 30 | 99 | 145 |

226.    Drilling the Trust II Development Wells at an accelerated pace initially boosted oil production during Trust II's first two reporting periods running from (i) March through May 2012 (reported on 7/26/12), and (ii) June through August 2012 (reported on 11/1/12), and resulted in quarterly cash distributions exceeding the targeted quarterly distribution estimates in the Trust II Registration Statement and Prospectus during Trust II's first two reporting periods. However, Trust II's distributions subsequently began to fall below the quarterly distribution estimates as oil production faltered due to the Negative Trust I Oil Production Trends:

| SDR Quarterly Oil Production (BBL) | | | | |
|---|---|---|---|---|
| Production Period | Report Date | Projected | Actual | +Beat/-Miss |
| March-May 2012 | 7/26/2012 | 206,000 | 231,000 | 12.1% |
| June-Aug 2012 | 11/1/2012 | 249,000 | 271,000 | 8.8% |
| Sept-Nov 2012 | 1/31/2013 | 261,000 | 227,000 | -13.0% |

| SDR Quarterly Cash Distributions Per Unit | | | | |
|---|---|---|---|---|
| Production Period | Report Date | Targeted | Actual | +Beat/-Miss |
| March-May 2012 | 7/26/2012 | $0.46 | $0.50 | 8.7% |
| June-Aug 2012 | 11/1/2012 | $0.56 | $0.60 | 7.1% |
| Sept-Nov 2012 | 1/31/2013 | $0.60 | $0.53 | -11.7% |
| Dec 2012-Feb 2013 | 4/25/13 | $0.65 | $0.56 | -13.8% |

## POST-CLASS PERIOD DISCLOSURES

### SandRidge Discloses a Drop in the Percentage of Oil in the Mississippian Formation

227.    After the close of trading on November 8, 2012, SandRidge issued a press release disclosing its financial results for the third quarter of 2012 (the "November 2012 Press Release"). The November 2012 Press Release reported a "net loss applicable to common stockholders of $184 million, or $0.39 per diluted share, for third quarter 2012 compared to net income available to common stockholders of $561 million, or $1.16 per diluted share, in third quarter 2011."

228.    On November 9, 2012, before markets opened, SandRidge held a conference call for analysts and investors to discuss the financial results and other information in the 11/8/12 Press Release (the "November 2012 SandRidge Earnings Call"). On the call, Defendant Ward disclosed that the SandRidge's wells in the Mississippian Formation consisted of far more gas and far less oil deposits than the market had previously been led to believe:

As we continue to grow the Mississippian well count across a larger area, we also are seeing an increase in our natural gas production. ***And this increase has been offset by a lower amount of oil than we anticipated at the beginning of last year.***

229.   Subsequently on the call, Defendant Grubb similarly disclosed, "[a]s for the Mississippian, while the gas performance has been on target, we are seeing a steeper oil decline than we previously anticipated and have made revision to our model accordingly for 2013."

230.   During the November 2012 SandRidge Conference Call, the following exchange occurred in which an analyst expressed concern over the drop in oil production in the Mississippian Formation, and Defendant Ward conceded that wells in the Mississippian Formation assets were producing less oil:

**Analyst**

…***You know, Tom, I recognize that you guys have a lot more -- well, you guys have all the data, or almost -- you know, you guys have half of the whole industry data on the Mississippian***. So you have a lot more you can look at and, I guess, draw comfort from, than we will have here.

But I think from our perspective, and a lot of people, you're looking at this from the outside and you see 25% of the per well EUR oil go -- you know, kind of disappear in the Mississippian. It kind of makes you sit up in your chair. And you, you know, you kind of wonder -- is this the right time to be, you know, increasing concentration in the Mississippian play, when the play kind of just shifted on you? And so, can you kind of tell your, you know, your thought process there? Or maybe kind of give some detail on why you have -- you know, what your comfort level is?

**Defendant Ward**

Sure. ***We're looking at a well now that has about 40% projected oil in it instead of 45%.*** But the key is the rate of return, whether we're producing oil, water, or anything else, is that we focus on a rate of return. And even at depressed gas prices, we can see 50% rates of return. And I don't know any

other plays where you can consistently drill -- 1,100 wells that have been
drilled, there are 500 wells -- and have these types of rates of return over such
a large area. And so in my opinion, it's a very low-risk area that has very
high-rates of return. Whether it's producing oil or natural gas.

231.    Given that the Trust I and II Wells were all located in the Mississippian

Formation, and primarily in SandRidge's most active counties (Alfalfa, Grant and Woods),

Defendants' disclosures of steeper declines in oil production in the Mississippian

Formation than anticipated were a materialization of the risk of poor oil production

previously concealed by Defendants' materials omissions in (i) the Trust I Registration

Statement and Prospectus concerning the Chesapeake-operated Producing Wells in Woods

county, and (ii) the Trust II Registration Statement and Prospectus concerning the Alfalfa

County Pair Data and the Negative Trust I Oil Production Trends.

232.    On heavy trading volume, the price of Trust I Units declined from a close of

$18.95 per Unit on November 8, 2012 to a close of $17.54 per Unit on November 9, 2012

(a 7.4% decline and a 16.5% decline from the Trust I Offering price of $21/Unit).

Thereafter, between November 12 and 15, 2012, the price of Trust I Units dropped further

on each trading day to close at $14.81 on November 15, 2012 — an additional decline of

15.6%. In sum, between the close on November 8, 2012, and the close on November 15,

2012, the price of Trust I Units declined a total of 21.8%.

233.    On heavy trading volume, the price of Trust II Units declined from $19.36

per unit on November 8, 2012 to close at $17.70 per unit on November 9, 2012 (an 8.5%

decline, and a 15.7% decline from the Trust II Offering price of $21/Unit). Thereafter,

between November 12 and 15, 2012, the price of Trust II Units dropped further on each

trading day to close at $15.36 on November 15, 2012 — an additional drop of 13.2%. In sum, between the market close on November 8, 2012, and the market close on November 15, 2012, the price of Trust II Units dropped a total of 20.7%.

**The January 31, 2013 Trust I and Trust II Press Releases**

234.    On January 31, 2013, after the market closed, Trust I and Trust II issued press releases (the "January 31 Press Releases") announcing the quarterly distribution to Trust I and Trust II Unit holders for the production period running from September through November 2012. The distributions missed the targeted quarterly distribution estimates in the Trust I and Trust II Registration Statements and Prospectuses by 11% and 11.7%, respectively. The press releases also each announced that the cause was lower oil production.

235.    For the same reasons as the November 2012 Press Release and Earnings Call, the January 2013 Press Releases were materializations of the risks of poor oil production previously concealed by Defendants' material omissions in the Trusts' Registration Statements and Prospectuses.

236.    On February 1, 2013, the price of Trust I Units dropped 2.9% from its previous close of $19.50 to close at $18.94, while the price of Trust II Units dropped 14.4% from its previous close of $18.91 to a close of $16.18.

**February 4, 2013 Wunderlich Downgrade of Trust II**

237.    On February 4, 2013, Wunderlich – which had underwritten both Trusts' Offerings – issued a report reducing its per-Unit price target for Trust II from $22 to $18 "due to a lower distribution outlook based on higher expenses, lower production, and an

adjusted production mix that includes more natural gas." That day, the price of Trust II Units dropped another 3.7% from a close of $16.18 to close at $15.58.

238.   Wunderlich's downgrade was thus a further materialization of the risks of poor oil production previously concealed by Defendants' material omissions in the Trusts' Registration Statements and Prospectuses

**February 6, 2013 RBC Downgrade of Trusts I and II**

239.   On February 6, 2013, before markets opened, RBC Capital Markets, LLC ("RBC") downgraded Trust I to "Underperform," citing "the wide variability of results" and "lack of predictability inherent in the development" of the regions in Oklahoma and Kansas where the Trust I Wells were located. The news was notable because RBC had underwritten the Trust I Offering. That day, the price of Trust I Units fell by $1.86, or 8.21%.

240.   Also on February 6, 2013, before the markets opened, RBC downgraded Trust II from "Outperform" to "Sector Perform" citing "significant deterioration in well performance." RBC had also underwritten the Trust II Offering. That day, the price of Trust II Units dropped by $0.48, or 3.1%.

241.   RBC's downgrades were thus a further materialization of the risks of poor oil production previously concealed by Defendants' material omissions in the Trusts' Registration Statements and Prospectuses.

**The March 5, 2013 Wunderlich Downgrade of Trust I and Trust II Citing Negative Trust I Oil Production Trends**

242.    On March 5, 2013, before markets opened, Wunderlich – which had underwritten both of the Trusts' Offerings (a) downgraded Trust I from "Hold" to "Sell" and (b) reduced its price target on SDR from $18/Unit to $13/Unit. Wunderlich's grounds for both actions were: "1) an adjusted production mix that includes more natural gas; 2) higher expenses; 3) a higher decline rate; 4) a lower distribution outlook; and 5) the potential for the sponsor to sell units after the drilling program ends." Wunderlich also cautioned investors to "consider the risk profile of the trust given that the last few quarters have been disappointing and the potential for SandRidge to continue to miss its targeted distribution goal."

243.    Wunderlich's downgrades were thus a further materialization of the risks poor oil production previously concealed by Defendants' material omissions in the Trusts' Registration Statements and Prospectuses.

244.    On March 5, 2013, the price of Trust I Units dropped 11.49%, from a close of $14.54 to close at $12.87 on March 5, 2013. That same day, the price of Trust II Units dropped 3.54%, from a close of $12.70 to close at $12.25 on March 5, 2013.

**Trust I and Trust II "Restate" Their Reserves**

245.    On March 15, 2013, Trust I filed its 2012 Form 10-K ("2012 Trust I 10-K") with the SEC. In response to the declining oil production of the Trust I Wells, the 2012 Trust I 10-K disclosed a sharp downward revision of 4,361.1 MBBL of the prior December 31, 2011 estimate of Trust I's Proved Reserves of oil — a remarkable 52.4% drop between

December 31, 2011 and December 31, 2012. The 4,361.1 MBBL downward revision in the estimate of Proved Reserves of *oil* was offset by an upward revision of 895.9 MBOE of the prior December 31, 2011 estimate of Trust II's Proved Reserves of *gas*, resulting in net downward revision of 3,465.2 MBOE of the prior December 31, 2011 estimate of Proved Reserves of oil and gas combined.

246.    In explaining this downward revision of the prior estimate of Proved Reserves, however, the 2012 Trust I 10-K did not explain that the downward revision was primarily due to dismal well performance in terms of oil production:

> The Trust recognized net reductions to reserves associated with proved properties in the AMI of approximately 3,465.2 MBoe as a result of negative revisions due to pricing and well performance during 2012 as additional information was obtained through the continued horizontal development of and production from the Mississippian formation during the period.

247.    Similarly, on March 15, 2013, Trust II filed its 2012 10-K ("2012 Trust II 10-K") with the SEC. In response to the declining oil production of the Trust II Wells, the 2012 Trust II 10-K disclosed a sharp downward revision of 6,430 MBBL of the prior December 31, 2011 estimate of Trust II's Proved Reserves of oil — a remarkable 53.2% drop between December 31, 2011 and December 31, 2012. The 6,430 MBBL downward revision in the estimate of Proved Reserves of *oil* was offset by an upward revision of 811.5 MBOE of the prior December 31, 2011 estimate of Trust II's Proved Reserves of *gas*, resulting in net downward revision of 5,618.5 MBOE of the prior December 31, 2011 estimate of Proved Reserves of oil and gas combined.

248.    In explaining this downward revision of the prior estimate of Proved Reserves, however, the 2012 Trust I 10-K did not explain that the downward revision was primarily due to dismal well performance in terms of oil production:

> During the period from April 23, 2012, the date of the Royalty Interests conveyance, to December 31, 2012, the Trust recognized net reductions to reserves associated with proved properties in the AMI of approximately 5,618.5 MBoe as a result of negative revisions due to pricing and well performance as additional information was obtained through the continued horizontal development of and production from the Mississippian formation during the period.

249.    Because the above explanations of the substantial downward revisions to oil Reserves in the Trusts' 2012 10-K's did not disaggregate the impact of pricing and well performance on the revision of the prior Reserves estimate, on July 30, 2013, the SEC wrote to the Trustee requesting further detail:

> Please refer to the requirements set forth in FASB ASC 932-235-50-5. Revise the narrative disclosure [in the 2012 10-K] relating to the 2012 revisions of previous estimates to provide the net quantities associated with a change in economic factors separately from the changes resulting from new information obtained from development drilling and well performance.

250.    The Trusts responded that they disagreed with the SEC's opinion that FASB ASC paragraph 932-235-50-5 mandated further disclosure. But the SEC persisted, demanding that "[i]n light of the requirement for your estimates of proved reserves to be reasonably certain, we . . . ask that you please explain to us the proportion of the total change in your 2012 oil and natural gas reserves attributable to well performance and additional information obtained through the continued horizontal development of the Mississippian formation and the nature of the well performance and drilling related issues.

251.    On October 11, 2013, the Trustee provided the following disclosure with respect to Trust I, which highlighted, *inter alia*, the lack of geographic uniformity across the Trust I AMI:

> When royalty interests were initially conveyed to the Trust (effective January 1, 2011), the type curve for the Trust's area of mutual interest (the "AMI"), as well as the entire play being developed by SandRidge Energy, Inc., ***was based on an analysis of 37 horizontal Mississippian wells*** and the production decline characteristics of over 1,200 vertical wells with more than 30 years of performance history. At the end of 2011, an additional 45 wells had been drilled within the AMI and 63 new horizontal wells had been drilled by SandRidge or for its account in the play but outside the AMI. Analysis of the initial production from these wells was generally consistent with the initial type curve, which was modified only slightly at that time. During 2012, however, a significant increase in drilling activity occurred across the play and within the AMI. Although performance of the initial 37 wells has continued to closely track the initial type curve, by the end of 2012, ***performance of wells drilled in late 2011 and 2012 had indicated a higher degree of variability for both oil and gas due to geographic and stratigraphic reservoir heterogeneities and the use of various artificial lift strategies***. ***In light of the additional data made available to the Trust during 2012, the Trust determined, consistent with the analysis of its third party engineers, that it was appropriate to make performance revisions for wells drilled in 2011 and to update its type curve for locations that were undeveloped as of December 31, 2011***.

252.    Also on October 11, 2013, the Trustee provided a similar disclosure with respect to Trust II:

> When royalty interests were initially conveyed to the Trust (effective January 1, 2012), the type curve for the Trust's area of mutual interest (the "AMI"), as well as the entire play being developed by SandRidge Energy, Inc., was based on an analysis of 145 horizontal Mississippian wells and the production decline characteristics of over 1,200 vertical wells with more than 30 years of performance history. During 2012 a significant increase in drilling activity occurred across the play and within the AMI. By the end of 2012, ***performance of the initial 145 wells and wells drilled in 2012 had indicated a higher degree of variability for both oil and gas due to geographic and stratigraphic reservoir heterogeneities and the use of various artificial lift strategies. In light of the additional data made available to the Trust during 2012, the Trust determined, consistent with the analysis of its third party engineers, that it was appropriate to make performance revisions for***

*wells drilled in 2011 and to update its type curve for locations that were undeveloped as of December 31, 2011*.

## SEC Investigation of SandRidge for Securities Law Violations

253.   On June 16, 2016, the SEC filed a Proof of Claim against SandRidge in the SandRidge Chapter 11 Bankruptcy Proceeding in the amount of $1.2 million, based upon "[v]iolations of the federal securities laws."

254.   According to SandRidge's Form 10-Q, dated August 15, 2016, the SEC's $1.2 million claim against SandRidge was the result of an investigation of SandRidge by the SEC, which was triggered by a whistleblower who claims to have been terminated by SandRidge in retaliation for objecting to SandRidge's management about the "levels of oil and gas reserves disclosed by the Company in its public filings."

## Compliance With Statute of Limitations for Securities Act Claims

255.   On April 7, 2011, 15 million Common Units of Trust I were offered for sale to the public under the ticker symbol "SDT" at $21 per Common Unit pursuant to the Trust I Offering.

256.   On April 18, 2012, 26 million Common Units of Trust II were offered for sale to the public under the ticker symbol "SDR" at $21 per Common Unit pursuant to the Trust II Offering.

257.   On July 23, 2013 — approximately 27 ½ months after the Trust I Offering, and 15 ½ months after the Trust II Offering — the *Consolidated Second Amended Complaint for Violations of the Securities Laws* ("July 2013 SandRidge Energy Complaint") was filed in *In re SandRidge Energy, Inc. Securities Litigation*, No. 12-CV-

01341-LRW ("SandRidge Energy Action") pending in the United States District Court for the Western District of Oklahoma ("SandRidge Energy Court").

258.    The SandRidge Energy Action asserted claims against all of the Defendants named herein under Sections 11, 12(a)(2) and Section 15 of the Securities Act on behalf of all persons who bought Trust Units pursuant or traceable to the Trust Offerings, and (ii) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5) on behalf of all persons who bought Trust Units during a class period between February 24, 2011 and November 8, 2012, inclusive.

259.    In the SandRidge Energy Action, named Plaintiff Judith Greenberg alleged that she had bought Trust I Units pursuant or traceable to the Trust I Registration Statement, and named Plaintiffs Charles Blackburn and Ted Odell alleged that they bought Trust II Units pursuant or traceable to the Trust II Registration Statement.

260.    Under *Joseph v. Wiles,* 223 F.3d 1155 (10th Cir. 2000), the filing of the July 2013 SandRidge Energy Complaint tolled the running of the 3-year period under Section 13 of the Securities Act for the commencement of an action asserting the Securities Act Claims.

261.    On May 11, 2015, the SandRidge Energy Court dismissed the Securities Act claims asserted on behalf of Trust Unitholders in the July 2013 SandRidge Energy Complaint without prejudice for failure to comply with the publication notice requirements of the Public Securities Litigation Reform Act.

262. On June 9, 2015 — less than 30 days later — Lead Plaintiff Duane & Virginia Lanier Trust filed a complaint with this Court on behalf of all purchasers of Common Units of (i) Trust I, pursuant or traceable to the Trust I Offering, and/or (ii) Trust II, pursuant or traceable to the Trust II Offering, thereby asserting against the Defendants, *inter alia*, the same Securities Act Act claims asserted against them in the SandRidge Energy Complaint.

263. Accordingly, after subtracting the period of time during which the statute of limitations was tolled, the claims in this action were filed within one year after the discovery of the alleged material untrue statements and omissions in the Trusts' Registration Statements, and within three years after Trust Units were sold to the Securities Act Classes in connection with the SandRidge Trust Offerings.

## SECURITIES ACT CLAIM COUNT I

### Violations of Section 11 of the Securities Act Against All Defendants (Except Defendant Grubb)

264. Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

265. This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against SandRidge, the Trust Defendants, the Individual Defendants (except Defendant Grubb) and the Underwriter Defendants. This Count is based on negligence, and Lead Plaintiffs do not claim for purposes of this Count that these Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

266.    The Registration Statements for each of the Trust Offerings were inaccurate and misleading, omitted material facts necessary to make statements made therein not misleading, and omitted to state material facts required to be stated therein.

267.    SandRidge and the Trust Defendants were co-registrants for the SandRidge Trust Offerings. As issuers of the trust units, SandRidge and the Trust Defendants are strictly liable for the materially misleading statements contained in the Trust Registration Statements; omission of material facts necessary to make the statements made in the Trust Registration Statements not misleading, or required to be stated in the Trust Registration Statements; and the failure of the Trust Registration Statements to be complete and accurate.

268.    The Individual Defendants each had a duty to make a reasonable and diligent investigation of the completeness, truthfulness and accuracy of the statements contained in the Trust Registration Statements that they signed. That duty obligated them to ensure that such statements were true and accurate; that there were no omissions of material fact that would make statements in the Trust Registration Statements misleading; and that the Trust Registration Statements contained all material facts required to be stated therein. In the exercise of reasonable care, the Individual Defendants should have known of the material omissions contained in the Trust Registration Statements, and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading, and that were required to be stated therein. As such, the Individual Defendants are liable to the Plaintiffs and the Class under Section 11 of the Securities Act.

269.   The Underwriter Defendants were each underwriters, as that term is used in Section 11 (a)(5) of the Securities Act, with respect to the SandRidge Trust Offerings pursuant to which the Trusts' Common Units were sold through the Trust Registration Statements.

270.   Concerning those portions of the Trust Registration Statements for the SandRidge Trust Offerings (i) not purporting to be made on the authority of an expert, the Underwriter Defendants did not conduct a reasonable investigation concerning whether, or possess a reasonable ground to believe that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading, and (ii) purporting to be made on the authority of an expert other than themselves, the Underwriter Defendants did not possess a reasonable ground to believe that there was no omission to state a material fact required to be stated therein or necessary to make the statements therein not misleading. For the aforementioned reasons, the Underwriters were negligent in failing to ensure that the Trust Registration Statements for the SandRidge Trust Offerings were prepared properly and accurately, and such negligence caused the harm complained of herein.

271.   By reasons of the conduct herein alleged, SandRidge, the Trust Defendants, the Inidividual Defendants (other than Defendant Grubb), and the Underwriter Defendants violated Section 11 of the Securities Act.

272.   Plaintiffs and putative Class members acquired units in the SandRidge Trust Offerings, and in reliance on, the Trust Registration Statements and without knowledge of the misleading omissions alleged herein. Plaintiffs and the Class sustained damages when

the price of the Trust I and Trust II securities subsequently declined substantially as a direct result of Defendants' violations.

## SECURITIES ACT CLAIM COUNT II

**Violations of Section 12(a)(2) of the Securities Act Against**
**All Defendants (except Defendant Grubb)**

273.    Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

274.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77*l*, on behalf of Plaintiffs and the Class, against SandRidge, the Trust Defendants, the Individual Defendants (except Defendant Grubb), and the Underwriter Defendants. This Count is based on negligence, and Lead Plaintiffs do not claim for purposes of this Count that the Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

275.    Defendants were sellers and offerers and/or solicitors of purchasers of the securities offered pursuant to the Prospectuses of the Trust Offerings. Defendants issued, caused to be issued, and/or signed the Trust Registration Statements in connection with the SandRidge Trust Offerings. The Trust Registration Statements contained the Trust Prospectuses which were used to induce investors, such as the Plaintiffs and the other members of the Class, to purchase the Common Units of the Trusts.

276.    The Trust Prospectuses omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein. The Individual Defendants' actions of solicitation included participating in the preparation

of the misleading Trust Prospectuses. The Trust Defendants, and the Underwriter Defendants, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Trust Prospectuses.

277.   The Underwriter Defendants participated in the preparation and dissemination of the misleading Trust Prospectuses for their own financial benefit. But for their participation in the SandRidge Trust Offerings, including their solicitation as set forth herein, the SandRidge Trust Offerings could not and would not have been accomplished. Specifically, the Underwriter Defendants:

(a)   made the decision to conduct the SandRidge Trust Offerings and to do it at the price set forth in the offering documents. The Underwriter Defendants drafted, revised and/or approved the Trust Registration Statements. The Trust Registration Statements were calculated to create interest in the securities of Trust I and Trust II, and were widely distributed by or on behalf of these Defendants for that purpose;

(b)   finalized the Trust Prospectuses and caused them to become effective; and

(c)   conceived and planned the Trust Offerings and orchestrated all activities necessary to affect the sale of these securities to the investing public, by issuing securities, promoting the securities and supervising their distribution and ultimate sale to the investing public.

278.   As alleged more specifically above, the Trust Prospectuses omitted to state material facts necessary in order to make the statements, in light of circumstances in which they were made, not misleading.

279.   Plaintiffs and the other Class members did not know, nor could they have known, of the omissions contained in the Trust Registration Statements and Prospectuses.

280.   The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Trust Prospectuses to ensure that there was no omission of a material fact required to be stated therein or necessary to make the statements therein not misleading. None of the Defendants named in this Count exercised reasonable care, made a reasonable investigation or possessed reasonable grounds for the belief that there was no omission of a material fact required to be stated in the Prospectus or necessary to make the statements therein not misleading. Had they done so, these Defendants would have known of the material omissions alleged herein.

281.   By reason of the conduct alleged herein, the Defendants named in this Count violated §12(a)(2) of the Securities Act. Accordingly, Plaintiffs and members of the Class who hold securities of the Trust I or Trust II, purchased in any of the Trust Offerings have the right to rescind and recover the consideration paid for their trust securities and hereby elect to rescind and tender their trust securities to the Defendants sued herein. Plaintiffs and Class members who have sold their trust securities are entitled to rescissory damages.

## SECURITIES ACT CLAIM COUNT III

### Violations of Section 15 of the Securities Act
### Against the Officer Defendants

282.   Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

283.    This Count is brought pursuant to Section 15 of the Securities Act against the Officer Defendants (i.e., Defendants Ward, Grubb and Bennett). This Count is based on negligence, and Lead Plaintiffs do not claim for purposes of this Count that these Defendants committed intentional or reckless misconduct or acted with scienter or fraudulent intent.

284.    As set forth above, SandRidge and the Trust Defendants, each violated Sections 11 and 12(a)(2) of the Securities Act by their acts and omissions as alleged in this Complaint.

285.    The Officer Defendants acted as controlling persons of SandRidge within the meaning of Section 15 of the Securities Act by virtue of their directly and/or indirectly possessing at all relevant times authority and power through ownership of voting securities, senior executive positions, or by agreement, agency and/or otherwise, to directly and/or indirectly control, influence or direct the management and policies of SandRidge, including without limitation, the (i) financing initiatives pursued by SandRidge in 2011 and 2012 to raise funds to finance its rising capital expenditures (including without limitation, the SandRidge Trust Offerings, pursuant to which Defendants Ward and Bennett signed the Trust Registration), and (ii) the operations of SandRidge (including without limitation, operation of the Trust I and Trust II Wells).

286.    By reason of directly and/or indirectly exercising such authority, power and control, as alleged above, the Officer Defendants, individually and acting pursuant to a common plan, caused SandRidge to engage in the violations of Sections 11 and 12(a)(2)

of the Securities Act complained of herein, and are thereby liable pursuant to Section 15 of the Securities Act

287.    The Officer Defendants acted as controlling persons of the Trust Defendants within the meaning of Section 15 of the Securities Act by serving as the "de facto" officers of the Trust Defendants at all relevant times, and thereby directly and/or indirectly possessing at all relevant times authority and power by agreement, agency and/or otherwise to directly and/or indirectly control, influence or direct the management and policies of the Trust Defendants, including without limitation, the (i) financial reporting of the Trust Defendants (including without limitation, signing the Registration Statements for the SandRidge Trust Offerings, and conducting Conference Calls with analysts concerning the operational and financial results of the Trust Defendants), (ii) the performance of the Trust Defendants' basic functions under the Administrative Services Agreements between SandRidge and the Trust Defendants, and (iii) management of the sole assets of the Trust Defendants (i.e., the Trust I and Trust II Royalty Interests in the Trust I and Trust II Wells).

288.    By reason of directly and/or indirectly exercising such authority, power and control, as alleged above, the Officer Defendants, individually and acting pursuant to a common plan, caused the Trust Defendants to engage in the violations of Sections 11 and 12(a)(2) of the Securities Act complained of herein, and are thereby liable pursuant to Section 15 of the Securities Act.

## II. EXCHANGE ACT CLAIMS ALLEGATIONS AND COUNTS

### Summary of the Exchange Act Claims

289.   After the SandRidge Trust Offerings, neither Trust had any employees, officers or directors. Instead, SandRidge employees (i) handled all of the Trusts' business functions (including, without limitation, collecting the production data from the Trusts' Wells underlying the financial and operational results reported in the Trusts' SEC filings), and (ii) managed the Trust Wells that generated the royalties used to pay quarterly distributions to Trust Unitholders.

290.   The Officer Defendants acted as the "de facto" officers of the Trusts, overseeing management of the Trust Wells, and serving as the Trusts' public face, including handling all of the Trusts' quarterly conference calls with analysts concerning the Trusts' financial and operational results.

291.   Throughout the Class Period, SandRidge, the Trust Defendants, and the Officer Defendants (the "Exchange Act Defendants") had knowledge of the performance of the individual Trust Wells that generated the royalties used to pay quarterly distributions to Trust Unitholders. Among other things, according to FE1 and SandRidge CW 2, throughout the Class Period, Defendants Ward and Grubb attended weekly Management Meetings at which SandRidge employees discussed the production results of individual wells, including the Trusts' Wells.

292.   As a result of the Management Meetings, Defendants Ward and Grubb knew, or were reckless in not knowing, among other things, that (i) the Trust I Development Wells drilled after the Trust I Offering were producing considerably *less* oil, and considerably

*more* gas than the Trust I Producing Wells (which, as noted, was the opposite of the results forecast in the Trust I Registration Statement and Prospectus); and (ii) Trust I Development Wells drilled after the Trust I Offering in Alfalfa county in the same T-R-S as other Trust I Wells were producing divergent proportions of gas and oil (thus demonstrating a lack of geological uniformity in Alfalfa county, in contradiction to the statements in the Trusts' Registration Statements and Prospectuses that geological uniformity existed across the Trust I and II AMI's).

293.    The negative trends and developments described above with respect to the Trust I Development Wells resulted in the oil production of the Trust I Wells falling more steeply than anticipated, which would have caused the quarterly cash distributions to Trust I Unitholders to fall below the quarterly estimates in the Trust I Registration Statement and Prospectus. Such an adverse development would, in turn, have made it far more difficult for SandRidge to raise capital to finance its rising capital expenditures via the Trust II Offering planned for April 2012, or the sale of its Trust I Common Units. Therefore, the Exchange Act Defendants knowingly took steps to conceal the falling oil production of the Trust I Wells, by accelerating the pace at which the Trust I Development Wells were scheduled to be drilled under the Trust I Registration Statement and Prospectus. The accelerated drilling artificially boosted the aggregate oil production of the Trust I Wells, and thus masked the steeply declining oil production that the Exchange Act Defendants knew was occurring.

294.    At the same time, when questioned by analysts on the Trust I Conference Calls concerning ominous signs of the Trust I Wells' declining oil production, the Officer

Defendants made false and misleading statements that sought to conceal such declines from investors.

295.   The false and misleading statements of the Exchange Act Defendants artificially inflated the prices of Trust I and Trust II, and Trust Unitholders suffered losses when the truth began to leak out and the risks concealed by the Exchange Act Defendants began to materialize, thereby causing the price of the Trust Common Units to decline.

## EXCHANGE ACT CLAIMS ALLEGATIONS AND COUNTS

**The Negative Trust I Oil Production Trends Represented New Material Information That Rendered Prior Public Statements Misleading**

296.   Given that oil production from the Proved Reserves of Trust I was expected to contribute nearly 80% of the Trust I revenue from which quarterly cash distributions were paid, the Negative Trust I Oil Production Trends was material new information since it indicated that the projections in the Trust I Registration Statement and Prospectus concerning the production of the Trust I Development Wells (i.e., *more* oil and *less* gas than the Trust I Producing Wells) were not being met, and thus there was a material risk that quarterly cash distributions would not meet the estimates in the Trust I Offering Documents.

297.   Further, the SEC's definition of "Reasonable Certainty" contemplates that as more production and other data becomes available, a "reasonably certain" recovery "is much more likely to increase or remain constant than to decrease." The Negative Trust I Oil Production Trends *decreased* the likelihood of recovering the oil Reserves estimated for the Trust I Development Wells in the Trust I Registration Statement and Prospectus.

Therefore, the material new information concerning the Negative Trust I Oil Production Trends rendered misleading the prior statements in the Trust I Registration Statement and Prospectus classifying the oil Reserves of the Trust I Development Wells as "Proved" based on a "Reasonable Certainty" concerning the amounts that could be recovered from those Wells.

**The Alfalfa County Pair Data Represented New Material Information That Rendered Prior Public Statements Misleading**

298.   The Trust I Prospectus had classified the oil Reserves of the Trust I Development Wells as "Proved" instead of "Probable" based on an assumption of geological uniformity across the Trust I AMI. The Alfalfa County Pair Data demonstrated, however, the absence of geological uniformity within Alfalfa County. As a result, the Reasonable Certainty required to classify as "Proved" the oil Reserves of all of the Trust I Development Wells drilled *across the Trust I AMI* did not exist. Given that, among other things (i) oil sales were projected to supply nearly 80% of the revenue from which quarterly cash distributions would be paid, and (ii) nearly 50% of the Trust I Development Wells drilled during the Class Period were drilled in Alfalfa county, the Alfalfa County Pair Data constituted material new information that rendered misleading prior statements in the Trust I Registration Statement and Prospectus classifying the oil Reserves of all the Trust I Development Wells as "Proved."

**The Exchange Act Defendants Had Strong Motives to Conceal the Negative Trust I Oil Production Trends and Alfalfa County Pair Data From Investors**

299.   As set out in ¶¶68-72, 74, above, Defendants Ward and Grubb regularly attended weekly senior management meetings throughout the Class Period at which the

performance of SandRidge's individual wells (including the Trust I Wells) were discussed, and according to FE 1, Defendants Ward and Grubb would therefore have had knowledge of the Negative Trust I Oil Production Trends and Alfalfa County Pair Data.

300.   Armed with knowledge of the Negative Trust I Oil Production Trends and Alfalfa County Pair Data, the Exchange Act Defendants understood that disclosure of those trends to investors could materially reduce the amount of money that SandRidge could raise from the Trust II Offering planned for April 2012 for two reasons.

301.   First, because a majority of the Trust II Producing Wells were located in Alfalfa county, and hence a majority of the Proximate Trust II Development Wells would be drilled in Alfalfa county, disclosure of the Alfalfa County Pair Data would materially increase the risk for investors of the Trust II Offering planned for April 2012 by contradicting classification of the Reserves of a majority of Proximate Trust II Development Wells as "Proved."

302.   Second, because (i) oil commanded a market premium, (ii) all of the Trust II Producing Wells were in the 3 Overlapping Counties, and (iii) a majority of the Trust II Development Wells would be drilled in the 3 Overlapping Counties, disclosure of the Negative Trust I Oil Production Trends would materially increase the risk for investors of the Trust II Offering planned for April 2012 by calling into question the likelihood that Reserve estimates for the Trust II Wells would be realized.

303.   Separately, the Exchange Act Defendants understood that because (i) oil sales had been projected to contribute nearly 80% of the Trust I revenue used to fund quarterly cash distributions, and (ii) 2/3 of Trust I's Proved Reserves were attributable to

the Trust I Development Wells, disclosure of the Negative Trust I Oil Production Trends and Alfalfa County Pair Data could cause Trust I to miss the quarterly distribution estimates in the Trust I Registration Statement and Prospectus. In turn, missing such Estimates would have caused the price of the Trust I Common Units to collapse (which is what has ultimately occurred over time as quarterly cash distributions have continued to drop), and prevented SandRidge from unloading over 85% its Trust I Common Units via sales during the Class Period on February 21, 2012; June 15, 2012; and October 2, 2012.

304.    To complete the Trust Offerings and sell SandRidge's Trust I Units, it was critical for the Exchange Act Defendants to conceal the Negative Trust I Oil Production Trends and Alfalfa County Pair Data from investors.

305.    To that end, as more fully alleged in ¶163 above, SandRidge accelerated the drilling schedule of the Trust I Development Wells so that instead of drilling 31 Development Wells in 2011 (as projected in the Trust I Prospectus), SandRidge drilled 53 Development Wells during 2011 (as per Trust I's SEC filings).   Drilling the Trust I Development Wells at an accelerated pace boosted oil, gas and aggregate MBOE production during Trust I's first five reporting periods running from January 2011 (reported on 7/22/11) through May 2012 (reported on 7/26/12), and thereby enabled Trust I to beat production and quarterly distribution estimates in the Trust I Prospectus during that critical timeframe.

306.    The accelerated drilling of the Trust I Development Wells thus created the misleading impression that the Trust I Wells were successful and substantially exceeding expectations, which allowed SandRidge to successfully consummate the Trust II Offering

in April 2012 (ultimately raising $590.2 million), and sell over 85% of its Trust I Common

Units on February 21, 2012; June 15, 2012; and October 2, 2012.   After SandRidge

achieved its twin goals of a successful Trust II Offering in April 2012, and the sale of over

85% of its Common Units by October 2, 2012, quarterly cash distributions started falling

below the quarterly distribution estimates in the Trust I Registration Statement and

Prospectus.

**MATERIALLY MISLEADING OMISSIONS KNOWINGLY OR RECKLESSLY MADE AFTER THE TRUST I OFFERING DURING THE TRUST I CLASS PERIOD CONCERNING TRUST I**

307.    As set forth below, Trust I held five conference calls during the Class Period

concerning Trust I's financial and operational results. As evidence that Trust I's wells were

not performing as well as expected began to emerge in late 2011, analysts raised pointed

questions on the Trust I Conference Calls. In response, the Officer Defendants concealed

the negative trends.

**The November 11, 2011 Trust I Earnings Call**

308.    On November 11, 2011, the Officer Defendants held the November 2011

Trust I Earnings Call to discuss the financial and operational results for Trust I for the 3-

month period beginning June 1, 2011, and ending August 31, 2011.

309.    During the question and answer portion of the November 2011 Trust I

Conference Call, the following exchange occurred:

**Analyst**

Okay. All right, and then I wanted to confirm with the gas production being higher than anticipated that ***liquids [i.e., oil] as a percent of total has remained the same?***

**Defendant Grubb**

*Yes. That's correct*. Gas did out produce our forecast for gas production and our liquids is -- *we produced more liquids because overall the well performed better* and we drilled higher net revenue interest wells in addition to more wells. *However, on a type curve basis the liquids were roughly on trend*.

310.    Defendant Grubb's statements above were knowingly or recklessly materially misleading.    Contrary to Grubb's "Yes, that's correct" response above, Defendant Grubb knew or was reckless in not knowing that "liquids"  (i.e., oil) as a percentage of total production did *not* remain the same during the June through August 2011 period. Rather, as alleged in paragraphs 160 above, the oil-to-gas ratio of the Trust I Wells declined from 49.7% oil vs. 50.3% gas in June 2011 to 46.8% oil vs. 53.2% gas in August 2011. Thus, by the end of August 2011, the ratio of oil-to-gas had already dropped below the Aggregate Trust I Ratio of 48.4% oil to 51.6% gas projected in the Trust I Registration Statement and Prospectus, and was trending downwards.

311.    Further, contrary to Defendant Grubb's statement, "liquids" were *not* "roughly on trend" on a "type curve basis." As alleged in paragraphs 111-119 above, the Mississippian Type Curve was based on the production data of the Trust I Producing Wells. However, as of the end of August 2011, Defendant Grubb knew (or was reckless in not knowing) that oil production for the Trust I Development Wells was not exceeding the oil production of the Trust I Producing Wells as had been forecast in the Trust I Registration Statement and Prospectus. In other words, Defendant Grubb knew (or was reckless in not knowing) that the expected trend of oil production for the Trust I Development Wells was worse than expected.

**The February 17, 2012 Trust I Earnings Call**

312.    On February 17, 2012, Trust I held a Conference Call ("February 2012 Trust I Earnings Call") to discuss the financial and operational results for Trust I for the 3-month period beginning on September 1, 2011 and ending November 30, 2011.

313.    On the call, Defendant Ward stated:

[W]elcome to the SandRidge Mississippian Trust Number 1 conference call. *[Trust I]'s third period results once again surpassed the projections. And in addition to beating the target distribution, we exceeded the (inaudible) threshold for the period.* The successful performance of -- for the period resulted in a distribution slightly over 79 cents per unit, which is approximately 25 percent higher than the 63 cents per unit target distribution.

We continue to be very pleased with the trust performance and the performance of the Mississippian [Play], which is the premiere shallow oil project in the United States.

314.    Defendant Grubb then summarized the operational and financial results of Trust I during the September to November 2011 period. Among other things, Defendant Grubb stated that:

*As Tom mentioned, [Trust I]'s performance exceeded projections for the third reporting period.* Production attributable to the trust was 446,000 barrels of oil equivalent, which is about 148,000 barrels of oil equivalent more or 50% higher than the target projection of 298,000 barrels of oil equivalent.

*This marks the third consecutive period that the production has come in higher than what was projected.* Though the first three -- through the first distributions period, the actual production attributable to the trust has exceeded the target production levels in that S-1 by 28%. *Approximately half of the production [beat] was generated by better than expected well performance. The remaining beat was due to an accelerated drilling pace and having drill wells with higher net revenue interest than projected.*

The production split for this period was 185,000 barrels of oil and 1.57 BCF of natural gas. Oil production exceeded projections by roughly 26%, and natural gas production exceeded projections by approximately 72%.

During the period, SandRidge brought on 11 new gross wells or 6.8 new net wells on production. This puts the drilling program since inception 12.3 net wells ahead of the drilling schedule through the end of the third reporting period. The hire net well count is a combined result of having higher than projected net revenue and interest in the wells and ***utilizing four drilling rigs early in the program instead of the planned three rig schedule***. Today, we are drilling three rigs on the trust acreage.

315. Defendants Ward and Grubb's statements above were knowingly or recklessly misleading because, as alleged in paragraph 157 above, though Trust I's oil production was exceeding targets set out in the Trust I Registration Statement and Prospectus, the oil production of the Trust I Development Wells through November 2011 what had been forecast in the Trust I Registration Statement and Prospectus. Thus, Defendants Ward and Grubb knew (or was reckless in not knowing) that the only reason that Trust I was able to beat the targeted quarterly distribution estimates in the Trust I Registration Statement and Prospectus was the accelerated drilling of the Trust I Development Wells.

316. Moreover, contrary to Defendant Grubb's statement that "[a]pproximately half of the production [beat] was generated by better than expected well performance . . . [and] the remaining beat was due to an accelerated drilling pace," well performance was *not* responsible for the "production beat." Instead, Defendant Grubb knew (or was reckless in not knowing) that absent the accelerated drilling schedule, well performance would have caused actual production to fall short of the targeted quarterly distribution estimates.

317. During the question and answer portion of the February 2012 Trust I Conference Call, the following exchange occurred:

**Analyst**

[I]t seems like your ***recent wells have had a higher gas weighting than I think 55% is what you're kind of forecast***. Are you -- do you agree with that? Is that what you're seeing? Or are you just then maybe drilling in a gassier weighted part of the field? Or how should I think about that?

**Defendant Ward**

No, you know, we do agree with that. I think the wells overall in the play appears to be gassier than what we initially projected. ***The important thing is to know that that's not the -- at the expense of oil. The oil is coming in on target***. And they're just making more gas.

318.    Defendant Ward's statements above were knowingly or recklessly materially misleading. The analyst's question focused on the "recent wells," i.e., the Trust I Development Wells. Defendant Ward's answer thus gave the misleading impression that the Trust I Development Wells' oil production was "on target." But Defendant Ward knew (or was reckless in not knowing) that the oil production of the Trust I Development Wells through November 2011 had not exceeded the oil production that had been forecast in the Trust I Registration Statement and Prospectus, and thus oil was *not* "coming in on target," and SandRidge was only able to meet cash distribution targets by drilling more wells more quickly.

## The May 11, 2012 Trust I Earnings Call

319.    On May 11, 2012, Trust I held a Conference Call ("May 2012 Trust I Earnings Call") to discuss the financial and operational results for Trust I for the 3-month period beginning on December 1, 2011 and ending February 28, 2012.

320.    On the call Defendant Ward stated:

Thank you, James, and welcome to the SandRidge Mississippian Trust I conference call. ***[Trust I]'s fourth period results once again surpassed expectations, and in addition to beating the target distribution, we exceeded the incentive threshold for the period***. The successful performance for the period resulted in an distribution slightly under $0.79 per unit which is approximately 20% higher than the $0.65 per unit target distribution.

We continue to be very pleased with the Trust performance and the performance of the Mississippian play which in our opinion continues to have the highest rate of return drilling in the United States. Now I will turn the call over to Matt Grubb for a review of SDT's production and drilling results during the period.

321.    Defendant Grubb then summarized the operational and financial results of

Trust I during the December 2011 to February 2012 period. Among other things, Defendant

Grubb stated that:

The Trust production of 413,000 barrels of oil equivalent exceeded expectations for the fourth recording period by about 37% which is 111,000 barrels equivalent more than the target estimate of 300,000 barrels of oil equivalent. ***This marks the fourth consecutive period that production has come in higher than estimated***. Through the first four distribution periods, actual production has exceeded the estimated production levels in the S-1 by roughly 30%. ***The production beat was due to better than expected well performance, accelerated drilling pace and having drill wells with higher net revenue interest than originally assumed***. The production split for this period was 170,000 barrels of oil and 1.46 Bcf of natural gas. Oil production exceeded target estimates by roughly 14% and natural gas production exceeded targets estimate by approximately 59%.

Moving on to drilling results. During the period, SandRidge brought 11 gross wells or 6.9 net wells on production. This puts the drilling program 14 net wells ahead of the same drilling schedule at the end of the period. The higher net well count is a combined result of having higher than assumed net revenue interest in the wells that have been drilled and utilizing four drilling rigs during the previous periods instead of the originally anticipated three rigs. SandRidge had three rigs running in the Trust during this distribution period. In addition to the wells brought online, there are also four gross wells undergoing completions at the end of the period which started producing in March.

322.    During the question and answer portion of the May 2012 Trust I Conference

Call, the following exchange occurred:

**Analyst**

And then if I look at the way from the second to third distributions, production on an aggregate basis went up from the third to fourth distributions, it actually went down a little bit but you brought online 12 wells. So you brought on line the similar number of wells, was there-- is there something that kind of explains that or are there some -- is there something that's declining faster or that trend to me was a little confusing?

**Defendant Grubb**

Yes, there's a number of factors that play into that. If you look at the third distribution period, I think we averaged about 4,900 barrels equivalent per day in the fourth or current distribution period. We average about 4540 barrels equivalent per day, so there was a slight drop off. Two or three things explain that one is just statistically, we do move around this Trust and there is some variation of the wells that come online, it could be better next period or whatever but that does move around a little bit. The timing of wells come on does impact the way it produces.

We had just of the total Mississippian play overall we had 12 wells that we had bad casing on that we had to repair the casing. And 2 of those 12 were in this Trust, and so those two wells came on I think line after we drilled them 63 days and 71 days respectively. And the average well should come on about 45 days, so there's a delay in production in those two wells in this Trust. And there's also timing of submersible pumps that we installed also. So it's a number of things. And then there were some weather-related issues during the period that caused some downtime. ***Overall, the wells are doing fine. I think they're meeting our expectations or exceeding them.*** But just these related factors does — can cause a production drop or production increase from period to period.

323.   Defendant Grubb's statements above were knowingly or recklessly materially misleading when made because, as detailed in paragraph 158 above, oil production of the Trust I Development Wells through February 2012 was not meeting or exceeding expectations. To the contrary, Defendant Grubb knew (or was reckless in not knowing) that through February 2012, the Trust I Development Wells were producing considerably less oil, and considerably more gas than the Trust I Producing Wells, and

Trust I was only able to meet or exceed its oil targets through the accelerated drilling schedule.

**The August 10, 2012 Trust I Earnings Call**

324.    On August 10, 2012, before the market opened, Trust I held a Conference Call ("August 2012 Trust I Earnings Call") to discuss the financial and operational results for Trust I for the 3-month period beginning on March 1, 2012 and ending May 31, 2012.

325.    On the call, Defendant Ward stated:

Thank you, James, and welcome to the SandRidge Mississippian Trust I conference call. ***[Trust I]'s fifth period results once again surpassed expectations***. The performance for the period resulted in a distribution slightly under $0.73 per unit, which is approximately 4% higher than the $0.70 per unit target distribution.

Now I'll turn the call over to Matt Grubb for a review of SDT's production and drilling results during the period.

326.    Defendant Grubb then summarized the operational and financial results of Trust I during the March to May 2012 period. Among other things, Defendant Grubb stated that:

[Trust I]'s production of 377,000 barrels equivalent ***exceeded expectations for the fifth reporting period*** by about 17%, which is 55,000 barrels equivalent more than the target estimate of 322,000 barrels equivalent. The production split for this period was 157,000 barrels of crude oil and 1.32 Bcf of natural gas. During the period, SandRidge brought 12 new wells on production. We continue to be ahead of the assumed drilling schedule as a result of higher than assumed net revenue interest in the wells drilled to date and running four drilling rigs in the previous periods instead of the originally anticipated three rig schedule. In addition to 12 new wells we brought online during the period, there was one well being completed at the end of the period.

327.    Defendants Ward's and Grubb's statements above were knowingly or recklessly misleading because they knew (or were reckless in not knowing) that the Trust

I Development Wells' oil production through May 2012 did not exceed, and in fact fell short, of the projections in the Trust I Registration Statement, and the only reason Trust I's oil production met production targets was that the drilling of the Trust I Development Wells was accelerated.

328.    During the question and answer portion of the August 2012 Trust I Conference Call, the following exchange occurred:

**Analyst**

It seems like your drilling pace has kind of gotten to a steady state. Is that fair?

**Defendant Grubb:**

We're well ahead of the schedule. We drilled 72.5 wells of the 123 wells planned, and we should be -- we anticipate to drill out this program sometime mid-2013. So yes, we are ahead, but I would say -- to answer your question, yes, I think we're at a fairly steady rate now. We ran three rigs in the fourth distribution period and three rigs in the fifth distribution period as well.

**Analyst**

Okay. So I guess if you're talking about drilling it out by mid-2013, you're talking about more than, call it -- or somewhere around 12 wells per quarter?

**Defendant Grubb**

Well, you're looking at -- yes, that's probably about right, somewhere in that range.

**Analyst**

And I guess my next question is, with production declining a little bit this quarter*, do you think we've hit the high watermark for production in Q1, or not expected to meaningfully move above that?*

**Defendant Grubb**

I think that's fair. I think production certainly was high. If you look at our drilling, number of wells we drilled, we've gone through five distributions. The first two distributions we drilled about 50% of the wells to date, right. ***So we have slowed***

*down the drilling the last three distributions. So production should continue to come down a bit.*

**[…]**

**Analyst**

Just to elaborate a little bit more on Kevin's line of questioning, aside from the deceleration of activity and a couple of the issues that you had mentioned on the last call related to -- I think it was casing -- a well casing repair and some pump install issues. *Were there any other one-time items or issues that led to the sequential decline, or is that really just a function of the slower pace and the front end loading of the drilling program?*

**Defendant Grubb**

Yes, I think it's just a function of the front end loading of the program. If you look at the first and second distributions, we drilled 36 wells there. And since then we drilled another 36 wells. So it really is front end loaded.

**Analyst**

Okay, great. *Can you give us a little bit more commentary on just what you're seeing given the amount of activity that you've done at the parent level in terms of development in the Mississippian? Just when you think about the play geographically and the layout and the variances in terms of production split, is there anything that's coming, more of a trend that you're seeing like whether it's gassier to the north or is that a type of an outlay of the play?*

**Defendant Grubb**

I'll just answer that in reference specific to [Trust I]. *If you look at our gas to oil cut, if you look at cumulatively from inception to now, it's run about 42% oil. If you look at our fifth distribution, it's also about 42% oil. So it's been pretty constant across this program.*

329.   When asked what he thought "about the [Mississippian] play geographically and the layout and the variances in terms of production split," and whether "there anything that's coming, more of a trend that you're seeing like whether it's gassier to the north,"

Defendant Grubb's response knowingly or recklessly failed to disclose information that he had a duty to disclose, namely the lack of geological consistency as demonstrated by the Alfalfa County Pair Data and the Negative Trust I Oil Production Trends.

**Loss causation**

330.   As set out above in ¶¶227-244 the price of the Trusts' Units fell when the truth concealed by Defendants' misleading statements materialized in a series of corrective disclosures.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

331.   At all relevant times, the market for Trust I Common Units was an efficient market for the following reasons, among others:

(a)   Trust I Common Units met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)   as a regulated issuer, Trust I filed periodic public reports with the SEC and the NYSE;

(c)   Trust I regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)   Trust I was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain

customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

332.   As a result of the foregoing, the market for Trust I Common Units promptly digested current information regarding Trust I from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of Trust I Common Units during the Class Period suffered similar injury through their purchase of Trust I Common Units at artificially inflated prices and a presumption of reliance applies.

333.   Additionally, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as the Exchange Act Defendants omitted material information from their Class Period statements in violation of a duty to disclose such information, as detailed above.

## EXCHANGE ACT CLAIM COUNT I

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against SandRidge, Trust I, and the Officer Defendants

334.   Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

335.   This Count is asserted against the Exchange Act Defendants (i.e., SandRidge, Trust I and the Officer Defendants) for violations of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. This Count is asserted on behalf of both Trust I and Trust II Class Members.

336.    During the Class Period, the Exchange Act Defendants disseminated or approved the materially misleading statements specified above, which they knew or deliberately disregarded were misleading in that they failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

337.    The Exchange Act Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Trust I and Trust II as specified herein.

338.    The Exchange Act Defendants: (a) employed devices, schemes, and artifices to defraud; (b) omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Trust I and Trust II Common Units during the Class Period in an effort to maintain artificially high market prices for Trust I and Trust II Common Units in violation of Section 10(b) of the Exchange Act and Rule 10b-5. Trust I is sued as a primary participant in the wrongful and illegal conduct charged herein.

339.    Each of the Officer Defendants' primary liability, and controlling person liability, arises from their serving as the *de facto* officers of Trust I at all relevant times by directly and/or indirectly possessing at all relevant times authority and power by agreement, agency and/or otherwise to directly and/or indirectly control, influence or direct the management and policies of Trust I, including without limitation, the (i) financial

reporting of Trust I (including without limitation, conducting Conference Calls with analysts concerning the operational and financial results of Trust I), (ii) the performance of Trust I's basic functions under the Administrative Services Agreements between SandRidge and Trust I, (iii) management of the sole assets of Trust I (i.e., the Trust I and Trust II Royalty Interests in the Trust I and Trust II wells). Further, by virtue of acting as the *de facto* officers of Trust I at all relevant times, each of the Officer Defendants (i) had access to Trust I's internal budgets, plans, and/or projections; (ii) enjoyed significant personal contact and familiarity with the Trustee for Trust I; and (iii) was aware of Trust I's dissemination of information to the investing public via press releases, SEC filings and otherwise, which they knew or recklessly disregarded were materially misleading.

340.    The Exchange Act Defendants had actual knowledge of the omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the significant problems with the Trust I Wells (including without limitation, the Negative Trust I Oil Production Trends, Declining Aggregate Oil-to-Gas Ratio, and Alfalfa County Pair Data), and supporting the artificially inflated price of the Trust I and Trust II Units. As demonstrated the Exchange Act Defendants' misstatements of Trust I's business, operations, and oil and gas reserves during the Class Period, Defendants, if they did not have actual knowledge of the omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were misleading.

341.    As a result of the dissemination of the materially misleading information and failure to disclose material facts, as set forth above, the market price of Trust I Units was artificially inflated during the Class Period. In ignorance of the fact that market prices of Trust I Units was artificially inflated, and relying directly or indirectly on the misleading statements made by the Exchange Act Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or recklessly disregarded by the Exchange Act Defendants but not disclosed in public statements by the Exchange Act Defendants during the Class Period, Plaintiffs and the other members of the Class acquired Trust I and Trust II Units during the Class Period at artificially high prices and were damaged as a result of the securities law violations alleged herein.

342.    At the time of said omissions, the Plaintiffs and the other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the significant problems alleged herein, which were not disclosed by the Exchange Act Defendants, Plaintiffs and the other members of the Class would not have purchased or otherwise acquired Trust I and Trust II Units, or, if they had purchased such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

343.    By virtue of the foregoing, the Exchange Act Defendants violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

344.    As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, the Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Trust I and Trust II Units during the Class Period.

## EXCHANGE ACT CLAIM COUNT II

**Violations of Section 20(a) of the Exchange Act
Against Officer Defendants**

345.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

346.    This Count is asserted against the Officer Defendants (i.e., Defendants Ward, Grubb, and Bennett) for violation of Section 20(a) of the Exchange Act.

347.    As set forth above, SandRidge and Trust I violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

348.    The Officer Defendants acted as controlling persons of SandRidge within the meaning of Section 20(a) of the Exchange Act by virtue of their directly and/or indirectly possessing at all relevant times authority and power through ownership of voting securities, senior executive positions, or by agreement, agency and/or otherwise, to directly and/or indirectly control, influence or direct the management and policies of SandRidge, including without limitation, (i) participating in the Trust I Conference Calls as officers of SandRidge, and (ii) the operations of SandRidge (including without limitation, operation of the Trust I Wells).

349.    The Officer Defendants acted as controlling persons of Trust I within the meaning of Section 20(a) of the Exchange Act by virtue of their directly and/or indirectly

possessing at all relevant times authority and power by agreement, agency and/or otherwise to directly and/or indirectly control, influence or direct the management and policies of Trust I, including without limitation, the (i) financial reporting of Trust I (including without limitation, conducting Conference Calls with analysts concerning the operational and financial results of Trust I), (ii) the performance of Trust I's basic functions under the Administrative Services Agreements between SandRidge and Trust I, and (iii) management of the sole assets of Trust I (i.e., the Trust I Royalty Interest in the Trust I Wells), and thereby serving as the "de facto" officers of Trust I at all relevant times. By reason of directly and/or indirectly exercising such authority, power and control, as alleged above, the Officer Defendants, individually and acting pursuant to a common plan, caused Trust I to engage in the violations of Sections 11 and 12(a)(2) of the Securities Act complained of herein, and are thereby liable pursuant to Section 15 of the Securities Act.

350.    By virtue of their positions as controlling persons of SandRidge and Trust I, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

351.    As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Trust I and Trust II Common Units during the Class Period. As a direct and proximate result of the Officer Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of Trust I Common Units during the Class Period.

## CLASS ACTION ALLEGATIONS

352.   Lead Plaintiffs assert the Securities Act and Exchange Act Claims pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of (i) Trust I purchasers (i.e., all purchasers of the Common Units of Trust I in or traceable to the Trust I Offering, and/or during the Class Period), and (ii) Trust II purchasers (i.e., all purchasers of the Common Units of Trust II in or traceable to the Trust II Offering, and/or during the Class Period) (collectively, the "Class" and "Class Members").

353.   Excluded from the Class are Defendants herein, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest, or which is related to or affiliated with any of the Defendants, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

354.   The members of the Class are so numerous that joinder of all members is impracticable. The Common Units of Trust I and Trust II were and continue to be actively traded on the NYSE under the symbols "SDT" and "SDR," respectively. Trust I sold approximately 17.25 million Common Units during the Trust I Offering, and Trust II sold approximately 29.9 million Common Units during the Trust II Offering. The precise number of the members of Class Members is unknown to Lead Plaintiffs at this time but is believed to be in the thousands. In addition, the names and addresses of the members of the Class Members can be ascertained from the books and records of Trust I and Trust II, or their transfer agents, or if applicable, the Underwriters to the SandRidge Trust Offerings. Notice can be provided to such record owners by a combination of published notice and

first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

355.    Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Lead Plaintiffs have retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intend to prosecute this action vigorously.

356.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class because Lead Plaintiffs' and Class Members' damages arise from and were caused by the same misleading omissions made by or chargeable to Defendants. Lead Plaintiffs do not have any interests antagonistic to, or in conflict with, the Class.

357.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Since the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it virtually impossible for the class members to seek redress for the wrongful conduct alleged. Lead Plaintiffs know of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

358.    Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class. Among the questions of law and fact common to the Class are, including without limitation:

(a)    whether the federal securities laws were violated by Defendants' acts and/or omissions as alleged herein;

(b)     the extent of injuries sustained by members of the Class and the appropriate measure of damages; and

(c)     as to the Exchange Act claims, whether Defendants made misleading omissions with scienter.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     awarding Plaintiffs and other members of the Class damages together with interest thereon;

C.     with respect to Securities Act Claim Count II, ordering that the Trust I Offering and the Trust II Offering be rescinded;

D.     awarding Plaintiffs and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     awarding Plaintiffs and other members of the Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury.

Dated: November 7, 2016                    Respectfully submitted,

                                           *s/ Nicholas G. Farha*

                                           Nicholas G. Farha, OBA # 21170
                                           FARHA LAW, PLLC
                                           1900 NW Expressway, Suite 501
                                           Oklahoma City, OK 73118
                                           (405) 471-2224
                                           (405) 810-9901 (Facsimile)
                                           nick@farhalawfirm.com

                                           *Liaison Counsel for Plaintiffs*

                                           THE ROSEN LAW FIRM, P.A.
                                           Laurence M. Rosen, Esq. (pro hac vice)
                                           Phillip Kim, Esq. (pro hac vice)
                                           275 Madison Avenue, 34th Floor
                                           New York, NY  10016
                                           (212) 868-1060
                                           (212) 202-3827 (Facsimile)
                                           lrosen@rosenlegal.com
                                           pkim@rosenlegal.com

                                           *Lead Counsel for Plaintiffs*

                                           WOHL & FRUCHTER, LLP
                                           J. Elazar Fruchter
                                           570 Lexington Avenue, 16th Floor
                                           New York, NY  10022
                                           (212) 758-4000
                                           (212) 758-4004 (Facsimile)
                                           jfruchter@wohlfruchter.com

                                           *Additional Plaintiffs' Counsel*

**CERTIFICATE OF SERVICE**

I certify that on November 7, 2016, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the appropriate ECF registrants.

By: *s/ Nicholas G. Farha*