## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IVAN NIBUR, LAWRENCE ROSS, JASE LUNA, MATTHEW WILLENBUCHER, and the DUANE & VIRGINIA LANIER TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>SANDRIDGE MISSISSIPPIAN TRUST I, SANDRIDGE MISSISSIPPIAN TRUST II, TOM L. WARD, JAMES D. BENNETT, MATTHEW K. GRUBB, RANDALL D. COOLEY, JIM J. BREWER, EVERETT R. DOBSON, WILLIAM A. GILLILAND, DANIEL W. JORDAN, ROY T. OLIVER, JR., JEFFREY S. SEROTA, D. DWIGHT SCOTT, RAYMOND JAMES & ASSOCIATES, INC., MORGAN STANLEY & CO. LLC (F/K/A MORGAN STANLEY & CO INC.), MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., CITIGROUP GLOBAL MARKETS INC., and RBC CAPITAL MARKETS, LLC,<br><br>Defendants.<br><br>SANDRIDGE ENERGY, INC.,<br><br>Nominal Defendant. | **Civil Action No. 15-cv-00634-M**<br><br>**CLASS ACTION**<br><br>**JOINT OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS** |

## TABLE OF CONTENTS

**Page(s)**

SECTION I.: SECURITIES ACT CLAIMS ..................................................................... 1

BACKGROUND ....................................................................................................... 4

    A.    The Trust Offerings ..................................................................... 4

    B.    The SandRidge Energy Action ..................................................... 6

SECURITIES ACT CLAIMS ARGUMENT ................................................................. 8

I.    THE SECURITIES ACT CLAIMS ARE TIMELY UNDER *JOSEPH* ................. 8

    A.    On July 30, 2013, the SandRidge Energy Action Tolled the 3-Year
        Statute of Repose to Assert the Securities Act Claims Against the
        Defendants ................................................................................... 8

    B.    The SandRidge Energy Action Tolled the 1-Year Statute of Limitations .. 11

    C.    *Joseph* Remains Good Law in the Tenth Circuit ........................ 12

        1.    In the Tenth Circuit, Statutes of Repose Like the Three Year
            Limit Remain Subject to Legal Tolling Even After *CTS* ............ 12

        2.    Alternatively, *Joseph* Did Not Involve Tolling the 3-Year Statute
            of Repose At All Since the Tenth Circuit Deems All Members of
            a Class Covered by a Timely Class Action Lawsuit to Have
            Instituted Their Own Timely Actions for Limitations Purposes ...... 14

        3.    Tolling the 3-Year Statute of Repose Under *American Pipe*
            Discourages Placeholder Class Actions, and Preserves Class
            Members' Constitutional Opt Out Rights ........................................ 15

II.    PLAINTIFFS HAVE ADEQUATELY ALLEGED SECURITIES ACT
      CLAIMS ....................................................................................... 17

    A.    Legal Standards ........................................................................... 17

    B.    Defendants Are Liable Under Section 11 and Section 12(a)(2) For
        Omitting Material Data From the Trust Offering Documents ............ 19

1.  The Trust I Offering Documents Omitted Material Data Indicating That the Reserve Estimates for the Trust I Development Wells Were Riskier Than Disclosed .........................19

2.  The Trust I Offering Documents Omitted Material Data Relevant to Assessing SandRidge's Operating Experience ............................23

3.  The Trust II Offering Documents Omitted Material Data Concerning the Absence of Geological Uniformity in Alfalfa County ...........................................................................................23

4.  The Trust II Offering Documents Omitted Material Data Concerning the Production Trends of the Trust I Wells .................29

III.   THE BESPEAKS CAUTION DOCTRINE DOES NOT APPLY ........................30

IV.   THE REASONABLE RELIANCE DEFENSE IS NOT AVAILABLE...............32

A.   The Trust Reserve Reports Constituted Management Opinions.................32

B.   The Defense Does Not Appear Clearly on the Face of the Complaint .......33

C.   "Red Flags" Precluded Reliance on the Trust II Reserve Report ..............34

V.   ALL DEFENDANTS ARE LIABLE UNDER SECTION 12(A)(2).....................35

VI.   THE SECTION 15 "CONTROL PERSON" CLAIMS ARE VALID...................35

SECTION II.: EXCHANGE ACT CLAIMS ....................................................................36

VII.   ARGUMENT ................................................................................................39

A.   The Complaint Adequately Alleges Falsity ................................................39

B.   The Defendants Made a Series of False and Misleading Statements To Conceal The Weaker Than Expected Oil Production of the Trust I Development Wells......................................................................................39

C.   The Complaint Adequately Alleges Scienter ..............................................46

1.   The Fact that the Wells' Performance Constituted the Trust's Core Operations Supports Scienter .................................................47

2.   By Virtue of Their Attendance at Meetings, Defendants Were Presented With Factual Information Showing Their Statements Were False.......................................................................................48

3.      The Accelerated Drilling Schedule Supports Scienter......................53

4.      Motive Supports Scienter...................................................54

5.      The Complaint Makes Individualized scienter allegations ..............58

VIII.   THE COMPLAINT ADEQUATELY ALLEGES SECTION 20(A) CLAIMS ....58

CONCLUSION ...........................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Kinder-Morgan, Inc.*,
  340 F.3d 1083 (10th Cir. 2003) ...........................................................................59, 60

*Am. Pipe & Constr. Co. v. Utah*,
  414 U.S. 538 (1974).............................................................................................passim

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
  827 F.3d 1229 (10th Cir. 2016) ...................................................................................53

*Appleton Elec. Co. v. Graves Truck Line, Inc.*,
  635 F.2d 603 (7th Cir. 1980) .......................................................................................14

*Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*,
  94 F. Supp. 3d 1035 (D. Minn. 2015).........................................................................40

*Berson v. Applied Signal Tech., Inc.*,
  527 F.3d 982 (9th Cir. 2008) .......................................................................................27

*Boilermakers Nat. Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates,*
  *Series AR1*,
  748 F. Supp. 2d 1246 (W.D. Wash. 2010) ..................................................................10

*Brady v. UBS Fin. Servs., Inc.*,
  No. 10-CV-284-SPF-FHM, 2013 WL 1309250 (N.D. Okla. Mar. 26, 2013) .............23

*Bright v. United States*,
  603 F.3d 1273 (Fed. Cir. 2010). ..................................................................................14

*Bumgarner v. Williams Companies, Inc.*,
  No. 16-CV-26-GKF-FHM, 2016 WL 3162062 (N.D. Okla. June 3, 2016) ................31

*California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*,
  No. 16-373, 2017 WL 125670 (U.S. Jan. 13, 2017)....................................................17

*City of Philadelphia v. Fleming Cos., Inc.*,
  264 F.3d 1245 (10th Cir. 2001) .............................................................................47, 56

*Credit Suisse Sec. (USA) LLC v. Simmonds*,
  132 S. Ct. 1414 (2012).................................................................................................13

*Crown, Cork & Seal Co. v. Parker*,
  462 U.S. 345 (1983)............................................................................................8, 9, 15

*CTS Corp. v. Waldburger*,
  134 S. Ct. 2175 (2014).............................................................................2, 12, 13, 15

*Eisen v. Carlisle & Jacquelin*,
   417 U.S. 156 (1974) ................................................................................................ 16

*Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*,
   825 F. Supp. 2d 1082 (D.N.M. 2011) ....................................................................... 17

*Goldman v. Belden*,
   754 F.2d 1059 (2d Cir. 1985) .................................................................................... 18

*Grossman v. Novell, Inc.*,
   120 F.3d 1112 (10th Cir. 1997) ................................................................... 4, 17, 30

*Howard v. Liquidity Servs., Inc.*,
   No. CV 14-1183 (BAH), 2016 WL 1301044 (D.D.C. Mar. 31, 2016) ..................... 40

*In re Ambac Fin. Grp., Inc. Sec. Litig.*,
   693 F. Supp. 2d 241 (S.D.N.Y. 2010) ....................................................................... 52

*In re CytRx Corp. Sec. Litig.*,
   No. CV 141956 GHKPJWX, 2015 WL 5031232 (C.D. Cal. July 13, 2015) ............. 33

*In re Dynegy, Inc. Sec. Litig.*,
   339 F. Supp. 2d 804 (S.D. Tex. 2004) ........................................................... 33, 34, 35

*In re Dynex Capital, Inc. Sec. Litig.*,
   No. 05 CIV. 1897HB, 2009 WL 3380621 (S.D.N.Y. Oct. 19, 2009) ............. 40, 51, 52

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   No. CIV. H-01-3624, 2005 WL 3704688 (S.D. Tex. Dec. 5, 2005) .......................... 33

*In re Fleming Cos. Inc. Sec. & Derivative Litig.*,
   2004 WL 5278716 (E.D. Tex. June 16, 2004)..................................................... 34, 56

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) ................................................................................. 17

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
   982 F. Supp. 2d 277 (S.D.N.Y. 2013) ................................................................. 34, 35

*In re Molycorp, Inc. Sec. Litig..*,
   157 F. Supp. 3d 987 (D. Colo. 2016).............................................................. 48, 49, 50

*In re Network Assocs., Inc., Sec. Litig.*,
   No. C 99-01729WHA, 2000 WL 33376577 (N.D. Cal. Sept. 5, 2000)...................... 54

*In re Oppenheimer Rochester Funds Grp. Sec. Litig.*,
   838 F. Supp. 2d 1148 (D. Colo. 2012)................................................... 17, 21, 27, 35

*In re SandRidge Energy, Inc. Sec. Litig.*,
   No. CIV-12-1341-W, 2015 WL 12942217 (W.D. Okla. Aug. 27, 2015)........ 48, 51, 55

*In re Sandridge Energy, Inc. Sec. Litig.*,
   No. CIV-12-1341-W, 2015 WL 3652522 (W.D. Okla. May 11, 2015) ........................ 6

*In re SemGroup Energy Partners, L.P.*,
  729 F. Supp. 2d 1276 (N.D. Okla. 2010)........................................................32, 36, 48

*In re Sprint Corp. Sec. Litig.*,
  232 F. Supp. 2d 1193 (D. Kan. 2002)........................................................58

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008) ........................................................55

*In re Thornburg Mortg., Inc. Sec. Litig.*,
  695 F. Supp. 2d 1165 (D.N.M. 2010)........................................................59

*In re U.S. Aggregates, Inc. Sec. Litig.*,
  235 F. Supp. 2d 1063 (N.D. Cal. 2002)........................................................56

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011) ........................................................50

*In re Williams Sec. Litig.*,
  339 F. Supp. 2d 1206 (N.D. Okla. 2003)........................................................30, 32, 56

*In re Williams Sec. Litig.*,
  496 F. Supp. 2d 1195 (N.D. Okla. 2007)........................................................18

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir. 2009) ........................................................53

*Joseph v. Wiles*,
  223 F.3d 1155 (10th Cir. 2000) ........................................................passim

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
  501 U.S. 350 (1991)........................................................12, 13

*Lenartz v. Am. Superconductor Corp.*,
  879 F. Supp. 2d 167 (D. Mass. 2012)........................................................34

*Ley v. Visteon Corp.*,
  543 F.3d 801 (6th Cir. 2008) ........................................................50

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)........................................................39

*Medina v. Clovis Oncology, Inc.*,
  No. CV 15-02546-RM-MEH, 2017 WL 530344 (D. Colo. Feb. 9, 2017) 40, 49, 55, 56

*MHC Mut. Conversion Fund, L.P. v. Sandler O'Neill & Partners, L.P.*,
  761 F.3d 1109 (10th Cir. 2014) ........................................................55, 56

*Miller v. Shell Oil Co.*,
  345 F.2d 891 (10th Cir. 1965) ........................................................34

*N. Sound Capital LLC v. Merck & Co.*,
  No. 3:13-CV-7240 FLW DEA, 2015 WL 5055769 (D.N.J. Aug. 26, 2015) ..............13

*Nakkhumpun v. Taylor*,
    782 F.3d 1142 (10th Cir. 2015) ................................................................ 39

*Nakkhumpun v. Taylor*,
    No. 12-CV-01038-CMA-CBS, 2013 WL 5446081 (D. Colo. Sept. 30, 2013) .......... 30

*Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA) LLC*,
    939 F. Supp. 2d 1113 (D. Kan. 2013).......................................................... 10

*Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.*,
    764 F.3d 1199 (10th Cir. 2014) .................................................... 11, 12, 13

*Nat'l Credit Union Admin. Bd. v. Barclays Capital Inc.*,
    785 F.3d 387 (10th Cir. 2015) .................................................................... 13

*New Jersey & its Div. of Inv. v. Sprint Corp.*,
    314 F. Supp. 2d 1119 (D. Kan. 2004)........................................................... 60

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    135 S. Ct. 1318 (2015)......................................................... 18, 20, 22, 26

*Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*,
    No. 1:12-CV-00993, 2015 WL 3833849 (M.D. Pa. June 22, 2015) .......................... 31

*Phillips Petroleum Co. v. Shutts*,
    472 U.S. 797 (1985)................................................................................ 16

*Pirraglia v. Novell, Inc.*,
    339 F.3d 1182 (10th Cir. 2003) ......................................................... 46, 47, 55

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ...................................................................... 27

*State Farm Auto Ins. Co. v. Boellstorff*,
    540 F.3d 1223 (10th Cir. 2008) ............................................................... 15, 16

*Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*,
    531 F.3d 190 (2d Cir. 2008) ...................................................................... 52

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)............................................................... 39, 46, 47, 56

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976)................................................................................ 17

*U.S. v. Brooks*,
    751 F.3d 1204 (10th Cir. 2014) .................................................................. 12

*United Food & Commercial Workers Union Pension Fund v. Chesapeake Energy Corp.*,
    774 F.3d 1229 (10th Cir. 2014) .................................................................. 19

*W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*,
    No. 05-CV-01344WDMMEH, 2008 WL 879023 (D. Colo. Mar. 28, 2008) ............. 49

*Weinstein v. McClendon*,
    No. CIV-12-465-M, 2013 WL 1457718 (W.D. Okla. Apr. 10, 2013) ....................... 59

**Statutes**

15 U.S.C. § 78u-4(b)(1) ........................................................................... 39

15 U.S.C. § 78u-4(b)(2) ........................................................................... 46

**Rules**

17 C.F.R. § 229.503(c) ............................................................................. 23

17 C.F.R. 230.405 ................................................................................... 59

Okla. Admin. Code 710:45-5-1 ................................................................ 18

Lead Plaintiffs ("Plaintiffs") respectfully submit this omnibus memorandum of law in opposition to the arguments in Defendants' two memoranda of law (Dkt. No. 95, 98) filed in support of their motions ("Motions") (Dkt. Nos. 94, 97, 101, 102, 103) to dismiss the claims in the amended complaint ("Complaint") (Dkt. No. 78) under (i) Sections 11, 12(a)(2) and 15 of the Securities Act ("Securities Act Claims"), and (ii) Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder ("Exchange Act Claims").[1]

The Securities Act Claims are brought on behalf of all persons who bought or acquired Common Units of Trust I or Trust II, pursuant or traceable to the Trust's Registration Statements. The Exchange Act Claims are brought on behalf of persons and entities who bought or acquired Trust I Common Units **only**, in the period between April 5, 2011 and November 8, 2012.

Section I of this memorandum addresses Defendants' arguments to dismiss the Securities Act Claims in their Securities Act brief ("SA-Br.") (Docket No. 95), and Section II of this brief addresses Defendants' arguments to dismiss the Exchange Act Claims in their Exchange Act brief ("EA-Br.") (Docket No. 98).

## SECTION I.

## THE SECURITIES ACT CLAIMS SHOULD NOT BE DISMISSED

## SUMMARY OF SECURITIES ACT ARGUMENTS

---

[1] All capitalized terms not defined herein shall have the meanings in the Complaint. In all quotations any emphasis is added, and internal citations omitted, unless otherwise noted.

**Point I:** The Securities Act Claims are timely under *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538 (1974) and *Joseph v. Wiles*, 223 F.3d 1155 (10th Cir. 2000). The 3-year statute of repose for those Claims (in Section 13 of the Securities Act) began to run on April 5, 2011 for the Trust I Offering, and on April 17, 2012 for the Trust II Offering. The separate 1-year statute of limitations for those Claims (in Section 13 of the Securities Act) began to run on November 8, 2012 for both Offerings.

On July 30, 2013, however, about two years after the first Trust offering and nine months after the first corrective disclosure, named plaintiffs who had purchased Trust Common Units timely filed a complaint asserting the Securities Act Claims against the Defendants on behalf of the *same* class alleged in this action. Under *American Pipe* and *Joseph*, the very filing of that complaint instantly tolled both the 1-year statute of limitation and 3-year statute of repose for the Securities Act Claims, regardless of whether those named plaintiffs were appointed under the PSLRA. Subsequently, after the Securities Act Claims were dismissed from the prior action without prejudice, this new action was filed less than 30 days later. Thus, this action is timely under both the 1-year statute of limitation and 3-year statute of repose.

*Joseph* remains good law in the Tenth Circuit despite *CTS Corp. v. Waldburger*, 134 S. Ct. 2175 (2014). *First*, even after *CTS*, the Tenth Circuit has continued to hold that the 3-year statute of repose is subject to *legal* tolling (the same species of tolling used in *Joseph*). *Second*, *Joseph* did not technically involve tolling at all since the Tenth Circuit deems all putative members of a class covered by a timely class action lawsuit to have instituted their own timely actions for limitations purposes when the original lawsuit was

2

filed. *Third*, tolling the 3-year statute of repose is consistent with the Tenth Circuit's policies of discouraging placeholder actions, and preserving class members' Constitutional opt out rights. Defendants' arguments to the contrary boil down to an improper request to ignore controlling Tenth Circuit precedent, and apply the law of other Circuits.

**Point II:** Defendants are liable under Section 11 because the Trust Offering documents omitted material facts required to make statements therein not misleading (as well as required to be stated therein by regulation). Specifically, the Trust I Registration Statement failed to disclose that the data most strongly influencing the Reserve estimate for future Trust I Wells came almost entirely from existing Trust I Wells that were not representative of those future Wells in terms of operator and location. That material omission misled investors into believing that the Reserve estimate for those future Wells was less risky than it actually was. Additionally, the Trust I Registration Statement omitted material data showing that SandRidge's track record as an operator of oil and gas wells in the relevant drilling locations was inferior.

The Trust II Registration Statement failed to disclose material data showing that the assumption of geological uniformity underlying the Reserve estimate for future Trust II Wells had been discredited in the county (Alfalfa) where a majority of those Wells would be drilled. This meant that the risk that the estimate was inaccurate was materially greater than disclosed. Further, the Trust II Registration Statement omitted material data showing that newly-drilled Trust I Development Wells were producing materially less oil, and more gas, than projected in the Trust I Registration Statement. Therefore,

unbeknownst to investors, the Trust I Offering was not the resounding "success" that the Trust II Offering documents touted it to be.

**Point III:** The bespeaks caution doctrine does not apply here under *Grossman v. Novell, Inc.*, 120 F.3d 1112 (10th Cir. 1997) because the statements in the Trust Offering documents rendered misleading by the material omissions concerned historical or then-present facts and opinions.

**Point IV:** The reasonable reliance defense does not apply here for several reasons. *First*, because they were prepared jointly by both Netherland Sewell *and* SandRidge, the Trust Reserve Reports constituted SandRidge management's opinions upon which Defendants were not entitled to rely as a defense. *Second*, the reliance defense does not "clearly" appear on the face of the Complaint since there are no allegations in the Complaint establishing that Defendants' reliance on the Trust Reserve Reports was reasonable. *Third*, at a minimum, "red flags" precluded Defendants' reliance on the Trust II Reserve Report.

**Point V:** All of the Defendants are liable under Section 12(a)(2). Courts in the Tenth Circuit have held issuers liable under Section 12(a)(2). Further, the Individual Defendants were motivated to serve the financial interests of SandRidge and the Trusts.

**Point VI:** Plaintiffs have adequately plead primary violations under the Securities Act. Therefore, the Section 15 claims should not be dismissed.

## BACKGROUND

### A. The Trust Offerings

In December 2010, SandRidge conveyed royalty interests to Trust I in (i) 37 existing horizontal Trust I Producing Wells located in Oklahoma in a geographic area known as the Trust I AMI; and (ii) 123 future horizontal Trust I Development Wells to be drilled in the Trust I AMI. (¶¶ 93-95).[2] To compensate SandRidge for the royalty interests, on April 5, 2011, Trust I offered Common Units to investors in the Trust I Offering underwritten by the Underwriter Defendants, yielding approximately $23.5 million in commissions for the Underwriter Defendants, and $338.7 million in net proceeds for SandRidge. (¶¶ 61, 101, 128). The Trust I Common Units were sold pursuant to a Registration Statement and Prospectus ("Trust I Offering Documents"), which incorporated a report prepared jointly by SandRidge and Netherland Sewell ("Trust I Reserve Report") that estimated the "Reserves" (i.e., anticipated oil and gas production) of the Trust I Wells, and the likelihood that such quantities would be recovered. (¶¶ 103-119). As detailed in Points II.B.1-2 below, the Trust I Offering Documents violated the Securities Act by omitting material facts required to make statements therein not misleading and that were also required to be stated therein by regulation.

In December 2011, SandRidge conveyed royalty interests to Trust II in (i) 67 existing horizontal Trust II Producing Wells located in Oklahoma in a geographic area known as the Trust II AMI, and (ii) 206 future horizontal Trust II Development Wells to be drilled in the Trust II AMI (which also included locations in Kansas). (¶¶ 177-78). To

---

[2] Citations to "¶_" without referencing a particular document are to paragraphs of the Amended Complaint.

compensate SandRidge for the royalty interests, on April 17, 2012, Trust II offered Common Units to investors in the Trust II Offering underwritten by the Underwriter Defendants, yielding approximately $37.6 in commissions for the Underwriter Defendants, and $590.2 million in net proceeds for SandRidge. (¶¶ 61, 183, 209). The Trust II Common Units were sold pursuant to a Registration Statement and Prospectus ("Trust II Offering Documents"), which incorporated a report prepared jointly by SandRidge and Netherland Sewell ("Trust II Reserve Report") that estimated the "Reserves" of the Trust II Wells, and the likelihood that such quantities would be recovered. (¶¶ 184-200). As detailed in Points II.B.3-4 below, the Trust II Offering Documents violated the Securities Act by omitting material facts required to make statements therein not misleading and required to be stated therein by regulation.

### B.  The SandRidge Energy Action

In late 2012 and early 2013, complaints were filed in the Western District of Oklahoma asserting Exchange Act claims. *In re Sandridge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2015 WL 3652522, at *1 (W.D. Okla. May 11, 2015). (*See* Declaration of Jonathan Horne, dated March 16, 2017 ("Horne Dec."), Ex. A). An amended complaint ("SandRidge Energy Complaint") was filed on July 30, 2013, identifying three named plaintiffs — Judith Greenberg, Charles Blackburn, and Ted Odell ("Securities Act Plaintiffs") — who collectively purchased Common Units in or traceable to both of the Trust Offerings, and asserted the Securities Act Claims against the Defendants on behalf of the same class alleged in this action (consisting of all purchasers of Common Units in or traceable to the Trust Offerings ("Securities Act Class")). (Horne Dec. Ex. B at ¶¶ 23-

54, 391-411; ¶¶ 2, 36-62, 264-88, 352). Since the Plaintiffs here purchased Common Units in or traceable to the Trust Offerings (¶¶ 34-35), the Securities Act Class in the SandRidge Energy Complaint covered the Plaintiffs here.

On May 11, 2015, Judge West entered orders ("SandRidge Energy Dismissal Orders") dismissing the Securities Act Claims against the Underwriter and Trust Defendants without prejudice for failure to comply with the notice provisions of the PSLRA. (Horne Dec. Exs. A and C).[3]

This Action was filed on June 9, 2015, less than one month later. The following chart sets out the relevant time limits, and the effect of *American Pipe* tolling under *Joseph*:

|  | **3-year statute of repose** | **1-year statute of limitations** |
| --- | --- | --- |
| Time statute began to run | April 2011 (Trust I); April 2012 (Trust II) | November 2012 |
| Time elapsed between running of statute and filing of SandRidge Energy Complaint (which tolled the statutes) | 2 years, 3 months (Trust I); 1 year, 3 months (Trust II) | 8 months |
| Additional time between dismissal of SandRidge Energy Complaint and filing of this action | 1 month | 1 month |
| **Total time elapsed** | **2 years, 4 months (Trust I); 1 year, 4 months (Trust II)** | **9 months from corrective disclosure** |
| **Length of statute** | **3 years from relevant offering - timely** | **1 year from corrective disclosure - timely** |

---

[3] On August 27, 2015, the Oklahoma District Court dismissed, *inter alia*, the Securities Act Claims against SandRidge and the Individual Defendants without prejudice for the same reason. (Horne Dec. Exs. D and E).

Therefore, since the SandRidge Energy Complaint tolled the 1-year statute of limitations and 3-year statutes of repose, the Section 11 claims in this action are timely.

## SECURITIES ACT CLAIMS ARGUMENT

**I.     THE SECURITIES ACT CLAIMS ARE TIMELY UNDER *JOSEPH***

### A.  On July 30, 2013, the SandRidge Energy Action Tolled the 3-Year Statute of Repose to Assert the Securities Act Claims Against the Defendants

The timely filing of a federal class action instantly tolls the statute of limitations on the claims asserted therein for all members of the purported class until class certification is denied. *American Pipe*, 414 U.S. at 554.  *American Pipe* tolling enables subsequent lawsuits by class members on the same claims to be deemed timely (even if such lawsuits would be untimely absent tolling). *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345, 353-54 (1983).

The Tenth Circuit has held that *American Pipe* tolls the 3-year statute of repose. *Joseph*, 223 F.3d at 1166-68 . In *Joseph*, a class action lawsuit filed in October 1989 timely asserted Exchange Act and Securities Act claims arising out of a May 1987 debenture offering on behalf of a class of investors. *Id.* at 1157. After the Securities Act claims were dropped from that lawsuit, an investor filed a new action asserting Securities Act claims in August 1990, more than 3 years after the May 1987 debenture offering. After the district court dismissed the new action as untimely under the 3-year statute of repose, the Tenth Circuit reversed, holding that the timely filing of the earlier October 1989 lawsuit tolled the statute of repose under *American Pipe*, and rendered the new action timely. *Id.* at 1167-68.

*Joseph* is directly on point. In the SandRidge Energy Action, the named Securities Act Plaintiffs who had purchased Trust Common Units *timely* asserted the Securities Act Claims against the Defendants on behalf of the Securities Act Class (consisting of all purchasers of Trust Common Units, including the Plaintiffs). (*See* Background, Section B, above). Thus, the SandRidge Energy Action tolled the running of the 3-year statute of repose on the Securities Act Claims, and those Securities Act Claims were timely asserted in this action.

Defendants argue that *American Pipe* tolling does not apply here because (i) the Plaintiffs appointed under the PSLRA in the SandRidge Energy Action never represented members of the Securities Act Class, and (ii) due to Judge West's dismissal, the "Trust I and Trust II unitholders never were part of any class" in the SandRidge Energy Action. (SA-Br. at 16-17). To trigger *American Pipe* tolling, however, there was no need for Judge West to appoint a representative for the Securities Act Class under the PSLRA, or to separately certify the Securities Act Class. Instead, tolling took effect instantly upon the filing of the SandRidge Energy Complaint. As the Supreme Court has explained, the filing of a class action complaint tolls "the applicable statute of limitations as to all *asserted* members of the class *who would have been parties had the suit been permitted to continue as a class action*." *Crown*, 462 U.S. at 353–54.

Here, as purchasers of Common Units, the Plaintiffs were members of the Securities Act Class "asserted" in the SandRidge Energy Complaint, and thus "would have been parties" to the SandRidge Energy Action had Judge West allowed the Securities Act Claims to proceed. Accordingly, the 3-year statute of repose was tolled as

to the Plaintiffs when the SandRidge Energy Complaint was filed.[4]

Defendants cite a single lower court case from a jurisdiction outside the Tenth Circuit holding that tolling does not apply when the plaintiffs in the earlier, timely filed lawsuit did not have standing to assert claims on behalf of the plaintiffs in the second action. (SA-Br. at 16) (citing *Boilermakers Nat. Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1*, 748 F. Supp. 2d 1246, 1259 (W.D. Wash. 2010)). That case is inapposite, however, since dismissal of the Securities Act Claims from the SandRidge Energy Action was not based on lack of standing, but rather based solely on the failure to issue a new PSLRA notice. *See* Horne Dec. Ex. A at *9 n.22; Ex. C at *11, n.26. Moreover, the Securities Act Plaintiffs named in the SandRidge Energy Complaint purchased Trust Common Units, and thus indisputably had standing to assert the Securities Act Claims on behalf of all class members who had purchased Trust Common Units. Finally, even if standing had been an issue (which it was not), Defendants ignore the majority view adopted by district courts in the Tenth Circuit, which holds that *American Pipe* tolling applies even where the named plaintiff in the earlier timely lawsuit lacked standing. *See, e.g.*, *Nat'l Credit Union Admin. Bd. v. Credit Suisse Sec. (USA) LLC*, 939 F. Supp. 2d 1113, 1127 (D. Kan. 2013).

Defendants misread *Joseph* when they cite it to argue that the SandRidge Energy Action did not toll the 3-year statute of repose. (SA-Br. at 16). In the paragraph in *Joseph*

---

[4] Defendants have not cited any authority that *American Pipe* tolling is not applicable to Securities Act claims raised for the first time in an amended complaint, as opposed to in an initial complaint. Logically, there is no difference since when an initial complaint triggers *American Pipe* tolling, the named plaintiffs will also not have yet been appointed under the PSLRA, and the tolling still instantly takes effect.

from which Defendants selectively quote, the Tenth Circuit unambiguously concluded that a lawsuit filed in May 1989 did not toll the 3-year statute of repose because the complaint in that lawsuit "contained *no named plaintiffs who had purchased debentures.*" 223 F.3d at 1168. In contrast, the SandRidge Energy Complaint named three plaintiffs who had purchased Trust Common Units. Thus, the SandRidge Energy Complaint tolled the running of the 3-year statute of repose for all investors who had purchased Trust I and Trust II Common Units (including Plaintiffs).

### B.  The SandRidge Energy Action Tolled the 1-Year Statute of Limitations

Defendants challenge the timeliness of the Securities Act Claims under the 1-year statute of limitations based on the same flawed arguments they raise concerning the 3-year statute of repose. (SA-Br. at 17).  Those arguments fail for the same reasons stated in Point I.A above. Moreover, *Joseph* held that legal tolling applies to statutes of repose just as it applies to statutes of limitations.  223 F.3d at 1166. Thus, if the filing of the SandRidge Energy Complaint tolled the 3-year statute of repose under *Joseph* (Point I.A above), then *a fortiori* the SandRidge Energy Complaint also tolled the 1-year statute of limitations since there is no controversy in the caselaw over applying *American Pipe* to ordinary statutes of limitations. *See Nat'l Credit Union Admin. Bd. v. Nomura Home Equity Loan, Inc.,* 764 F.3d 1199, 1224 n.10 (10th Cir. 2014) ("*Nomura*") (the 1-year statute of limitations is an ordinary statute of limitations).[5]

---

[5] Even Circuits that have declined to apply *American Pipe* tolling to the 3-year statute of repose agree that it applies to the 1-year statute of limitations. *See, e.g., Police & Fire Ret. Sys. of City of Detroit v. IndyMac MBS, Inc.*, 721 F.3d 95, 106-07 (2d Cir. 2013).

### C. *Joseph* Remains Good Law in the Tenth Circuit

#### 1. In the Tenth Circuit, Statutes of Repose Like the Three Year Limit Remain Subject to Legal Tolling Even After *CTS*

The Supreme Court's decision in *CTS* is not "contrary to," and does not "invalidate" *Joseph*. *See U.S. v. Brooks*, 751 F.3d 1204, 1209 (10th Cir. 2014) (absent *en banc* consideration, the Tenth Circuit will not "overturn the decision of another panel of this court" unless "the Supreme Court issues an intervening decision that is 'contrary' to or 'invalidates our previous analysis.'").

For the proposition that statutes of repose "generally may not be tolled," *CTS* cited *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350 (1991). 134 S. Ct. at 2183. *Joseph*, however, distinguished *Lampf* as barring *only* "equitable tolling," and *not* "legal tolling" of statutes of repose, and held that since *American Pipe* tolling constitutes legal tolling (i.e., tolling based on a statutory source like Rule 23), it was not affected by *Lampf. Id.* at 1166-67.

In 2013, the Tenth Circuit — citing *Joseph* — reaffirmed that "legal tolling" applies to statutes of repose. *Nomura*, 764 F.3d at 1225 n.12. With that principle in mind, *Nomura* held that the Extender Statute (prolonging the time period for the federal credit union agency to sue on certain claims) displaced the 3-year statute of repose. *Id.* at 1230-31. In 2014, on remand from the Supreme Court for reconsideration in light of *CTS*, the Tenth Circuit adhered to its earlier ruling, and reissued its original opinion. *Id.* at 1217-18. *Nomura* thus establishes that legal tolling of the 3-year statute of repose remains the law in the Tenth Circuit.

Defendants cite the *Barclays* decision (SA-Br at 14-15), but in *Barclays,* the Tenth Circuit *reaffirmed* the holding in *Nomura* that the Extender Statute displaces the 3-year statute of repose. *Nat'l Credit Union Admin. Bd. v. Barclays Capital Inc.*, 785 F.3d 387, 392 (10th Cir. 2015). Accordingly, *Barclays supports* Plaintiffs' argument that legal tolling of the 3-year statute of repose still applies in the Tenth Circuit.

To be sure, the Extender Statute addressed in *Nomura* and *Barclays* is a formal statute. But since *American Pipe* tolling also "derives from a statutory source (i.e., Rule 23)" (*Credit Suisse Sec. (USA) LLC v. Simmonds*, 132 S. Ct. 1414, 1419 n.6 (2012)), *Nomura* and *Barclays* indicate that the Tenth Circuit would continue to apply *American Pipe* legal tolling to the 3-year statute of repose as it did in *Joseph*, especially given that the Tenth Circuit has strongly embraced the policies underlying such tolling; *see* Point I.C.3 below. *See also N. Sound Capital LLC v. Merck & Co.*, No. 3:13-CV-7240 FLW DEA, 2015 WL 5055769, at *4-5, 11 (D.N.J. Aug. 26, 2015) (time limit that is a statute of repose under *CTS* is subject to *American Pipe* legal tolling).

In light of the foregoing, *CTS* is plainly inapposite. *CTS* never discusses legal tolling. It focuses on equitable tolling only. 134 S.Ct. at 2183 (statutes of repose not "subject to *equitable* tolling," and "*[e]quitable* tolling is applicable to statutes of limitations…"). Moreover, *CTS* (like *Lampf*) did not involve a class action, and thus did not even cite *American Pipe*, let alone limit its scope, or analyze the policies underlying its holding. (*See* Point I.C.3 below).[6]

---

[6] *Joseph* has never been an outlier. Both the Seventh Circuit and the Federal Circuit applied legal (a/k/a "class action") tolling to "jurisdictional time limits" that — like

**2.    Alternatively, *Joseph* Did Not Involve Tolling the 3-Year Statute of Repose At All Since the Tenth Circuit Deems All Members of a Class Covered by a Timely Class Action Lawsuit to Have Instituted Their Own Timely Actions for Limitations Purposes**

The holding in *Joseph* did not rest exclusively on legal tolling. Critically, in *Joseph*, the October 1989 lawsuit timely asserted a Securities Act claim on behalf of a class of which Mr. Joseph (the investor who filed the later August 1990 action) was a member. As a result, the Tenth Circuit treated Mr. Joseph as having already instituted his own action for limitations purposes. Thus, tolling was not required since Mr. Joseph's new lawsuit in August 1990 effectively continued the earlier, timely lawsuit filed in October 1989. As the Tenth Circuit explained:

> Here, the claim was (timely) brought within this period on behalf of a class of which Mr. Joseph was a member. Indeed, in a sense, application of the *American Pipe* tolling doctrine to cases such as this one ***does not involve "tolling" at all***. Rather, ***Mr. Joseph has effectively been a party to an action against these defendants*** since a class action covering him was requested but never denied.

*Joseph*, 223 F.3d at 1168. In 2008, the Tenth Circuit reaffirmed *Joseph*'s reasoning:

> Conceptually, *American Pipe* incarnates the principle that the class action is a representative creature. That is, members of a putative class are treated as if they were parties to the action itself . . . ***Thus, the filing of a class action, in a classic legal fiction, causes the courts to treat members of the asserted class as if they have instituted their own actions, at least so long as they continue to be members of the class***, and they have the benefit of tolling for as long as the class action purports to assert their claims . . . (Thus, applying) *American Pipe* tolling doctrine to cases such as this one ***does not involve tolling at all***.

*State Farm Auto Ins. Co. v. Boellstorff*, 540 F.3d 1223, 1229, 1232 (10th Cir. 2008).

Here, the Securities Act Plaintiffs timely asserted the Securities Act Claims within

---

statutes of repose — "destroy[] the liability," *Appleton Elec. Co. v. Graves Truck Line, Inc.*, 635 F.2d 603, 608 (7th Cir. 1980), and are not subject to equitable tolling. *Bright v. United States*, 603 F.3d 1273, 1287-88 (Fed. Cir. 2010).

the 3-year statute of repose on behalf of a class of which the Plaintiffs were members. Therefore, under *Joseph* and *Boellstorff*, the Plaintiffs are deemed to have already instituted a timely action against the Defendants. After Judge West dismissed the Securities Act Claims from the SandRidge Energy Action, the Plaintiffs simply assumed control over Securities Act Claims that had already been timely asserted. *See Boellstorff*, 540 F.3d at 1233 (in new action, class member "simply retook the reins" from original named plaintiff).

CTS does not undermine the approach above since there was no prior *timely* lawsuit against the defendants in that case. Rather, in *CTS*, the *only* lawsuit against the defendants was an *untimely* state nuisance action commenced more than 14 years *after* the expiration of the North Carolina statute of repose (barring toxic tort suits brought more than 10 years after the last culpable act of the defendant). 134 S.Ct. at 2181.

### 3. Tolling the 3-Year Statute of Repose Under *American Pipe* Discourages Placeholder Class Actions, and Preserves Class Members' Constitutional Opt Out Rights

The Supreme Court has stressed that tolling time limits upon the commencement of a class action lawsuit advances Rule 23's goals of judicial efficiency and economy by discouraging protective filings, and instead encouraging class members to rely on the named plaintiffs to press their claims. *Crown*, 462 U.S. at 352-53; *American Pipe*, 414 U.S. at 550-54. The Tenth Circuit has embraced that rationale:

> Pragmatically, the (Supreme) Court concluded that a tolling rule was necessary to advance the goals of Rule 23, namely "the efficiency and economy of litigation." ***If not for a tolling doctrine, individuals would feel compelled to file placeholder lawsuits prior to the expiration of the statute of limitations***, thereby clogging the channels of the court with suits already encompassed by the class action.

*Boellstorff*, 540 F.3d at 1229. *See also Joseph*, 223 F.3d at 1167 (same).

The Supreme Court has also interpreted *American Pipe* as ensuring that the Constitutional right to opt out is not rendered meaningless due to expiration of time limits. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 n. 13 (1974). *See also Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 812 (1985) (due process requires that absent plaintiff be provided with an opportunity to opt out). The Tenth Circuit has embraced that rationale as well. *See Joseph*, 223 F.3d at 1167 (right to opt-out and pursue individual claims would be meaningless without tolling because the limitations period for absent class members would most likely expire before the class certification stage).[7]

Not applying *American Pipe* tolling to the 3-year statute of repose would prompt a flood of placeholder lawsuits, and curtail the Constitutional right to opt out in Securities Act cases. Thus, since the Tenth Circuit supports the policies of judicial efficiency and preservation of opt out rights underlying *American Pipe* tolling, there is no question it would continue to apply *American Pipe* tolling to the 3-year statute of repose as it did in *Joseph*.[8] No intervening decision is "contrary" to *Joseph* or "invalidates" its reasoning.

---

[7] In the SandRidge Energy Action, the new motions to dismiss filed on December 18, 2015 in the SandRidge Energy Class Action remain pending more than three years after the original complaints were filed; Horne Dec. Ex. F).

[8] On January 13, 2017, the Supreme Court granted a petition for certiorari on the following question: "Does the filing of a putative class action serve, under the *American Pipe* rule, to satisfy the three-year time limitation in Section 13 of the Securities Act with respect to the claims of putative class members?" *California Pub. Employees' Ret. Sys. v. ANZ Sec., Inc.*, No. 16-373, 2017 WL 125670 (U.S. Jan. 13, 2017). Notably, a group of six retired federal district court judges filed an amicus brief urging the Court to take up the case, and find that *American Pipe* tolls the 3-year statute of repose. In doing so, they

16

## II. PLAINTIFFS HAVE ADEQUATELY ALLEGED SECURITIES ACT CLAIMS

### A. Legal Standards

On a motion to dismiss, a court must accept all well-pleaded allegations in a complaint as true, and draw all reasonable inferences in favor of the plaintiff. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1333, 1343 (10th Cir. 2012).

Section 11 imposes liability for omission of material facts required to be stated in a registration statement, or necessary to make statements therein not misleading. *In re Oppenheimer Rochester Funds Grp. Sec. Litig.*, 838 F. Supp. 2d 1148, 1166 (D. Colo. 2012); *Genesee Cty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3*, 825 F. Supp. 2d 1082, 1124 (D.N.M. 2011). An omitted fact is material if a reasonable investor would have considered it important in determining whether to buy or sell the relevant security, and if its disclosure would have "significantly altered the 'total mix' of information available" to investors. *Grossman*, 120 F.3d at 1119 .[9]

Under Section 11's omissions clause, a subjective belief in the accuracy of an

---

expressed the concern that "protective filings" will increase (and further complicate securities class actions) if the Supreme Court were to hold that the *American Pipe* rule does not toll the 3-year statute of repose. (*See* Horne Dec. Ex. I at 1-2).

[9] The Supreme Court has cautioned that the materiality determination "requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976). Therefore, a complaint should not be dismissed on the ground that alleged omissions are not material "unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985). *See also In re Williams Sec. Litig.*, 496 F. Supp. 2d 1195, 1279 (N.D. Okla. 2007) (same), *aff'd*, 558 F.3d 1130 (10th Cir. 2009) ("*Williams II*").

opinion contained in a registration statement will *not* insulate a defendant from liability "in the face of known contradictory evidence." *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1329 n.6 (2015). That is, to avoid liability, even an honestly held opinion contained in a registration statement must still "fairly align with the information in the issuer's possession" when the opinion was stated. *Id.* at 1329.

Here, at the time of each Trust Offering, Defendants possessed oil and gas production data from the Trust Wells that SandRidge had reported monthly to the Oklahoma Tax Commission ("OTC") under Subchapter 5 of Chapter 45 of the Regulations of the Oklahoma Tax Commission (Okla. Admin. Code 710:45-5-1). (Horne Dec., Ex. G). In turn, the OTC provided that data to commercial providers such as LasserData.com (the source of the data alleged in the Amended Complaint). (¶ 97). Therefore, the OTC Production Data alleged in the Complaint constitutes evidence possessed by Defendants at the time of each Trust Offering. (*See* SA-Br. at 26-30). Indeed, such data was closely monitored by SandRidge, discussed by its senior management at monthly meetings, and incorporated into management presentations to analysts. (¶¶ 63-75, 109-10, 153-54, 188). As discussed below, the failure to disclose relevant portions of that data in the Trust Offering Documents creates liability under Section 11 and Section 12(a)(2).[10]

---

[10] Defendants concede that Section 12(a)(2) imposes liability for material omissions in prospectuses under the same standards as Section 11 (arguing only that certain defendants may not be held liable under Section 12(a)(2); *see* Point V below). Defendants also do not dispute that Plaintiffs need not allege scienter, reliance or loss causation to sustain their Securities Act claims. *See United Food & Commercial Workers Union Pension Fund v. Chesapeake Energy Corp.*, 774 F.3d 1229, 1233 (10th Cir. 2014).

**B.  Defendants Are Liable Under Section 11 and Section 12(a)(2) For Omitting Material Data From the Trust Offering Documents**

> **1.  The Trust I Offering Documents Omitted Material Data Indicating That the Reserve Estimates for the Trust I Development Wells Were Riskier Than Disclosed**

The Trusts were intended to appeal to public investors looking for investment income. (¶ 103). The cash available for distribution to Trust investors depended in major part on the Reserves of the Trust Wells. (¶ 104). In the case of Trust I, *two-thirds* of the Reserves were attributable to the 123 horizontal Trust I Development Wells to be drilled primarily by SandRidge across the Trust I AMI (consisting of locations across five Oklahoma counties — Alfalfa, Woods, Grant, Garfield and Major). (¶¶ 95, 99, 116; Declaration of John J. Clarke, Docket No. 96 ("Clarke Dec."), Ex. 1 at 10).

The Trust I Reserve Report estimated the Trust I Development Well Reserves and classified them as "Proved" because it concluded there was a "Reasonable Certainty" (i.e., "high degree of confidence" akin to a 90% probability) of recovering those Reserves (as opposed to classifying them as "Probable," which would have meant there was a much lower likelihood of recovering the estimated Reserves akin to a 50% probability). (¶¶ 80-82, 113).

The Trust I Offering Documents explained that a Reasonable Certainty "exists with respect to the Reserves that can be expected from" the Trust I *Development* Wells because Trust I *Producing* Wells that "***cover a wide area of the [Trust I] AMI***," and ***were drilled primarily by SandRidge***, had "all encountered proven reserves in the Mississippian formation" and "demonstrated consistent levels of production." (¶¶ 114,

138-39; Clarke Dec., Ex. 1 at 10, 67, F-5 note (a)).

A reasonable investor would have understood from the statements above that a "Reasonable Certainty" existed concerning the Reserve estimates of the Trust I Development Wells because they shared the same attributes in terms of operator (SandRidge) and location (the five counties comprising the Trust I AMI) as existing Trust I Producing Wells that had been successful. *See Omnicare*, 135 S.Ct. at 1331-32 ("Section 11's omission clause, *as applied to statements of both opinion and fact*, necessarily brings the reasonable person into the analysis, and asks what she would naturally understand a statement to convey beyond its literal meaning.").

In discussing the risks associated with estimating the Trust I Reserves, the Trust I Offering Documents conceded that "[r]eserve estimates for fields that do not have a lengthy production history are less reliable than estimates for fields with lengthy production histories," and disclosed that "[m]ost of the Producing Wells have been operational for less than one year." (¶ 131; Clarke Dec., Ex. 1 at 20). Unbeknownst to investors, however, 9 out of the 10 Trust I Producing Wells with production for *one year or more* prior to the Trust I Offering — i.e., the Producing Wells with concededly the most reliable production history — were operated by *Chesapeake* in *Woods* County (and *not* by SandRidge across all five counties in the Trust I AMI). (¶¶ 130-37). Trust I Producing Wells with more reliable production histories would have more strongly influenced Reserve estimate for the Trust I Development Wells than Trust I Producing Wells with less reliable production histories. (¶ 140 n.8). Consequently, unbeknownst to investors, the Production Data most strongly influencing that estimate came almost

entirely from Producing Wells that were *not* representative of the Development Wells being estimated because the attributes of those Producing Wells (drilled by Chesapeake exclusively in Woods County) *materially differed* from the attributes of the Development Wells (to be drilled primarily by SandRidge across all 5 counties comprising the Trust I AMI). (¶¶ 140-41).

The failure to disclose the influence of the non-representative Chesapeake Well data was material (i.e., significantly altered the total mix of information available to investors, and withheld data that would have been important to reasonable investors in determining whether to buy Common Units). That is because (i) the Trust I Development Well Reserves were projected to generate the majority of the revenue to pay distributions, and (ii) the use of non-representative Chesapeake Well data to estimate those Reserves materially increased the risk that the estimate was inaccurate. (¶¶ 116, 140).

Accordingly, Defendants are liable under Section 11 because, by not disclosing the Chesapeake Well data, they affirmatively misled investors into believing that the estimate of the Trust I Development Wells Reserves was less risky than it actually was. *See Oppenheimer*, 838 F. Supp. 2d at 1166-67 (nondisclosure of data created Section 11 and 12(a)(2) liability where such nondisclosure affirmatively misled investors by suggesting that certain of Funds' investments were less risky than they actually were). Moreover, even if Defendants honestly believed the estimate, they remain liable since the omitted *non-representative* Chesapeake Well data conflicts with what a reasonable investor would have taken from the statements above (from the Trust I Offering Documents) describing the basis for the estimate; namely, that it was based on

*representative* data. *See Omnicare*, 135 S.Ct. at 1329.

Defendants counter that the Trust I Reserve Report relied on a "much broader universe of data" than the Chesapeake Well data, "including 'data from more than 1,200 vertical wells and 40 horizontal wells' that had already been drilled in the Mississippian Formation." (SA-Br. at 23).[11] But the Trust I Offering Documents warned that vertical wells were not representative of horizontal wells: "there can be no assurance that" historical production data from *vertical* wells "can accurately predict future production from *horizontal* wells." (Clarke Decl. Ex. 1, at 20). As noted above, the Trust I Offering Documents also warned in the same Risk Factor that horizontal wells with production histories of less than one year were less reliable. A reasonable investor would have assumed that all material risk factors concerning Reserve estimates had been disclosed. But that was not the case since there was *no warning* that the most reliable — and hence most influential — data used to prepare the Trust I Development Wells Reserve estimate came almost exclusively from the *non-representative* Chesapeake Wells in Woods County. Defendants should have warned of that risk — because it was material — and could have easily done so by adding the language highlighted below to the Risk Factor:

> Reserve estimates for fields that do not have a lengthy production history are less reliable than estimates for fields with lengthy production histories . . . Most of the Producing Wells have been operational for less than one year, ***and nearly all of the Producing Wells operational for one year or more (i.e., those with the most reliable production histories) were drilled by a third party exclusively in Woods County, while the Development Wells will be drilled primarily by SandRidge in***

---

[11] The 40 Wells referenced in this excerpt refer to the Trust I Producing Wells, but as noted in the Complaint, it should be 37. (¶ 114 n.2).

**_all five counties in the Trust I AMI_**. (*See* Clarke Dec., Ex. 1 at 20).[12]

### 2. The Trust I Offering Documents Omitted Material Data Relevant to Assessing SandRidge's Operating Experience

Omission of the Chesapeake well data also rendered misleading statements in the Trust I Offering Documents citing SandRidge's operating experience in the Mississippian formation as a key investment consideration. (¶ 142-43). A reasonable investor would have understood those statements as suggesting that SandRidge's operation of a majority of the Trust I Wells was a *positive* factor supporting investment in Trust I.

In fact, unbeknownst to investors, SandRidge's Producing Wells had produced considerably less oil than Chesapeake's Producing Wells. (¶ 134-36). Given the premium price commanded by oil (¶ 120-24), the fact that SandRidge would operate a majority of the Trust I Wells could thus reasonably be deemed a *negative* consideration.

The issue is not that SandRidge should have portrayed its operating capabilities in a negative light. (SA-Br. at 28). Rather, SandRidge misled by portraying its capabilities in a positive light when reasonable investors would have perceived SandRidge's experience as a negative factor had the relevant data been disclosed.

### 3. The Trust II Offering Documents Omitted Material Data Concerning the Absence of Geological Uniformity in Alfalfa County

More than 60% of Trust II's Proved Reserves were attributable to 122 horizontal

---

[12] Item 503 requires a discussion of the "principal factors that make the offering speculative or one of high risk." *Brady v. UBS Fin. Servs., Inc.*, No. 10-CV-284-SPF-FHM, 2013 WL 1309250, at *20 (N.D. Okla. Mar. 26, 2013) (*citing* 17 C.F.R. § 229.503(c)). Accordingly, for the reasons noted, nondisclosure of the Chesapeake Well data in the Trust I Offering Documents also violated Item 503 of Regulation S-K by failing to disclose a principal risk factor. (¶ 144).

Trust II Development Wells ("Proximate Development Wells") to be drilled proximate to existing Trust II Producing Wells in three counties — Alfalfa (58.7%), Grant (27%) and Woods (14.3%). (¶¶ 177-80, 198-99). The Trust II Reserve Report estimated the Proximate Development Well Reserves and classified them as "Proved" because it concluded that there was a "Reasonable Certainty" of recovering those Reserves. (¶ 191).

The Trust II Offering Documents explained that a Reasonable Certainty "exists with respect to the reserves that can be expected from" Proximate Development Wells drilled proximate to Trust II Producing Wells for two reasons. First, Trust II Producing Wells had "all encountered proven reserves in the Mississippian formation" and "demonstrated consistent levels of production." Second, it was concluded there existed "***continuity . . . across the [Trust II AMI]***" as demonstrated by, *inter alia*, "***consistency in reservoir properties such as porosity, thickness and stratigraphic conformity***." (Clarke Dec., Ex. 2 at 11, 68, F-5 at note(b); ¶¶ 192, 211).

A reasonable investor would have understood from the second reason above that the assumption of geological "continuity across the Trust II AMI" was central to the conclusion that recovery from Proximate Development Wells in the Trust II AMI was "Reasonably Certain." Unbeknownst to investors, however, Defendants possessed but failed to disclose data invalidating the assumption of "continuity" in Alfalfa County — nearly every pair of horizontal Trust I wells drilled in Alfalfa County prior to the Trust II Offering produced divergent quantities of oil and gas ("Alfalfa County Data"). (¶¶ 170-

74, 212-13 and Exs. C and D).[13]

Given the divergent oil production of adjacent wells drilled in Alfalfa County, Defendants knew or should have known that, as of the time of the Trust II Offering, Alfalfa County was not geologically uniform. As SandRidge's expert testified:

> In the Mississippian (Lime) there is not a uniformity of geology, it's not a homogeneous geology. ***You can have reserves that even though they are developed right next to each other from a well bore basis, they produce very differently*** . . . So from a predictability standpoint the Mississippian (Lime) assets are not a predictable resource. (¶ 175; Horne Decl. Ex. H at 73:16-25).

The Alfalfa County Data was material. First, nearly 60% of Trust II's Proved Reserves were attributable to the Proximate Development Wells. (¶ 199). Second, a majority of those Wells were likely to be (and ultimately were) drilled in Alfalfa County (since (i) nearly 60% of the Trust II Producing Wells had already been drilled in Alfalfa County, and Proximate Development Wells — by definition — would be drilled proximate to existing Trust II Producing Wells, and (ii) Alfalfa County was SandRidge's most active county in the Mississippian Formation; ¶¶ 168, 180). Thus, the Alfalfa County Data indicated that a *significant* percentage of the Proximate Development Well Reserves might *not* have a "Reasonably Certain" likelihood of recovery (due to lack of geological uniformity in Alfalfa County), and thus might not justifiably be classified as "Proved." (¶¶ 174, 213). Accordingly, Defendants are liable under *Omnicare* — the opinion that geological uniformity existed "*across* the (Trust II) AMI" (which would

---

[13] For example, in their first four months of production, Producing Well Jeffrey 1-27H produced 73.3% oil while the adjacent Development Well, Jeffrey 2-27H, produced 19.8% oil. (AC, Ex. C). Similarly, Development Well Doherty 1-3H produced 6.3% oil while the adjacent Development Well, Doherty 2-3H, produced 78.2% oil. (AC, Ex. D).

have included Alfalfa County) did not "fairly align" with — indeed, was contradicted by — the omitted Alfalfa County Data that Defendants possessed showing that geological uniformity did not exist in Alfalfa County. *Omnicare*, 135 S.Ct. at 1329 & n. 6.[14]

Defendants engage in meaningless semantics when they mistakenly contend the Trust II Registration Statement "never claimed there was 'geological uniformity' throughout the Mississippian Formation." (SA-Br. at 29). The allegations concerning geological uniformity pertain to locations in Alfalfa County (not the entire Mississippian Formation) (¶¶ 169-74), and as noted, the Trust II Offering Documents plainly stated that the "continuity" and "consistency" of the formation "across the AMI" — which included drilling locations in Alfalfa County — was "*established*" by techniques that included "geological mapping," and "*confirmed*" by geological attributes "such as porosity, thickness and stratigraphic conformity." (Clarke Decl., Ex. 2 at 68).

Critically, geological "continuity," "consistency," and "uniformity" are not terms of art. (*See* Netherland Sewell's Definitions of Oil and Gas Reserves at Clarke Decl., Ex. 2 at A-4-13, A-17-26; Plaintiffs' Glossary at ¶¶ 76-91). Thus, the Complaint was not being imprecise when it referred to "uniformity" rather than "consistency" or "continuity;" it merely employed the synonym used by SandRidge's own expert. (¶ 175).

In plain English, "geological continuity" and "geological consistency" (as used in the Trust II Registration Statement) mean the same thing as "geological uniformity" (as

---

[14] For the reasons noted, disclosure of the Alfalfa County Data in the Trust II Offering Documents was also required by Item 503 of Regulation S-K, which requires disclosure of all significant risk factors. (¶¶ 221-24).

used by SandRidge's expert), and thus are synonyms that can be used interchangeably. (*See* online version of Roget's 21st Century Thesaurus, Third Edition, *http://www.thesaurus.com/browse/consistency* (listing "uniformity" as a synonym for "continuity" when used as a noun in the sense of "*constancy*, regularity") and *http://www.thesaurus.com/browse/continuity* (listing "constancy" as a synonym for "continuity")). Thus, Defendants' contention that those words do not mean the same thing cannot be resolved on a motion to dismiss. *See Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 689 (5th Cir. 2014) (declining to consider defendant's interpretation of a term used in the defendant's statements because plaintiff's interpretation was plausible); *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("Absent *undisputed* evidence that these were terms of art that investors would have understood to refer to stop-work orders, we cannot find, as a matter of law, that defendants disclosed that backlog included a significant amount of work that had been halted by the company's customers"); *Oppenheimer*, 838 F. Supp. 2d at 1162 n.7 (challenge to plaintiff's definition of "illiquidity" and related methodologies not germane on motion to dismiss).

Defendants' suggestion that they were not aware of the Alfalfa County Data (SA-Br. at 30) is directly contradicted by SandRidge's reference in a June 2011 presentation to data from the Peffly and Victor wells in Alfalfa County (which formed a part of the Alfalfa County Data). (*See* ¶ 154 & Ex. C (Victor wells) and Ex. D (Peffly wells)). Defendants' assertion that they could not have drawn the same inferences from the Alfalfa County Data as Plaintiffs did is belied by the Trust II Offering Documents, which

27

state that Proximate Development Wells could be classified as Proved because the *continuity* of the Trust II AMI had been *established* by reviewing "extensive production data from more than . . . 145 horizontal wells," which included the horizontal Trust I Wells that generated the Alfalfa County Data. Those statements demonstrate that Defendants reviewed the performance of proximate horizontal wells to assess geological uniformity, and when they found divergent results (as per the Alfalfa County Data), they would have realized the geology in Alfalfa County was not uniform (as per the testimony of SandRidge's expert).[15]

Finally, the Complaint states that short production histories are "less reliable" (¶135 n.7), *not* "unreliable." (SA-Br. at 28, 31). The Complaint further explains that characterization of short production histories as "less reliable" derives from the Trust Offering Documents, which warned that "[m]ost of the Producing Wells have been operational for less than one year" (¶ 131), and yet concededly relied primarily on those less reliable short production histories to estimate Reserves for hundreds of future horizontal Development Wells. (Clarke Decl., Ex. 1 at 20, Ex. 2 at 22-23). As such, Plaintiffs' use of production histories of less than one year when analyzing the Alfalfa County Data (as well as the Negative Trust I Oil Production Trends, *see* Point II.B.4 below) is fully consistent with the methodologies used in the Trust Reserve Reports,

---

[15] Defendants err when they contend that classification of the 84 Trust II Development Wells as "Probable" took the omitted Alfalfa County Data into account. (SA-Br. at 24). Those 84 Wells were classified as "Probable" because they would *not* be drilled adjacent to any existing horizontal Well. (¶ 193). The Alfalfa County Data was not relevant to that classification since it was generated by pairs of Development Wells drilled next to each other; not single, unpaired horizontal wells. (¶¶ 170-73).

which also concededly used production histories shorter than one year.

### 4. The Trust II Offering Documents Omitted Material Data Concerning the Production Trends of the Trust I Wells

The Trust II Offering Documents touted the "success" of the Trust I Offering by highlighting how recent quarterly cash distributions to Trust I Unitholders had exceeded the target distributions for those quarters. (¶ 214). However, OTC Production Data shows that — in the months leading up to the Trust II Offering — the oil production of the Trust I Development Wells drilled primarily in Alfalfa, Grant and Woods counties was *not* meeting the projections in the Trust I Registration Statement that those Wells would produce 18% *more* oil than the Trust I Producing Wells. (¶¶ 118-19, 155-61) ("Negative Trust I Oil Production Trends"). Thus, the only way for Defendants to meet the production and cash distribution targets in the Trust I Offering Documents was to accelerate drilling of the Trust I Development Wells (thus making up for poor oil production at the individual well level with an increased number of wells). (¶¶ 162-65).[16]

Touting the success of the Trust I Offering without disclosing the Negative Trust I Oil Production Trends was a material omission under Section 11 (and violated Item 303 of Regulation S-K, which requires disclosure of known trends; ¶¶ 217-20) because it would have significantly altered the total mix of information available to investors — and

---

[16] Defendants' suggestion that SandRidge "had a powerful incentive" to accelerate drilling of the Trust I Development Wells (SA-Br. at 7) would only be true if the Wells were performing successfully (in which case, SandRidge would be eager to share a greater portion of the profitable revenue). But since the Trust I Development Wells were performing poorly, SandRidge would have been — absent other considerations — incentivized to slow down drilling to minimize losses. (*See* Clarke Decl., Ex. 1, at 18). Since Defendants, however, wished to tout the success of the Trust I Offering, they accelerated drilling anyway to boost results.

been considered important by prospective investors in the Trust II Common Units — to know that the oil production of the Trust I Development Wells was not meeting forecasts in the *same three counties* where all of Trust II Producing Wells had been drilled, and the majority of the Trust II Development Wells would be drilled. (¶¶ 214-16).

## III.    THE BESPEAKS CAUTION DOCTRINE DOES NOT APPLY

The bespeaks caution doctrine does not apply to misleading statements concerning historical or then-present facts or opinions. *See Grossman*, 120 F.3d at 1123; *In re Williams Sec. Litig.*, 339 F. Supp. 2d 1206, 1231 (N.D. Okla. 2003); *Nakkhumpun v. Taylor*, No. 12-CV-01038-CMA-CBS, 2013 WL 5446081, at *9 (D. Colo. Sept. 30, 2013), *aff'd in part, rev'd in part on other grounds*, 782 F.3d 1142 (10th Cir. 2015). Here, all of the statements rendered misleading by Defendants' omissions of material data concerned historical or then-present facts or opinions, and thus the bespeaks caution doctrine does not apply to them.

Point II.B.1 discusses misleading statements concerning classification of the Trust I Development Well Reserves as "Proved" *on the date of the Trust I Offering*; Point II.B.2 concerns misleading statements regarding SandRidge's *historical* experience as an operator in the Mississippian Formation; Point II.B.3 addresses misleading statements concerning geological continuity across the Trust II AMI *as of the date of the Trust II Offering*; and Point II.B.4 covers misleading statements touting the *then-current* "success" of the Trust I Offering.

To be sure, Reserve classifications such as "Proved" also communicate the probability of future recoveries. But Plaintiffs do *not* claim any of the statements

addressed in Points II.B.1 or II.B.3 above were misleading because of that forward-looking aspect (i.e., because actual results fell short of forecasts). Rather, the statements in Point II.B.1 were rendered misleading because they failed to disclose that the estimate of the Trust I Development Well Reserves (classified as "Proved") was most strongly influenced by the non-representative Chesapeake Well data, which increased the risk that such estimate was inaccurate *as of the date of the Trust I Offering*. Similarly, the statements in Point II.B.3 were misleading because they explained that the Proximate Development Well Reserves could be classified as "Proved" *on the date of the Trust II Offering* based on the *then-current* assumption of geological uniformity across the Trust II AMI, but failed to disclose that such assumption had been discredited in Alfalfa County. *See Bumgarner v. Williams Companies, Inc.*, No. 16-CV-26-GKF-FHM, 2016 WL 3162062, at *3-4 (N.D. Okla. June 3, 2016) (allegedly misleading statements pertaining to estimates not protected by bespeaks caution doctrine where misleading explanations pertaining to estimates were statements of then-current fact); *Se. Pennsylvania Transp. Auth. v. Orrstown Fin. Servs., Inc.*, No. 1:12-CV-00993, 2015 WL 3833849, at *16 (M.D. Pa. June 22, 2015) (mixed present/future statements not protected under bespeaks caution doctrine as to part of statement that refers to then-present facts) (citing multiple Circuit Court authorities).

Finally, even were the Court to conclude that the misleading statements in Points II.B.1 and II.B3 were forward-looking, the cautionary language here was inadequate given the materially heightened risks posed by the omitted data. *See Williams*, 339 F. Supp. at 1231 (under bespeaks caution doctrine, cautionary language "must warn

investors of exactly the risk that Plaintiffs claim was undisclosed."). Specifically, as per Point II.B.1 above, the Risk Factor on page 20 of the Trust I Offering Documents should have disclosed (but did not) the increased risk from the use of the non-representative Chesapeake Well data. Similarly, as per Point II.B.3 above, the Trust II Offering Documents should have included (but did not) a Risk Factor disclosing that the assumption of geological uniformity had been discredited in Alfalfa County where the majority of the Proximate Development Wells would be drilled.

In short, at a minimum, "reasonable minds could disagree" concerning whether the disclosures made in the Trust Offering Documents adequately warned investors concerning the additional risks posed by the omitted data. *See In re SemGroup Energy Partners, L.P.*, 729 F. Supp. 2d 1276, 1293 (N.D. Okla. 2010). Therefore, even assuming *arguendo* that the bespeaks caution doctrine applies (it does not), the Securities Act Claims should not be dismissed under it.

## IV.  THE REASONABLE RELIANCE DEFENSE IS NOT AVAILABLE

### A. The Trust Reserve Reports Constituted Management Opinions

The reliance defense does not extend to management opinions. *See In re CytRx Corp. Sec. Litig.*, No. CV 141956 GHKPJWX, 2015 WL 5031232, at *17 (C.D. Cal. July 13, 2015) (underwriters not entitled to rely on management assurances); *In re Dynegy, Inc. Sec. Litig.*, 339 F. Supp. 2d 804, 872 (S.D. Tex. 2004) (same regarding board members). Here, the Trust Reserve Reports constituted management opinions (not independent expert reports) because they were prepared jointly by Netherland Sewell *and* SandRidge (*not* Netherland Sewell alone). (¶¶ 106-08, 186-87). Defendants cite no

authority that they were entitled to rely on the Trust Reserve Reports when those Reports contained conclusions reached jointly by SandRidge and Netherland Sewell. Moreover, the misleading statements identified in Points II.B.2 (concerning SandRidge's experience as an operator in the Mississippian Formation) and II.B.4 (concerning the alleged "success" of the Trust I Offering) concerned management representations not addressed in the Trust Reserve Reports at all.

### B. The Defense Does Not Appear Clearly on the Face of the Complaint

Even assuming *arguendo* that the Trust Reserve Reports constituted "expertised" material, a reasonable reliance defense almost always raises "question[s] of fact that cannot be resolved on pleadings alone." *Dynegy*, 339 F. Supp. 2d at 874. *See also In re Enron Corp. Sec., Derivative & "ERISA" Litig.,* No. CIV. H-01-3624, 2005 WL 3704688, at *19 (S.D. Tex. Dec. 5, 2005) (same). Therefore, as Defendants concede, a complaint should not be dismissed based on reasonable reliance unless the defense "*clearly* appears on the face of the complaint." (SA-Br. at 32). That is a very high hurdle. As such, not surprisingly, two of the cases cited by Defendants *denied* requests by officers, directors and underwriters to dismiss claims based on reasonable reliance. *See In re Fleming Cos. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *51 (E.D. Tex. June 16, 2004); *Dynegy*, 339 F. Supp. 2d at 874-75.[17]

A reasonable reliance defense does not appear "clearly" on the face of a complaint

---

[17] The two other cases cited by Defendants are inapt. In *Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965), which concerned deprivation of property without due process, the defense was not discussed at all. In *Lenartz v. Am. Superconductor Corp.*, 879 F. Supp. 2d 167, 187-93 (D. Mass. 2012), the defense was referenced but not applied by the court; apparently it was not pressed by the defendants.

unless the complaint contains allegations *establishing* that reliance was reasonable. *Dynegy*, 339 F. Supp. 2d at 875, *Fleming*, 2004 WL 5278716, at *51. Here, Defendants claim only that the Trust Reserve Reports were expertised, but have not identified any allegations in the Complaint (such as investigations or inquiries) establishing reasonable reliance on those Reports. To the contrary, the conclusions in the Trust Reserve Reports were concededly based in part on data from SandRidge (generated by it own wells or obtained by SandRidge from other operators) (¶¶ 108, 187; Clarke Dec. Ex. 1 at 67; Ex. 2 at 68-69), and the Complaint alleges that SandRidge concealed key data in its possession. (Point II.B above). *See Dynegy*, 339 F. Supp. 2d at 874 (distinguishing case where defense accepted as one in which plaintiffs *admitted* that management disclosed *all* material information to expert). Further, the complaint explains what reasonable investigations would have uncovered, i.e., omission of the Cheasapeake Well data, Alfalfa County Data, and Negative Trust I Oil Production Trends. *See In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 323 (S.D.N.Y. 2013) (defense not adequately plead where a reasonable investigation would have revealed the omissions).

Ultimately, the burden is *not* on the Plaintiffs to allege that reliance was not reasonable (SA-Br. at 4), but on Defendants to cite allegations on the face of the Complaint demonstrating reasonable reliance. *Dynegy*, 339 F. Supp. 2d at 874. Conclusory assertions of reliance do not satisfy Defendants' burden.

### C.  "Red Flags" Precluded Reliance on the Trust II Reserve Report

Plaintiffs need not plead "red flags" to defeat the reasonable reliance defense on a motion to dismiss. *MF Global*, 982 F. Supp.2d at 322-23.  However, at a minimum,

Defendants were not entitled to rely on the Trust II Reserve Report because the Trust II Offering Documents raised "red flags" in the form of the unexplained change in the classification from "Proved" to "Probable" of future horizontal wells that would *not* be drilled proximate to existing horizontal wells. (¶¶ 193-96). *See MF Global*, 982 F. Supp.2d at 323 ("Given that Plaintiffs have pled red flags, the [complaint] should not be dismissed based on a reasonable reliance defense.").

## V.     ALL DEFENDANTS ARE LIABLE UNDER SECTION 12(A)(2)

Defendants cite authorities that issuers are not liable under Section 12(a)(2) when securities are sold pursuant to "firm commitment" underwritings despite the SEC's position in Rule 159A that issuers can be held liable under Section 12(a)(2) in that circumstance. (SA-Br. at 33-34 & n.11). But the law on that issue remains unsettled, and courts in the Tenth Circuit have held issuers liable under Section 12(a)(2). *See, e.g., Oppenheimer*, 838 F. Supp. 2d at 1179 (D. Colo. 2012) (argument to evade liability under Section 12(a)(2) "foreclosed as a matter of logic and by SEC Rule 159A"); *SemGroup.*, 729 F. Supp. 2d at 1307 (N.D. Okla. 2010) (holding issuer liable under Section 12(a)(2)).

Concerning the Individual Defendants (SA-Br. at 34), they were clearly motivated to serve the financial interests of SandRidge (which required the proceeds of the Trust Offerings to finance its massive capital expenditures without incurring more debt) and the Trusts (which had to compensate SandRidge for the royalty interests). (¶¶ 92-94, 101, 177, 183). Therefore, they should also be held liable under Section 12(a)(2).

## VI.     THE SECTION 15 "CONTROL PERSON" CLAIMS ARE VALID

Plaintiffs have adequately plead primary violations under the Securities Act

(Points I-V above). Therefore, the Section 15 claims should not be dismissed.

## SECTION II.

## THE EXCHANGE ACT CLAIMS SHOULD NOT BE DISMISSED[18]

## SUMMARY OF EXCHANGE ACT ARGUMENTS

The Trust I Registration Statement projected that the Trust I Development Wells would produce approximately 18% more oil than the Trust I Producing Wells. By the end of Trust I's second reporting period in August 2011, however, it had become clear to Defendants that Trust I would not meet its projections because through August 2011, the oil production of the Trust I Development Wells was only matching that of the Trust I Producing Wells (i.e., the Negative Trust I Oil Production Trends). Given the premium price of oil, the shortfall in oil production from the Trust I Development Wells threatened to cause cash distributions to Trust I investors to miss the targets in the Trust I Registration Statement. Since Defendants were planning the Trust II Offering to finance their business plan, they specifically needed to showcase the success of the Trust I Offering. Thus, the failure of Trust I to meet targeted cash distributions would have derailed the Trust II Offering.

To avoid this disaster, Defendants sought to offset the weaker than projected oil production of the Trust I Development Wells by accelerating the drilling of those Wells. Defendants thereby successfully masked the weaker oil production of individual Trust I Development Wells with higher aggregate oil production from a greater number of Wells

---

[18] References to "Defendants" in this Exchange Act Section are to SandRidge, Trust I, Ward, Grubb, and Bennett.

drilled than planned. Defendants thus enabled Trust I to announce increasingly higher production and cash distribution beats during the first three reporting periods for Trust I prior to the Trust II Offering.

In reporting Trust I's production and cash distribution beats on conference calls with analysts, Defendants falsely stated, among other things, that oil production was "on trend" and "on target" even though the oil production of the Trust I Development Wells (accounting for two-thirds of the Trust I Reserves) was not meeting forecasts.

Defendants made their false and misleading statements with scienter. Courts evaluate scienter by reviewing the allegations holistically. The allegations in this case are more than sufficient. First, there is the importance of the false statements. Trust I had no operations other than to receive royalties from the sale of oil and gas produced by the Trust I Wells. The Trust I Wells' performance, therefore, was the exclusive driver of Trust I's results. As the "de facto" officers of Trust I who served as Trust I's "public face" to analysts, Defendants were plainly in a position to know about and appreciate the significant of the Trust I Development Wells' poor oil production.

In fact, Defendants stayed regularly informed of Trust I Well production. Every week, Defendants Grubb and Ward attended 1-2 hour meetings at which SandRidge engineers and geologists made presentations to them and other senior SandRidge executives on the performance of individual wells. These detailed weekly meetings, extending over years, kept Defendants abreast of new developments – including the poor Trust I Development Well oil production. Defendants also received daily drilling and completion reports containing substantially similar information. And Defendants' own

actions in accelerating the drilling schedule likewise suggest scienter.

Finally, Defendants plainly had a motive to make false statements. By concealing the Trust I Development Wells' poor oil production, SandRidge was able to liquidate most of its Trust I Units (generating $92.8 million in proceeds) and complete the Trust II Offering (raising net proceeds of $590.2 million). Critically, these motives do not reflect the general motive to raise capital common to all businesses. Instead, the alleged motives are tied to the specific needs and circumstances of SandRidge' business. Specifically, had the Trust I Development Well poor oil production been disclosed, SandRidge could not have successfully consummated the Trust II Offering because investors would have little interest in buying Trust II Common Units had they known that the oil production of the Trust I Development Wells was not meeting forecasts in the *same counties* where the Trust II Wells were to be drilled. Therefore, Defendants were *compelled* to conceal these trends to successfully consummate the Trust II Offering. Disclosure would also have caused the price of Trust I Common Units to collapse, and SandRidge would not have been able to unload 85% of its Units.

In sum, the Complaint in no way resembles the cases Defendants cite in which plaintiffs point to unspecified internal reports advising a defendant of facts that did not go to the core of a company's operations, accompanied by allegations of a general motive to make the company look good. Here, Defendants received critical information concerning the performance of the Trust I Development Wells *by virtue of their attendance* at meetings whose agenda, frequency and duration are pled, took steps to conceal that information from investors, and had a $683 million motive to make false statements.

Thus, the Complaint adequately pleads scienter.

## VII.    ARGUMENT

### A.  The Complaint Adequately Alleges Falsity

The elements of securities fraud are that a defendant (1) made a false statement or omission of material fact (2) connected to the purchase or sale of a security; (3) reliance; (4) economic loss; (5) loss causation; and (6) *scienter*. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 36 (2011). Defendants dispute falsity and scienter.

As to falsity, Plaintiffs must "specify each fraudulent statement, explain why the statement was misleading, and allege with particularity [the] basis for believing that the statement was false." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015) (citing 15 U.S.C. § 78u-4(b)(1)). Plaintiffs are entitled to all reasonable inferences from the facts pled. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007).

 Hence, so long as a fact is pled with particularity, the Court must draw all reasonable inferences from that fact urged by plaintiffs (except as to *scienter*). *Medina v. Clovis Oncology, Inc.*, No. CV 15-02546-RM-MEH, 2017 WL 530344, at *2 (D. Colo. Feb. 9, 2017).

### B.  The Defendants Made a Series of False and Misleading Statements To Conceal The Weaker Than Expected Oil Production of the Trust I Development Wells

False or misleadingly incomplete descriptions of the causes of poor quarterly results are actionable under Rule 10b-5. *Howard v. Liquidity Servs., Inc.*, No. CV 14-1183 (BAH), 2016 WL 1301044, at *10-*11 (D.D.C. Mar. 31, 2016) (defendants made material misrepresentations by "misstating key drivers of [] apparent overall health");

*Beaver Cty. Employees' Ret. Fund v. Tile Shop Holdings, Inc.*, 94 F. Supp. 3d 1035, 1049-52 (D. Minn. 2015) (defendants made material misrepresentations by accurately disclosing good margins but omitting to disclose the true cause); *In re Dynex Capital, Inc. Sec. Litig.*, No. 05 CIV. 1897HB, 2009 WL 3380621, at *10 (S.D.N.Y. Oct. 19, 2009) (defendant lender made misleading disclosures by claiming market conditions were responsible for poor performance that was in fact largely caused by poorly structured loans).

The Trust I Registration Statement projected that the average Trust I Development Well would produce *18% more oil* than the average Trust I Producing Well. (¶ 119). Given the premium price commanded by oil relative to natural gas, the Trust I Registration Statement projected that 78-79% of the revenue generated for Trust I during the first 4 quarters of production after the Trust I Offering (i.e., through March 31, 2012) would result from oil production: (¶ 123). Additionally, the Trust I Registration Statement attributed about 2/3 of the aggregate Trust I Reserves to the Trust I Development Wells. (¶ 116). Thus, the amount of the quarterly cash distributions to Trust I Unit holders depended heavily on the oil production of the Trust I Development Wells meeting projections.

By August 2011, however, it had become clear that the oil production of the Trust I Development Wells would not *exceed* the oil production of the Trust I Producing Wells as projected. Specifically, by the end of Trust I's second reporting period in August 2011, the oil production of the Trust I Development Wells was *only matching* that of the Trust I Producing Wells. (¶ 156). By the end of Trust I's third reporting period in November

2011, the oil production of the Trust I Development Wells only continued to match that of the Trust I Producing Wells. (¶ 157). Finally, by the end of Trust I's fourth reporting period in February 2012, the oil production of the Trust I Development Wells had deteriorated so that they were producing *20% less* oil per month than the Trust I Producing Wells. (¶ 158).[19]

On all of Trust I's quarterly conference calls preceding the Trust II Offering, Defendants made false and misleading statements that concealed the weaker than expected oil production of the Trust I Development Wells. First, on Trust I's earnings call for the three months ended November 2011, Defendant Grubb stated that "on a type curve basis the liquids [i.e., oil] were roughly on trend." Defendants claim this statement was not misleading by arguing that the oil-to-gas ***ratio*** was roughly on trend. EA-Br. at 24. But a ratio is not the same thing as a type curve. A type curve is a graphical curve that can be used to forecast the production of a group of wells in a particular geological formation. (¶ 90). An oil-to-gas ratio, in contrast, measures the ratio of oil production to gas production. Thus, even if the ***oil-to-gas ratio*** was "roughly on trend," it would not follow that ***oil production*** was on trend (since, for example, if oil production is weaker than expected, a projected oil-to-gas ratio can still be maintained if gas production is also proportionately weaker than expected).

_____

[19] And, because oil production was therefore already falling short of projections by August 2011, there is no merit to Defendants' contention that the accelerated drilling schedule began well before the trends it was supposed to mask. (EA Br. 12, 25). Defendants simply assume, contrary to the Complaint, that it the Development Wells needed only to match the Producing Wells' performance.

Here, the Mississippian Type Curve was used to forecast the Reserves of the Trust I Development Wells, which resulted in the projection that the oil production of the Trust I Development Wells would *exceed* the oil production of the Trust I Producing Wells by 18%. (¶¶ 115-119). However, as noted, as of August 2011, oil production for the Trust I Development Wells was only matching the oil production of the Trust I Producing Wells, and *not exceeding* it. Thus, Defendant Grubb's statement that "on a ***type curve basis*** the liquids [i.e., oil] were roughly on trend" was false and misleading since it concealed that the weaker than expected oil production of the Trust I Development Wells was lower than had been forecast by the Mississippian Type Curve.

Defendants also made misleading statements about the oil-to-gas ratio. On that same call, an analyst asked whether, "liquids [i.e., oil] as a percent of total has remained the same," and Defendant Grubb responded, "Yes, that's correct." (¶ 309).

But the oil-to-gas ratio did not remain "the same". The aggregate Trust I oil-to-gas ratio commenced an inexorable decline soon after the Trust I Offering. By August 2011, the aggregate oil-to-gas ratio had already fallen below the 48% trend for the life of the wells:

| Month | % Oil | % Gas |
|---|---|---|
| May 2011 | 51.3% | 48.7% |
| June 2011 | 49.7% | 50.3% |
| July 2011 | 47.5% | 52.5% |
| Aug 2011 | 46.8% | 53.2% |
| Sept 2011 | 45.5% | 54.5% |

| | | |
|---|---|---|
| Oct 2011 | 44.7% | 55.3% |
| Nov 2011 | 43.9% | 56.1% |
| Dec 2011 | 43.5% | 56.5% |
| Jan 2012 | 43.4% | 56.6% |
| Feb 2012 | 43.2% | 56.8% |
| March 2012 | 42% | 58% |

(Source: ¶160).

Defendants claim that because 46.8% is close to 48%, the percentages were roughly on trend. But Defendants misstate the record. Paragraph 160 does not report the oil-to-gas ratio on a month-to-month basis. Rather, it reports the *aggregate* oil-to-gas ratio of Trust I as of the given date based on all production through that date. Thus, in May 2011, Trust I's aggregate ratio stood at 51.5%. The trend of the *aggregate* ratio in the following months was so poor that by August 2011, only four months' production had caused the ratio to fall 5%. Thus, mathematically, the *month-to-month* oil-to-gas ratio in June-August 2011 had to be ***much*** lower than 48% to cause the *aggregate* ratio to decline so far, and continue declining.

Indeed, even the aggregate ratio did not remain "the same". Rather, the aggregate oil-to-gas ratio of the Trust I Wells was *declining* (due to the weaker than expected oil production of the Trust I Development Wells; ¶ 160)— from 49.7% oil vs. 50.3% gas in June 2011 to 46.8% oil vs. 53.2% gas in August 2011. (*Id.*). "Declining" is not equivalent to "remaining the same," and therefore Defendant Grubb misled when he responded, "Yes, that's correct."

On February 17, 2012, Trust I held its earnings call for the three months ending

November 30, 2011. (¶ 312). Responding to an analyst's question concerning the "gassier" production profile of "recent wells," Defendant Ward stated:

> "I think the wells overall in the play appears to be gassier than what we initially projected. ***The important thing is to know that that's not the -- at the expense of oil. The oil is coming in on target***." (¶ 317).

The highlighted statements above were false and misleading. The analyst's question focused on the "recent wells," which indicates he was referring to the Trust I Development Wells, which had been drilled recently and had been much gassier. (¶ 157). Defendant Ward's response that higher gas production was not "at the expense of oil," and "oil is coming in on target," was false and misleading because, as of November 2011, oil production for the Trust I Development Wells was *only matching* the oil production of the Trust I Producing Wells, and *not exceeding* it as had been forecast. (*Id.*). Thus, the higher gas production *was* at the expense of oil production, and oil was *not* coming in on target.

On May 11, 2012, Trust I held a call to discuss its results for the three months ended February 28, 2012. (¶ 319). Speaking of Trust I's operational results for that quarter, Defendant Grubb stated that "the production beat was due to [among other things] better than expected well performance." (¶ 321). In response to analyst questions, Defendant Grubb reiterated that the wells were "meeting our expectations or exceeding them." (¶ 322). These statements were false. In fact, the Trust I Development Wells were producing about 20% less oil than the Trust I Producing Wells as of the end of February 2012 (¶ 158) – not 18% more oil as had been forecasted. And because the Trust I Development Wells' oil production was worse than expected, the production beat was not

partly due to better than expected well production, but entirely due to the accelerated drilling schedule. (¶¶ 315-16).

Defendants claim that it might have been accurate that the production beat was due to better than expected well production. (EA-Br. at 26-28). Defendants speculate that the 70% higher gas production might have been sufficient to counterbalance the roughly 32%-below target oil production.[20] But this ignores the premium price of oil. Oil was expected to account for about 78-79% of revenues during the first four quarters after the Trust I Offering. A 32% decline in oil production coupled with a 70% increase in gas production still leaves a 10% shortfall in proceeds.[21] Accordingly, the worse than expected well production detracted from – rather than contributed to – the production beat.

Nor is there any merit to Defendants' contention that superior performance from the Trust I Producing Wells might have made up for poor Trust I Development Wells' performance. EA-Br. at 26. First, such performance is inconsistent with the aggregate oil-to-gas ratio for all Trust I Wells, which consistently fell every single month to reach 44% by November 2011. (¶ 160). Second, already by September 2011, more than half of the Trust I Wells were Trust I Development Wells (42 Trust I Development Wells vs. 37 Trust I Producing Wells; ¶ 163), meaning that Trust I Producing Wells would have had to

---

[20] Specifically, given that it was forecast that Trust I Development Wells would produce 18% more oil than the Trust I Producing Wells, but ultimately produced 20% less oil than the Trust I Producing Wells, the Trust I Development Wells' actual oil production as of the end of February 2012 was 68% lower than forecast (80% divided by 118%).

[21] Specifically, 68% of 78% plus 170% of 22% equals 90% of the total.

massively exceed expectations to offset for poor oil production of the Trust I Development Wells. There is no basis to indicate that occurred. And third, even if Trust I Producing Wells were continuing to meet expectations, the Defendants' statements that oil production was exceeding expectations still misled investors because it lumped together the Trust I Producing Wells and the Trust I Development Wells, and did not explain that the oil production of the Trust I Development Wells was not meeting expectations.

### C.  The Complaint Adequately Alleges Scienter

As to *scienter*, investors must "state with particularity facts giving rise to a strong inference that the defendant acted with" recklessness or an intent to defraud. *Tellabs*, 551 U.S. at 308 (*quoting* 15 U.S.C. § 78u-4(b)(2)). The Court must also assume every fact pled in the complaint is true, and must grant Plaintiffs reasonable inferences, but must also entertain defendants' plausible inferences that might explain those facts. *Tellabs*, 551 U.S. at 323;  *Pirraglia v. Novell, Inc.*, 339 F.3d 1182,1187-88 ("[W]e consider the inference suggested by the plaintiff while acknowledging other possible inferences, and determine whether plaintiff's suggested inference is 'strong' in light of its overall context.") "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences." *Tellabs*, 551 U.S. at 324.  Indeed, "[f]aced with two seemingly equally strong inferences, one favoring the plaintiff and one favoring the defendant, it is inappropriate" for a court to "make a determination as to which inference will ultimately prevail" because that would "invade the traditional role of the factfinder." *Pirraglia*, 339 F.3d at 1188.  The

Tenth Circuit has long recognized that "to establish scienter in a securities fraud case alleging non-disclosure of potentially material facts, the plaintiff must demonstrate: (1) the defendant knew of the potentially material fact, and (2) the defendant knew that failure to reveal the potentially material fact would likely mislead investors." *City of Philadelphia* v. *Fleming Cos., Inc.*, 264 F.3d 1245, 1261 (10th Cir. 2001). The scienter analysis is holistic, requiring the court to analyze all allegations in the complaint and not view any particular allegation in isolation. *See Tellabs,* 551 U.S. at 322–23.

The Complaint alleges numerous facts probative of scienter. First, the Complaint alleges that because the Trust I Wells comprised Trust I's core operations and the reasons for falsity were obvious, Defendants were plainly in a position to know and understand them. Second, the Complaint alleges that Defendants attended meetings and received reports through which they received to information showing their statements were false. Third, the Complaint alleges that Defendants took conscious action to conceal the poor oil production. And fourth, the Complaint alleges that Defendants had a specific motive to make false and misleading statements.

### 1. The Fact that the Wells' Performance Constituted the Trust's Core Operations Supports Scienter

Contrary to Defendants' contention (EA Br. 15-16), in the Tenth Circuit, the importance of the information that was misstated to the company's operations can contribute to an inference of scienter for senior executives. *SemGroup*, 729 F. Supp. 2d at 1298; *see also SandRidge*, 2015 WL 12940036, at *10 (same). Defendants Ward, Grubb and Bennett were SandRidge's CEO, COO, and CFO, respectively, and served as the "de

facto" officers of the Trusts (which had no officers of their own), and in that capacity, served as the "public face" of the Trusts on conference calls with analysts.

Trust I was not typical companies with multifarious operations. Rather, its sole purpose was to collect and distribute cash generated by the sale of oil and gas from the Wells in which it held royalty interests. The performance of Trust I's Wells (and particularly their oil production) was thus the *exclusive* driver of Trust I's financial results. Under these circumstances, Defendants "were in a position to know this information, understand its materiality, and realize that failure to provide complete and accurate information with regard to these subjects would likely mislead investors." *SemGroup*, 729 F. Supp. 2d at 1298; *In re Molycorp, Inc. Sec. Litig..*, 157 F. Supp. 3d 987, 1011 (D. Colo. 2016) (considered with other facts, executives could be presumed to have knowledge of operations of important mine under "core operations" inference). Accordingly, Defendants' senior positions and the obvious importance of the information strongly support scienter.

### 2. By Virtue of Their Attendance at Meetings, Defendants Received Factual Information Showing Their Statements Were False

In the Tenth Circuit, plaintiffs can adequately allege scienter by showing that reports transmitted to or meetings attended by the Defendants would have presented them with information contradicting their public statements. *See, e.g.*, *Molycorp*, 157 F. Supp. 3d at 1011 (sufficient that defendants ignored reports to which they had access); *W. Palm Beach Firefighters' Pension Fund v. Startek, Inc.*, No. 05-CV-01344WDMMEH, 2008 WL 879023, at *16 (D. Colo. Mar. 28, 2008) (plaintiffs sufficiently alleged scienter

through meetings by pleading defendant's attendance at, and subject of, meetings); *Medina*, 2017 WL 530344, at \*22 (fact that defendants had access to raw experiment data sufficed to show scienter). The Complaint adequately alleges that there were meetings and reports advising Defendants that their statements were false.

SandRidge held weekly senior management meetings concerning the oil and gas production performance of SandRidge wells (including the Trust Wells, after the Trust Offerings). (¶ 68). The meetings took place on the 28th floor of SandRidge's headquarters, and lasted one to two hours. (¶ 72). Both Defendants Grubb and Ward attended the meetings, and Defendant Grubb often led the meetings. (¶¶ 68, 69, 70, 72). In fact, the major purpose of the meetings was for engineers and geologists to brief the company's executives – including Ward and Grubb– about drilling and production results. (¶ 70).[22]

At the meetings, Defendants Grubb and Ward were exposed to individual well performance. (¶ 69). Meeting attendees specifically discussed which wells did better than others. (*Id.*) The status of drilling and production would be discussed, with production data provided by county or township. (¶ 72). Moreover, individual wells that were either

---

[22] Defendants assert that the Court should discount allegations drawn from former SandRidge employees (the "FE"). EA-Br. at 17 n.6. They cite out-of-circuit cases holding that the Court might discount witnesses if, say, the Complaint does not show how they knew what they report, or did not have any contact with Defendants. *Ley v. Visteon Corp.*, 543 F.3d 801, 811 (6th Cir. 2008); *In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 351 (S.D.N.Y. 2011). But in this case, the Complaint pleads that the witnesses received the information they report from the same meetings also attended by Defendants and from the same reports that were also sent to Defendants. The Complaint thus precisely sets out the information required by the cases Defendants cite. *See Molycorp*, 157 F. Supp. 2d at 1007-08 (detailed provided by confidential witness well pled).

performing well or needed improvement were highlighted. (*Id.*) Indeed, FE 2 presented on the wells in Woods and Garfield counties prior to the Trust I Offering. (¶ 74).

In particular, FE 1 confirmed that that the declining oil production of the Trust I Wells after the Trust I Offering was discussed at these meetings. Therefore, Defendants Ward and Grubb knew of that trend when they made their statements on Trust I's quarterly conference calls. (¶ 73).

Thus, it was by virtue of their attendance at meetings (and *not* merely by virtue of their positions; EA-Br. at 15, 18), that Defendants Grubb and Ward possessed the information that would have made them aware that their statements on the conference calls were false. The Drilling and Completion Reports circulated Company-wide daily contained the same information discussed during the weekly senior management meetings, and thus would have reinforced that awareness. (¶ 75).

Defendants argue that the discussion of the declining production of the Trust I Wells at the weekly meetings reflected nothing more than that the Wells were depleting assets. (EA-Br. at  17). This argument mistakenly conflates *aggregate* production over time with *individual* well performance. The table in paragraph 126 of the Amended Complaint (the source of the statement in paragraph 161 that the Trust Wells were depleting assets) displays *aggregate* production from *all* of the Trust I Wells over time. Since it was known that *aggregate* production would decline over time (beginning in 2014), it could not have been a subject of concern at the weekly meetings in 2011 and 2012. Instead, as plead, the concern at the weekly meetings was *individual* well performance (¶¶ 68-74), which only became known as individual wells were drilled and

their performance was analyzed.

Judge West's decision in *SandRidge* is inapposite. There, the plaintiffs failed because they did not plead that the defendants actually "received and reviewed a report" showing the falsity of their statements. *In re SandRidge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2015 WL 12942217, at *13 (W.D. Okla. Aug. 27, 2015). Here, Plaintiffs allege that the Defendants actually attended weekly meetings at which *individual* well production (including the declining oil production of the Trust I Wells) was discussed sufficient to show Defendants knew the falsity of their statements.

Defendants incorrectly interpret *Dynex* to require that contrary information be spoonfed to Defendants to show their scienter. EA-Br. at 18. In fact, *Dynex* holds that a plaintiff cannot establish scienter by pleading that as a senior executive, a defendant ***surely*** had access to ***some*** raw internal data showing his or her statements were false. *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) ("Teamsters' broad reference to raw data lacks even an allegation that these data had been collected into reports that demonstrated that loan origination practices were undermining the collateral's performance.") In fact, on remand, it was enough for the plaintiffs to set out reports that, taken collectively, would have shown the falsity of the Defendants' statements. *In re Dynex Capital, Inc. Sec. Litig.*, 2009 WL 3380621, at *14 ("neither the Circuit's decision in *Teamsters* nor any other binding precedent requires that the contradictory facts must be summarized in a single report that explicitly states the direct opposite of the misleading statement."); *accord In re Ambac Fin. Grp., Inc. Sec. Litig.*, 693 F. Supp. 2d 241, 267 (S.D.N.Y. 2010) (same). Here, the

Defendants received daily reports setting out drilling and well completion, and attended meetings at which individual well performance was analyzed specifically for their benefit. This is not a "broad reference to raw data."

Defendants incorrectly claim that the issue is whether they were required to perform the precise analysis recommended by Plaintiffs. *E.g.* EA-Br. 10, 18-19. There is nothing arbitrary or unusual about the analyses conducted by Plaintiffs:

- ***Oil to gas ratio analysis***. The Registration Statement estimated that the aggregate oil-to-gas ratio over the lifetime of Trust I would be approximately 48%. Plaintiffs' analysis shows actual production ratios for all of Trust I's Wells – exactly what would have been required to see whether Trust I was meeting its oil-to-gas ratio projection.
- ***Alfalfa County Pairs***. SandRidge's own expert testified that the reason he knew that production in the Mississippian was unpredictable was that wells drilled next to each other would produce divergent results. The Alfalfa County Data shows that Defendants knew this before the Trust II Offering. *See* Securities Act section, end of Point II.B.3.
- ***Aggregate Oil Production***. The Trust I Registration Statement estimated the aggregate oil production of both the Development Wells and the Producing Wells, and forecast that the Development Wells would produce 18% more oil per well than the Producing Wells. Plaintiffs simply compared the aggregate production of all Development Wells to all Producing Wells over a similar period to show that Development Wells did not meet their projections. The methodology was no different than that employed by Defendants in the Registration Statement. *See* Securities Act section, end of Point II.B.3.

And while Defendants claim they may not have determined that Trust I Wells were performing poorly, as opposed to other SandRidge wells in the area, that is no excuse. EA-Br. at 19. Defendants held conference calls, and made detailed statements about the performance of Trust I's Wells, knowing that investors would rely on the statements. Even supposing that SandRidge's wells were performing well, Defendants' failure to isolate the performance of Trust I Wells – which were not – when they had the

means to do so, is the definition of recklessness.[23] *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3d Cir. 2009) (possibility that defendant made false statement without knowledge "not necessarily exculpatory" because "confident, unhedged denial" when executive is ignorant has the obvious capacity to mislead).

Defendants assert that the Individual Defendants' lack of stock sales negates scienter. (EA-Br. 20). But the Individual Defendants did not sell any Trust I stock for the simple reason that they didn't own any. The only Defendant that did own Trust I stock – SandRidge – sold over 85% of its Trust I holdings during the Class Period. Accordingly, the Individual Defendants' failure to sell stock they didn't own does not weigh against Plaintiffs' claims.

### 3. The Accelerated Drilling Schedule Supports Scienter.

Evidence that a defendant took actions to cover up declining financial performance will support scienter. *In re Network Assocs., Inc., Sec. Litig.*, No. C 99-01729WHA, 2000 WL 33376577, at *10 (N.D. Cal. Sept. 5, 2000) (company's decision to engage in aggressive accounting indicative of scienter in light of claims it was pursuing conservative accounting even though company may have had basis for its accounting position given its auditor's assent).

---

[23] Defendants cite *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1238 (10th Cir. 2016). There, though, the issue was that the defendants were allegedly too slow in realizing that they would eventually suffer a loss on a long-term contract. Here, when Defendants made false and misleading statements about the Trust I Wells' historical performance on conference calls, they already knew those statements were false because they already knew that the oil production of the Trust I Development Wells was missing forecasts.

Not only were Defendants presented with information showing their statements were false, they actively took steps to conceal declining production trends from the markets. To mask these trends – permitting the completion of the Trust II Offering as well as SandRidge's sale of some of its Trust I stock – SandRidge accelerated the drilling schedule of Trust I Wells. (¶¶ 162-64). In the period between July and September 2011, SandRidge had only estimated drilling 8 Trust I Wells; instead, it drilled 20. By the time of the Trust II Offering, SandRidge had only 57 remaining wells to drill, while the Trust I Registration Statement projected that 81 would remain undrilled. (¶ 163). The accelerated drilling enabled Defendants to mask the weaker oil production of *individual* Trust I Development Wells with higher *aggregate* oil production from a greater number of Wells than planned. (¶¶ 164, 293). The steps Defendants took to cover up the declining Trust I production support an inference of scienter.

### 4.  Motive Supports Scienter

In the Tenth Circuit, motive allegations will support an inference of scienter. *Pirraglia*, 339 F.3d at 1191.

Defendants cite the rule that "generalized motives" cannot form the basis of scienter. EA-Br. at 20. "Generalized motives" refers to motives that are not specifically connected to the false statements and which are shared by all companies. These include, for example, the motive for a company's executives to express a favorable opinion about an industry's future in order to complete an offering. *MHC Mut. Conversion Fund, L.P. v.*

*Sandler O'Neill & Partners, L.P.*, 761 F.3d 1109, 1121-22 (10th Cir. 2014).[24] In *MHC*, the executives' false statements are not integral to the offering – they are merely what is expected of every business executive.

Generalized motives, however, do not include cases where the motive is "specifically and directly related to the underlying facts." *Medina*, 2017 WL 530344, at *25 (*quoting Fleming*, 264 F.3d at 1268 ). Thus, for example, a company's motive to lie about its most important product obtain enough capital from investors to keep operating is not a "generalized motive." *Id.* at *25 and n.22. Similarly, the need to make false statements about an underperforming subsidiary in order to spin it off is a sufficient motive to plead scienter. *Williams*, 339 F. Supp. 2d at 1234; *see also In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1071 (N.D. Cal. 2002) (need to maintain compliance with loan covenants).[25]

Here, as in *Clovis* and *Williams*, the alleged motives are tied to the specific

---

[24] The other cases Defendants cite are even further afield, as they address the desire to make the company look good without citing any particular corporate action benefiting from that appearance. *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 270 (S.D.N.Y. 2008) (mere "desire to improve a company's year-end financial numbers"); *In re SandRidge Energy, Inc. Sec. Litig.*, No. CIV-12-1341-W, 2015 WL 12942217, at *14 (W.D. Okla. Aug. 27, 2015) (mere motive to continue to receive salary not sufficient).

[25] *MHC Mutual* cannot be read to suggest that every motive except an individual's personal financial benefit is a "general motive." Tenth Circuit law at the time of *MHC Mutual* held that a motive to benefit a company can be a specific motive. *Fleming*, 264 F.3d at 1268. *MHC Mutual* did not cite intervening law overruling *Fleming*; in fact, it relied on *Fleming* alone. Indeed, later Supreme Court precedent only reinforces *Fleming*. *Tellabs* held that "motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. By referring to them separately, the *Tellabs* court plainly found that motive was not limited to personal financial gain.

business needs and circumstances of Trust I's controlling unitholder, SandRidge. In its 10-K for the year ended December 31, 2010, SandRidge disclosed that it had spent $1.1 billion in capital expenditures in 2010, and planned to spend another $1.3 billion in 2011, largely to finance its expansion into the Mississippian. (¶ 92). As of December 31 2010, SandRidge's long term debt was already $2.9 billion – nearly double its equity of $1.5 billion. (¶ 94). To reduce its reliance on debt as a source of capital, SandRidge decided to monetize its revenue interests in certain oil and gas properties by selling a percentage of those interests to the public, and using the proceeds of the public offering to repay debt and for general corporate purposes. (*Id*.). The outcome of this strategy was the Trust I Offering, which raised $339 million in April 2011. (¶ 128).

On August 4, 2011, SandRidge announced that, in connection with new acquisitions and increased drilling activity in the Mississippian Formation, it was increasing its 2011 capital expenditure budget nearly 40% to $1.8 billion, and establishing a 2012 capital budget of $1.8 billion. (¶ 177). To help finance these increased capital expenditures, SandRidge decided in late 2011 to undertake the Trust II Offering. (*Id.*).

Obviously, if investors believed that the Trust I Offering had been a success, they would be more inclined to invest in the Trust II Offering. Therefore, the Trust II Offering touted the "success" of the Trust I Offering. (¶ 214). However, had investors known that the oil production of the Trust I Development Wells was not meeting forecasts in the *same counties* where the Trust II Development Wells were to be drilled (¶¶156-59, 180, 215-16), and that the Alfalfa County Data had discredited the assumption of geological

uniformity in Alfalfa County where a majority of the Trust II Wells would be drilled(¶¶ 180, 212), they would obviously have had little interest in investing in Trust II. (¶¶ 301-02). Therefore, Defendants were *compelled* to conceal the weaker than expected oil production of the Trust I Development Wells to successfully consummate the Trust II Offering. (¶¶ 299-302, 304-06). And, as in *Williams* and *Clovis*, the false statements were directly tied to Defendants' motives, as Defendants made false statements about Trust I's performance, which was substantially similar to the Trust II assets Defendants sought to sell.

Similarly, had Defendants disclosed the weaker than expected oil production of the Trust I Development Wells, it would have caused the price of the Trust I Common Units to collapse. (¶ 303). Therefore, Defendants were *compelled* to conceal the weaker than expected oil production of the Trust I Development Wells for SandRidge to successfully unload its Trust I Common Units at higher prices. (¶¶ 129, 304-06).

Defendants finally issued a corrective disclosure with respect to SandRidge in November 2012 (¶ 227), which represented a materialization of the risks that had been concealed with respect to the Trusts. (¶ 231). But by that point, SandRidge had already achieved its goals with respect to the Trusts, having completed the Trust II Offering (raising $590.2 million), and sold over 85% of its remaining Trust I Units (raising $92.8 million). (¶¶ 129, 209, 306). Moreover, by that time, only about 16 Trust I Wells remained undrilled. (¶ 163). Thus, SandRidge could not continue to mask the Trust I Development Wells' poor oil production by drilling more Wells more quickly. Contrary to Defendants' suggestion (EA-Br. at 19-20), any forced disclosure in November 2012

does nothing to detract from scienter.

**5.   The Complaint Makes Individualized scienter allegations**[26]

**6.   The Complaint Makes Individualized Scienter Allegations**[27]

The Complaint contains numerous allegations of Defendant-specific conduct, including which ones attended the weekly meetings (Grubb and Ward), which ones received drilling and completion reports (Grubb, Ward and Bennett), and which ones made which false and misleading statements on the relevant conference calls (Grubb and Ward). In turn, the scienter of those senior officers may be attributed to SandRidge and Trust I to establish their liability as primary violators of Section 10(b) and Rule 10b-5 since Grubb, Ward and Bennett were acting within the scope of their apparent authority. *Molycorp*, 157 F. Supp. 3d at 1011.

The Complaint also succinctly refers to "Defendants" collectively; but it is not necessary or beneficial to break out all references to defendants. Indeed, a case Defendants cite specifically held that such abbreviated references are appropriate, as "[t]he reality is that individuals in a corporation often act collectively, and there is no reason to ban good, succinct prose when reviewing the allegations of conduct and

---

[26] Defendants incorrectly argue that Plaintiffs' claims are "group pleading". EA-Br. at 21. In fact, "group pleading" refers to pleading that a group of defendants were the authors of a group-published document, and therefore made the statements it contains. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1225 (D. Kan. 2002). It has nothing to do with scienter, which is what Defendants challenge.

[27] Defendants incorrectly argue that Plaintiffs' claims are "group pleading". EA-Br. at 21. In fact, "group pleading" refers to pleading that a group of defendants were the authors of a group-published document, and therefore made the statements it contains. *In re Sprint Corp. Sec. Litig.*, 232 F. Supp. 2d 1193, 1225 (D. Kan. 2002). It has nothing to do with scienter, which is what Defendants challenge.

omissions that the defendants did collectively." *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165, 1200 (D.N.M. 2010). And the sentence immediately following Defendants' quote from the Court's *Weinstein* case makes clear that the issue was not the Plaintiffs' prose, but their substance: "The allegations in the Complaint ***do not reference any meeting attended by any defendant, any internal report he received or reviewed, any internal email, or any other information*** that would tend to show that the particular defendant knew the 'truth' about the facts that were purportedly misstated and knew that its non-disclosure would likely mislead investors." *Weinstein v. McClendon*, No. CIV-12-465-M, 2013 WL 1457718, at *4 (W.D. Okla. Apr. 10, 2013) (emphasis added).

## VIII.   THE COMPLAINT ADEQUATELY ALLEGES SECTION 20(A) CLAIMS

To plead a control person claim, it suffices to plead (a) a primary violation and (b) facts suggesting the Defendants had "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003) (indirectly quoting 17 C.F.R. 230.405). CEOs plainly have control by virtue of their title alone. [28] Even the case Defendants cite show that lesser officers have control if the false statements fall within their domain. *New Jersey & its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1144 (D. Kan. 2004).

---

[28] Defendants cite *Adams* for the proposition that allegations that "merely refer" to an executive's position do not plead control. (EA-Br. at 32). In fact, *Adams* held that the mere title of CEO is sufficient to plead control. *Adams*, 340 F.3d at 1108 ("As President and CEO, Hall would have possessed the ultimate management authority of the corporation on a daily basis.").

Since the false statements fall within the scope of operations, Grubb's control is adequately alleged. Moreover, the majority of the false statements relate to the reasons why SandRidge exceeded its quarterly distribution goals. The explanation for quarterly results plainly relates to financial performance.[29]

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully ask the Court to deny the Motions in their entirety, and grant Plaintiffs such other and further relief as the Court deems appropriate. Should the Court find any portion of the Complaint inadequate, Plaintiffs respectfully request leave to replead.

---

[29] In *Sprint*, the misstatements concerned the personal financial affairs of two of its executives – which plainly does not relate to the company's financial performance., 314 F. Supp. 2d at 1125.

Dated:  March 16, 2017

Respectfully submitted,


/s/ Laurence M. Rosen
The Rosen Law Firm, P.A.
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
275 Madison Avenue, 34th Floor
New York, NY  10016
(212) 868-1060
(212) 202-3827 (Facsimile)

*Lead Counsel for Plaintiffs*


-and-

FARHA LAW, PLLC
Nicholas G. Farha, OBA # 21170
Farha Law, PLLC
6301 Waterford Blvd., Suite 110
Oklahoma City, OK 73102-8273
(405) 471-2224
(405) 810-9901 (Facsimile)
nick@farhalawfirm.com

*Liaison Counsel for Plaintiffs*


WOHL & FRUCHTER, LLP
J. Elazar Fruchter, Esq.
570 Lexington Avenue, 16th Floor
New York, NY  10022
(212) 758-4000
(212) 758-4004 (Facsimile)

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I certify that on November 7, 2016, I electronically transmitted the foregoing document to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the appropriate ECF registrants.

By: *s/ Laurence M. Rosen*