## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IVAN NIBUR, LAWRENCE ROSS, JASE LUNA, MATTHEW WILLENBUCHER, and the DUANE & VIRGINIA LANIER TRUST, Individually and On Behalf of All Others Similarly Situated, | ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| vs. | ) Case No. CIV-15-634-M ) |
| SANDRIDGE MISSISSIPPIAN TRUST I, et al., | ) ) ) |
| Defendants. | ) ) |

## ORDER

Before the Court are the motions to dismiss of defendants SandRidge Mississippian Trust I, James D. Bennett, Matthew K. Grubb, and Tom L. Ward and nominal defendant SandRidge Energy, Inc. ("Moving Defendants").[1]  The motions have been fully briefed.

I.    Introduction[2]

Nominal defendant SandRidge Energy, Inc. ("SandRidge") is an oil and gas company headquartered in Oklahoma City.  In December 2010, in an effort to monetize certain properties in the Mississippian lime formation, SandRidge created a royalty trust, Mississippian Trust ("Trust

---

[1] On August 30, 2017, this Court entered an order dismissing plaintiffs' claims under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 asserted in this case.  The only claims remaining are plaintiffs' claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 and Rule 10b-5 promulgated thereunder.  The only defendants remaining in this case are defendants SandRidge Mississippian Trust I, James D. Bennett, Matthew K. Grubb, and Tom L. Ward and nominal defendant SandRidge Energy, Inc.

[2] The information contained in the Introduction is based primarily on plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws [docket no. 78].

I"), and conveyed to Trust I royalty interests in 160 wells located in an area of mutual interest ("AMI") spanning five counties in Northern Oklahoma (Alfalfa, Garfield, Grant, Major and Woods).  The well interests conveyed to Trust I consisted of (1) a 90% interest in the revenue earned by SandRidge from 37 existing horizontal oil and gas wells that had already been drilled and begun producing oil and gas (the "Trust I Producing Wells") and (2) a 50% interest in the revenue earned by SandRidge from 123 additional wells that had yet to be drilled (the "Trust I Development Wells").  In April 2011, Trust I conducted an initial public offering ("IPO") in which it sold units representing beneficial interests in Trust I to investors.

The registration statement for the IPO indicated that Trust I would pay quarterly cash distributions to investors from the sale of oil and gas produced by the Trust I Producing and Development Wells ("Trust I Wells"); oil sales were projected to contribute nearly 80% of that revenue.  In preparation for the IPO, SandRidge collaborated with an independent petroleum engineering consultant to prepare a report that estimated the total oil and gas production expected from all the Trust I Wells over the 20-year lifetime of Trust I.  The report estimated that (1) the future Trust I Development Wells would produce more oil, and less gas, in the aggregate than the Trust I Producing Wells, and (2) the ratio of oil-to-gas produced by all the Trust I Wells in the aggregate would be approximately 48.4% oil to 51.6% gas.

Plaintiffs allege that by the end of February 2012, the Trust I Development Wells were producing considerably less oil, and considerably more gas, then the Trust I Producing Wells and that divergent production data between proximate Trust I Wells demonstrated a lack of geological uniformity in Alfalfa county.  Plaintiffs further allege that SandRidge accelerated the drilling of the Trust I Development Wells, which boosted aggregate oil and gas production, and enabled Trust

I to beat the quarterly distribution estimates in the Trust I registration statement during its first five reporting periods after the Trust I offering.

In December 2011, SandRidge formed a second royalty trust, Mississippian Trust II ("Trust II"), to raise additional funds.  SandRidge conveyed to Trust II royalty interests consisting of (1) 80% of SandRidge's revenue from 67 existing horizontal oil and gas wells that had already been drilled and begun producing oil and gas (the "Trust II Producing Wells") within an AMI located in 9 counties in Oklahoma and Kansas, including Alfalfa, Grant, and Woods counties, and (2) 70% of SandRidge's revenue from 123 additional wells in the same AMI that had yet to be drilled (the "Trust II Development Wells").  In April 2012, Trust II conducted an IPO in which it sold units representing beneficial interests in Trust II to investors.

On November 9, 2012, SandRidge held a conference call to discuss its third quarter 2012 earnings.  On the call, SandRidge disclosed that oil production in the same regions of Oklahoma and Kansas where the Trust Wells were located had declined more steeply than expected, and, therefore, SandRidge was reducing its expected recovery of oil from those regions by approximately 25%.  Over the next four trading days, the price of Trust I units fell by $4.14, or 21.8%, while the price of Trust II units fell by $4.00, or 20.7%.  On January 31, 2013, after markets closed, Trusts I and II issued press releases announcing that the quarterly distribution to their unitholders for the September-November 2012 production period had missed the estimates in their respective registration statements, which was attributed to lower oil production.  On February 1, 2013, the price of Trust I units fell by $0.56, or 2.9%, while the price of Trust II units fell by $2.73, or 14.4%.  The price of Trust I units and Trust II units additionally fell when Trusts I and II were downgraded.

On July 30, 2013, holders of common units in Trust I and Trust II were joined as plaintiffs in a putative securities class action that had been filed several months earlier by common stockholders of SandRidge.  On May 11, 2015, the unitholders claims were dismissed.  On June 9, 2015, plaintiffs filed the instant action asserting two independent claims.  First, plaintiffs asserted claims and remedies against defendants under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933, and these claims have been dismissed.  Second, plaintiffs assert claims and remedies against defendants under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934,  as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5) ("Exchange Act Claims") on behalf of all persons who purchased or otherwise acquired Common Units of (1) Trust I, between April 5, 2011, and November 8, 2012, inclusive (the "Class Period"), and/or (2) Trust II, during the Class Period. Moving Defendants now move, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss the Exchange Act Claims.

II.    Discussion

A.    Summary of plaintiffs' Exchange Act Claims

Plaintiffs allege that the Trust I registration statement projected that the Trust I Development Wells would produce approximately 18% more oil than the Trust I Producing Wells. Plaintiffs further allege that by the end of Trust I's second reporting period in August 2011, it had become clear to the Moving Defendants that Trust I would not meet its projections because through August 2011, the oil production of the Trust I Development Wells was only matching that of the Trust I Producing Wells (negative Trust I oil production trends).  Given the premium price of oil, the shortfall in oil production from the Trust I Development Wells threatened to cause cash distributions to Trust I investors to miss the targets in the Trust I registration statement.  Plaintiffs

allege that since Moving Defendants were planning the Trust II IPO to finance their business plan, they specifically needed to showcase the success of the Trust I IPO. Thus, the failure of Trust I to meet targeted cash distributions would have derailed the Trust II IPO. Plaintiffs allege that to avoid this result, Moving Defendants sought to offset the weaker than projected oil production of the Trust I Development Wells by accelerating the drilling of those Wells and successfully masked the weaker oil production of individual Trust I Development Wells with higher aggregate oil production from a greater number of wells drilled than planned.

Additionally, plaintiffs allege that in reporting Trust I's production and cash distribution beats on conference calls with analysts, Moving Defendants falsely stated, among other things, that oil production was "on trend" and "on target" even though the oil production of the Trust I Development Wells (accounting for two-thirds of the Trust I reserves) was not meeting forecasts. Plaintiffs further allege that Moving Defendants made these false and misleading statements with scienter. First, plaintiffs allege Moving Defendants were plainly in a position to know about and appreciate the significance of the Trust I Development Wells' poor oil production and stayed regularly informed of the Trust I well production. Second, plaintiffs allege that Moving Defendants had a motive to make false statements – by concealing the Trust I Development Wells' poor oil production, SandRidge was able to liquidate most of its Trust I units and complete the Trust II IPO.

B.    Pleading requirements of the PLSRA

"[T]o state a claim under Section 10(b) of the [Exchange] Act and Rule 10b-5 a plaintiff must allege: (1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages." *City of Phila. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1257-58 (10th Cir. 2001) (internal

quotations and citation omitted).   To curb abuse in private securities lawsuits, Congress enacted

the PSLRA, which mandates a more stringent pleading standard for securities fraud actions.  First,

the PSLRA requires that a complaint asserting a violation of Section 10(b):

> shall specify each statement alleged to have been misleading, the
> reason or reasons why the statement is misleading, and, if an
> allegation regarding the statement or omission is made on
> information and belief, the complaint shall state with particularity
> all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).   Second, the PSLRA heightens the standard for pleading scienter with

the following requirement:

> in any private action arising under this chapter in which the plaintiff
> may recover money damages only on proof that the defendant acted
> with a particular state of mind, the complaint shall, with respect to
> each act or omission alleged to violate this chapter, state with
> particularity facts giving rise to a strong inference that the defendant
> acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2).

> The term "scienter" has been defined by the Supreme Court of the
> United States as "a mental state embracing intent to deceive,
> manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185,
> 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).   The Supreme
> Court has further elaborated on the meaning of the term by stating:
> "The words 'manipulative or deceptive' used in conjunction with
> 'device or contrivance' strongly suggest that § 10(b) was intended
> to proscribe knowing or intentional misconduct." *Id.* at 197, 96
> S.Ct. 1375.   Recklessness, defined as "conduct that is an extreme
> departure from the standards of ordinary care, and which presents a
> danger of misleading buyers or sellers that is either known to the
> defendant or is so obvious that the actor must have been aware of
> it," can also satisfy the scienter requirement for Section 10(b).
> *Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215, 1232 (10th Cir.
> 1996) (citations and quotations marks omitted).   Simple negligence,
> however, does not satisfy the scienter requirement.

*City of Phila.*, 264 F.3d at 1258.

The United States Supreme Court has established the following prescriptions for a court faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action:

> *First*, faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .
>
> *Second*, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. . . . The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. . . .
>
> *Third*, in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . .
>
> . . . To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.  The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the "most plausible of competing inferences," . . . .  Yet the inference of scienter must be more than merely "reasonable" or "permissible" – it must be cogent and compelling, thus strong in light of other explanations.  A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Telltabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-24 (2007) (emphasis in original).

C.    Analysis

1.    Scienter

Moving Defendants assert that the consolidated amended complaint falls far short of pleading the requisite strong inference of scienter.  Specifically, Moving Defendants contend that plaintiffs fail to identify any report or witness describing information actually known by

defendants Ward, Bennett, and Grubb ("Officer Defendants") that caused them, or should have caused them, to know any of their statements were inaccurate or misleading and instead plaintiffs attempt to plead scienter by alleging that the Officer Defendants, by virtue of their positions, had access to well production data, such as reports with unspecified content from the Reservoir Engineering department and unspecified information presented at weekly senior management meetings. Moving Defendants further assert that it is not sufficient for plaintiffs to claim that the Officer Defendants had access to raw production data from which they could have performed the analyses described in the complaint. Additionally, Moving Defendants contend that plaintiffs have failed to offer a plausible explanation for why Moving Defendants disclosed declining oil production trends beginning in or about November 2012. While plaintiffs' theory implies that Moving Defendants were engaged in a fraud which they suddenly decided to abandon, the far more plausible inference is that Moving Defendants acted in good faith and disclosed any significant well performance trends when they learned of them. Finally, Moving Defendants assert that plaintiffs cannot rescue their deficient scienter allegations by alleging that Moving Defendants had strong motives to commit fraud. Moving Defendants contend that plaintiffs fail to identify individualized financial motives for any Officer Defendant to have participated in this alleged fraud.

Having carefully reviewed the parties' submissions, and having carefully and thoroughly reviewed plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws, and taking all facts alleged collectively and accepting them as true, the Court finds that plaintiffs have sufficiently alleged scienter as to defendants Ward and Grubb. Particularly, the Court finds that plaintiffs have set forth sufficient facts that give rise to a strong inference that defendants Ward and Grubb acted with the required state of mind. The complaint specifically

alleges that both defendants Ward and Grubb attended senior management meetings concerning

the oil and gas production performance of individual SandRidge wells, including the Trust Wells,

after the Trust offerings, that the meetings were often led by defendant Grubb, and that the

declining oil production of the Trust I Wells after the Trust I IPO, and the unpredictability of the

performance of individual Trust I Wells after the Trust I IPO, was discussed at these weekly

meetings.  *See* Consolidated Amended Complaint for Violations of the Federal Securities Laws

[docket no. 78] at ¶¶ 68-73.  Further, the Court finds plaintiffs' allegations regarding Moving

Defendants' motive, *see* complaint at ¶¶ 299-304, further support a finding that plaintiffs have

sufficiently alleged scienter as to defendants Ward and Grubb.  Under the circumstances alleged,

the Court finds the inference of scienter as to these defendants is more than merely reasonable or

permissible and is cogent and at least as compelling as any opposing inference one could draw

from the facts alleged.

The Court, however, finds that plaintiffs have not sufficiently alleged scienter as to

defendant Bennett.  Particularly, the Court finds that plaintiffs have not set forth sufficient facts

that give rise to a strong inference that defendant Bennett acted with the required state of mind.

There are no specific allegations in the complaint that identify defendant Bennett as participating

in the above referenced meetings or receiving any specific reports.  The Court finds plaintiffs'

allegations with respect to defendant Bennett are nothing more than generalized imputations of

knowledge and are not sufficient to establish scienter.  Accordingly, the Court finds that plaintiffs'

Section 10(b) claim against defendant Bennett should be dismissed.

2.   Material misrepresentation or omission

Moving Defendants also assert that the complaint fails to plead a material

misrepresentation or omission.  As to falsity, a plaintiff must "specify each fraudulent statement,

explain why the statement was misleading, and allege with particularity [the] basis for believing that the statement was false." *Nakkhumpun v. Taylor*, 782 F.3d 1142, 1147 (10th Cir. 2015) (citing 15 U.S.C. § 78u-4(b)(1)). "Mere conclusory allegations of falsity are insufficient." *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997) (internal quotations and citation omitted). Further, "securities claims [can] not be based on 'fraud by hindsight'"; a complaint must explain "why the disputed statement was untrue or misleading *when made*." *Id.* (internal quotations and citation omitted) (emphasis in original).

Having carefully reviewed plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws, the Court finds plaintiffs have sufficiently alleged material misrepresentations and/or omissions. Specifically, the Court finds plaintiffs have specified each fraudulent statement, have explained why the statement was misleading, and have alleged with particularity [the] basis for believing that the statement was false when made. Accordingly, the Court finds that plaintiffs' Section 10(b) claim should not be dismissed on this basis.

3.    Section 20(a) claim

Moving Defendants also contend that plaintiffs' Section 20(a) claim should be dismissed. Specifically, Moving Defendants assert that the complaint does not adequately plead the element of control.

Liability under Section 20(a) attaches to "[e]very person who, directly or indirectly, controls any person liable," 15 U.S.C. § 78t(a), for violations of the federal securities laws. "The statute is remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir. 1998) (internal quotations and citations omitted).

10

Thus, for plaintiffs to state a prima facie case of control person liability, plaintiffs must establish: "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person[s]." *Id.* (internal citations omitted). To establish control, "plaintiffs must point to facts which indicate the defendants had possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1108 (10th Cir. 2003) (internal quotations and citation omitted).

As set forth above, the Court has found that plaintiffs have sufficiently alleged a violation of Section 10(b). Having carefully reviewed the Consolidated Amended Complaint for Violations of the Federal Securities Laws, the Court finds that plaintiffs have also sufficiently alleged control over SandRidge and Trust I by defendants Ward, Grubb, and Bennett. Specifically, in the complaint, plaintiffs allege:

> 348. The Officer Defendants acted as controlling persons of SandRidge within the meaning of Section 20(a) of the Exchange Act by virtue of their directly and/or indirectly possessing at all relevant times authority and power through ownership of voting securities, senior executive positions, or by agreement, agency and/or otherwise, to directly and/or indirectly control, influence or direct the management and policies of SandRidge, including without limitation, (i) participating in the Trust I Conference Calls as officers of SandRidge, and (ii) the operations of SandRidge (including without limitation, operation of the Trust I Wells).

> 349. The Officer Defendants acted as controlling persons of Trust I within the meaning of Section 20(a) of the Exchange Act by virtue of their directly and/or indirectly possessing at all relevant times authority and power by agreement, agency and/or otherwise to directly and/or indirectly control, influence or direct the management and policies of Trust I, including without limitation, the (i) financial reporting of Trust I (including without limitation, conducting Conference Calls with analysts concerning the operational and financial results of Trust I), (ii) the performance of Trust I's basic functions under the Administrative Services Agreements between SandRidge and Trust I, and (iii) management

>of the sole assets of Trust I (i.e., the Trust I Royalty Interest in the
>Trust I Wells), and thereby serving as the "de facto" officers of Trust
>I at all relevant times. . . .

Consolidated Amended Complaint for Violations of the Federal Securities Laws at ¶¶ 348 and

349. Accordingly, the Court finds that plaintiffs' Section 20(a) claim should not be dismissed.

III.    Conclusion

      For the reasons set forth above, the Court DENIES defendant Tom L. Ward's Motion to

Dismiss [docket no. 101], nominal defendant SandRidge Energy, Inc.'s Motion to Dismiss [docket

no. 102], and defendant SandRidge Mississippian Trust I's Motion to Dismiss [docket no. 103]

and GRANTS IN PART and DENIES IN PART defendants James D. Bennett and Matthew K.

Grubb's Motion to Dismiss [docket no. 97] as follows: (A) the Court GRANTS the motion to

dismiss as to plaintiffs' Section 10(b) claim against defendant James D. Bennett and DISMISSES

said claim, and (B) the Court DENIES the motion to dismiss in all other respects.

      **IT IS SO ORDERED this 11th day of September, 2017.**

VICKI MILES-LaGRANGE
UNITED STATES DISTRICT JUDGE