## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

DUANE & VIRGINIA LANIER TRUST,
individually and on behalf of all others
similarly situated,

              Plaintiffs,

    v.

SANDRIDGE MISSISSIPPIAN TRUST I,
et al.,

              Defendants.

Case No. 15-CV-00634-SLP

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL

# CONTENTS

Page

I.  MOVANTS' PROPOSED CLASS PERIOD IS IMPERMISSIBLY
    OVERBROAD ........................................................................................ 9

    A.  The Class Period Cannot Begin Before May 11, 2012 ............................... 10

    B.  The Class Period Must End On November 1, 2012 .................................... 12

II. MOVANTS HAVE NOT PROVEN THAT THE MARKET FOR TRUST
    UNITS WAS EFFICIENT DURING THE ALLEGED CLASS PERIOD
    AND THUS CANNOT INVOKE THE *BASIC* REBUTTABLE
    PRESUMPTION OF RELIANCE ........................................................... 14

    A.  Werner's Event Study Did Not Measure Market Efficiency For Trust
        I And Trust II Units During The Class Period ........................................... 17

    B.  Werner's "News vs. No News" Study Is Unreliable .................................... 21

    C.  Movants Cannot Rely On The *Basic* Presumption For Persons Who
        Purchased Trust Units In The IPOs, And Not The Secondary Market ....... 24

    D.  Trust II Unit Purchasers Cannot Be In The Class Because Movants
        Do Not Attempt To Show The Market Efficiently Reacted To Trust I
        News ................................................................................................ 24

III. ANY PRESUMPTION OF MARKET EFFICIENCY IS REBUTTED BY
     THE ABSENCE OF MOVEMENTS IN STOCK PRICE ASSOCIATED
     WITH PLAINTIFFS' ALLEGED MISSTATEMENTS OR OMISSIONS .......... 25

IV.  NONE OF THE PROPOSED CLASS REPRESENTATIVES CAN
     ADEQUATELY PROTECT THE INTERESTS OF THE CLASS
     BECAUSE THEY HAVE ABDICATED THEIR RESPONSIBILITIES TO
     COUNSEL ......................................................................................... 27

V.   MOVANTS SUFFER FROM UNIQUE DEFECTS AND DEFENSES
     THAT RENDER THEM INADEQUATE CLASS REPRESENTATIVES .......... 29

     A.  Deborah Rath ................................................................................. 30

     A.  Reed Romine .................................................................................. 31

     B.  Duane And Virginia Lanier Trust ...................................................... 32

C.    Jase Luna ...................................................................................................... 33

D.    Matthew Willenbucher .................................................................................. 33

E.    Ivan Nibur...................................................................................................... 34

# **TABLE OF AUTHORITIES**

**Page(s)**

## CASES

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
   568 U.S. 455 (2013) .................................................................................................. 14

*Anderson Living Tr. v. WPX Energy Prod., LLC*,
   308 F.R.D. 410 (D.N.M. 2015) .................................................................................. 28

*Ark. Teachers Ret. Sys. v. Goldman Sachs Grp. Inc.*,
   879 F.3d 474 (2d Cir. 2018) ................................................................................ 26, 27

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988) ........................................................................................... *passim*

*Bell v. Ascendant Sols., Inc.*,
   2004 WL 1490009 (N.D. Tex. July 1, 2004) ............................................................ 21

*Bell v. Ascendant Sols., Inc.*,
   422 F.3d 307 (5th Cir. 2005) .................................................................................... 20

*Better v. YRC Worldwide Inc.*,
   2016 WL 1056972 (D. Kan. Mar. 14, 2016) ............................................................ 28

*Buford White Lumber Co. v. Octagon Prop., Ltd.*,
   740 F. Supp. 1553 (W.D. Okla. 1989) ................................................... 31, 33, 34, 35

*Cammer v. Bloom*,
   711 F. Supp. 1264 (D.N.J. 1989) ................................................................ 15, 18, 23

*City P'ship Co. v. Jones Intercable, Inc.*,
   213 F.R.D. 576 (D. Colo. 2002) ................................................................... 29, 30, 32

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013) ...................................................................................................... 9

*E. Tex. Motor Freight Sys. Inc. v. Rodriguez*,
   431 U.S. 395 (1977) .................................................................................................. 33

*Edgington v. R.G. Dickinson & Co.*,
   139 F.R.D. 183 (D. Kan. 1991) ................................................................................. 25

*In re Enron Corp. Sec.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ........................................................ 16

*In re Fed. Home Loan Mortg. Corp. Sec. Litig.*,
    281 F.R.D. 174 (S.D.N.Y. 2012) ............................................. 16, 18, 19, 22

*Freeman v. Laventhol & Horwath*,
    915 F.2d 193 (6th Cir. 1990) ............................................................... 24, 32

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*,
    903 F.2d 176 (2d Cir. 1990), *abrogated on other grounds by Microsoft*
    *v. Baker*, 137 S. Ct. 1702 (2017)....................................................... 25, 30, 31

*George v. China Auto. Sys.*,
    2013 WL 3357170 (S.D.N.Y. July 3, 2013) ........................................... 15, 27

*Halliburton Co. v. Erica P. John Fund, Inc.*,
    134 S. Ct. 2398 (2014) ................................................................. 9, 12, 15, 26

*Hayes v. MagnaChip Semiconductor Corp.*,
    2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ........................................... 13

*In re HealthSouth Corp. Sec. Litig.*,
    213 F.R.D. 447 (N.D. Ala. 2003).............................................................. 33

*Hockenbury v. Hanover Ins. Co.*,
    2016 WL 552967 (W.D. Okla. Feb. 10, 2016) ......................................... 10

*IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*,
    818 F.3d 775 (8th Cir. 2016) .................................................................. 27

*In re Initial Public Offerings Sec. Litig.*,
    471 F.3d 24 (2d Cir. 2006).............................................................. 24, 32

*Inst. Inv'rs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009)..................................................................... 10

*J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*,
    628 F.2d 994 (7th Cir. 1980) ................................................................... 34

*Kas v. Fin. Gen. Bankshares, Inc.*,
    105 F.R.D. 453 (D.D.C. 1985).................................................................. 30

*Katz v. Comdisco, Inc.*,
    117 F.R.D. 403 (N.D. Ill. 1987).............................................................. 10

*Metzger v. Am. Fid. Assur. Co.*,
　　249 F.R.D. 375 (W.D. Okla. 2007) .............................................................. 32

*In re Nature's Sunshine Prods. Inc. Sec. Litig.*,
　　251 F.R.D. 656 (D. Utah 2008) ........................................................... 12, 13

*In re Northfield Labs., Inc. Sec. Litig.*,
　　267 F.R.D. 536 (N.D. Ill. 2010) .................................................................. 27

*O'Neil v. Appel*,
　　165 F.R.D. 479 (W.D. Mich. 1996) ............................................................ 22

*Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks
　　Corp.*,
　　369 F.3d 27 (2d Cir. 2004) .......................................................................... 25

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
　　314 F.3d 1180 (10th Cir. 2002) .................................................................. 30

*In re Safety-Kleen Corp. Bondholders Litig.*,
　　2004 WL 3115870 (D.S.C. Nov. 1, 2004) .................................................. 24

*In re Salomon Analyst Metromedia Litig.*,
　　236 F.R.D. 208 (S.D.N.Y. 2006), *vacated and remanded*, 544 F.3d 474
　　(2d Cir. 2008) ............................................................................................. 30

*Sapssov v. Health Mgmt. Assoc.*,
　　608 F. App'x 855 (11th Cir. 2015) ............................................................. 20

*Serfaty v. Int'l Automated Sys., Inc.*,
　　180 F.R.D. 418 (D. Utah 1998) ............................................... 15, 22, 23, 24

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*,
　　546 F.3d 196 (2d Cir. 2008) .......................................................... 15, 16, 21

*Trevizo v. Adams*,
　　455 F.3d 1155 (10th Cir. 2006) ................................................................ 8, 9

*Tucker v. BP Am. Prod. Co.*,
　　278 F.R.D. 646 (W.D. Okla. 2011) ............................................................ 30

*Unger v. Amedisys, Inc.*,
　　401 F.3d 316 (5th Cir. 2005) ..................................................................... 24

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
　　2018 WL 620383 (D. Minn. Jan. 30, 2018) .................................... 12, 13, 20

*Wal-Mart Stores, Inc. v Dukes*,
  564 U.S. 338 (2011) ................................................................................................ 8, 9

*Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*,
  725 F.3d 1213 (10th Cir. 2013) ...................................................................................... 9

*Weikel v. Tower Semiconductor Ltd.*,
  183 F.R.D. 377 (D.N.J. 1998) ................................................................................. 32, 35

## RULES

Fed. R. Civ. P. 23(a) ................................................................................................... 9

Fed. R. Civ. P. 23(a)(3) ............................................................................................. 29

Fed. R. Civ. P. 23(b)(3) .............................................................................................. 9

## OTHER AUTHORITIES

Eugene Fama, *Efficient Capital Markets: II*, Journal of Finance (1991) .......................... 17

Oya Altinkilic, *et al., Are Analysts' Forecasts Information to the General
  Public*, 59 Mgmt. Sci. 11 (2013) .................................................................................. 20

Defendants Tom Ward, James Bennett, Matthew Grubb, SandRidge Mississippian Trust I ("Trust I"), and nominal defendant SandRidge Energy, Inc. ("SandRidge," collectively "Defendants"), respectfully submit this opposition to the Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel by Lead Plaintiffs the Duane & Virginia Lanier Trust (the "Lanier Trust"), Ivan Nibur, Jase Luna, and Matthew Willenbucher (collectively, "Plaintiffs"), and movants Reed Romine and Deborah Rath (together with Plaintiffs, "Movants").

## INTRODUCTION

This is not a run-of-the-mill motion to certify a securities fraud class.

To start, Movants propose a class period that fails to account for the dismissal of many of their claims and thus begins over a year before the first actionable misstatement. It similarly ends more than a week after Trust I disclosed the "true" information Lead Plaintiffs allege was misstated.  Plaintiffs' artificial enlargement of the class period is obviously intended to increase the putative class's theoretical damages, but it also is just as obviously improper.  Even before conducting the rigorous analysis that Federal Rule of Civil Procedure 23(b) requires, this Court should narrow the class to persons who purchased securities between the first actionable misstatement (May 11, 2012) and the Trust I disclosure (November 1, 2012).

Second, the securities the putative class members purchased are not the typical common stock of a single public company that courts usually encounter when assessing whether to certify a securities fraud class.  Rather, the putative class members are purchasers of "units"—not common stock—of two separate and distinct royalty trusts

(Trust I and SandRidge Mississippian Trust II ("Trust II") (collectively, the "Trusts")) sponsored by SandRidge.  These units are unique because each Trust derived its revenues from its interests in a fixed number of specific oil and gas wells and paid out virtually all of its earnings to unit holders in the form of quarterly cash distributions.  Because the wells are depleting assets (*i.e.*, the amount of oil and gas in the wells declines), the Trusts projected declining distributions over time and, as a result, the units' market prices would decline rather than appreciate.  By the same token, analysts and investment advisors recognized that investments in the Trust units were unlike an investment in common stock of a public company like SandRidge.

Movants and their market efficiency expert Adam Werner ignore these peculiarities and blindly apply the standards adopted by courts when evaluating class certification in common stock cases.  Indeed, Werner testified he understood next to nothing about the nature of the Trusts, the differences between the Trust units and common stock, how the Trusts earned revenue, or their relationship to each other or SandRidge, and did not consider whether he should adjust his analysis to account for any of these unique attributes.  As a result of these failings, Werner structured and performed his tests in a manner that is fundamentally flawed and inherently unreliable.

Specifically, plaintiffs in securities fraud class actions must demonstrate that the market for the securities was efficient during the class period in order to invoke a class-wide preemption of reliance under the "fraud on the market" theory articulated in *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988), which holds that market prices will reflect all public information (including alleged misrepresentations).  Absent this presumption,

2

individual proof of reliance would predominate over common issues and the class could not be certified.

In  addition to a basic misapprehension of the nature of the Trust securities and their distinction from common stock, Werner incorrectly applied the so-called *Cammer* factors that courts examine as indicia of market efficiency.  The most important factor is a cause and effect analysis of whether the market price for a security quickly reacts to the disclosure of new company specific information.  Werner performed two faulty "cause and effect" tests, and erroneously concluded that both indicated efficiency.  For example, Werner's first "event study" concluded the markets for Trust I and Trust II units were efficient *during the class period* even though he failed to test the price reaction on even a single day of the alleged class period.  He also failed to consider whether the unit prices reacted to any alleged misstatements.  Similarly, Werner's second test relied upon the wrong "news" and ignored that unit prices moved far more often on non-news days than news days, which reflects volatility and not efficiency.  In sum, his analysis failed to show market efficiency for either Trust's units, and Movants cannot use his analysis to invoke the fraud-on-the-market presumption.  Moreover, Werner's analysis revealed that the price for Trust II units did not react to the alleged false statements, Trust I units only moved in response to one, and neither unit reacted to Trust I's curative disclosure.  Under Supreme Court precedent, this lack of price impact means that the *Basic* presumption does not apply.

Third, the proposed class representatives' testimony proves their surprising absence of attention to, and control over, this litigation.  Despite promising to "fairly and adequately protect the interests of the Class," the proposed class representatives, among other things,

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████. The law of this Circuit is clear that the interests of absent class members should not be entrusted to such derelict representatives, and the proposed class should not be certified for this additional reason.

## BACKGROUND

The Lanier Trust filed this securities fraud class action against Defendants because, in its representative's words, "█████████████████████████████████" Lanier Dep. 115:12.[1]  The Lanier Trust was later joined by four other purchasers of Trust I and Trust II units who accused Defendants of making false or misleading statements about Trust I's oil and gas production, the pace of drilling, and available reserves.  Plaintiffs asserted claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") (and Rule 10b-5 thereunder) and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act") against Defendants on behalf of all purchasers

---

[1]     The Lanier Trust actually made money on its investment in Trust I units during the proposed class period.  It purchased 14,000 units for $21.00 in the initial public offering and the trading price was $3.46 lower at the end of the class period.  However, the Lanier Trust received distributions from Trust I in the amount of $4.40 per unit.  *See* Werner Dep. Ex. 4 (Decl. Ex. 17).  Thus, the Lanier Trust's investment in Trust I netted it a gain of $0.94 per unit over the alleged class period, or $13,160 in total.  *See* Decl. Ex. 2, Lanier PSLRA Filing.

of Trust I or Trust II units between April 5, 2011 and November 8, 2012.  Defendants moved to dismiss these claims in their entirety.

Judge Miles-LaGrange partially agreed with Defendants and dismissed Plaintiffs' Securities Act claims, which were based on alleged misrepresentations and omissions in Trust offering documents, including the registration statement and prospectus for Trust I's April 2011 initial public offering.  (*See* Doc. No. 129.)  However, the Court denied the motion with respect to the Exchange Act claims, concluding, among other things, that Plaintiffs had adequately alleged scienter as to Mr. Grubb and Mr. Ward with respect to certain alleged misrepresentations or omissions in 2012.  Order at 8-9 (Doc. No. 130).  Specifically, the Court credited allegations that "by the end of February 2012, the Trust I Development Wells were producing considerably less oil, and considerably more gas, than the Trust I Producing Wells," and that "SandRidge accelerated the drilling of the Trust I Development Wells, which boosted aggregate oil and gas production."  *Id.* at 2.

Only the Exchange Act claims against SandRidge, Trust I, Mr. Bennett, Mr. Grubb, and Mr. Ward based upon alleged misstatements by and about Trust I remain in the case.  Trust II is no longer a defendant at all.  Nonetheless, Plaintiffs contend that *Trust II* purchasers somehow still have Exchange Act claims against Defendants based on Trust I statements.  Trust I moved for partial judgment on the pleadings on the basis that purchasers of Trust II units lack standing to sue Trust I.  Mot. for Partial Judg. on Pldgs. (Doc. No. 157).

Despite the dismissal of their Securities Act claims and the Court's Order finding facts supporting a strong inference of scienter only after February 2012, Movants have not

altered the class definition.  They still seek to certify a class of "[a]ll persons who purchased or acquired shares of SandRidge Mississippian Trust I and SandRidge Mississippian Trust II between April 5, 2011 and November 8, 2012, inclusive," except for Defendants and those affiliated with Defendants.  Notice of Mot. (Doc. No. 169).

The Trusts are royalty term trusts that are quite different from traditional public companies.  Am. Compl. ¶¶ 4, 19.  Each has a predetermined lifespan.  Trust I is set to dissolve and begin liquidation on December 31, 2030, and Trust II a year later.  *Id.* ¶ 100, 182.  The Trusts also have interests in a fixed portfolio of assets from which they can generate revenue (oil and gas wells), and a finite amount of inventory that can be sold (oil and gas reserves).  And neither Trust is permitted to acquire additional wells, or to receive proceeds from anything except the output of those wells.  In other words, the value of the Trusts would necessarily decline over time.  *See* Wunderlich Report (May 17, 2011) (Decl. Ex. 3); Kennedy Dep. 67:3-8; 93:4-11 (Decl. Ex. 4).

Each Trust sold "common units" to investors in an initial public offering.  Am. Compl. ¶¶ 5, 20, 255-56.  These common units are unlike the common stock issued by public companies like SandRidge.  In the words of an underwriter and analyst of the Trusts, common units and common stock are "████████████████████████████."  Kennedy Dep. 88:4-22.  Each Trust was obligated every quarter to make "cash distributions of substantially all of its cash receipts, after deducing the trust's administrative expenses."  Trust I Prospectus at 2 (Decl. Ex. 5); Trust II Prospectus at 2 (Decl. Ex. 6).  By contrast, any dividend paid to common stock shareholders is discretionary.  Because each Trust had a fixed number of wells and projected reserves, each Trust informed investors that its

projected target distributions would "initially increase" as new wells came online, and then target distributions would "decline . . . as a result of the depletion of the reserves."  Am. Compl. ¶¶ 126, 206.  This necessarily meant that "unit *prices* are also, by definition, expected to decline over time."  Wells Fargo Report (May 17, 2011) (emphasis added) (Decl. Ex. 7).  Indeed, the Trusts informed investors that the distributions are "a return of your original investment" because revenues are generated from "depleting assets" and production "will diminish over time."  Trust I Prospectus at 16; Trust II Prospectus at 18.

Each quarter during the alleged class period, the Trusts issued public press releases reporting the volume of oil and gas produced in the prior quarter, and announcing the distribution for that period.  Beginning in February 2012, Trust I's press releases also disclosed the exact number of wells drilled in the prior quarter, and estimated an overall drilling completion date.  Trust I Form 8-K (Feb. 2, 2012) (Decl. Ex. 8).  Plaintiffs do not allege any of these press releases were false or misleading.  *See* Am. Compl. ¶¶ 307-329.

Each Trust also held quarterly investor conference calls to discuss its earnings and performance.  It was repeatedly stated on these calls that the Trusts' wells were being drilled at an accelerated pace and this meant more oil sooner.[2]  And as the drilling pace slowed, Trust I disclosed that production would fall below the "high watermark" of the first quarter of 2012.  Trust I Earnings Call (Aug. 10, 2012) (Decl. Ex. 11).

---

[2]     *See, e.g.*, Trust I Earnings Call (Aug. 12, 2011) (Thompson Reuters), at 2-3 (Decl. Ex. 9) (noting Trust I was "1.5 net wells ahead of our drilling schedule"); Trust I Earnings Call (May 11, 2012) (Bloomberg) at 2 (Decl. Ex. 10) ("The higher net well count is a . . . result of . . . utilizing four drilling rigs during the previous period instead of originally anticipated three rigs.").

On November 1, 2012, Trust I reported that although its total production had increased from the prior quarter, "[t]his increased volume was due to higher natural gas production, offset by slightly lower oil production" and that its quarterly distribution would be less than the amount projected.  Trust I Form 8-K (Nov. 1, 2012) (Decl. Ex. 12).  Following the November 1 disclosure, one analyst reported his firm was "lowering [its] [earnings per unit] estimate . . . after adjusting differentials and accounting for an updated drilling schedule, which continues to track ahead of initial projections."  Wells Fargo Report (Nov. 1, 2012) (Decl. Ex. 13).  Another analyst acknowledged Trust I's lower oil-to-gas production ratio.  *See* Wunderlich Report (Nov. 5, 2012) (Decl. Ex. 14).

Plaintiffs ignore Trust I's November 1, 2012 press release.  They instead claim the market did not learn Trust I was producing less oil from its wells and would have a lower distribution until *SandRidge* disclosed a week later that *SandRidge* (not Trust I) suffered a net loss and that *SandRidge's* (not Trust I's) wells contained less oil than expected.

## LEGAL STANDARDS

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v Dukes*, 564 U.S. 338, 348 (2011).  To justify a departure from that rule, "a party seeking class certification must show under a strict burden of proof that all four requirements [of Rule 23(a)] are clearly met."  *Trevizo v. Adams*, 455 F.3d 1155, 1161-62 (10th Cir. 2006).  Those requirements are that "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a); *see also Trevizo*, 455 F.3d at 1161-62 (describing Rule 23(a)'s numerosity, commonality, typicality, and adequacy requirements). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Wal-Mart*, 564 U.S. at 350-51.

Separately, the proposed class must also satisfy one of the three requirements in Rule 23(b). Here, Movants rely on Rule 23(b)(3), which permits a class action if plaintiffs prove "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). This "predominance" element "is even more demanding than Rule 23(a)," in part because Rule 23(b)(3) is "an adventuresome innovation, [] designed for situations in which class-action treatment is not as clearly called for." *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013). Thus, the court has a "duty to take a close look at whether common questions predominate over individual ones." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy*, 725 F.3d 1213, 1219 (10th Cir. 2013) (quoting *Comcast*, 569 U.S. at 34).

## ARGUMENT

## I. MOVANTS' PROPOSED CLASS PERIOD IS IMPERMISSIBLY OVERBROAD

Movants' proposed class period begins too soon and ends too late. The Supreme Court has repeatedly held that the appropriate class period falls between "the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica*

*P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014).  This Court has wide discretion to reject or modify an improperly defined class.  *See Hockenbury v. Hanover Ins. Co.*, 2016 WL 552967, at *3-4 (W.D. Okla. Feb. 10, 2016) (rejecting class definition as "overbroad and unworkable").  Accordingly, any class to be certified in this action can include only persons who purchased Trust I units between **May 11, 2012** and **November 1, 2012**.

### A.     The Class Period Cannot Begin Before May 11, 2012

The Amended Complaint identified April 5, 2011, as the start of the class period because that is when the Trust I registration statement became effective.  Am. Compl. ¶ 2-3.  But now that the Securities Act claims based on that registration statement have been dismissed, that date cannot be the start of the class period.  The remaining Exchange Act claims require Plaintiffs to allege facts supporting a "strong inference" that Defendants made misleading statements with "scienter."  Order at 6 (Doc. No. 130).  "[T]he class period can begin to run no earlier than that date" of a misstatement made with scienter. *Inst. Inv'rs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 280 (3d Cir. 2009); *Katz v. Comdisco, Inc.*, 117 F.R.D. 403, 411 (N.D. Ill. 1987).  The first misstatement Defendants allegedly made with scienter occurred on May 11, 2012.

Judge Miles-LaGrange held that Plaintiffs sufficiently pled scienter by alleging Mr. Grubb and Mr. Ward attended "senior management meetings" where "the declining oil production of the Trust I Wells after the Trust I IPO, and the unpredictability of the performance of individual Trust I Wells after the Trust I IPO, was discussed."  Order at 9 (Doc. No. 130).  The Court reached this conclusion because "Plaintiffs alleged that by *the end of February 2012*, the Trust I Development Wells were producing considerably less

oil, and considerably more gas, than the Trust I Producing Wells and that divergent production data between proximate Trust I Wells demonstrated a lack of geological uniformity in Alfalfa county," where many of the Trust I wells were drilled.   *Id.* at 2 (emphasis added).

The facts alleged in the Amended Complaint are consistent with the Court's holding and contradict the conclusory assertion that Defendants allegedly knew of declining oil production before February 2012.   *See, e.g.*, Am. Compl. ¶ 311 (baldly asserting Defendants knew "as of the end of August 2011").[3]   The Amended Complaint concedes that oil production of Trust I Development Wells was actually *better* than Trust I Producing Wells through November 31, 2011.   Only by the "end of February 2012" did Trust I Development Wells oil production allegedly drop below Trust I Producing Wells.

| Average Monthly Oil Production During First 6 Months of Production of Wells With At Least 6 Months of Oil Production, According to the Amended Complaint | | | | |
|---|---|---|---|---|
| **Production Period** | **Average Monthly Oil (BBL)** | | **Average Monthly Gas (BOE)** | |
| | *Trust I Producing Wells* | *Trust I Development Wells* | *Trust I Producing Wells* | *Trust I Development Wells* |
| **June 1, 2011 - Aug. 31, 2011** | 3,080 (33 wells) | **3,081 (4 wells)** | 2,349 (34 wells) | 2,204 (5 wells) |
| **Sept. 1, 2011 - Nov. 30, 2011** | 3,080 (33 wells) | **3,090 (13 wells)** | 2,349 (34 wells) | 4,450 (20 wells) |
| **Dec. 1, 2011 - Feb. 29, 2012** | 3,080 (33 wells) | **2,464 (21 wells)** | 2,307 (35 wells) | 3,910 (35 wells) |

---

[3]   In any event, the first alleged false statement after August 2011 was made on November 11, 2011 and the class period cannot begin before that date.

Similarly, Plaintiffs alleged "Alfalfa county pair data" does not demonstrate any signs of inconsistency until "March 2012." Am. Compl. ¶ 170-71.

The first allegedly misleading statement any Defendant made after the end of February 2012 was on May 11, 2012, when Trust I held a quarterly earnings call. *See id.* ¶¶ 319-23. Persons who purchased Trust I or II units prior to this date could not have relied on an alleged misrepresentation made with scienter, and cannot be included in the class.

### B.    The Class Period Must End On November 1, 2012

The alleged class period also extends beyond the date on which Trust I disclosed the information that Plaintiffs allege was withheld. The Supreme Court has explained that when news "credibly entered the market and dissipated the effects of the misstatements, those who traded [] shares after the corrective statements would have no direct or indirect connection with the fraud." *Basic Inc. v. Levinson*, 485 U.S. 224, 249 (1988). For that reason, "[c]ourts have regularly examined the date of corrective disclosure at the class-certification stage in order to decide whether the class period should be modified." *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 2018 WL 620383, at *8-13 (D. Minn. Jan. 30, 2018) (citing *Halliburton*, 134 S. Ct. at 2413-14).[4] Trust I's statement on November 1, 2012, undeniably disclosed the facts Plaintiffs allege were misrepresented.

---

[4]    *See also In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 251 F.R.D. 656, 666-67 (D. Utah 2008) (shortening "a proposed class period at the class certification stage in a securities case involving fraud on the market" because, as a matter of law, "a curative disclosure had been made so as to render it unreasonable for an investor, or the market, to continue to be mislead [sic] by the defendants' alleged misrepresentations"); *Hayes v. MagnaChip Semiconductor Corp.*, 2016 WL 7406418, at *8 (N.D. Cal. Dec. 22, 2016).

On November 1, 2012, Trust I disclosed that, although combined volume increased over the previous three-month period, "[t]his increased volume was due to higher natural gas production, offset by slightly lower oil production." Trust I Form 8-K (Nov. 1, 2012). The market understood exactly what Trust I's disclosures meant. A Wells Fargo analyst reported on November 1, 2012—over a week before SandRidge's statement—that Trust I "production volumes came in 6% below as gas was 7% above while crude was 22% below." Wells Fargo Report (Nov. 1, 2012). The analyst also reported his firm was "lowering [its] [earnings per unit] estimate . . . after adjusting differentials and accounting for an updated drilling schedule, which continues to track ahead of initial projections." *Id.*

By disclosing its declining oil production, increased gas production, and reduced drilling pace on November 1, 2012, Trust I disclosed the very information Plaintiffs allege to have been misrepresented. *See Medtronic, Inc.*, 2018 WL 620383, at *10 ("[T]he corrective disclosure is essential to defining the class itself because it marks the end date of the class period."); *Nature's Sunshine*, 251 F.R.D. at 666-67 ("Court finds, as a matter of law, that it was unreasonable for an investor, or the market, to rely on Nature's financial statements after March 20, 2006. . . . Thus, the Court finds that the appropriate class ending date is March 20, 2006.").[5] Indeed, Trust I's disclosure was nearly identical to SandRidge's disclosure about a week later about SandRidge's wells, which latter announcement Plaintiffs alleged—without any basis—somehow disclosed the truth about Trust I's wells:

---

[5]     As explained below, the November 1, 2012 statement "severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price," and is thus "sufficient to rebut the presumption of reliance" for any transactions after that date. *Basic Inc.*, 485 U.S. at 248.

"[W]e are seeing an increase in our natural gas production.  And this increase has been offset by a lower amount of oil than [SandRidge] anticipated at the beginning of last year." Am. Compl. ¶ 228.  Plaintiffs' own expert, Adam Werner, testified that the information about Trust I was disclosed to the market on November 1, 2012.  Werner Dep. 156:3-6 (Decl. Ex. 16).  The class period must therefore end on that date.[6]

## II.  MOVANTS HAVE NOT PROVEN THAT THE MARKET FOR TRUST UNITS WAS EFFICIENT DURING THE ALLEGED CLASS PERIOD AND THUS CANNOT INVOKE THE *BASIC* REBUTTABLE PRESUMPTION OF RELIANCE

The Supreme Court recognized in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), that requiring direct proof that securities purchasers relied upon an alleged misstatement would "ordinarily preclude certification of a class action seeking money damages because individual reliance issues would overwhelm questions common to the class."  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 462 (2013) (citing *Basic*, 485 U.S. at 242). So, the *Basic* Court held that in certain circumstances securities fraud plaintiffs can invoke a rebuttable presumption of reliance under the "fraud on the market" theory.  *Basic*, 485 U.S. at 246.  This theory holds that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material

---

[6]     Moreover, SandRidge did not disclose anything about Trust I on November 9, 2012.  SandRidge began its statement by emphasizing that it was "intended to discuss SandRidge Energy *and not [its] public royalty trusts*."  SandRidge Earnings Call (Nov. 9, 2012) (emphasis added) (Decl. Ex. 15).  Plaintiffs ignore this clear statement that SandRidge's conference call did not apply to the Trusts and argue that SandRidge's disclosure revealed to the market that "oil production in the same regions of Oklahoma and Kansas where the Trust Wells were located had declined more steeply than expected."  Am. Compl. ¶ 25; Class Cert. Mot. at 5 (Doc. No. 170).  They are wrong, because Trust I had already disclosed the oil production decline in *its own wells* no later than November 1, 2012.

misrepresentations."   *Id*.   And, as a result, "an investor presumptively relies on a misrepresentation so long as it was reflected in the market price at the time of his transaction." *Halliburton*, 134 S. Ct. at 2414.

A plaintiff can trigger the rebuttable presumption of reliance only by showing that "(1) the alleged misrepresentations were publicly known, (2) that they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Id.* at 2413. The first three elements are essential requirements for proving "the alleged misrepresentation affected the market price in the first place"—*i.e.*, had "price impact." *Id.* at 2414. "In the absence of price impact, *Basic's* fraud-on-the-market theory and presumption of reliance collapse." *Id.* "To defeat the presumption of reliance, defendants do not, therefore, have to show an inefficient market. . . . [They need only] demonstrate that plaintiffs' proffered proof of market efficiency falls short of the mark." *George v. China Auto. Sys.*, 2013 WL 3357170, at *9 (S.D.N.Y. July 3, 2013). Movants fail on the third *Basic* element—they do not show that the markets for Trust I and Trust II common units were efficient.

In assessing market efficiency, courts often consider the factors prescribed in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989), to be a useful analytic tool. *See, e.g.*, *Serfaty v. Int'l Automated Sys., Inc.*, 180 F.R.D. 418, 421 (D. Utah 1998). The "most important" *Cammer* factor examines whether "unexpected corporate events or financial releases cause an immediate response in the price of a security." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207 (2d Cir. 2008). "Without the demonstration of such a causal relationship, it is difficult to presume that the market

15

will integrate the release of material information about a security into its price." *Id.* at 207; *see also In re Fed. Home Loan Mortg. Corp. Sec. Litig.*, 281 F.R.D. 174, 182 (S.D.N.Y. 2012) (describing cause-and-effect as "the *sine qua non* of efficiency").

Empirical price-impact evidence is even more critical for securities that do not behave like common stock, such as trust units, preferred stocks, and bonds.[7] *Cf. In re Fed. Home Loan*, 281 F.R.D at 178-81 (relying on cause and effect test for preferred stock); *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 747-48 (S.D. Tex. 2006) ("[C]ommentators and courts have recognized that the *Cammer/Unger/Bell* factors were developed to measure the efficiency of stock markets and do not fit the bond markets well."). Blindly applying the non-causal *Cammer* factors to the Trust units yields "a comparison between the proverbial apple and orange," *id.* at 755, because, as recognized by one Trust analyst and underwriter, "[t]hey're two different types of investments." Kennedy Dep. 88:9-22.

Movants rely exclusively upon their expert, Adam Werner, to invoke the *Basic* presumption.[8] Werner conducted two empirical tests on the efficiency of the markets for Trust I and Trust II units—an "Event Study" and a "news vs. no news" test. Neither test, however, satisfies Movants' obligation to show an efficient market.

---

[7] In an analyst report, Wells Fargo noted that the investment strategies of trust unit purchasers differed from that of investors in common stock, writing that "buyers of trusts bid the price up to a comparable and or 'reasonable' yield, failing to acknowledge that the distributions are likely to fall over time and that unit prices are also, by definition, expected to decline over time." Wells Fargo Report (May 17, 2011); Werner Dep. 61:10-17.

[8] Werner testified that he was both unaware of nearly all unique aspects of the Trusts and had no experience analyzing whether any royalty trust has traded in an efficient market. *See* Appendix A.

A. **Werner's Event Study Did Not Measure Market Efficiency For Trust I And Trust II Units During The Class Period**

Werner claims "[t]he cleanest evidence on market-efficiency comes from event studies, especially event studies on daily returns."  Werner Report ¶ 68 (quoting Eugene Fama, *Efficient Capital Markets: II*, Journal of Finance (1991), p. 1607) (Decl. Ex. 18). To provide this "cleanest evidence," Werner performed a three-step process to "measure[] the impact of new, firm-specific information on a firm's stock price."  *Id.* ¶ 70.  First, he identified dates "on which company-specific information was released that is new, unexpected, not confounded by major countervailing news, and is of such import as to reasonably be expected to elicit a stock price reaction over the threshold for statistical significance."  *Id.* ¶ 72.  Of "special importance" to Werner were dates on which news related to alleged misstatements in the Amended Complaint was disclosed.  *Id.* ¶ 74.  In the second and third steps, Werner constructed a model of expected market returns over the alleged class period and used a t-test to determine if actual returns were abnormal and statistically significant at the 95% confidence level.  *Id.* ¶¶ 79-88.  The general methodology Werner attempts to perform is not objectionable in principle.  However, Werner's Event Study suffers from basic and incontrovertible errors in its initial step that render it unreliable.

*First*, Werner did not test even a single day during the 583-day proposed class period—not even the dates of any alleged misstatements.  This is likely because such a test would not have suggested an efficient market—none of the alleged misstatements caused a statistically significant abnormal return in Trust II unit prices and only one of them (the

statement on August 10, 2012) occurred on a date with a statistically significant change in Trust I's unit price. *See* Werner Ex. 8-a (reflecting price movements on Nov. 11, 2011; Feb. 17, 2012; May 11, 2012; and Aug. 10, 2012). So Werner instead selected event dates *after* the class period: November 9, 2012; January 31, 2013; February 6, 2013; and March 5, 2013. This is contrary to Werner's acknowledgement that the "central question under the fraud on the market theory . . . is whether the stock price, *at the time a plaintiff effected a trade*, reflected the 'misinformation' alleged to have been disseminated." Werner Report ¶ 74 (quoting *Cammer*, 711 F. Supp. at 1282).

Werner also conceded during his deposition that he "can't just look at a data point and say hey, there was a statistically significant return on that day and, thus, the stock is efficient for the entire class period." Werner Dep. 90:9-12. Nevertheless this is precisely what Werner did. Werner's Event Study does not even test market efficiency "at the time" any class members purchased Trust units, *i.e.*, during the alleged class period, much less demonstrate it. *See In re Fed. Home Loan*, 281 F.R.D. at 179 (expert's reliance on event days outside the class period is a "serious error").

Three of the four event dates Werner tested were 84, 90 and 117 days, respectively, after the close of the alleged class period—and almost seven months after the last alleged misstatement in this case. *See* Am. Compl. ¶¶ 324-29. Werner unsurprisingly does not attempt to explain how events so far removed from the class period are at all meaningful to measuring efficiency during the relevant timeframe. Nor can Werner explain why these dates should be relied upon rather than any of the multitude of dates during the class period on which Trust I and Trust II disclosed new information about their financial results and

oil and gas production. *In re Fed. Home Loan*, 281 F.R.D. at 179 (finding it improper to include dates "not within the class period").

**Second**, none of the post-class period event dates Werner studied contain new, company-specific information that was free from confounding news related to the alleged fraud—as Werner's parameters require. Werner Report ¶ 72. Only one of the dates Werner examined even contained a statement by Trust I—the one on January 31, 2013. *Id.* ¶ 97. Werner cannot explain what new information about the alleged misstatements was disclosed; especially because Movants (and Werner) contend the market learned the truth about Trust I and Trust II months earlier when SandRidge disclosed it recovered less oil than expected in the Mississippian (more on this later). *See supra* § I.B. Moreover, Werner found that the price of Trust I units did ***not*** react in a statistically significant way to the January 31, 2013 news. *Id.* ¶ 101. Thus, the one (and only) data point that potentially fits Werner's characterization of an "appropriate" event date for Trust I does not demonstrate efficiency.

Werner's Report identifies 39 analyst reports during the class period that he considered. Werner Ex. 2, at 87-88. But he ignores them all. He instead cherry-picked two temporally displaced analyst reports to test market efficiency (and it is surely not a coincidence these reports were issued on dates of large price declines and identified in the Amended Complaint, *see* Am. Compl. ¶¶ 237-41 (discussing Wunderlich Securities Report

(Feb. 4, 2013) and RBC Report (Feb. 6, 2013)).[9]  These two analyst reports discussed information the Trusts had already publicly disclosed; the reports did not tell investors any *new facts*. *See Sapssov v. Health Mgmt. Assoc.*, 608 F. App'x 855, 863-64 (11th Cir. 2015) ("[T]he mere repackaging of already-public information by an analyst or short-seller is simply insufficient to constitute a corrective disclosure."); *Medtronic*, 2018 WL 620383, at *29 (analyst reports "reiterated and reinforced" company disclosures); Oya Altinkilic, *et al.*, *Are Analysts' Forecasts Information to the General Public*, 59 Mgmt. Sci. 11 (2013) ("[A]nalysts convert public information into a forecast revision, which is not very informative beyond the information itself.").  Werner makes no effort to (and cannot) explain how or why those analysts' opinions about stale information should be expected to move the price of Trust units.  If the market efficiently incorporated the Trusts' prior disclosures of the facts repeated by the analysts, the later repetition of the same facts by the analysts should have had no impact on the price of Trust units.

That leaves only the last date Werner studied: November 9, 2012, the alleged "corrective disclosure" that ends the putative class period.  But the "single decline on the last day of the class period is plainly insufficient by itself to show market efficiency throughout the class period, especially here where the class period begins as early as the day of the IPO itself."  *Bell v. Ascendant Sols., Inc.*, 422 F.3d 307, 316 (5th Cir. 2005).  November 9 is also inappropriate as an event date because Trust I did not make a statement

---

[9]     Analysts also issued post-class period reports about Trust I on November 19, 2012; November 21, 2012; February 4, 2013; and March 4, 2013.  *See* Werner Ex. 2, at 87-88.  *None of those days* saw significant movements for Trust I unit prices.

on this date.  Instead, SandRidge spoke about its own performance and expressly stated it "intended to discuss SandRidge Energy *and not [its] public royalty trusts*."  SandRidge Earnings Call (Nov. 9, 2012) (emphasis added).  SandRidge statements are irrelevant because "[t]he *Cammer* efficiency factors evaluate whether stock price responds to company-specific news, not industry-specific news."  *Bell v. Ascendant Sols., Inc.*, 2004 WL 1490009, at *3 (N.D. Tex. July 1, 2004); *see also, e.g.*, *Bombardier*, 546 F.3d at 209-10 (rejecting attempt to impute a parent company's statements onto a related trust).[10]

### B.    Werner's "News vs. No News" Study Is Unreliable

Werner's second test compared the percentage of days on which unit prices experienced statistically significant changes when "news" was present ("news days"), relative to days when news was not present ("non-news days").  In an efficient market, news days should reflect meaningful price changes with much more regularity than non-news days.  Werner Report ¶¶ 66, 124.

With respect to Trust I, the news test Werner conducted generates more doubt about market efficiency than answers.  Correcting Werner's study for the appropriate class period, his analysis identifies twelve statistically significant movements of Trust I unit prices between May 11, 2012 and November 2, 2012, but only two of those movements

---

[10]    Indeed, Movants' argument that SandRidge's disclosure impacted Trust I and Trust II units despite the fact that Trust I had already disclosed the same facts about its wells means either (1) the market did not efficiently react to company-specific news about Trust I or (2) other non-company specific, confounding news disclosed by SandRidge (i.e., that it was considering a sale of "higher-margin producing Permian Basin oil assets," Third Am. Compl. ¶¶ 304, 347, *In re SandRidge Energy, Inc. Sec. Litig.*, No. 5:12-cv-1341 (W.D. Okla. Oct. 21, 2016)), impacted the Trust unit prices on November 9, 2012.

occurred on Werner's "news days."  *See* Word Decl. Ex. 1.  This means 83.33% (10 out of 12) of the statistically significant Trust I price movements over this time frame are *unexplained* by "news."  In other words, the price of Trust I was *inexplicably* volatile during the relevant time frame: significant price movements were far more likely to happen randomly than in response to "news"—the opposite of what one would expect in an efficient market.  This Court should not rely upon a test that purports to calculate "abnormal returns in the 'stormy ocean'" of a security subject to unexplained volatility.  *In re Fed. Home Loan*, 281 F.R.D. at 179; *see also Serfaty*, 180 F.R.D. at 423 (finding cause and effect analysis "does not support a finding of an efficient market" where the "likely conclusion is simply that the price history of IAS was volatile"); *O'Neil v. Appel*, 165 F.R.D. 479, 503 (W.D. Mich. 1996) (finding price fluctuations in price of stock not indicative of an efficient market, only that price history "appears to have been random and volatile"); *In re Fed. Home Loan*, 281 F.R.D. at 180 (rejecting news comparison test in which expert "calculate[d] his abnormal returns in the 'stormy ocean' of the last third of the class period").[11]  Moreover, Werner does not explain in his report why it is appropriate to draw any conclusion from so few statistically significant news days.

Similarly, over the correct timeframe of May 11, 2012 through November 1, 2012, Trust II experienced *zero* significant price movements on a day Werner defined as a "news day."  *See* Word Decl. ¶ 9 & Ex. 1.  Even within the class period Movants propose,

---

[11]     Similarly, Werner's test would not produce a statistically significant Z-score if the class period began on the first alleged misstatement (November 11, 2011) and ended on Trust I's curative disclosure (November 1, 2012).  Decl. ¶ 7 & Ex. 1.

Werner's news test cannot show whether there was a strong causal connection between Trust I's statements and the price of Trust II units, because Werner's "news days" for Trust II did not include statements by Trust I; it was instead limited to statements by Trust II and SandRidge.  This is likely because Trust II only experienced a statistically significant price change *one* out of the *seven* days (or 14.29%) on which Trust I issued a press release, financial report, or held a conference call during the class period.  That percentage of Trust II price reactions is not statistically significantly different from the percentage of days on which Trust II prices moved without news from Trust I.  Accordingly, Werner's news test does not suggest the market for Trust II units was efficient during the correct time frame, or with respect to the correct "news."

In sum, neither of Werner's two tests adequately addresses—let alone establishes— the causal relationship between Trust I news and the behavior of Trust I unit prices throughout the alleged class period.  This failure as to the "most important" *Cammer* factor—and the *only* direct measure of market efficiency—is fatal to Plaintiffs' theory, and forecloses the application of any "fraud-on-the-market" reliance presumption.[12]

---

[12]    Werner's analysis of the *Cammer* "market makers" factor is also inadequate.  The logic of this factor is that "these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1287.  But "it is impossible to accord much significance to the number of market makers, until one knows the volume of shares that they commit to trade, the volume of shares they actually traded, and the prices at which they did so." *Serfaty*, 180 F.R.D. at 422.  Movants fail to identify any such information, and offer merely a conclusory assertion that "[t]here was sufficient market-maker interest in Trust I and Trust II units during the Class Period for the stock to trade efficiently." *See* Mot. at 17 (Doc. No. 170); Werner  Report ¶¶ 54-55.  "[T]his evidence of the number of market makers, without more, does not weigh in favor of a finding of an efficient market." *Serfaty*, 180 F.R.D. at

**C.     Movants Cannot Rely On The *Basic* Presumption For Persons Who Purchased Trust Units In The IPOs, And Not The Secondary Market**

Movants' proposed class includes persons who purchased Trust I and Trust II units directly in the initial public offerings and therefore cannot, as a matter of law, rely on the fraud-on-the-market presumption of class-wide reliance.  The market for securities in an initial offering is not efficient.  *See In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 42 (2d Cir. 2006) ("[T]he market for IPO shares is not efficient."); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) ("[A] primary market for newly issued [securities] is not efficient or developed under any definition of these terms."); *In re Safety-Kleen Corp. Bondholders Litig.*, 2004 WL 3115870, at *5 (D.S.C. Nov. 1, 2004) (same). Indeed, no market yet exists for those newly-issued securities because the prices are set by the underwriters and the issuer.  *See* Trust I Prospectus at 28. Thus, the IPO purchasers would need to prove reliance directly, which would predominate over common issues, and must be excluded from the class.  *In re Initial Public Offering Sec. Litig.*, 471 F.3d at 43.

**D.     Trust II Unit Purchasers Cannot Be In The Class Because Movants Do Not Attempt To Show The Market Efficiently Reacted To Trust I News**

To prevail on a claim against Trust I, Trust II purchasers would need to prove ***actual reliance*** on Trust I statements because Movants have not even attempted to show that the market for *Trust II* is efficient at incorporating *Trust I* information.[13]  Werner tested only

---

422; *Unger v. Amedisys, Inc.*, 401 F.3d 316, 324 (5th Cir. 2005) (concluding district court "erred" where it "failed to acknowledge growing concern that the mere number of market makers, without further analysis, has little to do with market efficiency").

[13]     The three Movants that purchased Trust II securities testified they ███████████ ██████████████████████████████████████████. Luna Dep. 67:18-68:1, 73:20-

whether the market for Trust II was efficient at incorporating information about Trust II and SandRidge—**not Trust I**.  *See* Werner Report ¶ 9(e) ("Event study analysis demonstrate[d] . . . a cause and effect relationship between the release of new Trust II-specific and SandRidge Energy-specific information and movements in SandRidge Trust II's common unit price during the Class Period").  In fact, Werner's Report reveals that Trust II prices did not move in a statistically significant way on *any* of the days on which Trust I made an alleged misstatement.  Accordingly, Trust II purchasers and IPO purchasers cannot be included in any certified class.[14]

## III.   ANY PRESUMPTION OF MARKET EFFICIENCY IS REBUTTED BY THE ABSENCE OF MOVEMENTS IN STOCK PRICE ASSOCIATED WITH PLAINTIFFS' ALLEGED MISSTATEMENTS OR OMISSIONS

If a plaintiff successfully demonstrates the presumption of reliance applies,

---

23 (Decl. Ex. 19); Willenbucher Dep. 72:13-74:13 (Decl. Ex. 20); Lanier Tr. 105:10-14 (Decl. Ex. 24).  *See Edgington v. R.G. Dickinson & Co.*, 139 F.R.D. 183, 194 (D. Kan. 1991) (finding plaintiffs inadequate where they "testified in their deposition that they did not read or rely on the Official Statement in purchasing the Series III bonds").

[14]     The law is clear: "class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation."  *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith*, 903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft v. Baker*, 137 S. Ct. 1702 (2017).  Trust II purchasers are **already** subject to individualized arguments and defenses, because they assert claims based upon statements by Trust I.  *See* Plfs' Mot. for Partial Judg. on Pldgs. (Doc. No. 157) (Trust  I motion for judgment on the pleadings); *Ontario Pub. Serv. Emps. Union Pension Tr. Fund v. Nortel Networks Corp.*, 369 F.3d 27, 34 (2d Cir. 2004) ("Stockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase.").  If Trust I prevails on its motion, a potential conflict of interest will arise between Trust II purchasers (who would have an incentive to emphasize that statements by defendants other than Trust I caused their losses) and Trust I purchasers (who would have an incentive to pursue claims against all Defendants).  Moreover, Trust II purchasers will become subject to additional standing challenges by Mr. Bennett, Mr. Grubb, and Mr. Ward.

defendants may rebut that presumption through "any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, and his decision to trade at a fair market price." *Halliburton*, 134 S. Ct. at 2408, 2415-16. At best, Movants' market-efficiency analysis can present only an "indirect proxy" of price impact that must give way to the "direct, more salient evidence showing that the alleged misrepresentation did not actually affect the stock's market price." *Id.* at 2416. For that reason, "[i]f a defendant shows that an alleged misrepresentation did not, for whatever reason, actually affect market price of defendant's stock, there is no grounding for any contention that the investor indirectly relied on the misrepresentation through his reliance on the integrity of the market price." *Ark. Teachers Ret. Sys. v. Goldman Sachs Grp. Inc.*, 879 F.3d 474, 486 (2d Cir. 2018) (quotation marks omitted); *see also Halliburton*, 134 S. Ct. at 2415.

Werner's analysis alone demonstrates that only one of the alleged misstatements— a conference call on August 10, 2012—was followed by a statistically significant price movement for Trust I units, and *none* of them resulted in a statistically significant price change for Trust II units. *See* Am. Compl. ¶¶ 307-29; Werner Ex. 7-a. Similarly, Werner concluded that the units of neither Trust showed a statistically significant price reaction to Trust I's disclosure that the wells produced less oil and more gas, and that it would miss the projected distribution. This near complete non-reaction to the very news Movants allege artificially inflated the Trusts' unit prices and to Trust I's curative disclosure suggests the market was not efficient. *See, e.g.*, *In re Northfield Labs., Inc. Sec. Litig.*, 267 F.R.D. 536, 548-49 (N.D. Ill. 2010) (expert's report "does not indicate a statistically

significant price change on those dates [of misstatements]"; "that the price did not change suggests the market was not efficient"); *China Auto. Sys.*, 2013 WL 3357170, at *13 (denying class certification where "the Court cannot help but note the numerous days during the Class Period when news events did not result in price movement"). The absence of a price change for the Trusts' units likewise rebuts any presumption of reliance and precludes certifying this case as a class action.[15]

## IV.  NONE OF THE PROPOSED CLASS REPRESENTATIVES CAN ADEQUATELY PROTECT THE INTERESTS OF THE CLASS BECAUSE THEY HAVE ABDICATED THEIR RESPONSIBILITIES TO COUNSEL

The Movants have demonstrated their inability to fairly and adequately protect the interests of the class as required under Rule 23(a)(4). To induce Judge Miles-LaGrange to appoint them as lead plaintiffs in March 2016, Plaintiffs submitted sworn declarations stating that they "will have responsibility for making important litigation decisions and directing counsel with respect to this litigation," that they "will take an *active role* in the prosecution of this case; including supervising Lead Counsel," and they "will continue to communicate regularly with counsel and *each other* regarding major litigation events, such

---

[15]     Movants may attempt to characterize their claim as a "price maintenance" case in which the alleged misstatements only sustained the *status quo* price. But this theory cannot explain the absence of a price reaction to the alleged misstatements, as the Eighth Circuit recently held. *See IBEW Local 98 Pension Fund v. Best Buy Co., Inc.*, 818 F.3d 775, 782-83 (8th Cir. 2016) (price maintenance theory "provided no evidence that refuted defendants' overwhelming evidence of no price impact" in reaction to "alleged misrepresentations"). Nor can the theory explain the absence of a price impact of a "corrective disclosure." *Id.* at 783; *Ark. Teachers Ret. Sys.*, 879 F.3d 486 (vacating and remanding for consideration of "evidence that the market learned the truth . . . without any accompanying decline in the price of Goldman stock").

as . . . *settlement discussions*." *See* Order at 7, 8 (Doc. No. 64) (emphasis added).  But Movants' did not uphold their commitments to the Court.

Movants have paid no attention to this action and permitted Class Counsel unilaterally to make litigation decisions that "ordinarily require client consent." *Anderson Living Tr. v. WPX Energy Prod.*, *LLC*, 308 F.R.D. 410, 428 (D.N.M. 2015).  For example, Movants testified ████████████████████████████████████████████ ████████████████████████████████████ Nibur Dep. 49:9-20 (Decl. Ex. 21); Rath Dep. 64:10-65:5 (Decl. Ex. 22); Romine Dep. 76:12-14 (Decl. Ex. 23); Willenbucher Dep. 149:16-20.  Movants also did not ████████████████████████████████ ████████████████████████████████████ Nibur Dep. 49:21-50:7, 125:12-22; Romine Dep. 76:12-13; Willenbucher Dep. 149:5-20, 151:15-25; Rath Dep. 64:3-9, 64:21-66:5.  And Movants were ignorant of ████████████████████ ████████████████████████████████████ Nibur Dep. 17:13-19; Lanier Dep. 122:3-18; Romine Dep. 75:25-76:1-11; Luna Dep. 151:1-3; Willenbucher Dep. 45:15-23.

████████████████████████████████████████████.

In *Better v. YRC Worldwide Inc.*, 2016 WL 1056972 (D. Kan. Mar. 14, 2016), the court denied plaintiffs' motion for class certification in part because a lack of communication among plaintiffs indicated that they were "lending their names to a suit controlled entirely by class counsel." *Id.* at *8.  Similarly, Movants represented to the Court in August 2015 that they had established a "dedicated conference call line for this case," had a conference call, and would "communicate regularly with counsel and *each other*."  Joint Decl. ¶ 2

(Doc. No. 60-2); Order at 7-8 (Doc. No. 64) (emphasis added).  Yet, prior to the first day

of depositions in April 2018, .  Lanier Dep.

64:22-65:10; (Doc. No. 60-2, at ¶ 2.).  Following Mr. Lanier's deposition, Class Counsel

Nibur  Dep.  31:12-32:18;  Lanier  Dep.  65:4-11;  Romine  Dep.  29:7-20;

Willenbucher Dep. 60:12-15; Rath Dep. 33:12-34:7.  As Mr. Nibur testified,

Nibur Dep. 32:11-33:12.

Lead Plaintiffs have not protected, and will not, adequately protect the interests of

the class they purport to represent, and the Court should deny class certification on this

basis alone.

## V.    MOVANTS SUFFER FROM UNIQUE DEFECTS AND DEFENSES THAT RENDER THEM INADEQUATE CLASS REPRESENTATIVES

Class certification is also inappropriate because Movants are each subject to unique

defenses and possess unique defects.[16]   Under Rule 23, a class representative must

demonstrate that its claims and defenses are typical of the class.   *See* Fed. R. Civ. P.

23(a)(3).  Where it is predictable that a major focus of the litigation will be an arguable

defense unique to the named plaintiff, that named plaintiff is not a proper class

representative.  *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576 (D. Colo. 2002).

Each Movant is "subject to unique defenses, [and as a result,] their claim[s are] not typical

---

[16]     If the potential class is redefined for the reasons described above, such that it includes persons who purchased Trust I units between May 11, 2012, and November 1, 2012, the only two possible class representatives are Deborah Rath and Reed Romine.

of the class." *Id.* at 583 (quoting *Kas v. Fin. Gen. Bankshares, Inc.*, 105 F.R.D. 453, 461 (D.D.C. 1985)).  Furthermore, several of the Movants suffer from unique defects that call into question their ability to vigorously prosecute the action on behalf of the class.  *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187-88 (10th Cir. 2002).

### A.    Deborah Rath

Deborah Rath did not purchase Trust I or Trust II units, is not a member of the putative class, ███████████████████████.  *Tucker v. BP Am. Prod. Co.*, 278 F.R.D. 646, 655 (W.D. Okla. 2011) (a person who "lack[s] personal knowledge of the facts underlying the case" is an inadequate class representative).  Instead, Class Counsel moved to substitute her for Lead Plaintiff Lawrence Ross after his death.  (Doc. No. 167.)  But Ms. Rath ████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████ Rath Dep. 10:5-14, 17:6-20:18.

Ms. Rath's ███████████████ is particularly concerning given that her claims are subject to unique defenses stemming from Mr. Ross's continued purchases of Trust I securities after the close of the alleged class period.  (Doc. No. 37-2.)  Purchasing a security after an alleged fraud is disclosed subjects a proposed class representative to unique defenses.  *See In re Salomon Analyst Metromedia Litig.*, 236 F.R.D. 208, 217 (S.D.N.Y. 2006), *vacated and remanded*, 544 F.3d 474 (2d Cir. 2008) ("[I]t may be reasonable to infer that the investor was not relying heavily on the integrity of the price in the first place."); *see also Gary Plastic Packaging Corp.*, 903 F.2d at 179  (district court

did not abuse discretion in finding plaintiff was an inappropriate class representative where plaintiff continued purchasing security after close of the class period).  Given her lack of knowledge regarding Mr. Ross's investments, Ms. Rath will be completely unable to respond to arguments related to these post-class period purchases.  Rath Dep. 25:15-19.

### A.    Reed Romine

Reed Romine is ████████████████████████████████████████

████████████████████████ Romine Dep. 82:16-20; 124:20-125:8.  Mr. Romine's

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████ In addition, Mr. Romine is subject to unique defenses related to the timing of his purchases: he purchased Mississippian Trust I securities after the close of the class period.  Romine Dep. 69:14-16; *Gary Plastic Packaging Corp.*, 903 F.2d at 179.

Mr. Romine is not typical of the purported class because he testified he did not ███

████████████████████████████████████████. Romine Dep. 39:2-19. Rather, █████████████████████████████████████████████

█████████████████ *Id.* at 39:8-16.  Mr. Romine then cannot rely on the fraud-on-the-market theory and thus must prove actual reliance.  *See Buford White Lumber Co. v. Octagon Prop., Ltd.*, 740 F. Supp. 1553, 1566 (W.D. Okla. 1989) (presumption of reliance may be rebutted where "the plaintiff did not in fact rely" on the market price of a security).

### B.      Duane And Virginia Lanier Trust

The Lanier Trust's claims are not typical of the class because its sole purchases of Trust I and Trust II units occurred in the initial offerings of each security.  (Doc. No. 37-2.)  Where, as here, a lead plaintiff purchased securities in an offering and other class members did not, they are susceptible to the unique defense that they purchased out of an inefficient market.  *See In re Initial Pub. Offering Sec. Litig.*, 471 F.3d at 41 ("In the first place, the market for IPO shares is not efficient."); *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 199 (6th Cir. 1990) (observing that the "price of newly issued securities is set primarily by the underwriter and the offeror, not by the market").  The Lanier Trust must therefore prove it actually relied on Defendants' alleged misstatements, and doing so would become a "major focus of the litigation . . . unique to" the Lanier Trust, rendering it "not a proper class representative."  *City P'ship Co.*, 213 F.R.D. at 583 (quotation omitted).

The Lanier Trust is also subject to the unique defense that it did not suffer any out-of-pocket damages because the decline in the unit price potentially attributable to the alleged fraud was less than the total distributions the Lanier Trust received.  *See* Lanier Dep. 86:9-88:4; *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 392 (D.N.J. 1998) (person subject to the defense of "inability to prove damages resulting from the alleged misrepresentation" is not a proper class representative). The Lanier Trust is thus an inadequate class representative for this additional reason.  *See Metzger v. Am. Fid. Assur. Co.*, 249 F.R.D. 375, 377 (W.D. Okla. 2007) (quoting *E. Tex. Motor Freight Sys. Inc. v. Rodriguez*, 431 U.S. 395, 405 (1977)) ("a class representative must be part of the class and possess the same interest and suffer the same injury as the class members").

### C.      Jase Luna

Jase Luna is an inadequate class representative because ███████████████
█████████████████████████████████████████████████████.  *See In re*
*HealthSouth Corp. Sec. Litig.*, 213 F.R.D. 447 (N.D. Ala. 2003).  Mr. Luna ███████
████████████████████████████████████████████████████████████████
█████████████████████████████████  Luna Dep.  53:1-5;  83:14-84:11.
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
██████████  *Id.* at 125:4-127:14.  Similarly, ██████████████████████████
████████████████████████████████████████████████████████████████
███████████████  *Id.* at 125:25-126:6.

Mr. Luna is not typical of the purported class because ██████████████████
█████████████████████████████████  Luna Dep. 46:24-47:4, 68:16-69:24.
In fact, Mr. Luna testified that a ███████████████████████████████████████
█████████████████████████████████████████████████  *Id.* at 46:24-
47:4.  Given that Mr. Luna ████████████████████████████████████████████
he cannot rely on the fraud-on-the-market theory and thus must prove actual reliance.  *See*
*Buford*, 740 F. Supp. at 1566.

### D.      Matthew Willenbucher

Matthew Willenbucher's ████████████████████████████████████████████
render him an inadequate class representative.  For eighteen years, Mr. Willenbucher was

████████████████████████████████████████████████████████

████████████████████ Willenbucher Dep. 13:25-14:8.  Mr. Willenbucher testified that he

████████████████████████████████████████████████████████

████████ *Id.* at 25:7-20.  But Mr. Willenbucher does ██████████████████████

████████████████████████████████████████████████████████

████████████████████ *Id.* at 152:2-21.  Mr. Willenbucher's ██████████████

████████████████████ render his claims susceptible to unique defenses relating to the

justification for his reliance on alleged false statements.  *J.H. Cohn & Co.*, 628 F.2d at

998–99.

Mr. Willenbucher is also an inadequate class representative because he purchased

shares of Mississippian Trust II securities after the end of the class period.  As a result, his

claim is subject to unique defenses.  *See supra* § V.A

Mr. Willenbucher is not typical of the purported class because he testified he did

███████████████████████████████████████████ Willenbucher Dep.

132:16-21.  Instead, his investment strategy was to ████████████████████

████████████████████ *Id*.  Mr. Willenbucher then cannot rely on the fraud-

on-the-market theory and must prove direct reliance.  *See Buford*, 740 F. Supp. at 1566.

### E.     Ivan Nibur

Mr. Nibur is an inadequate class representative because he did not suffer the same

alleged injury as the rest of the class and he did not ██████████████████████

████████████████ First, when accounting for the distributions he received during the

class period, Mr. Nibur suffered no out-of-pocket damages.[17]   Mr. Nibur, like the Lanier

Trust, is therefore subject to the unique defense of "inability to prove damages."   *Weikel v.*

*Tower Semiconductor Ltd.*, 183 F.R.D. 377 (D.N.J. 1998).

Mr. Nibur is atypical of the purported class because he testified   Nibur Dep.

70:18-21.  Rather, his sole reason for making the investment was ████████████████

███████████████  Nibur Dep. 145:22-146: 2-7.  Mr. Nibur then

cannot rely on the fraud-on-the-market theory and thus must prove actual reliance.  *See*

*Buford*, 740 F. Supp. at 1566.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny

Movant's motion for Class Certification outright.  If the Court does elect to certify a class,

that class should be limited to individuals that purchased Trust I common units between

May 11, 2012, and November 1, 2012.

---

[17]     Mr. Nibur purchased 11,000 units of Trust I on May 9, 2012.  *See* Decl. Ex 26, Nibur PSLRA Certification.  He received distributions from Trust I of $2.09 per unit from May 9, 2012 through November 9, 2012.  *See* Werner Dep. Ex. 4.  On the last day of the alleged class period, Trust I unit prices changed from $18.95 to $17.54, Am. Compl. ¶ 232, a difference of $1.41, which is less than he received in dividend distributions.

Dated: June 1, 2018

LATHAM & WATKINS LLP

LATHAM & WATKINS LLP

J. Christian Word (*pro hac vice*)
Stephen P. Barry (*pro hac vice*)
Norman G. Anderson (*pro hac vice*)
David L. Johnson (*pro hac vice*)
555 11th St. NW, Suite 1000
Washington, D.C. 20004-1304
Fax: (202) 637-2201

Steven M. Bauer (*pro hac vice*)
Email: steven.bauer@lw.com
505 Montgomery St., Suite 2000
San Francisco, CA 94111

CORBYN HAMPTON PLLC

<u>George S. Hampton, Jr.</u>
George S. Hampton, Jr.
Kim Caldwell
Email: gcorbyn@corbynhampton.com
Email: kcaldwell@corbynhampton.com
211 N. Robinson Ave, Suite 1910
Oklahoma City, OK 73102
Fax: (405) 702-4348

*Attorneys for Defendant Tom. L. Ward*

COVINGTON & BURLING

C. William Phillips (*pro hac vice*)
Mark P. Gimbel (*pro hac vice*)
Bryant Pulsipher (*pro hac vice*)
Swati R. Prakash (*pro hac vice*)
Jordan S. Joachim (*pro hac vice*)
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Fax: (212) 841-1010

Joanne Sum-Ping (*pro hac vice*)
One Front St., 35th Floor
San Francisco, CA 94111
Fax: (415) 591-6091

CHRISTENSEN LAW GROUP, PLLC

<u>Thomas B. Snyder</u>
Thomas B. Snyder
The Parkway Building
3401 N.W. 63rd Street, Suite 600
Oklahoma City, Oklahoma 73116
Fax: (405) 228-1125

*Attorneys for Defendants James D.*
*Bennett and Matthew K. Grubb*

BRACEWELL LLP

W. Stephen Benesh (*pro hac vice*)
Patrick A. Caballero (*pro hac vice*)
David B. Springer (*pro hac vice*)
111 Congress Ave., Suite 2100
Austin, Texas 78701
Fax: (800) 404-3970

WILSON LAW FIRM

*Ryan S. Wilson*
Ryan S. Wilson
Post Office Box 891390
Oklahoma City, OK 73189
Fax: (405) 246-9652

*Attorneys for Defendant SandRidge
Mississippian Trust I*


CONNER & WINTERS

*Kiran A. Phansalkar*
Kiran A. Phansalkar
Mitchell D. Blackburn
211 N. Robinson Ave., Suite 1700
Oklahoma City, OK 73102
Fax: (405) 232-2695

*Attorneys for Nominal Defendant
SandRidge Energy, Inc.*

**APPENDIX A**

| Cite | Question | Answer |
|------|----------|--------|
| **WERNER TESTIMONY REGARDING UNIQUE CHARACTERISTICS OF ROYALTY TRUSTS THAT HE WAS UNAWARE OF AND DID NOT ACCOUNT FOR IN HIS ANALYSIS** | | |
| 19:4-6 | During the class period, did the market price for the trust units decline as oil production declined? | As I sit here, I don't recall. |
| 19:7-9 | Did the oil production of the trusts, Trust I and Trust II, increase or decline during the class period? | I don't recall. |
| 23:15-17 | And did you also read the registration statement for Trust I and Trust II in this case? | As I sit here, I don't recall. |
| 33:22-24 | Do you know how many wells SandRidge Energy operated in 2011-2012? | Not as I sit here today. |
| 34:19-23 | And Trust I wells are not included in the count of SandRidge Energy wells, correct? | As I sit here, I don't know.  But I imagine at one point they were since the trusts were spun off from SandRidge Energy. |
| 35:1-3 | After the time of the creation of Trust I, were Trust I wells included in SandRidge Energy's well count? | I don't know as I sit here today. |
| 46:19-22 | Do you also understand that the results of Trust I do not depend upon results of SandRidge Energy? | I haven't thought about that.  I would need to think about that more. |
| 47:1-4 | Do you understand that SandRidge Energy does not operate all of the wells in Trust I? | I don't have an understanding one way or the other as I sit here today. |
| 47:5-7 | Do you know whether other companies operate wells included in Trust I? | I do not. |
| 47:11-13 | Do you know whether SandRidge Energy operates all of the wells included in Trust II? | As I sit here today, I do not. |

| 47:14-16 | Do you know any other the companies that operate wells included in Trust II? | As I sit here today, I do not. |
|---|---|---|
| 48:1-2 | What's the difference between units and common stock? | You know, as I sit here today, I don't recall. |
| 48:4-7 | Do units issued by Trust I or Trust II have special tax considerations different than common stock? | I believe they do, but as I sit here today, I don't recall. |
| 48:22-25 | Do you understand that a portion of those distributions reflect a return of capital? | As I sit here today, I don't recall one way or the other. |
| 52:24-53:2 | Did SandRidge Mississippian Trust I disclose to potential investors and investors that distributions would decrease over time? | As I sit here today, I don't recall. |
| 54:2-4 | Do you believe that market efficiency is different for stocks and trust units? | That's something I'd have to think about. |
| 61:21-25 | Did you read any information in any of the documents you reviewed regarding Sandridge Trust I in which SandRidge Trust I disclosed that distributions would decline over time? | As I sit here today, I don't recall. |
| 66:20-22 | Did you have an understanding that Trust I unit prices were expected to decline over time? | As I sit here today, I don't recall. |
| 68:25-69:2 | In step one did you make any account for the fact that the Trust I unit prices were expected to decline overtime? | As I sit here today, I don't believe so. |
| 70:3-6 | And in your market model did you account for the fact that Trust I units were expected to decline over time? | As I sit here today, I don't believe so. |
| 70:7-10 | In your market model did you account for the fact that Trust II units were expected to decline in value over time? | I don't believe so. |

| 70:16-21 | And for each t-test that you performed, did you consider that the trust units would decline over time in value? | As I sit here today, that would be something I would need to think about as to how it would affect my t-test. |
|---|---|---|
| 145:19-22 | Trust I has substantially fewer wells than SandRidge, correct? | I believe that is correct.  But as I sit here today, I don't know for sure. |
| 145:23-146:2 | And SandRidge Trust II also has substantially fewer wells than SandRidge Energy, right? | Again, if you want to stipulate to that, that's fine, but as I sit here today, I don't know the answer to that question. |
| 146:6-12 | Same thing for Sandridge Trust II.  Trust II makes projections for its wells.  Sandridge Energy makes projections for its wells. | Again, as I sit here today, I don't know.  If you want to stipulate to that fact, I'm more than happy to accept it and then ask -- ask any hypotheticals based on those questions -- or those assumptions. |
| 184:3-7 | Are you aware of any SandRidge Energy earnings announcements that concern the production of Trust I or Trust II wells? | As I sit here today, I don't know the answer to that question. |
| **WERNER TESTIMONY REGARDING LACK OF EXPERIENCE ANALYZING THE MARKET EFFICIENCY OF ROYALTY TRUSTS** | | |
| 53:14-17 | Have you previously performed in any of the more than 20 times you've testified as an expert on market efficiency an event study with respect to a trust unit? | As I sit here today, I don't recall. |
| 57:13-16 | Which of your papers, publications, and presentations involved evaluating whether trust units trade in an efficient market? | As I sit here, I don't recall. |
| 57:17-21 | And which of the matters listed on page 79 of your report, Exhibit 2, under Expert Reports and Testimony involved you offering an opinion on trust units and whether they trade in an efficient market? | I don't recall as I sit here. |
| 57:22-25 | Which of your engagements listed on page 83 of your report involve you evaluating whether trust units trade in an efficient market? | As I sit here, I don't recall. |

| | | |
|---|---|---|
| 65:5-14 | Because you've never done it, right?  You've never performed an event study with a security that's expected to decline over time, right? | I don't know one way or the other.  What do you mean I've never?  I may have. You're saying the word "never."  It's just a ridiculous question. It's overly broad with the expectation that a security could decline over time?  Any security?  Yeah. I probably have performed an event study with the expectation that a security might decline over time. |
| 65:15-66:2 | Not might. Will. You've told me and we've identified at least 22 times which you've appeared as an expert opining upon market efficiency.  On any of those occasions did you ever assume that the price of the security would decline over time? | So in those cases -- and now we're being more specific, correct?  In those cases, 20 cases, did I go in with the expectation that any of those stocks would decline over time, no, I did not form an expectation about whether or not those stocks would increase or decline over time in those event studies that I performed under the guise of performing reports or submitting reports with regards to market efficiency and securities class actions. |
| 75:15-20 | Have you ever before testified with respect to the types of information that one might expect to have a quicker price impact? | As I sit here today, I don't recall.  I believe I have had conversations with regards to that, but I don't recall them as I sit here today. |
| 234:3-7 | :And I may have already asked you.  Do you recall as you sit here whether you've ever done an event study in connection with a trust unit? | As I sit here today, I don't recall.  I believe the answer is no, but I don't recall. |
| 234:8-12; 234:22 | :And do you recall whether as you sit here today you've ever done a -- ever written a paper or done a presentation related to the market efficiency in connection -- related to market efficiency in connection with trust units? … | …I believe the answer to that is no. |

### CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2018, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel registered for ECF.

LATHAM & WATKINS LLP

*s/ J. Christian Word*
J. Christian Word (admitted *pro hac vice*)
555 Eleventh Street, NW, Suite 1000
Washington, DC  20004
Telephone:  (202) 637-2200
Facsimile:  (202) 637-2201
Email:  christian.word@lw.com

*Attorney for Defendant Tom L. Ward*