# EXHIBIT 16

Page 1

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF OKLAHOMA

IVAN NIBUR, LAWRENCE ROSS, JASE    )
LUNA, MATTHEW WILLENBUCHER, and    )
the DUANE & VIRGINIA LANIER        )
TRUST, Individually and on Behalf  )
of All Others Similarly Situated,) Civil Action No.
                                   ) 15-cv-00634-M
          Plaintiffs,              )
                                   )
     vs.                           )
                                   )
SANDRIDGE MISSISSIPPIAN TRUST I,   )
et al.,                            )
                                   )
          Defendants.              )
_____)

          Videotaped Deposition of ADAM WERNER, Ph.D.,

          taken on behalf of Defendants, at 10250

          Constellation Road, Suite 1100, Los Angeles,

          California, commencing at 9:42 A.M. on

          Tuesday, May 1, 2018, before SHANNA GRAY,

          Certified Shorthand Reporter, Certificate No.

          13690.

                    -    -    -

               MAGNA LEGAL SERVICES

                 (866) 624-6221

               www.magnaLS.com



## Page 2

APPEARANCES

For the Plaintiff:
THE ROSEN LAW FIRM
BY: LAURENCE ROSEN, ESQ.
275 Madison Avenue
34th Floor
New York, New York 10016
(212) 686-1060
(212) 202-3827 (Fax)
lrosen@rosenlegal.com

For the Defendant Tom Ward:
LATHAM & WATKINS
BY: J. CHRISTIAN WORD, ESQ.
BY: DAVID JOHNSON, ESQ.
555 Eleventh Street N. W.
Suite 1000
Washington, D.C. 20004
(202) 637-2200
(202) 637-2201 (Fax)
christian.word@lw.com
david.johnson@lw.com

For the Defendant Sandridge Mississippian Trust I:
BRACEWELL
BY: W. STEPHEN BENESH, ESQ.
BY: DAVID B. SPRINGER, ESQ.
111 Congress Avenue
Suite 2300
Austin, Texas 78701
(512) 494-3680
(800) 404-3970 (Fax)
steve.benesh@bracewell.com
david.springer@bracewell.com

## Page 3

APPEARANCES
(CONTINUED)

For the Defendant SandRidge Energy as Nominal Defendant:
CONNER & WINTERS
BY: KIRAN A. PHANSALKAR, ESQ.
1700 One Leadership Square
211 North Robinson
Oklahoma City, Oklahoma 73102
(405) 272-5711
(405) 232-2695 (Fax)
kphansalkar@cwlaw.com

For the Defendants James Bennett and Matthew Grubb:
COVINGTON & BURLING, LLP
BY: BRYANT E. PULSIPHER, ESQ.
One Front Street
San Francisco, California 94111
(415) 591-7055
bpulsipher@cov.com

Also Present:
DAVID KIM, Legal Videographer

## Page 4

INDEX

| DEPONENT | EXAMINATION BY | PAGE |
|---|---|---|
| ADAM WERNER, Ph.D. | | |
| | BY MR. WORD | 6 |
| | BY MR. BENESH | 211 |

EXHIBITS FOR IDENTIFICATION

| MARKED | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Declaration of Dr. Adam Werner dated 2/15/2018 | 6 |
| Exhibit 2 | SandRidge Mississippian Trust I Prospectus | 51 |
| Exhibit 3 | Wells Fargo Securities analyst Report dated 5/17/2011 | 51 |
| Exhibit 4 | Compilation Chart compiled by defense | 130 |
| Exhibit 5 | United States Securities and Exchange Commission Form 8-K for Sandridge Mississippian Trust I | 150 |

## Page 5

LOS ANGELES, CALIFORNIA; TUESDAY, MAY 1, 2018
9:42 A.M.

THE VIDEOGRAPHER: We are now on the record. This begins Media Number 1 in the deposition of Adam Werner in the matter of Lanier Trust v. SandRidge Mississippian Trust, et al. in the U.S. District Court, the Western District of Oklahoma.

Today is, May 1, 2018, and the time is 9:42 a.m. This deposition is being taken at 10250 Constellation Boulevard, Los Angeles, California at the request of Latham and Watkins.

The videographer is David Kim of Magna Legal Services, and the court reporter is Shanna Gray of Magna Legal Services. Will counsel and all parties present state their appearances and whom they represent.

MR. WORD: Christian Word, Latham and Watkins on behalf of Tom Ward. I'm with my colleague David Johnson.

MR. PHANSALKAR: Kiran Phansalkar, Conner & Winters, Oklahoma City, on behalf of SandRidge, nominal defendant.

MR. SPRINGER: David Springer of Bracewell here on behalf of SandRidge Mississippian Trust I.

MR. BENESH: Steve Benesh also with Bracewell also here representing Trust I.



Page 18

1    A.  Well, one way to do it would be based on the
2  trust prices.
3    Q.  The security prices of the trust units?
4    A.  Correct.
5    Q.  Just since you get a market cap for the
6  enterprise?
7    A.  That would be one such way to do it.
8    Q.  Was -- are there others?
9    A.  Well, presumably people could do DCF analyses.  I
10  mean, there's a whole host of things one could do.
11    Q.  Well, how did you do it when you determined that
12  the valuation of the trusts depended heavily on the oil
13  production of the trusts' wells?
14    A.  I'd refer back to my previous answer with regards
15  to what I reviewed in determining that that, in fact, had
16  an impact on the trust valuation.
17    Q.  Did you perform a DCF analysis?
18    A.  I did not perform a DCF analysis.
19    Q.  Did you look at the market cap of the trusts?
20    A.  I did look at the market cap of the trusts.
21    Q.  And did the market caps of the trusts indicate to
22  you that valuation of the trust depended heavily on the
23  oil production from the trusts' wells?
24    A.  Well, certainly that was indicative or seeing how
25  the price moved to changes in the announcement with

Page 19

1  regards to the breakdown of how the -- what the trusts
2  were producing or what the wells were producing.  I
3  suppose that informed my opinion.
4    Q.  During the class period, did the market price for
5  the trust units decline as oil production declined?
6    A.  As I sit here, I don't recall.
7    Q.  Did the oil production of the trusts, Trust I and
8  Trust II, increase or decline during the class period?
9    A.  I don't recall.
10    Q.  Did the valuation of the trusts increase or
11  decline during the class period?
12    A.  By the end of the class period?  I believe it had
13  declined.
14    Q.  Over the life of the class period.
15    A.  If you'd like me to look at the data with regards
16  to the prices of those trusts, I'll be happy to look at it
17  to answer your question.
18    Q.  You can.  What I'm trying to get at is what work
19  did you perform to determine whether or not over the class
20  period the valuation of the trust moved or was -- relied
21  heavily -- depended heavily on the oil production from the
22  trust.  Did you perform any analysis?  I didn't see it in
23  your report.
24    A.  Again, I refer to my previous answer about the
25  review of voluminous material that discussed the impact of

Page 20

1  oil prices, oil production on the value of the trusts.  In
2  addition, I looked at, at least with regards to my event
3  study at the end of the class period and the subsequent
4  disclosures, we saw that as there were discussions of
5  changes in oil production, that the stock price moved.
6    (Court reporter clarification.)
7    THE WITNESS:  The stock price moved.
8  BY MR. WORD:
9    Q.  But there's no analysis in your report to support
10  the conclusion that the valuation of the trust depended
11  heavily on the oil production from the trust wells?
12    A.  Would you define "analysis" for me?
13    Q.  Is there anything in the report that supports
14  your opinion that the valuation of the trust depended
15  heavily on the oil production from the trust wells?
16    A.  So, for instance, on page 50 of my report
17  paragraph 92, the sentence states -- and I'm starting
18  mid-sentence.
19    "Analysts updated their models for the SandRidge
20    Trusts to reflect, among other things, the lower
21    mix of oil in the Mississippian wells.
22    'Following comments from management of SandRidge
23    Energy ("SD"), the sponsor of SDT, regarding
24    horizontal Mississippian well performance we are
25    lowering EPU estimates and value range as a

Page 21

1    result of an updated type curve.  SD management
2    indicated that horizontal Miss wells are
3    experiencing a greater than anticipated decline
4    in oil volumes.  As such, SD has reduced per well
5    EURs to 421,000 Boe (37 percent oil) from 456,000
6    (45 percent oil).  We are updating our type curve
7    and production model to reflect the revised
8    economic assumptions and as a result, we are
9    lowering our EPU estimate -- excuse me --
10    estimates, plural, for 2012/2013 to $2.97/$2.82
11    from $3.07/$3.29 previously.  In addition, we are
12    lowering our valuation range to $15-$18 from
13    $18-$22 previously to reflect our revised fair
14    value estimates of $17.26.'"
15    And the quotation is from -- there is a footnote
16  at the end of that.  Footnote number 122 "Lowering
17  Estimates and Valuation on Updated Type Curve," by Gordon
18  Douthat, D-O-U-T-H-A-T, et al., Wells Fargo, analyst
19  report, November 19, 2012.
20    And I'm happy to read the rest of the quotes into
21  the record if you would like.
22    Q.  You don't have to.  You can refer to the page.
23  Whatever is convenient for you.  I understand.  The
24  lengthy quote you just recited, that's not your work,
25  correct?  That's the work of Wells Fargo?



Page 22

1    A.  It's an observation by Wells Fargo, yes.
2    Q.  Yeah, and --
3    A.  It's work done by Wells Fargo.  It informed my
4  opinion.
5    Q.  So it's work by Wells Fargo describing their
6  opinion of the valuation of the trust securities, correct?
7    A.  That is correct.
8    Q.  And my question for you was -- not trying to
9  trick you here.  I'm just trying to understand which of
10  your statements are reflective of work you performed.  You
11  can look at the registration statement for the
12  Mississippian Trust I and the company states that the
13  future production will reflect value.
14    A.  Right --
15    Q.  These statements here reflect others' opinions of
16  value.  I'm just trying to figure out what you did versus
17  what you read and just relied upon.
18    A.  Well, so my understanding of what you consider
19  analysis has nothing to do with reviewing documentation
20  and forming your own opinions.  When I think of analysis
21  or performing analysis, one of the things I would do would
22  be to review things like the registration statements,
23  things like analyst reports, and form an opinion based on
24  my understanding of what I've read.  I consider that to be
25  analysis.

Page 23

1      If you want to put a different definition on
2  analysis, I'd be happy to adopt that definition.  But my
3  understanding of analysis would be to review work,
4  possibly perform additional research.  Because I believe
5  reading is research.  And now I could answer a different
6  question for you.
7    Q.  And I'm happy to use your definition.  What I'm
8  just trying to do is get that language established so I
9  understand when you say what you've done, I know what you
10  mean.
11      So I take it, then, you accepted Wells Fargo's
12  statements here and their analysis as accurate and fair
13  and relied upon it?
14    A.  I believe that is correct.
15    Q.  And did you also read the registration statement
16  for Trust I and Trust II in this case?
17    A.  As I sit here, I don't recall.  So...
18    Q.  I probably should have gone to that part first.
19    A.  I believe I did, but let me just double check.
20    Q.  Sure.
21    A.  I'm looking now at Documents Considered.  This is
22  Exhibit 2 to my report which is Exhibit 1.  It appears
23  that I did review the registration statements.
24    Q.  And as you mentioned, you're looking at Exhibit 2
25  of your report which is labeled as Exhibit 1, correct?

Page 24

1    A.  Right.  My report is labeled Exhibit 1.
2    Q.  What page were you looking at?  Just so I...
3    A.  This is page 89.
4    Q.  Page 89.  And Documents Considered actually
5  begins a page earlier on 87, correct?
6    A.  Actually I -- did you say 87?
7    Q.  87.
8    A.  Correct.  Yes, that is correct.
9    Q.  And so then that runs -- this Documents
10  Considered section runs through page 96, correct?
11    A.  That is correct.
12    Q.  And does -- does that Exhibit 2 reflect all the
13  documents you considered and relied upon in forming your
14  opinions?
15    A.  I believe that is correct.
16    Q.  There are no additional documents you looked at?
17    A.  Not that I recall as I sit here today.
18    Q.  Did you review each of the documents listed on
19  Exhibit 2 of your report?
20    A.  Did I individually review each of those
21  documents?  I reviewed or people at my instruction
22  reviewed those documents.
23    Q.  So you were part of the team that you mentioned
24  before, that reviewed each of those documents?
25    A.  Well, I wouldn't say I was part of the team.  I

Page 25

1  would say --
2    Q.  Fair.
3    A.  -- I'd be the team leader.
4    Q.  Yes.
5    A.  But yes, that would be correct.
6    Q.  Fair point.  We just talked about a moment ago
7  that you accepted the Wells Fargo report as being a true
8  and accurate reflection of a valuation of the Trust I
9  securities --
10    A.  Well, sorry to interrupt you.  Could you read my
11  testimony upon that because I'm not sure that's exactly
12  what I stated.
13      THE COURT REPORTER:  At which point?
14      MR. WORD:  I can go back to where it is.  I can
15  point you back to which line it is.
16      THE COURT REPORTER:  When he asked you that
17  earlier or...?
18      THE WITNESS:  Mm-hm.
19      MR. WORD:  Yeah.
20      THE WITNESS:  Yes.  Sorry.  I know I need to be
21  verbal.
22      THE COURT REPORTER:  He did ask you if "you
23  accepted Wells Fargo's statements here and their analysis
24  as accurate, fair, and relied upon it," and you said, "I
25  believe that is correct."



Page 30

1     A.  No.
2     Q.  Did you ask for any information from plaintiffs'
3  counsel?
4     A.  I may have asked for legal documents in this
5  case.  I suppose -- I'm sure I asked for the complaint.
6  But other than that, nothing that I recall.
7     Q.  So, for example, your citation to legal cases,
8  that's something that you and your staff put together?
9     A.  That is correct.
10    Q.  You mentioned before that you had most of the
11  academic and professional literature at your fingertips or
12  available?
13    A.  Correct.
14    Q.  That's because you've done this before, this sort
15  of analysis, right?
16    A.  I have been asked to opine on market efficiency
17  and whether or not a damage model can be used to calculate
18  damages on a securities class action, yes.
19    Q.  How many times have you been asked to do that,
20  perform that work?
21    A.  As an expert?
22    Q.  Yes, as an expert.
23    A.  So we're talking about market efficiency,
24  correct?
25    Q.  Correct.  Market efficiency.  And that might be

Page 31

1  both in the class context and the damage context.
2     A.  Damage context as well?
3     Q.  Yes.  How many times have you evaluated market
4  efficiency as an expert?
5     A.  As an expert.  At least 22 times.
6     Q.  I take it that's an approximation based upon your
7  review of your report, right?
8     A.  Correct.  I'm looking at my vitae here.  I
9  believe there may be one or two cases that I have opined
10  upon that aren't listed here.  Since I submitted this
11  report.  There was a case against Theranos which went to
12  damages.  A securities case against K12 which is an
13  educational company.
14    Q.  I'm familiar with that one.
15    A.  Does that mean I'll be seeing you next week?
16    Q.  Not me.
17    A.  There might be one other I'm missing.
18    Q.  It's certainly fair to say more than 20 --
19    A.  Yes, that --
20    Q.  -- times you've opined as an expert on market
21  efficiency?
22    A.  Correct.
23    Q.  Sorry.  Stilted question.
24    A.  Do you mind if I get some more water?
25    Q.  Oh, sure.

Page 32

1     A.  Or if someone could just bring a pitcher to me,
2  that would be great.  Thank you.
3     Q.  Yeah.  We got plenty.  Just keep it off camera.
4     A.  Thank you.
5     Q.  Sure.
6     MR. WORD:  Larry, you want one?
7     MR. ROSEN:  No, thank you.
8  BY MR. WORD:
9     Q.  We're going to switch gears and talk more general
10  about the case.  Can you tell me what you understand
11  SandRidge Energy to be?
12    A.  "SandRidge Energy described itself" -- and I
13  should point out I'm quoting from page 7 of my report.
14  "Described itself as an oil and natural gas developer and
15  producer, with 'significant holdings in West Texas'" --
16  where both west and Texas are capitalized -- "'and the
17  Mid-Continent'" -- where, again, both "mid" and
18  "continent" are capitalized -- "'area of Oklahoma and
19  Kansas.'  The Mid-Continent area of Oklahoma and Kansas
20  contain the Mississippian formations where SandRidge began
21  drilling horizontal wells in 2009."
22    Q.  Is it fair to say that at the time of 2011-2012
23  SandRidge Energy was a large oil and natural gas developer
24  and producer?
25    A.  What do you mean by "fair"?

Page 33

1     Q.  Do you believe that in 2011-2012 Sandridge was
2  considered a large oil and natural gas developer and
3  producer?
4     A.  It describes itself as an oil and natural gas
5  developer and producer with significant holdings in West
6  Texas and the Mid-Continent areas of Oklahoma and Kansas.
7     Q.  Do you know the scope of SandRidge Energy's
8  holdings in those areas?
9     A.  I believe the holdings were significant.
10    Q.  Would you consider SandRidge Energy to be a
11  significant oil and natural gas developer and producer?
12    A.  I believe they believe they had significant
13  holdings in West Texas and the Mid-Continent areas of
14  Oklahoma and Kansas.
15    Q.  And you have no opinion on whether they were a
16  significant oil and gas producer?
17    A.  I haven't formed an opinion on that.
18    Q.  Okay.  SandRidge was a public company, correct?
19    A.  That is my understanding.
20    Q.  They issued common stock?
21    A.  That is my understanding.
22    Q.  Do you know how many wells SandRidge Energy
23  operated in 2011-2012?
24    A.  Not as I sit here today.
25    Q.  Okay.  Do you have an idea of whether it's a



Page 34

1  large number, small number of wells?  100?  More than 100?
2      A.  If I had to guess, I would say it was more than
3  100.
4      Q.  I don't -- you don't need to guess.  That's fine.
5      A.  Well, for instance, I'm looking at here the
6  discussion of the Trust I, and it says "37 horizontal
7  wells were already producing oil and natural gas," and so
8  that was just part of the trust.  So I would expect that
9  the company as a whole probably had more than 100 wells.
10     Q.  When you say "the company as a whole," what do
11 you mean?
12     A.  I mean, well, obviously, here I'm talking about
13 the trust, but I mean SandRidge Energy because that's what
14 you're asking about.
15     Q.  Right.  SandRidge Energy and -- strike that.
16         SandRidge Energy and Trust I are separate
17 entities, correct?
18     A.  I believe that's correct.
19     Q.  And Trust I wells are not included in the count
20 of SandRidge Energy wells, correct?
21     A.  As I sit here, I don't know.  But I imagine at
22 one point they were since the trusts were spun off from
23 SandRidge Energy.
24     Q.  Okay.  At the time of Trust I after -- strike
25 that.

Page 35

1         After the time of the creation of Trust I, were
2  Trust I wells included in SandRidge Energy's well count?
3      A.  I don't know as I sit here today.
4      Q.  What was SandRidge Mississippian Trust I?
5      A.  "According to the offering documents" -- and,
6  again, I'm reading from page 7 of my report -- "Trust I
7  would pay its unitholders a quarterly cash distribution
8  equal to the net proceeds that Trust I received from the
9  sale of oil and natural gas produced from the wells in
10 which Trust I had a royalty interest.  The Trust I
11 offering documents estimated that the wells in which
12 Trust I had a royalty interest had Proved Reserves" --
13 where "proved reserves" is capitalized -- of approximately
14 19.3 million barrels of oil equivalent ("MMBoe"), which
15 consisted of 48.4 percent oil and 51.6 percent natural
16 gas."
17         (Court reporter clarification.)
18         THE WITNESS:  Natural gas.
19         (Court reporter clarification.)
20         THE WITNESS:  Oh, 51.6.
21 BY MR. WORD:
22     Q.  My understanding of that statement describes what
23 Trust I does.  But what is SandRidge Mississippian
24 Trust I?  How would you describe it?
25     A.  I think the statement speaks for itself.

Page 36

1      Q.  That statement does speak for itself.  I agree.
2  But in your opinion, you've studied Trust I, looked at its
3  news reports, looked at its public filings, looked at a
4  host of documents, do you have an understanding of what
5  Trust I is?
6      A.  Yeah, it pays off based on performance of a
7  certain number of wells and how those wells perform in
8  regards to production of oil and natural gas.
9      Q.  How was Trust I organized?
10     A.  Can you define "organized"?
11     Q.  Is Trust I a corporation?
12     A.  I believe it was a trust.
13     Q.  What does it mean to be a trust?
14         MR. ROSEN:  Objection.  Calls for a legal
15 conclusion.
16         THE WITNESS:  To the extent I don't have a law
17 degree, I couldn't tell you.
18 BY MR. WORD:
19     Q.  How about just on your economic experience -- you
20 can just differentiate between different types of
21 organizations -- a public company versus a trust.
22     A.  Well, the problem is there are -- there are many
23 different types of trusts.
24     Q.  And what kind of trust is this?
25     A.  It's a type of trust that -- where revenues are

Page 37

1  tied to production from these wells.
2      Q.  Do you have anything else you can add about your
3  understanding of what Trust I is other than that
4  statement?
5      A.  Well, I would refer to my previous statements as
6  well.
7      Q.  Your quotation of paragraph 12 of your report?
8      A.  Well, I believe there was additional information
9  if you read back my testimony.
10     Q.  Okay.  We'll look back at it.  I think you just
11 read paragraph 12.  Okay.
12     A.  Would you like to read back my testimony after my
13 reading of -- what was it? -- paragraph 12?
14     Q.  I'll go back and look at it later.  I don't need
15 to waste your time to do that.
16     A.  You sure?  We can do it now.
17     Q.  Yeah, I can go back and read it later.
18     A.  Okay.
19     Q.  What was trust -- excuse me.  What was SandRidge
20 Mississippian Trust II?  Or what is SandRidge
21 Mississippian Trust II?
22     A.  "SandRidge Energy" -- and I'm reading from page 8
23 of my report now -- "conveyed a royalty interest in
24 certain of its Mississippian horizontal wells to Trust
25 II's in exchange for the proceeds from an initial public



1    Q.  Correct.
2    A.  I believe that is correct.
3    Q.  Fair.
4    A.  Can we take a break?
5    Q.  Yeah, that's fine.
6        THE VIDEOGRAPHER:  We are now going off the
7  record, and the time is 10:39 a.m.
8        (Recess taken.)
9        THE VIDEOGRAPHER:  We are now going back on the
10  record, and the time is 10:46 a.m.
11  BY MR. WORD:
12    Q.  Sir, do you understand that Mississippian Trust I
13  and Mississippian Trust II are comprised of different oil
14  wells?
15    A.  I believe that is correct.
16    Q.  Do you understand that the results of Trust I do
17  not depend upon the results of Trust II?
18    A.  I believe that is correct.
19    Q.  Do you also understand that the results of
20  Trust I do not depend upon results of SandRidge Energy?
21    A.  I haven't thought about that.  I would need to
22  think about that more.
23    Q.  And I assume the same would be with respect to
24  Trust II and SandRidge Energy?
25    A.  That is correct.

1    Q.  Do you understand that SandRidge Energy does not
2  operate all of the wells in Trust I?
3    A.  I don't have an understanding one way or the
4  other as I sit here today.
5    Q.  Do you know whether other companies operate wells
6  included in Trust I?
7    A.  I do not.
8    Q.  Do you know whether SandRidge Energy operates all
9  of the wells included in Trust I?
10    A.  I'm sorry.  Could you repeat the question?
11    Q.  Do you know whether SandRidge Energy operates all
12  of the wells included in Trust II?
13    A.  As I sit here today, I do not.
14    Q.  Do you know any other the companies that operate
15  wells included in Trust II?
16    A.  As I sit here today, I do not.
17    Q.  When I say "trusts," I assume you understand I'm
18  meaning Trust I and II together if I slip up and don't
19  mention both.  The plural refers to both SandRidge
20  Mississippian Trust I and Sandridge Mississippian Trust
21  II; is that fair?
22    A.  That's fair.
23    Q.  Do you understand that the trusts did not issue
24  common stock?
25    A.  I believe the trusts issued units.

1    Q.  What's the difference between units and common
2  stock?
3    A.  You know, as I sit here today, I don't recall.
4    Q.  Do units issued by Trust I or Trust II have
5  special tax considerations different than common stock?
6    A.  I believe they do, but as I sit here today, I
7  don't recall.
8    Q.  Did Trust I and Trust II units provide for the
9  issuance of dividends?
10    A.  I believe dividends were paid.  The distributions
11  were paid as dividends, but let me -- let me make sure
12  that was, in fact, the case, because as I sit here, I
13  don't recall.
14        Again, I believe the distributions were
15  dividends, but as I sit here, I don't recall.
16    Q.  Well, how about we refer to them as
17  distributions; is that fair?
18    A.  That's fair.
19    Q.  Do you understand that Trust I and Trust II
20  issued distributions to unitholders?
21    A.  I believe that is correct.
22    Q.  Do you understand that a portion of those
23  distributions reflect a return of capital?
24    A.  As I sit here today, I don't recall one way or
25  the other.  Let me ask a clarifying question.  What do you

1  mean by return of capital?
2    Q.  As described in the registration statements for
3  Trust I and Trust II units, the trusts indicate that their
4  distributions will be considered a return of capital.  Do
5  you have an understanding of what that means?
6    A.  If I could look at the registration statement, I
7  would have a better understanding of what that means.
8    Q.  Let's do that.  Good thing we didn't mark that
9  one.
10    A.  In the meantime, do you want to establish a
11  definition of return of capital as you understand it?
12    Q.  That might be easier.
13    A.  Oh, I'd still like to see the --
14    Q.  Okay.
15    A.  -- registration statement.
16    Q.  Yeah.
17    A.  But in the meantime...
18    Q.  And I'm also saying it may take me a second to
19  find where they say that in the registration statement.
20  It's a lengthy document.
21        My understanding of return of capital in the
22  context of the registration statement is it suggests that
23  if you purchase a unit issued in the offering, you will
24  pay capital in.  For example, you'll pay $21 for that
25  unit.  The distributions over time are intended to repay a



1   unitholder that $21 initial outlay.  That's how I'm using
2   the phrase "return of capital."  Is that fair?
3       A.  That's fair.
4           (Court reporter clarification.)
5           MR. WORD:  To repay that initial capital
6   contribution.
7   BY MR. WORD:
8       Q.  Still the same?
9       A.  Maybe.
10      Q.  Let me -- my understanding of return to capital,
11  as I'm using that term, refers to the initial contribution
12  of $21 to purchase a unit in one of the trusts, and that
13  distributions over time are intended to repay that initial
14  capital contribution.  Is that a fair description of -- or
15  can we agree that that's a definition of return of
16  capital?
17      A.  I believe that's how you defined return of
18  capital.
19      Q.  And with that definition in mind, do you
20  understand that the distributions issued by Trust I and
21  Trust II were intended to provide a portion of a return of
22  capital?
23      A.  I, again, would need to look at the registration
24  statement to verify that.
25      Q.  I've got it.  Exhibit 2 is the registration

1   statement for SandRidge Mississippian Trust I.
2           I'm going to use my time more effectively on a
3   break and find that phrase for you.  We can move on, and
4   I'll come back to that question if that's all right with
5   you?
6           (Exhibit 2 marked.)
7       A.  Sure.
8       Q.  Okay.  Do investors have -- strike that.
9           Let's mark this as Exhibit Number 3.  Sir, do you
10  have an understanding of how the market values trust units
11  as compared to stock?
12          (Exhibit 3 marked.)
13      A.  I'm not quite sure what differentiation you're
14  speaking of.
15      Q.  Are you aware of any?  Are there any
16  differentiations between trusts and common stock with
17  respect to how the market values them?
18      A.  It's possible that the marketplace is more --
19  more emphasis in terms of its valuation on the dividends
20  associated with the trust because that's the main
21  generator of income.  And to the extent that it -- as you
22  stated before, it was returning capital as part of that,
23  that's probably how they valued those.
24          But at the same time, I mean, if you talk about a
25  stock, theoretically you should be able to do a DCF

1   analysis and value that stock in the same way.
2       Q.  Would you value the trust units by performing a
3   DCF analysis?
4       A.  That would be one way to do it.
5       Q.  Is it your understanding --
6       A.  I'm sorry.  Let me clarify.  And when you say
7   "DCF analysis," are you speaking of a DCF analysis of the
8   expected cash flows, of expected dividend or
9   distributions?
10      Q.  Yes, of expected distributions.
11      A.  That would be one way to do it.
12      Q.  Okay.  And your answer is the same with that
13  clarification?
14      A.  Correct.
15      Q.  Do you have an understanding of whether there's
16  an expectation that distributions will increase or
17  decrease over the life of the trust?
18      A.  Expectation by who?
19      Q.  The market.
20      A.  To the extent that if the market does have
21  expectations about an increase or decrease that will be
22  reflected or should be reflected in the current price of
23  the unit.
24      Q.  Did SandRidge Mississippian Trust I disclose to
25  potential investors and investors that distributions would

1   decrease over time?
2       A.  As I sit here today, I don't recall.
3       Q.  Would you expect that a trust -- excuse me.  A
4   royalty trust predicated on oil wells would decline in
5   value over time?
6       A.  Again, it's possible.
7       Q.  But you don't have an expectation that that's
8   what would happen?
9       A.  I'd have to think about it more.
10      Q.  And so far you have not considered for the
11  purpose of your opinions today whether or not a trust unit
12  behaves differently than common stock, correct?
13      A.  I'm not sure what you mean by behaves.
14      Q.  Have you previously performed in any of the more
15  than 20 times you've testified as an expert on market
16  efficiency an event study with respect to a trust unit?
17      A.  As I sit here today, I don't recall.  And even
18  looking at my Exhibit 1 to my Exhibit 1 I wouldn't be able
19  to tell you as I sit here today.
20      Q.  Looking at Exhibit 2 to your report which is
21  Exhibit 1, which of your papers, publications, and
22  presentations involved evaluating whether trust units
23  trade in an efficient market?
24      A.  Well, it seems that your question is predicated
25  on that market efficiency for stocks and trust units are



Page 54

1  somehow different so I don't understand the question.
2      Q.  Do you believe that market efficiency is
3  different for stocks and trust units?
4      A.  That's something I'd have to think about.
5      Q.  And to date you have not thought about whether
6  market efficiency for stocks and trust units is different?
7      A.  Well, I believe the courts use the same criterion
8  in determining whether stocks or trust units are traded in
9  efficient markets.  So to the extent the courts look at
10 them the same way...
11     Q.  You're not a lawyer, right?
12     A.  I think we've established that.
13     Q.  So as an economist do you have an opinion on that
14 question?
15     A.  Could you re-read the question, please.
16         (The record was read back by the reporter as
17         follows: "QUESTION:  And to date you have not
18         thought about whether market efficiency for
19         stocks and trust units is different?")
20         THE WITNESS:  I just don't understand the
21 question.
22 BY MR. WORD:
23     Q.  Do you believe performing a market efficiency a
24 valuation of trust units would be different than
25 performing that same analysis for common stock?

Page 55

1      A.  Who am I performing that market efficiency
2  analysis for?
3      Q.  In this case.  You performed a -- let's say --
4  you performed an event study in this case, correct?
5      A.  That is correct.
6      Q.  And you performed that event study based on trust
7  units, correct?
8      A.  That is correct.
9      Q.  Did you make any alterations to your event study
10 analysis because the security you were examining was a
11 trust unit rather than common stock?
12     A.  To my event study analysis?  To the extent that
13 I've looked at non-dividend paying stocks, yeah, I haven't
14 included dividends and non-dividend paying stocks.  So I
15 had to adjust for the distributions in this analysis.  So
16 I suppose that would be different.
17     Q.  The only -- the only difference you made in your
18 analysis is accounting for dividends being paid on the
19 trust units?
20     A.  No, it's possible I made other differences, but I
21 don't understand your question.  And I'm not trying to be
22 difficult.
23     Q.  No, I understand.
24     A.  We're talking about market efficiency.  And so as
25 an economist, right, there are three different types of

Page 56

1  market efficiencies that we can look at.  In terms of
2  court cases, the court sets up certain criterions, and I
3  report on those criterions and they determine based on my
4  findings and possibly findings of other people whether or
5  not they believe that stock is traded in an efficient
6  market.  Trust -- sorry.  Stock or unit.
7          So I don't -- I just don't -- confused by your
8  question about the distinction between when you're talking
9  about market efficiency for a unit versus market
10 efficiency for a common stock.
11     Q.  And that's -- might be all the answer I need is
12 you have not evaluated or determined whether or not you
13 need to make any adjustments to your event study because
14 the security you were studying was a trust as opposed to a
15 common stock other than accounting for dividends.
16     A.  Well, again, that distinction is between trust
17 units and non-dividend paying stocks.  I would need to
18 think about whether or not I would need to make any other
19 types of alterations for the fact that I was looking at a
20 unit trust as opposed to a common -- but when you say
21 market efficiency, are you talking about an event study?
22 So are you asking would I make changes to my event study?
23 Would I make changes to my criterion?
24         So we're talking about Cammer factors one through
25 four or the Krogman factors -- if you want to call them

Page 57

1  Krogman factors -- one through three.  Are you asking if I
2  would need to adjust those somehow because I'm looking at
3  a trust unit as opposed to a common stock?
4      Q.  I'm only asking with respect to the efficient
5  market examination.  When you're conducting that
6  examination under Kramer factor five of whether or not --
7      A.  I'm sorry.  You mean Cammer factor five?
8      Q.  Yes, correct.  Sorry.
9      A.  Is that Cramer like Jim Cramer factor five?
10     Q.  One of those two.
11     A.  Okay.  All right.  Sorry.  I didn't mean to
12 interrupt.  A moment of levity.
13     Q.  So back to my question.  Which of your papers,
14 publications, and presentations involved evaluating
15 whether trust units trade in an efficient market?
16     A.  As I sit here, I don't recall.
17     Q.  And which of the matters listed on page 79 of
18 your report, Exhibit 2, under Expert Reports and Testimony
19 involved you offering an opinion on trust units and
20 whether they trade in an efficient market?
21     A.  I don't recall as I sit here.
22     Q.  Which of your engagements listed on page 83 of
23 your report involve you evaluating whether trust units
24 trade in an efficient market?
25     A.  As I sit here, I don't recall.



Page 58

1    Q.  Which of the documents listed on Exhibit 2 to
2  your report under Academic and Professional Literature
3  discuss evaluating whether trust units trade in an
4  efficient market?
5    A.  Again, I'm having difficulty with your question
6  because you're making it sound as if trust units are these
7  bizarre securities that are somehow different than
8  equities.  Is that what you're maintaining?  And so that
9  the test for market efficiency would be different?
10      I'm asked to test for market efficiency based on
11  criteria set up by the court.  I perform that whether I'm
12  looking at equities or common units.  I may -- I mean, I'm
13  just answering what the court asked me to put forward.
14    Q.  And I'm asking a very, very simple question.
15  It's --
16    A.  Well, okay.  I disagree it's a simple question.
17    Q.  Okay.  Well --
18    A.  Because you can't define for me what you mean by
19  market efficiency.  If you mean market efficiency in terms
20  of what the court is talking about, that's one thing.  If
21  you're talking about market efficiency with regards to
22  academia, that's a different thing.
23    Q.  Well, then, let me make it even simpler.  Let's
24  eliminate that term --
25    A.  Well, okay, again --

Page 59

1    Q.  Which of the documents listed under exhibit -- on
2  Exhibit 1, your report, under Academic and Professional
3  Literature discuss evaluating trust units?
4    A.  Without reviewing each one of these individual
5  articles, I don't know.  But if you have each one of those
6  individual articles, I'd be happy to go through each one
7  of them now.
8    Q.  I wish we had that time.
9    A.  Well, we have seven hours, right?
10    Q.  I've got other things to cover.  I think I can
11  tell you that none of them do.  But you can -- you can
12  feel free.  I mean, again, your -- plaintiffs' counsel can
13  make arguments about what's contained in those academic
14  reports.
15      I'm going to show you what we've marked as
16  Exhibit 3.  Have you seen Exhibit 3 before?
17    A.  I believe so.
18    Q.  Did you want to add to your answer?  I think you
19  said you believe so, but then you were checking your
20  report.
21    A.  Oh, yes, I have reviewed.
22    Q.  And this is a Wells Fargo analyst report from May
23  17, 2011, correct?
24    A.  It appears to be.
25    Q.  And this is issued by the same entity, Wells

Page 60

1  Fargo, as the earlier report you quoted in your report,
2  correct?
3    A.  Could you refer back to the earlier answer?
4    Q.  Page 92 of your report cites to in footnote 122
5  that Wells Fargo analyst report --
6    A.  I'm sorry.  Page 92 of my report?
7    Q.  Oh, I'm sorry.  Page 50, paragraph 92.
8  Apologize.
9    A.  So now we're at paragraph 92?
10    Q.  Paragraph 92, page 50.  The first block quote
11  with the footnote 122 is a statement from a Wells Fargo
12  analyst report, right?
13    A.  It is.
14    Q.  And this is also a Wells Fargo analyst report,
15  right?
16    A.  That is correct.
17    Q.  If you take a look at the fourth bullet on this
18  Wells Fargo analyst report which we've marked as
19  Exhibit 3.  You see where it says "Yield Versus Discount
20  Rate -- Importantly Different"?
21    A.  I do see that.
22    Q.  Can you read that to yourself?  I'd like to ask
23  you a couple questions about that.
24    A.  Okay.
25    Q.  Wells Fargo states in this report that unit

Page 61

1  prices -- I'm sorry.  Let me back up.
2      Wells Fargo states in this report that investors
3  failed "to acknowledge that the distributions are likely
4  to fall over time," correct?
5    A.  I'm sorry.  Where are you looking?
6    Q.  I'm sorry.  Still in that fourth bullet.
7    A.  I'm just not --
8    Q.  Yeah, sure.
9    A.  -- seeing where you're reading that from.
10    Q.  Yeah, sure.  "We think that at times, buyers of
11  trusts bid the price up to a comparable and/or, quote,
12  'reasonable' yield, failing to acknowledge that the
13  distributions are likely to fall over time."  Do you see
14  that sentence?
15    A.  I do see that sentence.
16    Q.  Do you agree with that sentence?
17    A.  I believe that that's what they believe.
18    Q.  Do you believe that the distributions of Trust I
19  are likely to fall over time?
20    A.  I'd have to think about that.
21    Q.  Did you read any information in any of the
22  documents you reviewed regarding Sandridge Trust I in
23  which SandRidge Trust I disclosed that distributions would
24  decline over time?
25    A.  As I sit here today, I don't recall.



Page 62

1    Q.  With stocks -- common stocks, that is, are
2  distributions or dividends likely to fall over time?
3    A.  Define the term "likely."
4    Q.  Is there an expectation that over the life of a
5  stock its distributions will decline over time?
6    MR. ROSEN:  All stocks?  You're talking about all
7  stocks in the universe of equities?
8    THE WITNESS:  Could you answer his question,
9  please?
10 BY MR. WORD:
11   Q.  You can answer and he can object.
12   A.  I can't answer the question without that
13 clarification.
14   Q.  You're not able to understand the words in the
15 question I asked you, right?
16   A.  Your question is overly broad.
17   Q.  Wells Fargo is able to state a general opinion of
18 what happens with trusts, right?  And I'm just trying to
19 understand are you not as qualified as Wells Fargo to
20 opine upon --
21   MR. ROSEN:  Objection.
22 BY MR. WORD:
23   Q.  -- what can happen with trusts and their price
24 distributions?
25   MR. ROSEN:  What's your question?  Would you give

Page 63

1  him a question?
2    A.  Could you re-read the question, please.
3    THE COURT REPORTER:  Counsel came in with an
4  objection before I was done with the question.
5    MR. WORD:  I can restate it, then.  That's fine.
6    THE COURT REPORTER:  It's the one with "is there
7  an expectation --
8    THE WITNESS:  Sure.  I'd like to hear it again.
9    THE COURT REPORTER:  -- "that over the life of a
10 stock..."
11   THE WITNESS:  No, I'd like to hear it.
12   MR. WORD:  I don't think she got it.
13   THE COURT REPORTER:  I just told her -- I just
14 told him that --
15   THE WITNESS:  Oh, you didn't get it.
16   MR. WORD:  Yeah.
17   THE COURT REPORTER:  -- at the very end I wasn't
18 done and counsel came in with an objection.
19 BY MR. WORD:
20   Q.  Do you have an understanding of whether or not
21 common stocks carry an expectation that distributions will
22 decline over time?
23   A.  That common stocks?  Do I have an understanding?
24 I don't have an understanding one way or the other.  You'd
25 need to be more specific.

Page 64

1    Q.  Okay.  Wells Fargo goes on to say that "unit
2  prices are also expected to decline over time."  Do you
3  see that?
4    A.  Well, you're saying also, but they weren't
5  talking about equity prices, correct?
6    Q.  I'll read it again.  "And that unit prices are
7  also, by definition, expected to decline over time."  Unit
8  prices is referring to the trust unit price, correct?
9    A.  Correct.  But I believe your previous question
10 was about equities, correct?
11   Q.  Yeah, that was the previous question.  Each
12 question is independent.  So I'm asking you do you see
13 this quote and statement from Wells Fargo that unit prices
14 are also, by definition, expected to decline over time?
15   A.  I do see that statement.
16   Q.  When you perform an event study for common stock,
17 do you have an expectation that the security price will
18 decline over time?
19   A.  Again, overly broad.  Do you have an example that
20 you would like to give to me?
21   Q.  Ever.  Have you ever, when performing an event
22 study, created an event study with, in mind, that the
23 security price will decline over time?
24   MR. ROSEN:  What could that possibly have to do
25 with an event study?  I can't believe you even asked that

Page 65

1  question.
2    THE WITNESS:  I'm sorry.  I don't understand the
3  question.  It doesn't make any sense.
4  BY MR. WORD:
5    Q.  Because you've never done it, right?  You've
6  never performed an event study with a security that's
7  expected to decline over time, right?
8    A.  I don't know one way or the other.  What do you
9  mean I've never?  I may have.  You're saying the word
10 "never."  It's just a ridiculous question.  It's overly
11 broad with the expectation that a security could decline
12 over time?  Any security?  Yeah.  I probably have
13 performed an event study with the expectation that a
14 security might decline over time.
15   Q.  Not might.  Will.  You've told me and we've
16 identified at least 22 times which you've engaged as an
17 expert opining upon market efficiency.  On any of those
18 occasions did you ever assume that the price of the
19 security would decline over time?
20   A.  So in those cases -- and now we're being more
21 specific, correct?  In those cases, 20 cases, did I go in
22 with the expectation that any of those stocks would
23 decline over time, no, I did not form an expectation about
24 whether or not those stocks would increase or decline over
25 time in those event studies that I performed under the



1  guise of performing reports or submitting reports with
2  regards to market efficiency and securities class actions.
3      Q.  Perfect.  It's not that hard.  I'm not trying to
4  trick you.  I'm just trying to understand --
5      A.  Well --
6      Q.  -- what you have or have not done.
7      A.  You say it's not that hard, but you're being very
8  vague.  So if you want me to give you a precise answer,
9  you need to ask a precise question.
10      Q.  Do you understand --
11      A.  If I asked you -- if I said to you, is the sky
12  blue or is the sky gray, well, it would depend on the day
13  of the week.  If you say to me is the sky gray when it is
14  raining, possibly.  Do you assume that the sky is gray
15  when it's raining?  Possibly.
16          You need to be more precise in how you ask your
17  question.  You can ask your questions however you want,
18  but if you want precise answers, you need to ask precise
19  questions.
20      Q.  Did you have an understanding that Trust I unit
21  prices were expected to decline over time?
22      A.  As I sit here today, I don't recall.
23      Q.  Did you make any account for an expectation that
24  unit prices of Trust I securities would decline over time
25  in your event study?

1      A.  In what part of my event study?
2      Q.  Any part.
3      A.  Well, that's overly vague.
4      Q.  You know what your event study is, right?
5      A.  I do know what my event study is.
6      Q.  And you performed three steps for your event
7  study, right?
8      A.  I don't know.  What were those three steps?
9      Q.  Well, again, I'll quote from your report because
10  I think you're the one who wrote it and should know it
11  better than me, but I will help you.  First --
12      A.  I'm sorry.  Look --
13          MR. ROSEN:  Let him ask the question.
14  BY MR. WORD:
15      Q.  You're making this unnecessarily difficult.
16      A.  Well, you're being argumentative.
17          MR. ROSEN:  Let him ask the question.
18  BY MR. WORD:
19      Q.  You're asking me which steps of your report.  You
20  wrote the report.
21      A.  You're right.  Well, you're saying three steps.
22  Do you want to point to the paragraph where I discuss the
23  three steps?
24      Q.  I can tell you the three steps.
25      A.  That's all you need to do.

1      Q.  I'll tell you the three steps.
2      A.  Is that too difficult?
3      Q.  First --
4      A.  Please --
5      Q.  Identify dates --
6      A.  Please show me in the report where I talk about
7  three steps, and --
8      Q.  Take a look --
9      A.  -- I'll be happy to look at it.
10      Q.  Take a look at your report under event study and
11  identify for me the steps you undertook to perform an
12  event study.
13      A.  Do you have a page number you're referring to?
14      Q.  It's your report, sir.  Can you find it or not?
15      A.  Well, there's many sections on event studies.
16  There's event studies of market efficiency.
17      Q.  And find for me the section that discusses the
18  steps to perform an event study.
19      A.  So you mean "The first step of a proper event
20  study -- and, again, I'm looking at page 39 -- "is to
21  identify the events to be tested."
22      Q.  Right.  Let's stop right there.  We can lead with
23  that one.
24      A.  That would be step one.
25      Q.  In step one did you make any account for the fact

1  that the Trust I unit prices were expected to decline over
2  time?
3      A.  As I sit here today, I don't believe so.
4      Q.  Next step?
5      A.  Well, I don't know if you mean -- when you say
6  steps, are you referring to reviewing news media?
7      Q.  I think you've helpfully referred to them by
8  numbers.  One was identifying of dates.  Two, market model
9  on page 43.
10      A.  Okay.
11      Q.  In conducting your market model, did you account
12  for the fact that the Trust I units were expected to
13  decline in value over time?
14          MR. ROSEN:  Conduct?  What do you mean by
15  conducting your market model?  Can you explain what you
16  mean by conducting a market model?
17  BY MR. WORD:
18      Q.  You performed -- you constructed a market model
19  for your event study, correct?
20      A.  What do you mean by constructed?
21      Q.  Did you use a market model in connection with
22  your event study?
23      A.  I believe that is correct.
24      Q.  And how did you use a market model in connection
25  with your event study?



1     A.  I used it to estimate what I believe the trust --
2  the different trust prices should have been.
3     Q.  And in your market model did you account for the
4  fact that Trust I units were expected to decline over
5  time?
6     A.  As I sit here today, I don't believe so.
7     Q.  In your market model did you account for the fact
8  that Trust II units were expected to decline in value over
9  time?
10     A.  I don't believe so.
11     Q.  The third step is the t-test step on page 47.
12     A.  Okay.
13     Q.  You conducted a t-test in your event study,
14  correct?
15     A.  I performed a series of t-tests, correct.
16     Q.  And for each t-test that you performed, did you
17  consider that the trust units would decline over time in
18  value?
19     A.  As I sit here today, that would be something I
20  would need to think about as to how it would affect my
21  t-test.
22     Q.  But thus far you have not done that analysis?
23     A.  I believe that is correct.
24     Q.  Your Cammer Factor 5 analysis focuses on two sets
25  of empirical tests of the efficiency of the market for

1  Trust I and II, correct?
2     A.  I'm sorry.  Could you read the question back,
3  please.
4         (The record was read back by the reporter as
5         follows: "QUESTION:  Your Cammer Factor 5
6         analysis focuses on two sets of empirical tests
7         of the efficiency of the market for Trust I and
8         II, correct?")
9         THE WITNESS:  I'm sorry.  I just don't understand
10  the question.
11  BY MR. WORD:
12     Q.  What were you attempting to evaluate in section 5
13  on page 32 of your report?
14     A.  Whether or not the stock reacted to new news.
15     Q.  On paragraph 64 you describe two sets of
16  empirical tests of the efficiency of the markets for
17  SandRidge Trust I common units and Sandridge Trust II
18  common units during the class period, correct?
19     A.  I'm sorry.  What paragraph?
20     Q.  64, sorry.
21     A.  That is correct.
22     Q.  And my question for you first is what is an
23  efficient market?
24     A.  In what context?
25     Q.  You're testing the efficiency of the markets,

1  correct?
2     A.  That's what I was asked to do, correct.
3     Q.  And what makes a market -- excuse me.  What makes
4  a market efficient?
5     A.  In what context?
6     Q.  In this context of you saying you're testing the
7  efficiency of the markets.
8     A.  So you're saying in a court case?
9     Q.  You say you're testing the efficiency of the
10  markets, right?
11     A.  So you -- for the purposes of this report, yes,
12  that's what I stated.
13     Q.  And what do you mean you're testing the
14  efficiency of the markets?
15     A.  I'm testing it or doing analysis that analyzes
16  eight different factors with regards to -- factors that
17  courts often use as indicators or inform their opinion
18  about whether or not stocks trade in an efficient market.
19     Q.  With respect to the two empirical tests you've
20  described you're testing -- that's a bad question.
21         The empirical tests that you're performing in
22  this section of your report, are they intended to
23  determine whether or not disclosure of new
24  company-specific information is quickly incorporated into
25  the Trust I and Trust II unit prices?

1     A.  I'm sorry.  Are you reading from my report?
2     Q.  No, I wasn't.
3     A.  Could you repeat the question, please.
4         (The record was read back by the reporter as
5         follows: "QUESTION:  The empirical tests that you
6         performed in this section of your report, are
7         they intended to determine whether or not
8         disclosure of new company-specific information is
9         quickly incorporated into the Trust I and
10         Trust II unit prices?")
11         THE WITNESS:  With the caveat that "quickly" can
12  be different across different sets of stocks, yes.  Or
13  in -- I shouldn't say different sets of stocks.  In
14  different situations the answer is yes.
15  BY MR. WORD:
16     Q.  And did you perform an event study to determine
17  whether the market for the trust units was efficient or
18  not?
19     A.  My event study informed my opinion as to whether
20  or not the stock traded in an efficient market.  But,
21  again, these are criterion set up by the court, not
22  academic criterion.
23     Q.  Is the purpose of your event study to determine
24  whether disclosure of new company-specific information
25  about the trust was quickly incorporated into their unit


MAGNA
LEGAL SERVICES

1 prices?
2    A.  I refer to my previous answer.
3    Q.  Which previous one?
4    A.  The one to the question you asked me two
5 questions ago.
6    Q.  Can you restate it?
7    A.  Could you re-read his question two questions ago
8 and then restate my answer, please.
9         MR. WORD:  You don't need to.  I can go back and
10 look at it.  It's now part of the record.  So...
11 BY MR. WORD:
12    Q.  Do you have an expectation of the type of new
13 company-specific information that you would expect to have
14 a price impact on the price of the trust units?
15    A.  In this matter?
16    Q.  Yes.  This matter.
17    A.  Do I have an expectation?  Well, again, quoting
18 the -- going back to the original Wells Fargo report I
19 quoted, I believe that production with regards to oil and
20 gas and the percentage distribution of those things are
21 certainly going to affect the value of the trust and might
22 impact the stock price -- or the unit price.
23    Q.  Are there types of information that would have
24 a -- that one would expect to have a quicker impact on
25 price than others?

1    A.  What do you mean by quicker?
2    Q.  How long -- for purposes of your event study,
3 what is the period of time over which you evaluated price
4 changes?
5    A.  Price changes relative to what?
6    Q.  Did your -- does your event study examine the
7 price impact of various disclosures over a one-day time
8 period?
9    A.  I believe that is correct.
10    Q.  Are there certain types of information that are
11 more likely or less likely to have a price impact over a
12 single day?
13    A.  That's something I need to consider or think
14 about.
15    Q.  Have you ever before testified with respect to
16 the types of information that one might expect to have a
17 quicker price impact?
18    A.  As I sit here today, I don't recall.  I believe I
19 have had conversations with regards to that, but I don't
20 recall them as I sit here today.
21    Q.  Do you recall testifying to that topic?
22    A.  Defining -- define "testify."
23    Q.  Took an oath sat in a chair.  Spoke.
24    A.  So including depositions?
25    Q.  Mm-hm.

1    A.  I believe I may have opined upon that in
2 deposition.
3    Q.  Do you believe testifying in court is different
4 than testifying in deposition?
5    A.  That calls for a legal conclusion.
6    Q.  Well, as to your understanding.  I mean, do you
7 think that your oath is any less valid here today than it
8 would be in a court of law?
9    A.  No.
10    Q.  Okay.  I didn't think you did.  I just wanted to
11 make sure.
12    A.  Thank God you clarified it.
13    Q.  Yeah, I know.  A lot of times we tell our young
14 attorneys to start with that.
15    A.  And you've been practicing for how long?
16    Q.  Not long enough evidently.
17    A.  Okay.
18    Q.  In an efficient market, when would you expect to
19 see -- strike that.
20        In an efficient market how quickly would you
21 expect to see a price impact from the disclosure of new
22 company-specific information?
23    A.  Again, it would depend upon the information, the
24 equity or the asset involved.  There's a whole host of
25 things that would go into that.

1    Q.  For some types of information it could be minutes
2 or hours and others it might be days; is that fair?
3    A.  Again, I need to think about that.
4    Q.  You didn't think about it for purposes of
5 rendering your opinions today in your report?
6    A.  It's certainly something I considered, but you're
7 asking a broad range of questions and so to the extent
8 that there are all sorts of things, factors that one might
9 need to consider in answering that question, I haven't
10 fully considered all of those.
11    Q.  Did you consider how quickly Trust I or Trust II
12 unit prices should reflect disclosures of new
13 company-specific information?
14    A.  What do you mean by "how quickly"?
15    Q.  How quickly.  A day?  Did you consider whether or
16 not Trust I securities should react to information within
17 one day to be an efficient market?
18    A.  Well, I think to the extent that I looked at
19 one-day returns, the implicit assumption is that the stock
20 or in this case units, would react to information within a
21 day.
22    Q.  And that's the same with regard to both stock --
23 excuse me -- both trust securities?
24    A.  I believe that is correct.
25    Q.  Should one expect disclosure of company



Page 82

1 information at the time. To the extent that people might
2 update their beliefs about that information or it might
3 inform their opinions in terms of performing analyses,
4 they might later arrive at an opinion that changes their
5 understanding of what the equity or in this case unit
6 trust might be worth. And, thus, it might result in a
7 price decline or a price change later on so not on the
8 exact day of the information release. There's not an
9 expectation that the market is a hundred percent accurate,
10 I guess, is what I'm trying to say.
11    Q.  I agree. Did your event study test whether or
12 not there were price reactions after the day of disclosure
13 in relation to disclosure of new information?
14    A.  I don't understand your question.
15    Q.  You just described for me a situation in which
16 the stock price could move later after the day of
17 disclosure in reaction to news, correct?
18    A.  Could you re-read the question, please.
19       (The record was read back by the reporter as
20       follows: "QUESTION: You just described for me a
21       situation in which the stock price could move
22       later after the day of disclosure in reaction to
23       news, correct?")
24       THE WITNESS: I'm not sure that's completely
25 accurate. But I'm not sure how it's not completely

Page 83

1 accurate.
2 BY MR. WORD:
3    Q.  Let me try making it better -- or asking a better
4 question.
5       You described that if investors change their
6 opinions, we could see a -- one could see a stock price
7 change days after information was disclosed.
8    A.  Well, I didn't say "investors." You said
9 investors.
10    Q.  What did you say?
11    A.  Individuals.
12    Q.  Individuals.
13    A.  So it could be that analysts change their
14 opinions or update their models, and those aren't
15 necessarily investors.
16    Q.  How do analyst opinions impact market price?
17    A.  Analyst opinions oftentimes inform people with
18 regards to a firm's valuation or a unit's valuation in
19 this case.
20    Q.  An investor has to believe that opinion and react
21 to it, correct?
22    A.  Believe with a hundred percent accuracy, I don't
23 know.
24    Q.  Well, if an investor does not make an investment
25 decision based upon an analyst report, that analyst report

Page 84

1 has no impact on the stock price, correct?
2    A.  If all investors made that decision, I believe
3 that is correct.
4    Q.  So what I'm trying to understand is whether you
5 believe information about Trust I or Trust II can have
6 more than a one-day price impact? Have you formed an
7 opinion on that?
8    A.  Again, I don't understand -- I'm sorry. I'm not
9 trying to be difficult.
10    Q.  I understand.
11    A.  I don't understand the question. Maybe re-read
12 it?
13       THE COURT REPORTER: All right. Yes?
14       MR. WORD: I'll form another one. Sorry.
15       THE COURT REPORTER: Okay.
16 BY MR. WORD:
17    Q.  Do you have an opinion on how quickly new
18 material information about Trust I or Trust II caused a
19 reaction in the unit prices?
20    A.  Again, I believe that the implicit assumption is
21 that it occurred within a one-day period. But, again, I
22 would need to think more about it.
23    Q.  Have you performed any analysis to determine
24 whether or not new material information about Trust I or
25 Trust II would cause a multi-day unit price impact?

Page 85

1    A.  I don't believe so.
2    Q.  What is the "null hypothesis"? Have you ever
3 heard that phrase before?
4    A.  Yes, I have.
5       MR. ROSEN: The null hypothesis is that a
6 question is well constructed.
7       MR. WORD: Trying to refute it.
8       THE WITNESS: Yeah, in what context?
9 BY MR. WORD:
10    Q.  Does your report refer to the null hypothesis?
11    A.  It does refer to the null hypothesis.
12    Q.  Where does it refer to the null hypothesis?
13    A.  I'm sure it's in more than one place. I'm trying
14 to find the footnote that I specifically recall. This
15 might take a little while.
16    Q.  Well, at risk of us not talking about the same
17 null hypothesis, check out footnote 84. See if I've got
18 it right.
19    A.  Okay.
20    Q.  Is footnote 84 describing the null hypothesis?
21    A.  See, it's not -- it's not -- sorry.
22    Q.  I mean --
23    A.  It is stating "a --
24    Q.  A null --
25    A.  -- null hypothesis."



Page 90

1    A.  Right.  Okay.  So yes.
2    Q.  So what I'm trying to get at is does the single
3  appearance of an abnormal return that is statistically
4  significant indicate market efficiency or is it merely a
5  data point on the way to determining whether or not the
6  market was efficient?
7    A.  I believe it's the latter.  And so when I say
8  "indicative," I mean that it informs my opinion as to
9  whether or not -- I can't just look at a data point and
10  say hey, there was a statistically significant return on
11  that day and, thus, the stock is efficient for the entire
12  class period.
13    Q.  Perfect.  And that's the clarification I was
14  trying to get at.
15    A.  At least in this matter.
16    Q.  And, conversely, does the absence of a
17  statistically significant abnormal return upon the
18  disclosure of new company-specific information indicate a
19  lack of market efficiency?
20    A.  No.  And I think I addressed that in my report.
21  Let me find exactly where I do that.
22    Q.  Might be paragraph 71.
23    A.  It might be.  That's right.  "So not every piece
24  of new information" -- and I'm reading from paragraph
25  71 -- "will result in a statistically significant abnormal

Page 91

1  stock return to the extent that the new information may
2  have been expected, or the valuation impact of the new
3  information is appropriately modest, such that the
4  appropriate abnormal price return is not statistically
5  significant.
6    "As such, a finding of nonsignificance does not
7  necessarily establish inefficiency, as a modest
8  nonsignificant stock price reaction may be the appropriate
9  and efficient stock price reaction to a particular
10  information event."
11    And that's quoting a paper by Alon Brav and J.B.
12  Heaton, who I believe are both at the University of
13  Chicago, but Alon Brav might be at UCLA.  "Event studies
14  in Securities Litigation: Low power, Confounding Effects,
15  and Bias." From the Washington University Law Review,
16  30th of March 2015, page 602.  Actually, J.B. Heaton may
17  no longer be at Chicago, but he certainly was when I was a
18  graduate student.
19    Q.  So similarly to the significant -- statistically
20  significant abnormal return, does the absence of a
21  statistically abnormal return inform your view of whether
22  or not a market is efficient?
23    A.  It could.
24    Q.  It's all data points you take into consideration
25  of forming your opinion of whether or not the market is

Page 92

1  efficient, correct?
2    A.  I'm not sure I would characterize it that way.
3  But I'm not sure how I would characterize it.  It's an
4  overly broad definition.  I'd need to think about that.
5    Q.  What I'm trying to get at is you for the purpose
6  of performing your event study identify a number of event
7  dates, right?
8    A.  Correct.
9    Q.  And you evaluate each of those event dates to
10  determine whether or not there is an abnormal return on
11  that date?
12    A.  A statistically significant abnormal return.
13    Q.  And sometimes you find that there is a
14  statistically significant abnormal return and sometimes
15  you find out there's not a statistically significant
16  abnormal return?
17    A.  That is correct.
18    Q.  And my question is do you focus on both of those
19  results in determining whether or not the market is
20  efficient or do you just focus on the findings that there
21  was a statistically significant abnormal return on that
22  event date?
23    A.  It depends upon the test I'm running.  So for
24  instance in the first test, I believe that I focused -- or
25  the first test with regards to event studies.  I'm focused

Page 93

1  on whether or not there's statistically significant stock
2  price movements to specific event dates.
3    To the extent that I look at both statistically
4  significant stock price movements and non-statistically
5  significant stock price movements on an objective
6  criterion for event dates which I use in my second
7  analysis, I believe I take all of these things into
8  consideration.
9    Q.  So for the purpose of your first evaluation which
10  is the event study in which you performed -- that's a
11  horrible question.
12    You describe your first -- let me back up even
13  more.
14    A.  Actually, let me correct that answer.  Because to
15  the extent that I -- I mean, I certainly also do
16  consider non-statistically significant stock price
17  movements in my first analysis as well.
18    (Court reporter clarification.)
19    THE WITNESS:  Do consider non-statistically
20  significant stock price movements in my first analysis as
21  well.  But it's more pronounced, I suppose, in my second
22  analysis.  Or more explicit.
23  BY MR. WORD:
24    Q.  And I should have done this at the outset.  You
25  performed two separate tests here, correct?



1    A.   Again, it would have to be done on a case-by-case
2  basis.
3    Q.   And that's all I'm trying to get at is I don't
4  want to be surprised later on when you give me a new
5  opinion about this.  If you haven't thought about it yet,
6  that's all I want to know.  If you have not yet performed
7  that analysis -- haven't thought about it with respect to
8  Trust I, that's all I want to know so I can cross it off
9  the list and say "haven't thought about it."
10       So have you thought about or evaluated whether or
11  not --
12   A.   Well, see, "thought about" and "evaluated" are
13  two different things.
14   Q.   If you've done one of those, that's great, too.
15  What I'm trying to --
16   A.   I may have --
17   Q.   -- is know what you've done.
18   A.   -- thought about it.  I'm not sure whether or not
19  I evaluated it.
20   Q.   Okay.
21   A.   I'm sure at some point I had a thought about
22  that.  And so to that extent, I'm sure I thought about it.
23   Q.   But you have not performed analysis to take that
24  thought from a thought into something more concrete?
25   A.   And, again, in these vague terms if you were

1  suggesting some type of analysis that I could perform, I
2  think I'd have a better understanding of the question
3  you're asking.  But because you're asking about analysis
4  in general, I'm not quite sure what you're talking about.
5    Q.   You told me that we should see statistically
6  significant abnormal returns on non-news days about
7  5 percent of the time, right?
8    A.   I don't know if I said we should.  We could.
9    Q.   Could.  Have you determined whether or not you
10  observed statistically significant abnormal returns on
11  more than 5 percent of the days?
12   A.   Oh, I could certainly go through this and tell
13  you whether or not I observed that.  Would you like me to
14  do that?
15   Q.   Yeah, I think it's part of your second test but
16  yes.  If it's not, go ahead.
17       (Court reporter clarification.)
18       MR. WORD:  Second test.
19  BY MR. WORD:
20   Q.   But if you could provide me something else,
21  that's fine.
22   A.   Oh, I see what you're saying.  Now -- I think I
23  have a better understanding of your question.
24   Q.   Okay.
25       MR. ROSEN:  Why don't you make sure you have a

1  better understanding?
2        THE WITNESS:  I will as soon as I look at what --
3  as soon as I see what I'm looking for here.
4        MR. ROSEN:  Is that Exhibit 9?
5        THE WITNESS:  I think he's talking about
6  Exhibit 9.
7        Okay.  All right.  If you could restate your
8  question.
9  BY MR. WORD:
10   Q.   Have you performed any analysis of the number of
11  statistically significant abnormal returns on days in
12  which there is not new company-specific information
13  disclosed?
14   A.   To the extent that Exhibit 9 has a very specific
15  definition of what a news day and a non-news day is, the
16  answer would be yes.  To the extent that you're talking
17  about news in general about the company, the answer is no.
18   Q.   And does the analysis appearing on Exhibit 9
19  suggest market inefficiency in any way?
20   A.   That's something I would need to think about, but
21  based on these tests or my test results, it indicates to
22  me market efficiency.
23   Q.   Ready for a break?
24   A.   Sure.
25        THE VIDEOGRAPHER:  We are now going off the

1  record, and the time is 12:05 p.m.
2        (Recess taken.)
3        THE VIDEOGRAPHER:  We are now going back on the
4  record, and the time is 12:49 p.m.
5  BY MR. WORD:
6    Q.   All right.  Let's dive right back in.  In the
7  morning session, you referred me to paragraph 68 of your
8  report describing event studies.  And paragraph 68 appears
9  on page 35.
10       In your first line there --
11   A.   I'm sorry.  I must be looking at the wrong page.
12  What page?
13   Q.   Paragraph 68 --
14   A.   Oh, paragraph.  I apologize.
15   Q.   Is it easier if I refer to only one of those
16  numbers rather than both of them?
17   A.   Sure.  If you want to stick with -- why don't we
18  stick with paragraphs?
19   Q.   Okay.
20   A.   How about that?
21   Q.   So paragraph 68, you read that to me before.  And
22  it states that "the event study is the paramount tool for
23  testing market efficiency."  You agree with that
24  statement, right?
25   A.   I believe so.

MAGNA
LEGAL SERVICES

Page 142

1    Q.  This was a statement by SandRidge Energy,
2  correct?
3    A.  Are we looking at November 9?
4    Q.  November 9, 2012.
5    A.  All right.  By what energy?
6    Q.  The disclosure on September -- excuse me, the
7  disclosure on November 9, 2012, was a disclosure made by
8  SandRidge Energy?
9    A.  Ah.  Okay.  I thought you said Standard Energy.
10    Q.  Okay.
11    A.  I was like what?  I don't know what we're talking
12  about here.  Yes, that is a disclosure -- or it appears to
13  be a disclosure by SandRidge Energy.
14    Q.  And that disclosure was about SandRidge wells,
15  correct?
16    A.  Well, it released its results for the quarter of
17  2012 and held a conference call with investors -- I'm
18  sorry -- before the market opened on November 9, 2012.
19    Q.  And SandRidge was describing its results, right?
20    A.  Among other things, correct.
21    Q.  It wasn't describing Trust I results, right?
22    A.  It was discussing the assets that make up Trust I
23  and Trust II.
24    Q.  How did it discuss the assets that make up
25  Trust I and Trust II?

Page 143

1    A.  "On the conference call, management disclosed it
2  had been producing more natural gas and less oil in it's
3  Mississippian wells and that it would be reducing its
4  guidance for oil production going forward.  Quote, 'As we
5  continue to grow the Mississippian well count across a
6  large area, we also are seeing an increase in our natural
7  gas production.  And this increase has been offset by a
8  lower amount of oil than we anticipated at the beginning
9  of last year.
10    "'Based on our production performance through Q3,
11  we are revising our 2012 production guidance up by
12  5 percent on natural gas to 93 BcF and down about
13  2 percent on oil to 17.8 million barrels of oil.'
14    "As for the Mississippian, while the gas
15  performance has been on target, we are seeing a steeper
16  oil decline than we previously anticipated, and have made
17  revisions to our model accordingly for 2013.  We will not
18  have a third-party consultant type curve until year end."
19    Q.  And you'll agree with me that no part of that
20  discussion you just read concerns Trust I, right?
21    A.  What do you mean?
22    Q.  Does any of the facts you just read concern
23  Trust I?
24    A.  What do you mean by "concern"?
25    Q.  Does it disclose any information about Trust I?

Page 144

1    A.  Well, to the extent that the Mississippian -- the
2  Trust I and Trust II have exposures to the Mississippian,
3  I believe it has.  But if you mean did they specifically
4  state Trust I and Trust II in that statement, no, there is
5  no specific mention of Trust I and Trust II in that
6  statement.
7    Q.  That's because Trust I discloses Trust I results,
8  right?
9    MR. ROSEN:  Objection.
10    THE WITNESS:  I don't -- I -- I don't know how to
11  answer that question.  To the extent that Trust I was made
12  up of wells in the Mississippian, I believe that this is
13  germane to my analysis.  If you're adding an extra
14  criterion that it must specifically state or talk about
15  Trust I or Trust II, no, that quote does not specifically
16  talk about Trust I or Trust II.
17  BY MR. WORD:
18    Q.  Did you consider any other disclosures by any
19  other company operating wells in Mississippian other than
20  SandRidge?
21    A.  I'd have to think about that.  I don't believe
22  so.  But, again, I'd need to think about that.
23    Q.  It's not listed in the materials you previously
24  identified as all the materials you relied upon for the
25  purpose of rendering your opinions, right?

Page 145

1    A.  Are you making a statement or asking a question?
2    Q.  I'm asking.  I didn't see any reports in
3  Exhibit 2 of Exhibit 1, your report, that indicated you,
4  for example, looked at the SEC filings of Chesapeake, an
5  operator of oil wells in the Mississippian.
6    A.  I believe that is correct.  I did not look at
7  Chesapeake's SEC filings.
8    Q.  And SandRidge operates different wells than
9  Trust I, right?
10    A.  To the best of my knowledge, yes.  But at the
11  same time we agree or we had agreed earlier that
12  SandRidge's profitability was going to be a function of
13  the return on units one and two since they held an
14  interest in this those two trusts.
15    Q.  But is SandRidge describing here the oil and gas
16  its receiving out of its wells or the wells that have been
17  allocated to Trust I and Trust II?
18    A.  As I sit here, I don't know.
19    Q.  Trust I has substantially fewer wells than
20  SandRidge, correct?
21    A.  I believe that is correct.  But as I sit here
22  today, I don't know for sure.
23    Q.  And SandRidge Trust II also has substantially
24  fewer wells than SandRidge Energy, right?
25    A.  Again, if you want to stipulate to that, that's



Page 146

1   fine, but as I sit here today, I don't know the answer to
2   that question.
3       Q.   SandRidge Energy has different projections than
4   Trust I projections for their wells, right?
5       A.   I believe that is correct.
6       Q.   Same thing for Sandridge Trust II.  Trust II
7   makes projections for its wells.  Sandridge Energy makes
8   projections for its wells.
9       A.   Again, as I sit here today, I don't know.  If you
10  want to stipulate to that fact, I'm more than happy to
11  accept it and then ask -- ask any hypotheticals based on
12  those questions -- or those assumptions.
13      Q.   Have you ever previously conducted an event study
14  in which you relied upon event days including -- strike
15  that.
16          Have you previously conducted an event study
17  using events dates on which a firm other than the one
18  being tested disclosed the news?
19      A.   Yes.
20      Q.   Which cases?
21      A.   As I sit here, I don't recall, but it's not like
22  you've described some kind of abnormal situation.
23      Q.   So before when you said you were looking for
24  company-specific news --
25      A.   Gesundheit.

Page 147

1       Q.   -- that wasn't a limitation and you could use
2   noncompany-specific news for purposes of selecting events?
3       A.   Well, let me give you an example.  Suppose Apple
4   is making their iPhones and so one of their -- the
5   producer of LED screens say that, you know, their
6   productivity for the quarter is lacking.  They don't
7   describe it to any particular item.  But it could be a
8   result of Apple producing less iPhones.
9           People might interpret that news without them
10  mentioning Apple and assume that oh, well, that might then
11  alter -- I might expect to see Apple's stock price change.
12  So I mean, I could go on for hours about this.  So the
13  fact that you're talking about news of a company not
14  necessarily -- yeah, I mean, other noncompany news can
15  drive a stock price or change a stock price.
16      Q.   But you chose to look at SandRidge disclosures
17  rather than, for example, Trust I disclosure, correct?
18      A.   Well, to the extent that there were SandRidge
19  Trust I and Trust II disclosures, I looked at those with
20  regards to the criterions that I set up.
21      Q.   And one of the criterions you set up was a
22  disclosure of changes in the mix of oil and gas, right?
23      A.   I believe that is correct.
24      Q.   So is it your understanding that SandRidge
25  Energy's disclosure on November 9, disclosed for the first

Page 148

1   time that Mississippian wells were finding more gas and
2   less oil?
3       A.   Is it the first time they disclosed that?  As I
4   sit here, I don't know.  I'd need to review the document.
5       Q.   If it's not the first time, it shouldn't be new
6   information, right?
7       A.   I'm sorry.  Could you repeat the question?
8       Q.   If the fact that Mississippian wells are
9   producing more gas and less oil had previously been
10  disclosed, then it wasn't new information on November 9,
11  right?
12          MR. ROSEN:  Objection as to form.
13          THE WITNESS:  So what's incorrect about that
14  statement is you're talking about just changes.  You're
15  not talking about size of changes.
16  BY MR. WORD:
17      Q.   I'm not talking -- I'm just talking about just
18  changes.  So for example, do you believe that on November
19  9, SandRidge's disclosure regarding the fact that
20  SandRidge was finding more gas and less oil communicated
21  information about Trust I and whether they were finding
22  more oil -- more gas and less oil?
23      A.   Okay.  Could you re-read the question, please.
24          THE COURT REPORTER:  Re-read the question?
25          MR. WORD:  Yes.  Yeah, if he asked for it, that's

Page 149

1   fine.
2           (The record was read back by the reporter as
3           follows:  "Do you believe that on November 9,
4           SandRidge's disclosure regarding the fact that
5           SandRidge was finding more gas and less oil
6           communicated information about Trust I and
7           whether they were finding more gas and less
8           oil?")
9           THE WITNESS:  I believe that -- that by choosing
10  that date, there is that implicit assumption, yes.
11  BY MR. WORD:
12      Q.   Okay.  This is marked as Exhibit 5.  This is the
13  SandRidge Mississippian Trust I 8-K filed on November 1,
14  2012 eight days before the SandRidge disclosure on
15  November 9.  This 8-K attaches a press release disclosing
16  SandRidge Mississippian Trust I quarterly results.
17          If you look at the second paragraph, sir, you'll
18  see that it reads "during the three-month period --
19  production period ended August 31, 2012, total sales
20  volume increased 10 percent over the previous three-month
21  period.  This increased volume was due to higher natural
22  gas production, offset by slightly lower oil production."
23  The same information that was communicated eight days
24  later by SandRidge Energy.
25          Do you agree with me that on November 1,

Page 154

1  going to be, correct.
2      Q.  And your analysis determined that there was not a
3  statistically significant abnormal return at the
4  95 percent confidence level in Trust I securities
5  following the February -- or excuse me -- the January 31,
6  2013 announcement, right?
7      A.  I'm sorry.  Now you're talking about what date?
8      Q.  Same -- same -- sorry.
9      A.  You just said January.
10     Q.  I moved.  January 31st, 2013, is the next date
11 you've identified as an event date, right?  Paragraph 97
12 of your report.
13     A.  Okay.
14     Q.  And I'm submitting to you that that information
15 had previously been disclosed in November 2nd of 2012.
16 The market knew that the oil-to-gas ratio --
17     A.  I'm sorry.  I don't mean to be difficult.
18     Q.  Okay.
19     A.  So now we're looking from November 1st to --
20     Q.  And now --
21     A.  -- February 1st?
22     Q.  Yeah, moving --
23     A.  No, 31st, whatever you want.  Right.
24     Q.  Yeah, I'm not sure which way we should describe
25 that.

Page 155

1      A.  Okay.
2      Q.  Yes.  Certainly the information was disclosed
3  after the market closed on January 31, 2013.  I'm just --
4  my reading of your report suggests that the market --
5  well, I take that back.
6          Trust I units did not demonstrate a statistically
7  significant abnormal return at the 95 percent confidence
8  level following the January 31, 2013 disclosure, correct?
9      A.  That is correct.
10     Q.  And based upon our earlier discussion, I think we
11 can agree that you did not attempt to determine whether or
12 not this absence of a statistically significant abnormal
13 return on this date was due to the fact that SandRidge
14 Mississippian Trust I disclosed the change in its
15 oil-to-gas ratio on November 2 of 2012?
16     A.  Well, other things occurred on that date.
17     Q.  On what date?
18     A.  On this February 1, 2013 day.  And so for
19 instance, Raymond James downgraded SandRidge Trust II at
20 least.  I believe there was some discussion of SandRidge
21 Trust I.  The point being that these individuals
22 presumably updated their models based on whatever
23 additional information or updating they had done and so
24 that was new information.
25     Q.  But was it fraud-related?

Page 156

1      A.  Well, to the extent that it dealt with the firm's
2  profitability as a result of the mix of oil and gas.
3      Q.  But wasn't that disclosed months earlier on
4  November 2 of 2012?
5      A.  That -- it was disclosed, but the interpretation
6  by Raymond James was not disclosed on that date.
7      Q.  How could Trust I have known Raymond James or any
8  other person's interpretation of their news three months
9  later...
10     A.  I'm sorry, what?
11     Q.  I'll move on.  What new fraud-related news was
12 disclosed on January 31, 2013 about Trust II?
13     A.  An interpretation or an update by Raymond James
14 was undertaken on that date or at least reported on that
15 date.
16     Q.  Did --
17     A.  So I mean --
18     Q.  -- Raymond James reveal part of the fraud that
19 wasn't revealed on November 9?
20     A.  It could reveal an effect of the fraud.
21     Q.  For how long should we expect to see the effect
22 of the fraud?  Each quarter when an analyst downgrades the
23 stock?  Is that an effect of the fraud?
24     A.  No, not necessarily.
25     Q.  So how do we decide -- how do you decide what's

Page 157

1  an effect of the fraud and what's not?
2      A.  To the extent we're talking about events that are
3  outside of the class period, I'm just dealing with issues
4  that are related to the fraud.  So for instance, if I'm
5  going to do a damage analysis, I won't be looking at these
6  dates presumably unless they are being treated as
7  corrective disclosures.  And in that case I will look at
8  those dates with regards to loss causation.
9      Q.  What I'm trying to understand is why you're
10 looking at a disclosure on January 31, 2013 when you have
11 disclosures within the class period on November 2012 that
12 relate to these exact issues?
13     A.  Because it possibly represents an upgrading or an
14 updating of investor information based on the information
15 that's released on those dates.
16     Q.  How do we know when the updating of the
17 information ceases?
18     A.  I think we'd have to take that on a case-by-case
19 basis and so I'd need to think about it as I sit here
20 today.
21     Q.  How do you know that Raymond James is related --
22 Raymond James is reacting to fraud-related news or
23 allegation-related news as opposed to simple performance?
24     A.  Well, you're now distinguish -- I guess I don't
25 quite understand the distinction you're making.  Because



Page 162

1 to resume growth on a material basis."
2 Q. So, again, I'll ask you which of that -- what
3 portion of that information is new company-specific
4 information related to the allegations of fraud?
5 A. RBC's opinion is new.
6 Q. RBC's -- only RBC's opinion is new? They're
7 basing that upon disclosed facts.
8 A. They are expressing what appears to be a new
9 opinion for them.
10 Q. How is their opinion related to the fraud?
11 A. Well, their opinion might inform people's
12 understanding of how the wells are performing. Look, you
13 keep going back to this idea of fraud. And maybe I was
14 inarticulate in my statement -- my original statement of
15 what I performed. I performed an event study looking at
16 four days that -- yes. "I reviewed news events during the
17 class period on which new information related to quantity
18 and mix of oil and natural gas in the underlying
19 properties for the SandRidge Trust I or SandRidge Trust II
20 was released, including announcements from the Trust and
21 the Trustor, SandRidge Energy."
22 Q. And we discussed earlier that "the appropriate
23 candidate events for inclusion in a market efficiency
24 event study are events on which company specific
25 information was released that is new, unexpected, not

Page 163

1 confounded by major countervailing news, and is of such
2 import as to reasonably be expected to elicit a stock
3 price reaction over the threshold for statistical
4 significance," correct?
5 A. That is what my report states.
6 Q. What portion of the RBC disclosure was
7 unexpected?
8 A. Their opinion with regards to the mix of oil and
9 gas and its impact on the trust.
10 Q. How do you know it was unexpected that an analyst
11 would downgrade the trust units after they disclosed
12 disappointing results and a declining dividend?
13 A. Well, implicit in the downgrade is an updating of
14 their model.
15 Q. Did the market not expect that the models would
16 be downgraded or revised following new information
17 disclosed by SandRidge Trust I?
18 A. Well, see you're now asking a question about
19 perfect foresight. And so to the extent that takes time
20 for information to be digested and in this case these
21 individuals, these analysts, in this case RBC, updated
22 their models based on this information, that was then
23 conveyed to the market and the market found that to be
24 news.
25 Q. And does that mean that the market didn't fully

Page 164

1 appreciate the price impact of the disclosures on November
2 9 or January 31?
3 A. So you need to make a distinction between price
4 impact and a proper price impact. And what I mean by that
5 is the market can update its beliefs about a stock or, in
6 this case, units based on the news release at the time,
7 but until they fully understand or have a full
8 comprehension of what that news is and how it might affect
9 the company, they might later change their analysis.
10 So, for instance, in this example -- and, again,
11 I don't believe RBC initially downgraded the company when
12 these announcements came out. All right? So it took RBC
13 time to distillate or analyze the news that they were
14 given, update their models, which are not known by the
15 market, and issue a new opinion. You seem to think that
16 those two things are separate, but they're not.
17 Q. Your opinion is that the market price for Trust I
18 and Trust II units is impacted by analyst opinions,
19 correct?
20 A. It certainly can be influenced by analyst
21 opinions.
22 Q. How many analyst opinions did you evaluate for
23 the purpose of conducting your event study?
24 A. As I sit here, I don't recall.
25 Q. Do you recall how many event -- analyst opinions

Page 165

1 were issued during the class period on Trust I or
2 Trust II?
3 A. During the class period?
4 Q. Mm-hm.
5 A. I don't recall.
6 Q. Do you recall how many were issued after the
7 class period?
8 A. I don't recall.
9 Q. Do you recall any time an analyst downgraded
10 Trust I securities prior to RBC declining -- downgrading
11 Trust I securities?
12 A. And we're talking about the downgrade on February
13 6, correct?
14 Q. Yeah, prior to RBC downgrading on February 6, had
15 any other analysts downgraded Trust I or Trust II
16 securities?
17 A. Now we're talking about both Trust I or Trust II?
18 Q. Or we can focus on Trust I if you like. I think
19 my first question was just about Trust I. You're right.
20 A. As I sit here today, I don't recall any
21 downgrades by analysts of Trust I from the end of the
22 class period to February 6, 2013.
23 Q. How about during the class period?
24 A. As I sit here today, I don't recall.
25 Q. Go to your last date March 5, 2013 which is

Page 182

1      THE COURT REPORTER:  Yeah, one more time.
2      THE WITNESS:  Oh, you need it?
3      THE COURT REPORTER:  Yeah, I got snarled.
4  BY MR. WORD:
5      Q.  Are you aware of any studies or literature
6  describing the expected ratio of statistically significant
7  abnormal return on news days to non-news days for
8  companies to determine whether they operate in an
9  efficient market?
10     A.  I believe there are two studies I cite in this
11 paper.  The one is "The Less Than Efficient Capital Market
12 Hypothesis:  Requiring More Proof From Plaintiffs in
13 Fraud-on-the Market Cases."
14     Where is the other cite?  Maybe it's earlier.
15 Ah, here we go.  So the paper I cited before, there's
16 another paper, "The Use and Misuse of Event Studies to
17 Examine Market Efficiency" by David Tabak which is a Nera
18 White Paper.  And then "The Curious Incident of the Dog
19 that Didn't Bark and Establishing Cause-and-Affect
20 Analysis in Class Action Securities" by Michael Hartzmark
21 and Nejat Seyhun in the Virginia Law and Business Review.
22     And then there's a series of court cases cited in
23 which they -- this type of analysis has been accepted,
24 which I'm happy to read off as well.  But in terms of
25 academic literature, there might be additional academic

Page 183

1  literature, but that would be three such examples.
2      Q.  Okay.  Why don't we take a break?
3      THE VIDEOGRAPHER:  We are now going off the
4  record, and the time is 3:08 p.m.
5      (Recess taken.)
6      THE VIDEOGRAPHER:  We are now going back on the
7  record, and the time is 3:21 p.m.
8  BY MR. WORD:
9      Q.  For your news and no-news day test, you included
10 as news days disclosures by Sandridge Energy, correct?
11     A.  I'm sorry.  What page are you looking at?
12     Q.  Let's say paragraph 119.
13     A.  Paragraph 119.  That was one of the things I
14 looked at, correct.
15     Q.  And directing your attention to footnote 149.
16 You describe why SandRidge Energy earnings announcements
17 would be of particular importance to unitholders of
18 SandRidge Trust I and SandRidge Trust II.  Do you see
19 that?
20     A.  I do.
21     Q.  What is the basis for your conclusion in that
22 footnote?
23     A.  Without going through all the SandRidge Energy
24 disclosures, I believe they discuss the unit trusts in
25 their SEC -- in some of their SEC filings.

Page 184

1      Q.  And how do they discuss the trusts?
2      A.  As I sit here, I don't recall.
3      Q.  Are you aware of any SandRidge Energy earnings
4  announcements that concern the production of Trust I or
5  Trust II wells?
6      A.  As I sit here today, I don't know the answer to
7  that question.
8      Q.  Did you also include SandRidge Energy analyst
9  calls as news days or just the earnings releases?
10     A.  I'm sorry.  What was that question?
11     (The record was read back by the reporter as
12     follows:  "QUESTION:  Did you also include
13     SandRidge Energy analyst calls as news days or
14     just the earnings releases?")
15     THE WITNESS:  Analyst calls meaning calls on
16 which analysts were -- like Sandridge was doing an
17 earnings announcement and there were analysts on the phone
18 call?
19 BY MR. WORD:
20     Q.  Correct.  Let's just call them earnings calls.
21     A.  I mean, I did look at conference calls so to some
22 extent I suppose analysts were on on those conference
23 calls.
24     Q.  So you identified Trust I and Trust II conference
25 calls as news days.  But you list only SandRidge Energy

Page 185

1  earnings releases.  I'm wondering why you excluded
2  conference calls there, if you did?
3      A.  As I sit here, I don't recall.  I believe --
4  well, I just don't recall as I sit here.
5      Q.  Paragraph 125, you state there that there are 19
6  days during the class period -- that's for Trust I --
7  which you identified as news days, correct?
8      A.  Well, I don't identify them as news days.  They
9  meet my criterion for news days or my definition of news
10 days.
11     Q.  I'm just reading the words you wrote.  "The class
12 period which I identified as news days."
13     A.  Oh, okay.  So I guess I'm just trying to be more
14 precise.
15     Q.  Okay.  So you identified a criteria for what
16 constituted a news day and then looked at the news days.
17 And if it met your criteria, you identified that as a news
18 day for purposes of your news/non-news day test?
19     A.  Correct.
20     Q.  And you identified in this paragraph 19 such
21 days, right?
22     A.  For?
23     Q.  Trust I.
24     A.  Trust I, correct.
25     Q.  Am I correct that Exhibit 7A reflects the



Page 234

1    not specifically with regards to trust units that I
2    recall.
3        Q.   And I may have already asked you.  Do you recall
4    as you sit here whether you've ever done an event study in
5    connection with a trust unit?
6        A.   As I sit here today, I don't recall.  I believe
7    the answer is no, but I don't recall.
8        Q.   And do you recall whether as you sit here today
9    you've ever done a -- ever written a paper or done a
10   presentation related to the market efficiency in
11   connection -- related to market efficiency in connection
12   with trust units?
13       A.   So I believe in your statement you used the word
14   "presentation."
15       Q.   Correct.
16       A.   What do you mean by presentation?
17       Q.   Well, you've got a section -- I thought
18   perhaps it was -- oh, yeah, you do.  You have a section in
19   Exhibit 1, your C.V., entitled Presentations.
20       A.   Ah.
21       Q.   So that's how I use the word.
22       A.   I believe the answer to that is no.
23       Q.   Do you recall ever performing any type of event
24   study or market efficiency analysis where the issuer of
25   the stock or unit that was at issue represented publicly

Page 235

1    that the stock price and dividends would decline over
2    time?
3        A.   As I sit here, I don't recall.
4        Q.   How many -- back to general questions.  I
5    apologize for jumping around.
6        How many depositions have you given before?
7        A.   Do you mean depositions in securities class
8    actions?
9        Q.   Securities class action.  Thanks for the
10   qualification on that.
11       THE VIDEOGRAPHER:  Got to go off.
12       THE COURT REPORTER:  Got to go off.
13       THE VIDEOGRAPHER:  Sorry.
14       MR. BENESH:  That's okay.
15       (Recess taken.)
16   BY MR. BENESH:
17       Q.   Again, the question is how many times have you
18   provided deposition testimony in connection with
19   securities cases?
20       A.   With regards to market efficiency --
21       Q.   Yes, sir.
22       A.   -- in a securities class action, at least 11.
23       Q.   And how many of those 11 depositions were you
24   retained by the plaintiffs in those lawsuits?
25       A.   I believe all of them.

Page 236

1       Q.   How many times have you rendered trial testimony
2    in connection with securities class actions on the market
3    efficiency topic?
4       A.   Trial testimony on market efficiency?  None.
5       Q.   If a -- if as part of your analysis a
6    statistically significant abnormal return on non-news days
7    occurs more than 5 percent of the time, does that suggest
8    to you that the event study either may be flawed or that
9    the market is not efficient?
10       A.   It's an incomplete hypothetical.  I'd need to
11   know a lot more about what type of things we're looking
12   at.
13       Q.   You would need to examine why the SSAR was
14   occurring more than 5 percent of the time on non-news days
15   to come to a conclusion as to why that was occurring?
16       A.   Maybe I'm -- maybe it's the end of a long day.
17   When you say SSAR you mean --
18       Q.   Statistically significant abnormal return.
19       A.   -- statistically significant abnormal return.
20       Q.   Correct.
21       A.   Sorry.  I didn't mean to interrupt you.
22        Could you repeat the question, please.
23        MR. ROSEN:  Objection.  I mean, he says it's an
24   incomplete hypothetical.  You're asking him to speculate
25   without any data.  You got to give him some data.

Page 237

1       MR. BENESH:  Read the question back, please.
2       THE COURT REPORTER:  You guys were going back and
3    forth a bit.
4       MR. BENESH:  You want me to clean it up a little
5    bit for you?
6       THE COURT REPORTER:  I mean, the one where you
7    were asking "you would need to examine why the SSAR was
8    occurring more than 5 percent of the time as to why that
9    was occurring?"
10       MR. BENESH:  Yeah, let me clean it up.
11   BY MR. BENESH:
12       Q.   If a SSAR occurs on non-news days more than
13   5 percent of the time, is it your testimony that you
14   wouldn't be able to conclude either that the event study
15   might be flawed or that the market is not efficient
16   without further examination of the issue?
17       MR. ROSEN:  Objection.  Calls for speculation.
18   Incomplete hypothetical.  You say "more than."  How much
19   more than?
20   BY MR. BENESH:
21       Q.   You may answer.
22       MR. ROSEN:  You have to be more specific.
23       THE WITNESS:  My testimony is that it is an
24   incomplete hypothetical and as such, I can't answer it.
25       MR. BENESH:  Fair enough.  And with that, I pass