# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DUANE & VIRGINIA LANIER TRUST, Individually and On Behalf of All Others Similarly Situated,<br><br>    Plaintiffs,<br><br>v.<br><br>SANDRIDGE MISSISSIPPIAN TRUST I, SANDRIDGE MISSISSIPPIAN TRUST II, TOM L. WARD, JAMES D. BENNETT, MATTHEW K. GRUBB, RANDALL D. COOLEY, JIM J. BREWER, EVERETT R. DOBSON, WILLIAM A. GILLILAND, DANIEL W. JORDAN, ROY T. OLIVER, JR., JEFFREY S. SEROTA, D. DWIGHT SCOTT, RAYMOND JAMES & ASSOCIATES, INC., MORGAN STANLEY & CO. LLC (F/K/A MORGAN STANLEY & CO INC.), MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., CITIGROUP GLOBAL MARKETS INC., and RBC CAPITAL MARKETS, LLC,<br><br>    Defendants.<br><br>SANDRIDGE ENERGY, INC.,<br><br>    Nominal Defendant. | **Civil Action No. 15-cv-00634-SLP**<br><br>**CLASS ACTION**<br><br>**[REDACTED] PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL** |

# <u>TABLE OF CONTENTS</u>

**Page**

I.    INTRODUCTION ............................................................................................ 1

II.   FACTS AND BACKGROUND ...................................................................... 3

    A.    Facts of the Case .................................................................................. 3

    B.    Defendants Impose Search Terms and Custodians ........................... 6

    C.    Relief Requested By This Motion ...................................................... 7

    D.    Defendants Have Employed Very Few Custodians and Omitted
          Custodians Likely To Possess Relevant Information .................................. 8

III.  ARGUMENT ............................................................................................... 13

    A.    Standard ............................................................................................ 13

    B.    Defendants May Not Refuse To Cooperate With Plaintiffs As They
          Have Done ........................................................................................ 14

    C.    Defendants Should Be Directed To Employ Additional Custodians .......... 15

    D.    The Court Should Order Defendants To Employ Additional Search
          Terms ................................................................................................ 18

    E.    Plaintiffs' Requests are Proportional to the Needs of the Case ................. 21

          1.    The Discovery Is Important to Resolving the Issues ...................... 21

          2.    The Amount in Controversy Exceeds $400 million ........................ 21

          3.    SandRidge Has $75 Million of Insurance Coverage ...................... 22

          4.    SandRidge Has Far Superior Access to Information ...................... 22

          5.    Because Defendants Have Refused to Quantify the Burden
               Imposed by Plaintiffs' Request, the Court Should Not Hear
               Any Complaints of Burdensomeness ............................................... 23

    F.    Defendants Should Be Ordered to Produce Documents From the
          Period of November 2012-December 2013 ................................................ 26

    G.    The Court Should Order the Parties To Meet and Confer Should
          Further Issues Arise .......................................................................... 29

IV.  CONCLUSION ........................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AG Equip. Co. v. AIG Life Ins. Co.*,
No. 07-CV-556-CVE-PJC, 2008 WL 5205192 (N.D. Okla. Dec. 10, 2008) .............. 13

*Agerbrink v. Model Serv. LLC*,
No. 14CIV7841JPOJCF, 2017 WL 933095 (S.D.N.Y. Mar. 8, 2017) ........................ 23

*Cartel Asset Mgmt. v. Ocwen Fin. Corp.*,
No. 01-CV-01644-REB-CBS, 2010 WL 502721 (D. Colo. Feb. 8, 2010)................. 29

*First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*,
No. 2:15-cv-00229, 2016 WL 3129139 (D. Utah June 2, 2016) ................................ 15

*Fosbre v. Las Vegas Sands Corp.*,
No. 210CV00765APGGWF, 2016 WL 54202 (D. Nev. Jan. 5, 2016) ................ 15, 17

*High Point SARL v. Sprint Nextel Corp.*,
No. 09–2269, 2012 WL 234024 (D. Kan. Jan. 25, 2012)........................................... 14

*In re Am. Apparel, Inc. S'holder Litig..,*
No. CV1006352MMMJCGX, 2014 WL 10212865 (C.D. Cal. July 28, 2014)........... 24

*In re Facebook PPC Advert. Litig.*,
No. C09-03043 JF HRL, 2011 WL 1324516 (N.D. Cal. Apr. 6, 2011) ..................... 29

*In re Giant Interactive Grp., Inc. Sec. Litig.*,
279 F.R.D. 151 (S.D.N.Y. 2011) ........................................................................ 24, 25

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014) ................................................................................... 16

*In re Seroquel Prod. Liab. Litig.*,
244 F.R.D. 650 (M.D. Fla. 2007)........................................................................ 14, 18

*In re Toyota Motor Corp. Sec. Litig.*,
No. CV 10-922 DSF AJWX, 2012 WL 3791716 (C.D. Cal. Mar. 12, 2012) ....... 16, 17

*Johnson v. Kraft Foods N. Am., Inc.*,
238 F.R.D. 648 (D. Kan. 2006)................................................................................ 29

*Metzger v. Am. Fid. Assur. Co.*,
No. CIV-05-1387-M, 2006 WL 3097178 (W.D. Okla. Oct. 31, 2006) ...................... 23

*Shenwick v. Twitter, Inc.*,
No. 16-CV-05314-JST (SK), 2018 WL 833085 (N.D. Cal. Feb. 7, 2018)............ 15, 17

*Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*,
No. 11-2684-JWL, 2014 WL 1794552 (D. Kan. May 6, 2014) ................................. 25

*State Farm Mut. Auto. Ins. Co. v. Fayda*,
   No. 14CIV9792WHPJCF, 2015 WL 7871037 (S.D.N.Y. Dec. 3, 2015) .................... 13

*United States v. New Mexico State Univ.*,
   No. 1:16-CV-00911-JAP-LF, 2017 WL 4386358 (D.N.M. Sept. 29, 2017) .............. 15

*UnitedHealthcare of Fla., Inc. v. Am. Renal Assocs. LLC*,
   No. 16-CV-81180, 2017 WL 4785457 (S.D. Fla. Oct. 20, 2017) .............................. 14

*W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
   No. CV 13-1686 (JRT/FLN), 2017 WL 9325026 (D. Minn. Oct. 12, 2017) ............. 16

*William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*,
   256 F.R.D. 134 (S.D.N.Y. 2009) ................................................................................ 14

**Rules**

Fed. R. Civ. P. 26(b)(1) ..................................................................................... 13, 21

Fed. R. Civ. P. 34 .................................................................................................... 13

Fed. R. Civ. P. 34(a)(1) ............................................................................................ 6

## I.   INTRODUCTION

Plaintiffs do not bring this motion lightly.[1] To date, the Parties have been able to resolve most of their discovery disputes, including negotiating a protective order, a stipulation concerning Electronically Stored Information, and several sets of requests for production of documents and interrogatories. Plaintiffs have also resolved discovery disputes with several third parties.

Defendants SandRidge Energy, Inc. ("SandRidge"), Grubb, and Bennett (referred to herein, for simplicity, as "Defendants")[2], however, have taken several non-negotiable positions that threaten to impair Plaintiffs' ability to prepare this case for trial. In response to Plaintiffs' document requests, Defendants collected documents from certain employees of SandRidge, i.e., "custodians." Defendants then applied search terms, also called key words, to these documents, and reviewed only those documents that contained the search terms. While Plaintiffs do not object to Defendants' approach of using custodians and search terms, Defendants have unreasonably and improperly limited the number of custodians from whom they requested documents, and the scope of their search of these documents. Plaintiffs have proposed additional custodians and search terms, but Defendants have outright rejected Plaintiffs' reasonable proposals and have

---

[1] Plaintiffs are Lead Plaintiffs Ivan Nibur, Jase Luna, Matthew Willenbucher, and the Duane & Virginia Lanier Trust, and Movants Deborah Rath and Reed Romine.

[2] This motion does not address Defendants Ward and SandRidge Mississippian Trust I, who have not raised the same issues.

refused to even apprise Plaintiffs of the purported burden such additional searches may impose.

**Custodians**. The Relevant Period spans nearly two and a half years — July 2010 to December 2013 — during which time SandRidge had anywhere from 2,000-2,500 employees at any given time. Of these, Defendants have selected a mere eight custodians, even though in similar class actions, defendants typically employ a minimum of 20-30 custodians. Plaintiffs have identified additional custodians who may possess relevant documents. Defendants responded that these new custodians' only potentially relevant documents are communications with Defendants, because other communications would not be probative of Defendants' scienter. Defendants ignore that these new custodians' documents might be relevant to other elements of Plaintiffs' cause of action, and might be relevant to Defendants' scienter, too, if for example the additional custodians' documents show that the facts rendering Defendants' statements false were widely known throughout the company or communicated to Defendants orally.

**Search terms**. Because Defendants have employed overly specific search terms, many relevant documents may never be reviewed for production. For example, almost all of Defendants' search terms consist either of specific technical terms or strings in quotation marks. Should the documents simply change word ordering – for example, referring to the "scheduling of drilling" rather than the "drilling schedule" – then the document, even if critical to Plaintiffs' case, will never be reviewed for production.

**Time Period for Production**. Defendants have refused to produce documents from the end of the Class Period on November 8, 2012, through to December 31, 2013,

unless they "relate to class period events or conditions". This vague definition would allow Defendants to avoid producing relevant, even critical documents, based on restrictions that do not appear in the Federal Rules of Civil Procedure. And as set out below, even without discovery, it is apparent that there are several examples of post-Class Period issues that the attorneys conducting Defendants' document review may interpret as not "relat[ing] to class period events or conditions."

The Court should order Defendants to run the additional search terms and custodians set out in Exhibit 1 to the Declaration of Jonathan Horne ("Horne Dec."), filed herewith. The Court should also order Defendants to produce all relevant documents from the period of November 8, 2012 through to December 31, 2013.

## II.   FACTS AND BACKGROUND

### A.   *Facts of the Case*

This is a securities class action brought on behalf of investors in two Trusts sponsored by SandRidge — SandRidge Mississippian Trust I (referred to below as "Trust I", or by its ticker symbol, "SDT") and SandRidge Mississippian Trust II ("Trust II", or "SDR"). The Trusts own royalty interests in oil and gas wells operated by SandRidge in a geological formation in Oklahoma and Kansas known as the Mississippian Formation. ¶4.[3] The royalty interests entitle the Trusts to a percentage of the revenue generated by the sale of oil and gas produced by those wells. *Id.* ████████████████████

---

[3] References to "¶__" are to paragraphs of Plaintiffs' Consolidated Amended Complaint for Violations of the Federal Securities Laws (dkt. # 78, "Complaint").

██████████████████████ Ex. 2, at SD-SECURITIES-0338738.[4] Because the royalty interests were projected to generate substantial distributions, the Trusts primarily attracted investors such as retirees looking for a stable income stream. Those initial public offerings together generated over $900 million in proceeds for SandRidge, which were primarily used to finance its ballooning capital expenditures. ¶¶14, 24.

Trust I's IPO filings represented that the geology of the Mississippian Formation was "well understood" and predictable. ¶¶8, 10. By highlighting the predictability of the formation, and therefore of the Trusts' receipts, SandRidge appealed to their target demographic, whose primary interest was preserving their existing capital. ████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████ Ex. 3, at SD-SECURITIES-0056857.

Trust I's IPO filings also projected that oil sales would represent the bulk of the revenue generated by the wells due to the premium price commanded by oil. ¶120. The wells' gas-to-oil ratio was thus important information to investors. However, it was clear that actual oil production from the wells was not meeting projections. ¶16. These poor results threatened to derail the $600 million IPO of Trust II planned for April 2012, which depended on the success of the Trust I IPO. ¶23. To conceal the weak oil production and ensure the success of the Trust II IPO, Defendants accelerated the drilling

---

[4] References to "Ex. __" are to the exhibits attached to the Horne Dec.

of the Trust I wells, thereby masking the poor oil production on an individual well basis by increasing aggregate oil production across a greater number of wells. ¶18. Additionally, in a series of conference calls with analysts in 2011 and early 2012, Defendants made several false and misleading statements, and omitted certain material facts, concerning the poor oil production of the Trust I wells. ¶¶307-329. In doing so, Defendants artificially inflated the price of the Trust I units, allowing SandRidge to complete the Trust II IPO, and sell most of the Trust I units it held.

A series of corrective disclosures beginning on November 9, 2012 leaked the truth to the market and removed the artificial inflation from the price of the Trust I units. First, SandRidge disclosed that its wells in the Mississippian Formation held far less oil than Defendants had previously led the market to believe. ¶25. Second, in their quarterly reports following SandRidge's admission, the Trusts each reported dismal results due to poor oil production. ¶26. Third, a series of analysts employed by the firms that had underwritten the Trusts' IPOs reduced their price targets for the Trust units – an exceptionally bad sign. ¶¶27-29. These corrective disclosures caused Trust I and Trust II unit prices to fall by $8.23 and $8.26, respectively. *Id.*

████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████ ¶¶63-70, 72; Ex. 4; Ex. 5, at SD-SECURITIES-0433232; Ex. 6, at SD-SECURITIES-0435285; Ex. 7; Ex. 8, at SD-SECURITIES-0030186. ████████████████████████████████████

███████████████████████████████████████████

███████████████████ Ex. 7; Ex. 9.

In ruling that the Complaint had stated a claim under the high standard imposed by the Private Securities Litigation Reform Act (the "PSLRA"), Judge Miles-LaGrange found that regular high-level meetings at which production was discussed like the Monthly Update Meetings were probative of scienter. Order Denying Motion to Dismiss, dkt. # 130, at 8-9. ████████████████████████████

████████████████ Ex. 10.

B.    *Defendants Impose Search Terms and Custodians*

The Federal Rules of Civil Procedure obligate parties to locate and produce documents that are within their possession, custody or control in response to Requests for Production. Fed. R. Civ. P. 34(a)(1). To locate relevant documents, Defendants employed a custodian/search term method. Defendants first collected documents from certain SandRidge employees, called custodians. Defendants then employed search terms to identify the documents from these custodians that they would review production. Thus, documents that are not in the possession the selected custodians, or documents produced by the custodians that do not contain Defendants' search terms, would never be reviewed for production, and Plaintiffs would never learn of their existence. It is thus crucial to carefully select custodians and search terms.

On April 5, 2018, after lengthy negotiations over the terms of an ESI Stipulation, Defendants circulated a list of proposed custodians and search terms. Horne Dec. ¶ 3. Defendants' list included eight custodians, as well as limited search terms. *Id.* One week

6

later, Plaintiffs circulated additional search terms and custodians identified by position. *Id.* Three weeks later, Defendants responded, agreeing to run a small fraction of the additional search terms proposed by Plaintiffs, but refusing to employ any additional custodians. *Id.*

On May 1, Defendants made their first production of documents. Horne Dec. ¶ 4.

On May 9, Plaintiffs requested that Defendants run additional search terms, and two days later identified specific additional custodians by name, substantiating their request with particularized information about each custodian drawn from Defendants' May 1 production and elsewhere. Horne Dec. ¶ 5.

By letter dated May 21, 2018, and in a conference taking place on June 4, 2018, Defendants categorically refused to add a single additional custodian. Horne Dec. ¶ 6. While Defendants agreed to run a small fraction of the additional search terms Plaintiffs suggested, they have now stated that they will not run any additional search terms beyond these limited terms. *Id.* The Court's assistance is therefore necessary.

C.    *Relief Requested By This Motion*

By this Motion, Plaintiffs on order compelling Defendants to: (a) obtain and review documents from additional custodians; (b) employ additional search terms, on both the new and old custodians, to find further relevant documents for review; and (c) produce documents from the period of November 2012-December 2013 if they are relevant.

D.    *Defendants Have Employed Very Few Custodians and Omitted Custodians
Likely To Possess Relevant Information*

During the relevant period of July 2010-December 2013, SandRidge had approximately 2,200-2,500 full-time employees, with significant turnover. Of these employees, Defendants have proposed a mere eight custodians (the "Existing Custodians"). They are:

- Defendants Ward, Bennett, and Grubb

- Rodney Johnson and Lance Galvin, who served as the successive heads of SandRidge's Reservoir Engineering Department for the relevant period, with Rodney Johnson also serving as SandRidge's EVP of Operations.

- Todd Tipton, who served as SandRidge's EVP of Exploration

- Leslie Weiher, who served as SandRidge's Investor Relations Coordinator.

- Kevin White, who served as SandRidge's SVP of Business Development.

Plaintiffs propose 10 new custodians, who are set out below. Including Plaintiffs' custodians would bring the total number of custodians to 18. Plaintiffs' proposed new custodians are:

- **David Lawler**. Mr. Lawler served as SandRidge's Executive Vice President of Operations from August 2011 through April 2013. ██████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

8

███████████████████████████████████ Ex. 4. ████████

███████████████████████ (*id.*), ████████████████████

███████████████████████████████████ Ex. 11. ██████████

██████████████████████████████████████████████████████

███████████ Exs. 5 and 12. ███████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████ Ex. 6, at SD-SECURITIES-

0435285.

- **Michael Brown.** Mr. Brown served as SandRidge's Vice President – Geology,

  Mid-Continent between December 2009 and August 2014, ████████████

  ██████████████████████████████████████████████████████

  ██████████████████████████████████████████████████████

  ████████████████████████████████████████ Ex. 13, at

  SD-SECURITIES-0071852. █████████████████████████████████

  ████████████████████████████████████ Ex. 14, at SD-

  SECURITIES-0045849. ████████████████████████████████████

  ████████████████████ Ex. 15.

- **Rick Kirby**. Mr. Kirby served as VP of Operations until 2012. ███████████

  ████████████████████████████████████████ Mr. Kirby

  "was responsible for a 22 rig horizontal drilling program in the Mississippian

9

Lime."[5] ███████████████████████████████████

███████████████████████████████████████

██████████████████████████████████ Ex. 16,

at  SD-SECURITIES-0052910. ██████████████████████

██████████████ Ex. 14, at SD-SECURITIES-0045849.

- **Rick Hughes**. Mr. Hughes served as Director of Production - Operations from

  2011  through  December  2013, ████████████████████████

  ███████████████████████████████████████

  ██████████████ *See, e.g.*, Ex. 17. ████████████████

  ██████████████████████████ Ex.  18,  at  SD-

  SECURITIES-0037101. ████████████████████████

  Ex. 7.

- **Larry McFarlin**. Mr. McFarlin served as Director of Trust Reporting from July

  2011  through  July  2014, █████████████████████

  ███████████████████████████████████████

  ███████████████████████████████████████

  ███████████████████████████████████████

  ███████████████████████████████████████

  █████████████████████ Ex. 19. ████████████████

---

██████████████████████████████████ Ex. 20. ██████████████████████

████████████████████████████████████████████

- **Kyle Koontz**. Mr. Koontz served as Reservoir Engineering Manager, Miss. Business Unit, from January 2012-August 2012, and Senior Reservoir Engineer, Mississippian Business Unit, from October 2010-January 2012. ████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████ Ex. 7. ██████████████████████

██████████████████████████████████████████████████████████

████████████████████ Ex. 8, at SD-SECURITIES-0030186. ████████████████

██████████████████████████████████████████████ Ex. 21, at

SD-SECURITIES-0233665. █████████████████████████████████████

████████████████████ Ex. 22, ████████████████████████ Ex. 6, at SD-

SECURITIES-0435285.

- **Jennifer Dunn**. Ms. Dunn was SandRidge's Director of Operations Performance and Reporting. ████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████ Ex. 23. ████████████████████████████████████

████████████ Ex. 24, at SD-SECURITIES-0555758. ██████████████████████

████████████ Ex. 7.

- **David Edwards**. Mr. Edwards's title was Business Analyst, ████████████████

██████████████████████████████████████████████████████████

11

███████ *E.g.* Ex. 25. ████████████████████████████████

████████████████████████████████████ Ex. 26. ████████

██████████████████████████████████████████ Ex. 27, at

SD-SECURITIES-0021702.

- **Craig Johnson**. ██████████████████████████████████

████████████████████████████████████ Ex. 28. ████

█████████████████████████████████████████████████

█████████ (*id.*), ██████████████████████ Ex. 29.

█████████████████████████████████████████████████

████████████ Ex. 22. ████████████████████████████

██████████ Ex. 30, at SD-SECURITIES-0081072.

- **Doug Johnson**. Doug Johnson served as SandRidge's Vice President, Geology

  from January 2011 through January 2013. ████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 31,

at SD-SECURITIES-0086889. ████████████████████████

Ex. 7. ████████████████████████████████████

████████████████████████████ Ex. 32, at SD-SECURITIES-0304273.

## III.    ARGUMENT

### A.    *Standard*

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). "Information within this scope of discovery need not be admissible in evidence to be discoverable." *Id.*

A responding party must produce documents in its "possession, custody, or control." Fed. R. Civ. P. 34. While documents must be relevant to a party's claims or defenses to be discoverable, "[a]t the discovery phase of litigation 'relevancy' is broadly construed and a request for discovery should be considered relevant if there is 'any possibility' that the information sought may be relevant to the claim or defense of any party." *AG Equip. Co. v. AIG Life Ins. Co.*, No. 07-CV-556-CVE-PJC, 2008 WL 5205192, at *1 (N.D. Okla. Dec. 10, 2008).[6]

The burden imposed by discovery requests must also be proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). In this case, however, Defendants have improperly refused to provide any indication of the burden imposed by Plaintiffs' requests, taking the position that they need not do so until Plaintiffs have filed a motion to compel. Horne

---

[6] The 2015 amendments to the Federal Rules of Civil Procedure had no impact on the scope of relevance, as noted by the respected Magistrate Judge James Francis. *State Farm Mut. Auto. Ins. Co. v. Fayda*, No. 14CIV9792WHPJCF, 2015 WL 7871037, at *2 (S.D.N.Y. Dec. 3, 2015).

Dec. ¶ 7. In any case, all of the factors employed to assess proportionality - the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit – favor production.

B.   *Defendants May Not Refuse To Cooperate With Plaintiffs As They Have Done*

Courts in the Tenth Circuit as well as around the country recognize that parties must cooperate in completing discovery, including in selecting custodians and search terms. *E.g. High Point SARL v. Sprint Nextel Corp.*, No. 09–2269, 2012 WL 234024, at *5 (D. Kan. Jan. 25, 2012). "Of course, the best solution in the entire area of electronic discovery is cooperation among counsel." *William A. Gross Const. Assocs., Inc. v. Am. Mfrs. Mut. Ins. Co.*, 256 F.R.D. 134, 136 (S.D.N.Y. 2009) (requiring parties' counsel to cooperate in formulating keyword searches for retrieval of ESI during discovery). "[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process." *In re Seroquel Prod. Liab. Litig.*, 244 F.R.D. 650, 662 (M.D. Fla. 2007) (imposing sanctions where "[r]ather than working with Plaintiffs from the outset to reach agreement on appropriate and comprehensive search terms and methods, [Defendant] undertook the task in secret"); *UnitedHealthcare of Fla., Inc. v. Am. Renal Assocs. LLC*, No. 16-CV-81180, 2017 WL 4785457, at *4 (S.D. Fla. Oct. 20, 2017) (quoting *The Federal Judges'*

14

*Guide to Discovery*, Edition 3.0) (noting that parties are expected to cooperate on "the scope of search efforts," including "custodians").

Collaboration with opposing counsel in designating custodians and crafting appropriate search terms is necessary to ensure that the parties arrive at an effective, responsive document production. Indeed, courts in the Tenth Circuit have often required parties to coordinate with opposing counsel in establishing search parameters for ESI. *First Am. Title Ins. Co. v. Nw. Title Ins. Agency, LLC*, No. 2:15-cv-00229, 2016 WL 3129139, at *3 n.32 (D. Utah June 2, 2016) (finding that where search terms were "not subject of any discussions with adverse counsel…Defendants may have started on a course unlikely to fulfill their discovery obligations"). "Cooperation prevents lawyers [from] designing keyword searches … without adequate discussion with each other to determine which words would yield the most responsive results." *United States v. New Mexico State Univ.*, No. 1:16-CV-00911-JAP-LF, 2017 WL 4386358, at *2 (D.N.M. Sept. 29, 2017).

C.    *Defendants Should Be Directed To Employ Additional Custodians*

Plaintiffs propose that Defendants add 10 custodians – a modest number by any measure – which would bring the total number of custodians to a mere 18, or much fewer than in similar securities class actions. *Shenwick v. Twitter, Inc.*, No. 16-CV-05314-JST (SK), 2018 WL 833085, at *2 (N.D. Cal. Feb. 7, 2018) (26 custodians); *Fosbre v. Las Vegas Sands Corp.*, No. 210CV00765APGGWF, 2016 WL 54202, at *6 (D. Nev. Jan. 5,

2016) (29 custodians).[7] Plaintiffs have requested that Defendants employ further custodians; rather than referring to the reasons that Plaintiffs provided, Defendants maintained, instead, that non-Defendant employees' documents are only relevant to the extent they are communications with Defendants. Based on this reasoning, Defendants have categorically refused to produce any other custodians' documents. Defendants' premise is wrong.[8]

First, every Circuit that has considered the issue except the Fifth and Eleventh have held that the scienter of a corporate defendant's non-party employees may be imputed to it. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 473 (6th Cir. 2014) (analyzing circuit split). Thus, the knowledge of senior SandRidge non-Defendant custodians like the ten proposed new custodians is relevant because their scienter may be imputed to SandRidge.

Second, Plaintiffs must prove not only scienter but also falsity and materiality. A document that reveals that a Defendant's statements are materially false – even if the Defendant did not know of its existence – is plainly relevant to the parties' claims or defenses, because it establishes one element of Plaintiffs' cause of action. *In re Toyota Motor Corp. Sec. Litig.*, No. CV 10-922 DSF AJWX, 2012 WL 3791716, at *9 (C.D.

---

[7] *See also W. Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, No. CV 13-1686 (JRT/FLN), 2017 WL 9325026, at *6 n.2 (D. Minn. Oct. 12, 2017) (42 custodians).

[8] Indeed, Defendants recognize that it is wrong in proposing five non-Defendant custodians.

Cal. Mar. 12, 2012) (discovery must focus not only on scienter but also on material falsity of statements, as well as loss causation and damages).

Third, even documents that bear directly on a defendant's knowledge need not be memorialized in the form of an email to a defendant. For example: an employee might recount in an email not sent to a defendant that the employee orally provided information to a defendant; an employee might keep notes in the employee's files of oral communications with a defendant; or an employee might make statements about what was commonly known or discussed within the company. *See Shenwick*, 2018 WL 833085, at *1 ("one custodian may have created a document, such as handwritten notes, that no other custodian possesses"); *Fosbre*, 2016 WL 54202, at *6 (requiring defendant to use as custodian person who attended meetings with defendant). In this case, many of the proposed custodians attended the regularly-scheduled Monthly Update Meetings with Defendants.

Fourth, Defendants are liable not only for statements that are intentionally false, but also for statements that are recklessly false. Thus, Defendants' failure to appreciate facts that were well known and discussed by all their subordinates may make them liable under the securities laws. *Toyota*, 2012 WL 3791716, at *12 (discovery from lower-level employees can lead to discovery of circumstantial evidence of defendants' scienter and can test whether defendants "remained blissfully unaware of mounting [problems].")

And fifth, "[i]t is always possible that one custodian will have a document or documents that other custodians have not retained." *Shenwick*, 2018 WL 833085, at *1.

17

D.      *The Court Should Order Defendants To Employ Additional Search Terms*

When conducting a search for relevant documents, the producing party may initially narrow the universe of documents by applying search terms. Documents that do not contain the search terms will never be reviewed for production, even if they are, in fact, critical. "[W]hile key word searching is a recognized method to winnow relevant documents from large repositories, use of this technique must be a cooperative and informed process." *Seroquel*, 244 F.R.D. at 662.

The search terms Defendants have run are included in Exhibit 1 to the Horne Declaration. These search terms will likely miss many critical documents. This is in part because when addressing concepts involving multiple words, Defendants have placed the words in quotation marks rather than employing a more flexible method. Thus, for example, the search terms will miss documents that discuss the "schedule of drilling" rather than the "drilling schedule", "proven undeveloped" [9] (rather than "proved developed") reserves, "depletion of reservoirs" rather than "reservoir depletion", or simply refers to the "Trusts" or "RT" rather than to one specific trust.[10] The search terms will also miss documents that use common alternative spellings, such as referring to a "type-curve" rather than a "type curve", which SandRidge employees frequently did. And

---

[9] The term "proven undeveloped" appears 128 times in Defendants' production, though it is not a search term and would only appear in documents that contain other search terms. For comparison, the search term "proved undeveloped" appears 816 times. Horne Dec. ¶ 9.

[10] *See* Ex. 33 (███████████████████████).

the search terms will miss documents that use common abbreviations, such as "est. ultimate recovery."

In essence, Defendants' search terms will only locate communications if they use the precise and slightly formal phrasing set out in Defendants' search terms. That is simply not how a company's employees correspond internally in email. They use abbreviations. They shorten phrases. They use makeshift phrasing and language. They add unnecessary connecting words. Defendants' search terms will miss all communications in which employees do not choose their words with great care – a substantial proportion of all business communications.

Moreover, there are no search terms concerning critical topics at issue in this case. There are no search terms directly addressing "wells," but only "net wells," "gross wells," or "well performance."[11] Thus, Defendants would never review or produce documents discussing "poorly performing wells," "bad wells", or "poor wells". The search terms Defendants have employed to find documents concerning their motive to sell SDT or SDR units are even more restrictive. Any documents concerning the sales must (a) discuss the security by using the terms either stock* or unit*; AND (b) the discuss the transaction by using the terms sale* or sell*; AND (c) it must **also** discuss the issuer by using search terms RT1, RT2, or Trust II.[12] Any document that does not employ

---

[11] If using the word "well" returns too many documents, there are alternatives, such as combining the term with other limiting terms, that would limit the universe of documents to review.

[12] Moreover, these search terms perversely exclude any documents where custodians refer to the Trusts by their ticker symbols, SDR and SDT.

these three precise formulations will never be reviewed for production – including documents that discussed, at length, "selling RT1", "selling SDT units", or "liquidating our interest in RT1."

Moreover, there are no search terms concerning investor questions, analyst reports, or analyst downgrades. In this case, three of the corrective disclosures were analyst downgrades. ██████████████████████████████████████ ████████████████████████████████████████ Ex. 34. Thus, discussions with analysts are key evidence of both the falsity of SandRidge's estimates and Defendants' knowledge that they were false.

Moreover, many of the search terms Defendants have added seem curiously designed to avoid picking up relevant documents. For example, the Complaint alleges that SandRidge incorporated Chesapeake Wells into the Trust I type curve, and that these wells performed notably better than SandRidge's. Yet Defendants' search terms in connection with Chesapeake include "Trust II" – but ***not*** "Trust I" or "Trust".

Finally, Defendants refused to add reasonable search terms. █████████████ ████████████████████████████████████████ ██████████████████████████ *See, e.g.*, Ex. 35; Ex. 36; Ex. 37, at SD-SECURITIES-0458296.

Plaintiffs' proposed additional search terms are also set out in Exhibit 1 to the Horne Declaration.

E.     *Plaintiffs' Requests are Proportional to the Needs of the Case*

Federal Rule of Civil Procedure 26(b)(1) permits discovery that is "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the discovery outweighs its likely benefit."

### 1.      The Discovery Is Important to Resolving the Issues

Defendants have readily admitted that the information Plaintiffs seek from the 10 additional custodians is important by producing this same information from the eight existing custodians. See section II.D, above. And the search terms Defendants proposed are grossly inadequate. See section III.D, above.

### 2.      The Amount in Controversy Exceeds $400 million

Plaintiffs' expert consultant has created a damages model. Horne Dec. ¶ 10. To create the model, Plaintiffs' expert first obtained relevant period trading data for SDT and SDR securities. Plaintiffs' consultant then applied generally accepted models of trading behavior to determine the proportion of shares that were traded multiple times. By eliminating such duplicative transactions, Plaintiffs' consultant modeled the number of "damaged shares," *i.e.* shares that were traded *during* the Class Period and held during each of the corrective disclosures. Total damages are obtained by multiplying, for each corrective disclosure, the number of damaged shares for that corrective disclosure and the total losses attributable to that corrective disclosure, and then adding the total losses.

Based on this preliminary damages model, Plaintiffs' consultant estimated that total damages for SDT were no less than $106.6 million while total damages for SDR were no less than $175.7 million, for total damages of no less than $282.3 million – a staggering sum. Horne Dec. ¶ 10.

Moreover, any discovery Defendants produce is likely to be of assistance not only in this case, but also in *In re SandRidge Energy, Inc. Sec. Litig.*, 5:12-cv-01341-W (W.D. Okla.) ("*Glitz*") pending before Judge West. Plaintiffs' consultant estimates that damages in that action are more than one hundred million dollars. Horne Dec. ¶ 10.

### 3. SandRidge Has $75 Million of Insurance Coverage

SandRidge's resources are significant. ███████████████████ ████████████████████████████████ Ex. 38. ██████████████ ██████████████████████████████ *Id.* In addition, SandRidge has set aside $25 million of the first $50 million to pay for a settlement in this action and in *Glitz*.[13] Accordingly, SandRidge holds approximately $75 million in coverage for this action and *Glitz*.

### 4. SandRidge Has Far Superior Access to Information

This is a securities class action in which Plaintiffs allege that Defendants misled investors in their public statements. As public investors, Plaintiffs do not have any

---

[13] *See Elliot v. Ward*, 5:13-cv-102-W (W.D. Okla.), dkt. # 301-1, Section 2 (provisions of Stipulation of Settlement for consolidated derivative actions brought on behalf of SandRidge, setting aside $38 million in escrow account for settlement of this action and *Glitz*, less approximately $13 million in attorneys' fees). The remainder of the first $50 million was presumably spent on attorneys' fees in this case, *Glitz*, and *Elliot*.

information beyond what they are able to obtain from public sources, conversations with SandRidge former employees, or discovery from Defendants or third parties. Put simply, this case, like many class actions, is a classic case of information asymmetry. *Agerbrink v. Model Serv. LLC*, No. 14CIV7841JPOJCF, 2017 WL 933095, at *4 (S.D.N.Y. Mar. 8, 2017).

> **5.     Because Defendants Have Refused to Quantify the Burden Imposed by Plaintiffs' Request, the Court Should Not Hear Any Complaints of Burdensomeness**

"Where, as here, a party makes only conclusory allegations of burdensomeness, and provides no detailed explanation, affidavit, or other evidence which demonstrate[s] that providing such information would be burdensome, time-consuming, or expensive, they cannot establish that responding to the discovery request imposes an undue burden." *Metzger v. Am. Fid. Assur. Co.*, No. CIV-05-1387-M, 2006 WL 3097178, at *9 (W.D. Okla. Oct. 31, 2006) (internal quotations omitted).

Plaintiffs have repeatedly requested hit counts for the search terms they proposed. Horne Dec. ¶ 7. Defendants have refused to provide an estimate of burden, or even hit counts for Plaintiffs' proposed search terms, having taken the position that they will not provide an estimate of the burden imposed by Plaintiffs' requests until Plaintiffs file a motion to compel. *Id.* Plaintiffs will thus learn of the burden purportedly imposed by their request at the same time as the Court, and will respond to Defendants' claims in their reply brief. Moreover, the ESI Stipulations the parties proposed (until the last one suggested by Defendants) contemplated the use of technology-assisted review. There is

no reason Defendants could not use such techniques to significantly reduce the costs of review.

The only fact Defendants have stated in support of their overbreadth claims is the number of pages in their existing production – 730,000. Horne Dec. ¶ 7. But that number of pages, in context, is not especially significant. First, damages in this case are more than $280 million, and there is more than $100 million in additional damages from the *Glitz* action. See section III.E.2, above. A production of 730,000 pages is by no means exceptional for a class action asserting such high damages. *In re Am. Apparel, Inc. S'holder Litig..*, No. CV1006352MMMJCGX, 2014 WL 10212865, at *3, *12 (C.D. Cal. July 28, 2014) (defendants produced 1.5 million pages in case with slightly more than $10 million in damages); *In re Giant Interactive Grp., Inc. Sec. Litig.*, 279 F.R.D. 151, 161, 162–63 (S.D.N.Y. 2011) (defendants produced 2 million pages in case with less than $100 million in maximum provable damages). And more than half of Defendants' production is from documents that are more than 50 pages long, suggesting that a good part of Defendants' production is simply filler. Horne Dec. ¶ 8.

Moreover, the production at issue here should be much greater than in the typical case. This production addresses document requests issued in two cases[14] brought on behalf of investors in three issuers.[15] During the relevant period, which spans almost three years, there were two initial public offerings that raised more than $900 million.

---

[14] This case and *Glitz*.

[15] SandRidge, Trust I, and Trust II.

24

During the period, SandRidge spent more than $2 billion on capital expenditures in the relevant area, the Mississippian. Yet Defendants have only produced one third as many pages of documents as the defendants in a case accusing an online game company of concealing a practice of gold farming in its IPO documents over a two-week class period with less than one third the damages in this case and *Glitz*. *See Giant Interactive*, 279 F.R.D. at 158.

Moreover, that Defendants might have produced a somewhat significant number of pages of documents does not mean they can ignore sources that will likely contain unique relevant documents. If that were the law, a party might avoid having to search for and produce documents it knows are adverse by producing haystacks of documents it knows are trivial or helpful to its own case.

Finally, Defendants' discovery misconduct weighs against considering their claims of undue burden. Throughout the discovery process, Defendants have refused to heed Plaintiffs' requests, or even explain their production, simply asserting conclusorily that their search has been reasonable. Courts have found such "Defendants know best" objections insufficient to show that a search was adequate. *Sprint Commc'ns Co., L.P. v. Comcast Cable Commc'ns, LLC*, No. 11-2684-JWL, 2014 WL 1794552, at *4 & n.23 (D. Kan. May 6, 2014) (party's statement that its production "has been based on an informed understanding of the facts" gives no weight to claim that production was adequate).

F.     *Defendants Should Be Ordered to Produce Documents From the Period of November 2012-December 2013*

The Federal Rules of Civil Procedure oblige parties to produce, or a Rule 30(b)(6) witness to testify to, information that is relevant to a party's claims or defenses. Defendants propose to restrict this obligation by refusing to produce documents or provide information from the period after November 8, 2012, if those documents or information do not "relate to class period events or conditions." Defendants have not defined "relate," "events", or "conditions." Further, Defendants propose that documents they withhold that purportedly do not relate to class period events or conditions will not be logged. Thus, if these documents are relevant to – or even critical for – Plaintiffs' case, Plaintiffs will never even know they exist.

There are many post-Class Period topics that are relevant to this case. By way of example:

- **Documents concerning the corrective disclosures**. The corrective disclosures alleged in the Complaint all came after the close of the Class Period. Documents concerning the fall in unit price following the corrective disclosures are plainly relevant to the issues of loss causation and damages. Indeed, Plaintiffs anticipate that Defendants will attempt to show that other news released at the same time as the corrective disclosures caused the stock price decline. If Defendants have any information casting doubt on this position – such as internal discussions that a particular confounding

disclosure was immaterial or not new news – Plaintiffs are entitled to see them.

- **Documents concerning SandRidge's March 2013 sharp downward revision of SDT and SDR's oil reserves, and October 2013 disclosures to the SEC concerning the reasons therefor**. On March 15, 2013, SandRidge drastically reduced estimates of SDT and SDR's proved reserves of oil by 52.4% and 52.3%, respectively. ¶¶245-47. Documents concerning this drastic downward revision in oil reserves, including the reasons therefor and facts which caused it, are plainly relevant to Plaintiffs' case since, after the SEC probed the basis for these revisions. ¶¶249-50. Defendants disclosed in October 2013 that substantially all of the drastic reduction in the Trusts' oil reserves "***was attributable to performance revisions for wells that were producing at December 31, 2011*** ... or changes in the Trust's type curve for locations that were undrilled as of December 31, 2011," and "performance of wells drilled in late 2011 and 2012 had indicated ***a higher degree of variability for both oil and gas*** ...." ¶¶251-52. These admissions to the SEC in October 2013 corroborate Plaintiffs' allegations concerning Defendants' prior concealment of poor oil production and lack of geological uniformity in the Mississippian Formation. ¶¶296-309. But it is not clear whether Defendants determined whether the drastic change in oil reserves announced in March 2013 "relate

27

to class period conditions or events" since reserves represent potential recovery going forward.

- **Documents concerning the resignations or terminations of Defendant Ward and Grubb**. Mere weeks after SandRidge's November 2012 announcement that it would reduce its estimates of proven oil reserves, SandRidge investor TPG-Axon launched a campaign to replace SandRidge's board of directors and management. The campaign focused on the recent reduction in estimates of the Mississippian's reserves.[16] The campaign was successful. On March 13, 2013, SandRidge announced that four new TPG-Axon directors would be added to SandRidge's board and that it would either terminate Ward by June 2013 or give TPG-Axon control over the board. The announcement further noted that Grubb had "resigned", effective March 15. Thus, the reduction in estimates that caused Plaintiffs' losses was also the cause of Ward and Grubb's terminations. Documents concerning these terminations are therefore relevant to this action, but would not be produced under Defendants' restrictions because they do not "relate to class period events or conditions."

---

[16] *See* Exhibit 1 to Proxy Statement filed by TPG-Axon on November 30, 2012, available at https://www.sec.gov/Archives/edgar/data/1349436/000090266412001533/p12-1903exhibit1.htm ("Even more importantly, the company provided updated well results for the Mississippian formation. We believe these well results, particularly in light of previous management commentary, were primarily responsible for the severe decline in the stock.").

These issues are apparent without any insider's knowledge of SandRidge. But there are undoubtedly many other issues that arose in 2013, are clearly relevant to this lawsuit, but do not "relate to class period events or conditions." They are hidden in documents Plaintiffs have not seen and, unless the Court grants this motion, will never see. Yet the Sedona Conference has warned that parties cannot exploit an information asymmetry to avoid producing documents that may prove the parties' case.[17] *In re Facebook PPC Advert. Litig.*, No. C09-03043 JF HRL, 2011 WL 1324516, at *1 n.1 (N.D. Cal. Apr. 6, 2011) (quoting *The Case for Cooperation*, 10 Sedona Conf. J. 339, 344-45 (2009)). That is exactly what Defendants are attempting to do here.

G.   *The Court Should Order the Parties To Meet and Confer Should Further Issues Arise*

Finally, though Plaintiffs have reviewed a portion of Defendants' production, the information asymmetry remains. Among other things, Plaintiffs have not been able to take SandRidge's Rule 30(b)(6) deposition and thus determine whether there are additional custodians with relevant information. Accordingly, the Court should order that the Parties meet and confer should further issues arise during the review and deposition stage of this case.

---

[17] The Sedona Conference is a non-profit organization which brings together judges and lawyers to achieve consensus on important issues in litigation, with a particular focus on discovery. *See* About the Sedona Conference, available at https://thesedonaconference.org/. Courts within the Tenth Circuit have endorsed or relied on the Sedona Conference's publications. *Johnson v. Kraft Foods N. Am., Inc.*, 238 F.R.D. 648, 656 (D. Kan. 2006); *Cartel Asset Mgmt. v. Ocwen Fin. Corp.*, No. 01-CV-01644-REB-CBS, 2010 WL 502721, at *13 (D. Colo. Feb. 8, 2010).

## IV.    CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion to Compel as set out above.

Dated: June 20, 2018                              Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Jonathan Horne
Jonathan Horne (Admitted *Pro Hac Vice*)
Phillip Kim (Admitted *Pro Hac Vice*)
Laurence M. Rosen (Admitted *Pro Hac Vice*)
275 Madison Avenue, 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: jhorne@rosenlegal.com
Email: pkim@rosenlegal.com
Email: lrosen@rosenlegal.com

*Lead Counsel for Plaintiffs*

**FARHA LAW, PLLC**
Nicholas G. Farha, OBA #21170
1900 NW Expressway, Suite 501
Oklahoma City, Oklahoma 73118
Telephone: (405) 471-2224
Facsimile:  (405) 810-9901
Email: nick@farhalawfirm.com

*Liaison Counsel for Plaintiffs*

**WOHL & FRUCHTER, LLP**
J. Elazar Fruchter
570 Lexington Avenue, 16th Floor
New York, NY 10022
Telephone: (212) 758-4000
Facsimile: (212) 758-4004
Email: jfruchter@wohlfruchter.com

*Additional Plaintiffs' Counsel*

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of June, 2018, I caused a true and correct copy of the foregoing PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL, to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Jonathan Horne
Jonathan Horne