## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| DUANE & VIRGINIA LANIER TRUST, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. SANDRIDGE ENERGY INC., et al., Defendants. | Case No. CIV-15-00634-SLP |

## MEMORANDUM OF LAW BY NOMINAL DEFENDANT SANDRIDGE ENERGY, INC. AND DEFENDANTS JAMES D. BENNETT AND MATTHEW K. GRUBB IN OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... ii

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION .............................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND .......................................................... 3

      A.      SandRidge Energy, Inc. and the Mississippian Trusts. ........................... 3

      B.      Plaintiffs Sue SandRidge for Insurance Recovery Purposes. ................ 4

      C.      SandRidge Produces 700,000-Plus Pages of Documents While Negotiating Mutually Agreeable Search Parameters with Plaintiffs. ......................... 5

      D.      Plaintiffs Name Additional Custodians and Seek to Justify Additional Search Terms After the Substantial Completion Deadline. ................................. 10

ARGUMENT ................................................................................................................... 11

I.      Plaintiffs' Motion Is Premature and Procedurally Improper. ........................... 11

II.      Plaintiffs Seek Unnecessary and Disproportionate Discovery. ........................ 13

      A.      Plaintiffs Greatly Exaggerate the Potential Damages in this Case. ...... 14

      B.      Adding Ten SandRidge Custodians Is Unlikely to Yield Relevant and Non-Duplicative Documents. ................................................................ 17

      C.      Plaintiffs' Proposed Search Terms are Overbroad and Unnecessary. ................. 20

      D.      SandRidge Produced Relevant Documents Dated in 2013. ................................. 23

CONCLUSION ................................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ....................................................................... 20

*Carbajal v. St. Anthony Cent. Hosp.*,
2014 WL 3746967 (D. Colo. July 30, 2014) ................................................... 13

*Caride v. Kohll*,
2005 WL 1860295 (W.D. Okla. Aug. 3, 2005) ............................................... 12

*China Agritech, Inc. v. Resh*,
138 S. Ct. 1800 (2018) ............................................................................... 3, 15

*City of Philadelphia v. Fleming Cos., Inc.*,
264 F.3d 1245 (10th Cir. 2001) ...................................................................... 17

*D & D Equip. & Supply Co. v. Those Certain Underwriters at Lloyd's London*,
2009 WL 10702874 (W.D. Okla. June 1, 2009) ............................................. 12

*Enslin v. Coca-Cola Co.*,
2016 WL 7042206 (E.D. Pa. June 8, 2016) .................................................... 20

*Entrada v. Marriott Hotel Servs., Inc.*,
2016 WL 5720832 (W.D. Okla. Oct. 3, 2016) ............................................... 13

*Fox v. Noram Energy Corp.*,
198 F.3d 257 (10th Cir. 1999) ........................................................................ 13

*Gilead Scis., Inc. v. Merck & Co.*,
2016 WL 146574 (N.D. Cal. Jan. 13, 2016) ................................................... 14

*Harrington Enters., Inc. v. Safety-Kleen Sys., Inc.*,
2014 WL 12611318 (W.D. Mo. July 11, 2014) ........................................ 19, 23

*In re Omnicare, Inc. Securities Litigation*,
769 F.3d 455 (6th Cir. 2014) .......................................................................... 18

*Lauris v. Novartis AG*,
   2016 WL 7178602 (E.D. Cal. Dec. 8, 2016) ................................................................. 15

*Lonn v. Corizon Health*,
   2016 WL 6433846 (D. Idaho Oct. 27, 2016)................................................................. 14

*Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*,
   314 F.R.D. 304 (S.D. Ind. 2016)................................................................................... 13

*Treppel v. Biovail Corp.*,
   233 F.R.D. 363 (S.D.N.Y. 2006) .................................................................................. 13

*U.S. ex rel. McBride v. Halliburton Co.*,
   272 F.R.D. 235 (D.D.C. 2011)...................................................................................... 19

*United States v. Grose*,
   2014 WL 12687487 (W.D. Okla. Apr. 17, 2014).......................................................... 11

## Rules

Fed. R. Civ. P. 26(b)(1) ......................................................................................... 2, 13, 14, 25

W.D. Okla. Civ. R. 37.1 .................................................................................................. 2, 12

Nominal Defendant SandRidge Energy Inc. ("SandRidge") and Defendants James

D. Bennett and Matthew K. Grubb respectfully submit this memorandum of law in

opposition to Plaintiffs' motion to compel (Dkt. 210).[1]

## INTRODUCTION

Plaintiffs' motion to compel is groundless.  In response to Plaintiffs' document

requests, SandRidge mobilized more than thirty attorneys to review hundreds of

thousands of documents, and produced more than 90,000 documents totaling over

700,000 pages.  SandRidge's production contained both email and non-email files,

including but not limited to databases of production data for every SandRidge, Trust I,

and Trust II well in the Mississippian during the class period; emails of each individual

defendant in this action; emails of the heads of the SandRidge department responsible for

monitoring oil and gas reserves during the class period; and emails of SandRidge

employees responsible for communications with investors.  These substantial efforts have

cost millions of dollars and are more than reasonable, especially since SandRidge is only

named as a nominal defendant in this action.

Now, nearly two months after the Court-ordered May 1, 2018 deadline to

substantially complete document production, Plaintiffs belatedly ask the Court to compel

SandRidge to more than double its efforts by adding 125% more email custodians and

---

[1] Plaintiffs filed this motion against Defendants Grubb and Bennett despite advising on June 4, 2018 that there were no discovery disputes with them. *See* Yeung Decl. ¶ 6.  In addition to being meritless, Plaintiffs' motion against Bennett and Grubb should be denied as futile.  Neither is a SandRidge employee or officer anymore, and neither has access to SandRidge emails for the time period at issue.

1,602 new search terms.  But in support of their motion to compel, Plaintiffs rely on an inaccurate, one-sided version of the discovery record; indeed, Plaintiffs' 38 exhibits contain zero pieces of discovery correspondence exchanged between the parties.

There is a good reason for Plaintiffs' omissions.  Instead of being the result of the flawed, unilaterally imposed search and review process portrayed in Plaintiffs' motion, the written record shows that SandRidge (1) sought to negotiate a reasonable process for exchanging search terms and custodians with Plaintiffs; (2) developed a reasonable list of search terms and custodians with the assistance of its employees while those negotiations were ongoing; (3) provided those search terms and custodian to Plaintiffs for their consideration and input one month before the Court-ordered deadline for substantially completing document production; (4) added nearly 200 search terms at Plaintiffs' request; and (5) produced nearly 700,000 pages of requested documents to Plaintiffs by the substantial completion deadline.  SandRidge's massive production effort was more than "proportional to the needs of the case . . . ."  Fed. R. Civ. P. 26(b)(1).

In addition, the written record shows that Plaintiffs' motion is entirely premature. Nearly all of the relief Plaintiffs seek was never discussed with Defendants during any pre-motion meet and confer, in violation of Local Rule 37.1.  Seven of the ten custodians whose emails Plaintiffs seek to compel were never sought prior to this motion. Moreover, 1,311 of the 1,602 search terms that Plaintiffs seek to compel were not previously proposed.  For this reason alone, Plaintiffs' motion should be denied.

If this Court entertains Plaintiffs' motion, denial would be warranted. SandRidge's custodians and search terms are more than reasonable in light of the needs

of the case.  Tellingly, Plaintiffs fail to identify any categories of documents that are actually missing.  Instead, Plaintiffs speculate that SandRidge's search terms *might* have missed certain documents, without regard to the documents that actually were produced.

Plaintiffs also drastically inflate the purported value of their claims to justify additional search terms and custodians.  As detailed in Defendants' motion for partial judgment on the pleadings (Dkt. 215), the Supreme Court's decision in *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800 (2018), requires the dismissal of all class claims in this action as untimely, which would effectively cap the amount in controversy in this action at approximately $1.2 million — substantially less than the document discovery-related fees that SandRidge has *already* incurred for electronic discovery services and contract and staff attorney review alone.  Plaintiffs' inflated calculations also include an estimated $100 million in damages sought in a *separate* securities action where no search terms or custodians are in dispute.  For these and the other reasons set forth below, Plaintiffs' motion to compel should be denied.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.     SandRidge Energy, Inc. and the Mississippian Trusts.

SandRidge is a publicly traded oil and gas exploration company with properties in the Mississippian formation in Oklahoma and Kansas, and elsewhere in the United States. Dkt. 78 ¶¶ 4; 93.  In 2011 and 2012, SandRidge monetized its interests in certain Mississippian oil and gas properties by conveying them to two royalty trusts — Mississippian Trust I ("Trust I") and Trust II ("Trust II") — which then sold units to investors in public offerings.  *Id.* ¶¶ 100, 177, 214.  Trust I and Trust II are distinct legal

3

entities, and the units each issued are distinct securities that trade separately from each other and from SandRidge common stock. *See id.* ¶¶ 39–40.

On November 8 and 9, 2012, SandRidge made various disclosures, including statements concerning the performance of oil and gas wells in the Mississippian that allegedly revealed that the Mississippian had more low-margin natural gas and less high-margin oil than previously anticipated. *Id.* ¶¶ 227–30.  In the wake of this and other news, the market closing prices of the Mississippian Trust I and II units dropped by 7.4% and 8.5%, respectively, between November 8 and 9, 2012. *Id.* ¶¶ 232–33.

### B.    Plaintiffs Sue SandRidge for Insurance Recovery Purposes.

On June 9, 2015, Plaintiff Lanier Trust commenced this action purporting to assert claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (and Rule 10b-5 promulgated thereunder) ("the Exchange Act Claims") and Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 (the "Securities Act Claims"), both individually and on behalf of a putative class of purchasers of Trust I or Trust II units. *See id.* ¶¶ 1, 2, 6. The Complaint alleged that a fraud had been "revealed to investors and the market" by November 9, 2012, when SandRidge executives disclosed that "Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe." Dkt. 1 ¶¶ 78–80.

On May 16, 2016, SandRidge petitioned for bankruptcy under Chapter 11 of the United States Bankruptcy Code. *See* Dkt. 72.  Under the ensuing bankruptcy court-approved Plan of Reorganization, Plaintiffs' direct claims against SandRidge were extinguished, but Plaintiffs were permitted to name SandRidge as a nominal defendant

"solely to the extent necessary to recover on any claims against [SandRidge] from available remaining coverage under any applicable insurance policy." *See* Dkt. 78 ¶ 38; *see also* Dkt. 74-2.  Accordingly, on November 11, 2016, Plaintiffs filed an amended complaint that reasserted Exchange Act and Securities Act Claims against the individual defendants and added SandRidge as a nominal defendant.  Dkt. 78 ¶ 38.

On January 13, 2017, the Defendants moved to dismiss the Exchange Act and Securities Act Claims.  *See* Dkts. 94, 97, 101–103.  Judge Miles-LaGrange dismissed Plaintiffs' Securities Act Claims, which were based on alleged omissions and misrepresentations in Trust offering documents.  *See* Dkt. 129.  However, the Court denied the motion with respect to certain Exchange Act Claims.  Dkt. 130, Order at 4–5, 8–12.  As a result, the only claims that remain are Exchange Act Claims against Trust I, Bennett, Grubb, and Ward based upon alleged misstatements about oil and gas production in SandRidge and Trust wells located in the Mississippian; and claims against SandRidge, as a nominal defendant, solely to facilitate insurance recovery.

### C.    SandRidge Produces 700,000-Plus Pages of Documents While Negotiating Mutually Agreeable Search Parameters with Plaintiffs.

On February 1, 2018, this Court entered a scheduling order that required the parties to substantially complete their document productions by May 1, 2018.  Dkt. 161.  Contrary to Plaintiffs' claim that SandRidge refused to cooperate (Pls.' Mot. 14), SandRidge repeatedly sought Plaintiffs' input in developing a mutually agreeable set of SandRidge custodians and search terms.  For example, on January 23, 2018, Defendants proposed a stipulation that would have required the parties to exchange custodians and

search terms within two weeks of entry, with counterproposals due one week later. Yeung Decl. Ex. 2.[2]  Then, on February 15, 2018, Defendants proposed that the parties exchange search terms and custodians within three days of entry, with counterproposals to be made three days later.  Yeung Decl. Ex. 3.[3]

Plaintiffs rejected Defendants' proposals.  *See, e.g.*, Yeung Decl. Ex. 4.  Instead, on February 16, Plaintiffs insisted that Defendants accept, without modification, Plaintiffs' proposal that the parties exchange and discuss search terms and custodians over a *two-month* period — *i.e.*, until at least April 16, 2018, a mere 15 days before the substantial completion deadline.  *Id.*; *see also* Yeung Decl. Ex. 1 at 3–5.[4]

While these discussions were ongoing, SandRidge was collecting and reviewing documents.  On March 1, 2018 — not May 1 like Plaintiffs incorrectly claim (*see* Horne

---

[2] "On or before [(2) two weeks from entry], the parties will exchange information about how they intend to conduct reasonable searches for responsive ESI, including custodians, date ranges, and search terms.  On or before [(1) one week from that initial exchange], a party may request that another party broaden the scope of its search for responsive ESI by identifying specific additional custodian(s) and/or search term(s) that the party proposes to be searched."  Yeung Decl. Ex. 2 at 2.

[3] "On or before [3 days from entry], 2018, the producing party shall provide a list of search terms that it proposes applying to the ESI of the custodians identified in Subpart II.A. above.  Within 3 days of the producing party's provision of a list of proposed search terms, the receiving party may suggest additional terms that it believes the producing party should include in order to identify potentially responsive documents in the ESI of the producing party's custodians."  Yeung Decl. Ex. 3 at 2.

[4] According to Plaintiffs' proposal, (1) the parties would exchange potential custodians and search terms "on or before [(1) one month from entry], 2018"; (2) "the receiving party shall provide any additional search terms" within "[(14) fourteen] days of receipt of the proposed search terms"; and (3) the "Parties will use best efforts to agree to a set of search terms within [(30) thirty] days of receipt of the originally proposed search terms."  Yeung Decl. Ex. 1 at 3–5.

Decl. ¶ 4) — SandRidge made its first production of documents.  Yeung Decl. Ex. 5.  On April 10, 2018, just one day after entry of the Protective Order allowing for the production of confidential materials, SandRidge made its second production, which included numerous confidential documents that had been prepared for production as soon as the Protective Order was entered.  Yeung Decl. Ex. 8.  These productions included oil and gas reserve reports for SandRidge, Trust I, and Trust II wells in the Mississippian; databases containing production data for each SandRidge, Trust I, and Trust II well in the Mississippian during the class period; and organizational charts for SandRidge personnel throughout the class period.

Rather than risk missing the May 1, 2018 production deadline because the parties had yet to agree on a written protocol for negotiating search terms and custodians, by April 2018 SandRidge developed and provided Plaintiffs with its list of 223 search terms and eight custodians on April 5, 2018 (Yeung Decl. Ex. 6), and made clear the next day that "[i]f Plaintiffs have an alternate proposal, please let Defendants know and we will consider it" (Yeung Decl. Ex. 7).  SandRidge's custodians included all three individual defendants in this case (Ward, Grubb, and Bennett), the heads of the SandRidge Reservoir Engineering Department charged with monitoring and estimating oil and gas reserves during the putative class period (Rodney Johnson and Lance Galvin), the head of the SandRidge department responsible for overseeing the geological analysis of the Mississippian formation during the putative class period (Todd Tipton), and SandRidge investor relations personnel during the putative class period (Leslie Weiher and Kevin White).  Yeung Decl. Ex. 6 at 3.

SandRidge crafted its list of search terms broadly.  SandRidge included, as stand-alone searches, seven terms designed to capture any and all references to the Mississippian — the only geographical area that is at issue in this case.[5]  *Id.*  For common industry terms like "gas to oil ratio" that would be overly broad because of SandRidge's oil and gas holdings outside of the Mississippian — none of which are at issue in this case — SandRidge proposed running them in combination with terms referring to the Mississippian Trusts.  These terms were listed in a separate "Column A" and "Column B," which SandRidge proposed running in combination as 216 more searches.  *See id.* ("Any Column A term AND any Column B term (total of 216 additional searches)").

On April 12, just weeks before the deadline for substantial completion of document discovery, Plaintiffs provided SandRidge with its first, and only, list of proposed search terms.  *See* Yeung Decl. Ex. 9 at 4–8.  Unlike the list of search terms Plaintiffs seek to compel here, which only proposes "modifications" to SandRidge's Columns A and B terms (*see* Horne Decl. Ex. 1, at 3–5), Plaintiffs' April 12 proposal *deleted* SandRidge's suggestion that the Column A terms be run in combination with Column B terms, and instead proposed that each Column A and B term be run on a stand-alone basis.  *See* Yeung Decl. Ex. 9 (removing proposed search for "Any Column A term AND any Column B term").[6]  This change would have required SandRidge to collect and

---

[5] These terms are: Mississippian, Midcon*, Mid-con*, "Horizontal Miss", "Miss Horizontal", "Miss hz", and "Miss lime".

[6] If Plaintiffs intended only to modify Columns A and B on April 12, they should have clarified their intentions after SandRidge stated its understanding on April 30 that "Plaintiffs' proposal deleted the suggestion to pair 'Column B' terms with other terms,

review all documents containing various common English words, including "question," "presentation," "probable," "proved," "liquids," "shareholder," and any words that begin with the root words "product," "project," or "investor."  Yeung Decl. Ex. 9; *see also* Yeung Decl. Ex. 10 at 2.  SandRidge pointed out these and other flaws in Plaintiffs' proposed search terms, but nonetheless accepted nearly 200 additional terms proposed by Plaintiffs in an effort to reach agreement.  Yeung Decl. Ex. 10 at 4.

On the May 1, 2018 substantial completion deadline, SandRidge made its third production of documents, which totaled 697,058 pages.  Yeung Decl. Ex. 11.  As disclosed to Plaintiffs, SandRidge utilized over thirty attorneys to review hundreds of thousands of documents in order to complete its document production on time.  Yeung Decl. Ex. 10 at 1.  All told, SandRidge produced over 96,920 documents, encompassing 715,801 pages.[7]  SandRidge's electronic discovery services and contract and staff attorney review alone (without including the substantial partner and associate review-related fees) have so far cost well over $1.5 million.  *See* Yeung Decl. Exs. 19 and 20.[8]

---

and instead proposed that those 'Column B' terms be run on a standalone basis."  Yeung Decl. Ex. 10 at 2.  Plaintiffs provided no such clarification.

[7] Without identifying any non-responsive material produced or acknowledging that they requested lengthy documents, Plaintiffs assert that the page count is due to "filler."  *See* Pls.' Mot. 24.  If anything, the page count understates the amount of discovery SandRidge provided.  For example, SandRidge produced 12,468 Excel files that count as single pages even though they may contain thousands of rows of data.

[8] Because Plaintiffs requested that SandRidge re-produce in this action all documents produced in the separate action captioned *In re SandRidge Energy, Inc. Securities Litigation*, No. 5:12-cv-01341-W (W.D. Okla.), and vice versa, SandRidge utilized the same electronic discovery vendor and attorneys to review documents in both actions.

Prior to May 1, 2018, Plaintiffs never justified any search terms they proposed, or provided any specific reasons for why Plaintiffs believed that SandRidge's search terms were inappropriate.  Nor did Plaintiffs name a single specific additional custodian that they believed should be included in SandRidge's searches for electronic documents.  At most, on April 12, Plaintiffs speculated, inaccurately, that "[t]he search terms Defendants propose suggest that SandRidge employees have not been extensively consulted yet," and provided SandRidge with a broad and open-ended list of additional custodians identified solely by position (*e.g.*, "Defendants' executive assistants" and unnamed "[a]dditional persons from organizational charts").  Yeung Decl. Ex. 9.  Plaintiffs did not explain why any of those additional custodians were necessary, especially since several already were included on SandRidge's custodian list (*e.g.*, "Head of the reservoir engineering department at all relevant times").  *Id*.  Plaintiffs also did not explain why they failed to identify any custodian by name despite SandRidge's earlier production of detailed organizational charts.  *See* Yeung Decl. Ex. 8, Ex. 15 at 1.

**D.    Plaintiffs Name Additional Custodians and Seek to Justify Additional Search Terms After the Substantial Completion Deadline.**

On May 9, 2018 — eight days *after* the substantial completion deadline passed — Plaintiffs provided their first justifications for running additional search terms.  Yeung Decl. Ex. 13.  In doing so, Plaintiffs did not point out any actual deficiencies in SandRidge's document production.  Instead, Plaintiffs incorrectly claimed that SandRidge's search terms "will entirely miss several of the critical issues in this case" (*id*. at 1–2), when in fact, SandRidge already had produced many documents that

10

pertained to each of those so-called "critical issues," *see* Yeung Decl. Ex. 15 at 4 (listing examples).  On May 11, 2018 — *ten* days after the substantial completion deadline ordered by this Court — Plaintiffs, for the first time, provided names of six additional proposed SandRidge custodians.  Yeung Decl. Ex. 14.  Incredibly, only three are included among the ten now at issue in Plaintiffs' motion to compel;[9] the other seven custodians that are at issue in this motion were <u>never identified as potential custodians by Plaintiffs before the motion was filed</u>.  *Id.*

By letter dated May 21, 2018, and in a conference taking place on June 4, 2018, SandRidge declined to add any new custodians from the list Plaintiffs proposed on May 11, or run additional search terms from Plaintiffs' April 12 list beyond the nearly 200 that SandRidge had already accepted.  Yeung Decl. Exs. 15 and 18.  This was due, in part, to Plaintiffs' categorical refusal to pay any of the costs associated with any additional SandRidge document review.  Yeung Decl., Ex. 18 at 3.

## ARGUMENT

### I.    Plaintiffs' Motion Is Premature and Procedurally Improper.

This Court routinely denies discovery motions where the movant fails to comply with the Local Rules, including the meet and confer requirement of Local Rule 37.1.  *See, e.g.*, *United States v. Grose*, 2014 WL 12687487, at *2 (W.D. Okla. Apr. 17, 2014) (granting a motion to strike a motion to compel for failure to comply with Local Rule 37.1); *D & D Equip. & Supply Co. v. Those Certain Underwriters at Lloyd's London*,

---

[9] These three custodians are Michael Brown, Rick Kirby, and Rick Hughes.

2009 WL 10702874, at *2 (W.D. Okla. June 1, 2009) (dismissing a motion to compel for not complying with Local Rule 37.1); *Caride v. Kohll*, 2005 WL 1860295, at *2 (W.D. Okla. Aug. 3, 2005) (same).  Such a result is warranted here.

*First*, despite Local Rule 37.1's pre-discovery motion meet and confer requirements, Plaintiffs never met and conferred about the vast majority of the relief they now seek.  Incredibly, seven of the ten custodians[10] and 1,311 of the 1,602 search terms at issue were never proposed by Plaintiffs prior to this motion.  *See* Yeung Decl. Ex. 21 (listing the search terms that Plaintiffs did not propose previously).

Plaintiffs incorrectly claim that SandRidge "categorically refused to add a single additional custodian" or any of these additional search terms.  Pls.' Mot. 7.  In fact, in a May 30, 2018 email, SandRidge specifically "disagree[d] with [Plaintiffs'] claim that SandRidge has categorically refused to do more."  Yeung Decl. ¶ 5, Ex. 16.  As is plain from the parties' written exchanges — which Plaintiffs omit from their motion papers — the vast majority of the search terms and custodians at issue were never even proposed by Plaintiffs, let alone rejected by SandRidge.  *See, e.g.*, Yeung Decl. Ex. 9 (Plaintiffs' April 12, 2018 proposed search terms); Ex. 14 (Plaintiffs' May 11, 2018 proposed custodians).  These terms and custodians are not properly before the Court, and allowing Plaintiffs to seek any relief on them would make a mockery of the *pre-motion* meet and confer requirements.

---

[10] David Lawler, Larry McFarlin, Kyle Koontz, Jennifer Dunn, David Edwards, Craig Johnson, and Doug Johnson.

*Second*, Plaintiffs' 30-page moving papers exceed the Local Rules' limits for moving briefs.  *See* Local Rule 7.1(e) (setting 25-page limit for motions other than summary judgment motions).  This is a separate basis for summarily denying Plaintiffs' motion.  *See, e.g.*, *Fox v. Noram Energy Corp.*, 198 F.3d 257 (10th Cir. 1999) (noting the district court's striking of a brief for exceeding Local Rule 7.1(e)'s 25-page limit).

## II.   Plaintiffs Seek Unnecessary and Disproportionate Discovery.

Under the Federal Rules of Civil Procedure, "there is no obligation on the part of a responding party to examine every scrap of paper in its potentially voluminous files in order to comply with its discovery obligations."  *See Treppel v. Biovail Corp.*, 233 F.R.D. 363, 374 (S.D.N.Y. 2006).  "Although pretrial discovery is broad, it is not limitless, and discovery should not be allowed where the resulting benefit would be negligible." *Carbajal v. St. Anthony Cent. Hosp.,* 2014 WL 3746967, at *4 (D. Colo. July 30, 2014) (internal citation omitted); *Entrada v. Marriott Hotel Servs., Inc.*, 2016 WL 5720832, at *1 (W.D. Okla. Oct. 3, 2016) ("While the relevancy of discovery is very broad, it is not all-encompassing.").

Moreover, the burden imposed by discovery must also be "proportional to the needs of the case."  Fed. R. Civ. P. 26(b)(1).  Rule 26's proportionality requirement was intended "to rein in popular notions that anything relevant should be produced." *Noble Roman's, Inc. v. Hattenhauer Distrib. Co.*, 314 F.R.D. 304, 307 (S.D. Ind. 2016).  Under this rule, the "party seeking discovery of relevant, non–privileged information must show, before anything else, that the discovery sought is proportional to the needs of the case." *Gilead Scis., Inc. v. Merck & Co.*, 2016 WL 146574, at *1 (N.D. Cal. Jan. 13,

2016); *see also Lonn v. Corizon Health*, 2016 WL 6433846, at *2 (D. Idaho Oct. 27, 2016) (same).  Here, even if the Court reaches the merits, Plaintiffs' motion should be denied because the additional discovery Plaintiffs seek would be largely cumulative of the voluminous discovery SandRidge provided, of at best negligible benefit, and utterly disproportionate to the value of Plaintiffs' few remaining claims.

### A.    Plaintiffs Greatly Exaggerate the Potential Damages in this Case.

SandRidge has already employed over thirty attorneys to review hundreds of thousands of documents for potential production at a cost, to date, of over $1.5 million solely for electronic discovery services and contract and staff attorney review.  *See* Yeung Exs. 10, 19–20.  Including fees for the substantial partner and associate time would result in an amount that is multiples higher.  Plaintiffs' motion demands that SandRidge more than double those efforts and bear the significant cost of doing so alone.[11]  Plaintiffs refusal to put their money where their mouth is and share the cost confirms that the additional discovery demanded would be wasteful and disproportionate to the needs of the case.  None of Plaintiffs' arguments demonstrate otherwise.

Plaintiffs drastically overstate the amount at issue in this case to justify their requested additional discovery.  *See* Fed. R. Civ. P. 26(b)(1) (including "the amount in controversy" as a factor to determine if discovery is proportional to needs of the case).

---

[11] Plaintiffs' suggest that SandRidge could use technology-assisted review to reduce costs because the parties' draft ESI stipulations "contemplated the use of technology-assisted review."  Pls.' Mot. 23.  But those drafts only provided that "No party shall use predictive coding/technology-assisted-review" without first conferring with the other parties about "a mutually agreeable protocol."  *See* Yeung Decl. Ex. 2 at 4, Ex. 3 at 2.

14

As detailed in Defendants' pending motion for partial judgment on the pleadings, all of

Plaintiffs' claims on behalf of a putative class must be dismissed as untimely pursuant to

the Supreme Court's recent decision in *China Agritech*, 138 S. Ct. 1800. *See* Dkt. 215.

As a result, Plaintiffs can at most claim approximately $1.2 million in damages — the

total amount of individual losses that Plaintiffs allege. *See id.*

The cost of SandRidge's electronic discovery vendor and contract and staff

attorney review fees alone already have exceeded this actual amount in controversy.

Accordingly, any additional document discovery would by definition be disproportionate

with the needs of the case, especially where, as here, Plaintiffs have not identified any

categories of actually missing documents, and instead provide only a list of what they

speculate *might* be missing (but, as detailed below, is not actually missing). *See Lauris v.*

*Novartis AG*, 2016 WL 7178602, *4–5 (E.D. Cal. Dec. 8, 2016) (holding that adding four

custodians was not proportional because of *inter alia* the high cost of discovery to date

and the likelihood that the nine existing custodians possessed relevant documents).

Even assuming that Plaintiffs have viable class claims (they do not), the dubious

class-wide damages calculation Plaintiffs rely on here cannot be credited because it is at

odds with arguments Plaintiffs relied on to support class certification. Specifically,

Plaintiffs have asserted that "the market for Trust I and II united during the Class Period

was efficient." Dkt. 170, at 16–23. Consistent with this position, Plaintiffs' market

efficiency expert assumed that new material information about the Trusts would cause a

reaction in Trust unit prices "within a one-day period." Yeung Decl. Ex. 12, at 84:17–

85:1; *see also id.*, at 77:18–21 ("[T]o the extent that I looked at one-day returns, the

15

implicit assumption is that the stock or in this case units, would react to information within a day").  Although the logical consequence of this assumption is that any "stock drop" associated with Plaintiffs' claims must have occurred within a day of November 8 or 9, 2012, when Plaintiffs allege that the "nature and extent of Defendants' fraud" was "revealed to investors and the market," 85% of Plaintiffs' purported class-wide damages are associated with declines in Trust unit prices that occurred *over the next four months* — through March 5, 2013.  *See* Yeung Decl. Ex. 17 at 12–13.  For example, Plaintiffs claim over $100 million in damages due to declines in Trust unit prices from November 12 to 15, 2012 without even alleging that any new information was disclosed to the market after November 9.  *See* Yeung Decl. Ex. 17 at 12–13.  Either the market for Trust units reacts efficiently to new material information "within a one-day period" or it does not; Plaintiffs cannot have it both ways.[12]

Plaintiffs also argue that an estimated $100 million in damages sought in a separate lawsuit, *In re SandRidge Energy, Inc. Securities Litigation*, No. 5:12-cv-01341-W (W.D. Okla.) (the "SandRidge Energy Action") should be considered when assessing proportionality.  *See* Pls.' Mot. 22.  But Plaintiffs provide no supporting authority for the novel proposition that the proportionality analysis in one action can be impacted by different litigation that is proceeding before a different judge.  If anything, the SandRidge Energy Action counsels in favor of denying Plaintiffs here additional discovery:

---

[12] Plaintiffs also cherry pick dates for damages purposes.  For example, Plaintiffs claim damages through November 15, but not November 16, 2012.  *See* Yeung Decl. Ex. 17 at 12–13.  The reason is clear: the prices of both Trust I and II units increased on November 16, thus reducing Plaintiffs' potential damages.  *See* Dkt. 171-1, at 147 and 153.

plaintiffs in the SandRidge Energy Action have never demanded that SandRidge use any of the search terms or custodians at issue in the instant motion.

Equally specious are Plaintiffs' claims that SandRidge refused to provide search term hit reports or a burden estimate prior to motion practice.  *See* Pls.' Mot. 23.  While certain of the parties' draft stipulations contemplated an exchange of hit reports, the final stipulation did not, and Plaintiffs never requested hit reports for any search term that was proposed.  *See* Yeung Decl. ¶ 4, Ex. 15 at 5.  Plaintiffs also never requested a burden estimate from SandRidge, nor did SandRidge refuse to provide one.  Yeung Decl. ¶ 3.

## B.     Adding Ten SandRidge Custodians Is Unlikely to Yield Relevant and Non-Duplicative Documents.

The ten custodians whose documents Plaintiffs seek to compel are of negligible importance to this action.  The only claims remaining in this lawsuit pertain to allegedly fraudulent statements about oil production in the Mississippian purportedly made by Defendants Ward and Grubb — statements for which Plaintiffs also seek to hold Bennett secondarily liable as a "control person" under Section 20(a) of the Exchange Act.  *See* Dkt. 130, at 8–12 (evaluating scienter as to Defendants Ward, Grubb, and Bennett, and dismissing the Section 10(b) claims against Bennett).  As a result, the core issue for discovery is whether Ward and Grubb made any materially false statements about oil reserves and production in the Mississippian with fraudulent intent or recklessness.  *See City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1257–58 (10th Cir. 2001).

In this context, SandRidge's custodian list is more than reasonable.  SandRidge reviewed and produced the documents of Ward and Grubb, the materials most likely to

17

reveal what each knew about SandRidge's oil reserves and production throughout the class period, and if either had any intent to defraud investors.  SandRidge also reviewed and produced the documents of SandRidge's then-CFO (Bennett), the heads of the department charged with monitoring and estimating oil and gas reserves during the class period (Rodney Johnson and Galvin), and the head of the department charged with performing geological analysis of the Mississippian during the class period (Tipton).

Plaintiffs nonetheless seek to compel SandRidge to add another ten non-executive custodians.  Plaintiffs' arguments for doing so are unavailing.  *First*, Plaintiffs argue that the knowledge of those ten non-executive employees can be imputed to SandRidge for the purposes of establishing scienter.  Pls.' Mot. 16.  But Plaintiffs elide the fact that the Tenth Circuit has not held that the scienter of a corporate defendant's non-executive employees may be imputed to the corporate defendant itself; at best, Plaintiffs point to a circuit split on the issue.  *See id*.

Even if this Court applied the Sixth Circuit authority upon which Plaintiffs rely, *In re Omnicare, Inc. Securities Litigation*, 769 F.3d 455 (6th Cir. 2014), the scienter of the ten custodians at issue would not be imputed to SandRidge.  In *Omnicare*, the court held that scienter may be imputed to a defendant corporation only from (1) an individual who made the alleged misstatement; (2) an individual who authorized, furnished, reviewed or approved the alleged misstatement; or (3) high ranking executive or board member who "ratified, recklessly disregarded, or tolerated" the alleged misrepresentation.  *Id*. at 476.  Here, Plaintiffs do not allege that any of the ten proposed custodians made any of the challenged statements.  *See* Pls.' Mot. 8–13.  Nor do they allege that any of the

18

custodians were involved in reviewing or approving any challenged statement. *Id*.  Nor are any of the proposed custodians high-ranking executives or board members.  *Id*. Moreover, SandRidge's scienter is not even relevant here because all claims against SandRidge have been extinguished through its bankruptcy, and it remains in this action only as a nominal defendant "solely to the extent of available insurance."  Dkt. 78 ¶ 38.

*Second*, Plaintiffs seek to justify the need for additional custodians because of the *possibility* that they possess documents (1) that show that a defendant made a materially false statement; (2) that memorialize oral communications or meetings with Defendants or others at SandRidge; or (3) that others have not retained.  Pls.' Mot. 16–17.  This is all pure speculation.  Plaintiffs do not point to a single reason to suspect that any custodian at issue (1) possessed any documents showing the material falsity of any statement by any defendant; (2) had a practice of memorializing any oral communications or meetings; or (3) retained relevant non-privileged documents that others did not.  These are precisely the types of fishing expeditions that courts have refused to condone.  *See. e.g.*, *Harrington Enters., Inc. v. Safety-Kleen Sys., Inc*., 2014 WL 12611318, at *2–3 (W.D. Mo. July 11, 2014) (finding that plaintiff was "on a fishing expedition" where it did not provide a reason to search additional custodians, "aside from noting their positions with Defendant"); *U.S. ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 241 (D.D.C. 2011) ("[T]there is no showing whatsoever from what has been produced that those e-mails not produced will make the existence of some crucial fact more likely than not.").

*Finally*, Plaintiffs suggest that the ten additional custodians might possess documents showing that Defendants made false statements recklessly.  Pls.' Mot. 17.

This too is pure speculation.  "Conduct is considered reckless only if the defendants (1) acted in an extreme departure from the standards of ordinary care and (2) presented a danger of misleading buyers or sellers that was known to the defendants or so obvious that the defendants must have been aware of the danger."  *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016) (internal quotations and citation omitted).  Here, SandRidge produced nearly 100,000 documents to Plaintiffs — including from the heads of the departments charged with monitoring and estimating oil reserves and performing geological analysis — but Plaintiffs have not pointed to any documents suggesting any reckless statement by any Defendant.  Absent any such evidence in the produced documents, it is highly unlikely that adding ten peripheral custodians, including eight who did not directly report to any individual defendant during the class period,[13] will help Plaintiffs establish that Defendants acted recklessly.  No additional custodians are warranted.  *See Enslin v. Coca-Cola Co.*, 2016 WL 7042206, at *3 (E.D. Pa. June 8, 2016) (finding additional custodians unjustified where there was no evidence that their documents "would produce responsive information that has not already been captured.").

### C.    Plaintiffs' Proposed Search Terms are Overbroad and Unnecessary.

Plaintiffs do not dispute SandRidge's right to use search terms to narrow the universe of documents for review, or the propriety of using connecting terms (*i.e.*, "and") to further limit the results where a single term "returns too many documents."  Pls.' Mot.

---

[13] Kirby, Hughes, McFarlin, Koontz, Dunn, Craig Johnson, Brown, and Doug Johnson did not directly report to any individual defendant during the purported class period.  In 2010, before the events of this case, Kirby and Craig Johnson reported to Grubb directly.

18–19 & n.11.  Instead, Plaintiffs focus on specific terms that SandRidge applied, claiming that SandRidge's terms will miss documents unless documents use "the precise and slightly formal phrasing set out in [SandRidge's] search terms."  Pls.' Mot. 19.

As a threshold matter, Plaintiffs never raised any of these complaints about SandRidge's search terms when it could have mattered — prior to the Court-ordered May 1 deadline to substantially complete document production.  Plaintiffs' only criticism of SandRidge's search terms before that deadline was Plaintiffs' inaccurate speculation that "[t]he search terms Defendants propose suggest that SandRidge employees have not been extensively consulted yet."  Yeung Decl. Ex. 9.  Had Plaintiffs articulated specific concerns about SandRidge's search terms, SandRidge could have addressed them prior to the production deadline, just as it accepted nearly 200 of Plaintiffs' proposed search terms.  SandRidge also could have advised Plaintiffs that certain of their concerns were misplaced.  For example, Plaintiffs' motion inaccurately claims for the first time that the term "type curve" will not bring up documents referencing "type-curve" (Pls.' Mot. 18), when SandRidge's search engine treats both terms the same.

Plaintiffs also drastically overstate the likelihood that SandRidge's search terms will miss any critical documents.  This litigation concerns allegedly false statements made about oil and gas reserves in the Mississippian formation.  *See* Dkt. 130; Pls.' Mot. 3–6.  Plaintiffs, however, fail to mention that SandRidge's search terms included seven terms designed to capture all references to the Mississippian, including alternative spellings.  These terms, designed to capture references to the only region at issue in this litigation, help ensure that critical documents are included in SandRidge's production.

21

The efficacy of SandRidge's approach is demonstrated in Plaintiffs' motion. Plaintiffs fail to identify even a single category of relevant documents missing from SandRidge's production.  While Plaintiffs claim that SandRidge did not design its terms with Plaintiffs' specific "critical topics" in mind, it is undeniable that SandRidge's terms resulted in the production of large volumes of documents concerning each of these topics. *See* Pls.' Mot. 19–20.  For example, SandRidge produced 22,773 documents containing the term "well" (the topic of wells); 3,185 documents containing the terms "investors" or "analysts," and 5,515 documents from the files of SandRidge investor relations personnel containing the Mississippian terms (investor and analyst communications); and 2,683 documents containing the word "IPO" (sales of Trust units).[14]  Nor are SandRidge's search terms the only means through which SandRidge located potentially relevant information; for example, SandRidge produced databases containing oil and gas production data for every SandRidge and Trust well in the Mississippian, investor analyst reports maintained in its files, and other non-email documents requested by Plaintiffs.

Additionally, Plaintiffs ignore the fact that SandRidge is an oil and gas company with assets and operations outside of the Mississippian that have nothing to do with this case, and sponsored royalty trusts besides the trusts at issue here.  *See* Am. Compl. ¶¶ 4, 214.  Thus, many of the search terms that Plaintiffs propose now would hit on irrelevant

---

[14] Plaintiffs also suggest that SandRidge might have missed certain documents concerning drilling, Pls.' Mot. 18, but SandRidge produced 32,903 documents containing the term "drilling".  On May 21, 2018, SandRidge identified for Plaintiffs specific examples of documents that it had produced concerning each of these, and other, so-called "critical issues."  Yeung. Decl. Ex. 15 at 4.

documents.  For example, "Trust" or "RT" could hit on documents that refer to the

Permian Trust; and "wells" could hit on documents that refer to wells, drilling wells, and

reservoir depletion in areas outside of the Mississippian.  And Plaintiffs' surprisingly

claim that the Chesapeake-related search terms SandRidge ran "seem curiously designed

to avoid picking up relevant documents"; *Plaintiffs* proposed those terms and SandRidge

accepted them not because they were relevant, but to avoid disputes.  *See* Yeung Decl.

Ex. 10 at 4.

In sum, without any indication that SandRidge's search terms actually missed any

critical information, Plaintiffs' request for additional search terms should be denied.  *See*

*Harrington Enters.*, 2014 WL 12611318, at *2 (finding request for additional search

terms unduly burdensome where requested information was produced and alleged

deficiencies were unexplained).

### D.   SandRidge Produced Relevant Documents Dated in 2013.

Plaintiffs have manufactured a dispute concerning the time period covered by

SandRidge's document production.  SandRidge has not withheld relevant, non-privileged

documents from production solely on the basis that they were created after the purported

class period.  Indeed, SandRidge has produced 15,235 documents totaling 121,343 pages

that *postdate* the end of the proposed class period on November 9, 2012.

For documents dated in 2013, SandRidge applied a simple relevance test:

responsive, non-privileged documents *relating to class period events or conditions* were

produced.  Plaintiffs offer no reason to second-guess this relevance criteria.  While

Plaintiffs' complaint contains allegations about events that *occurred* after the class period

23

ended, each of those events *related back* to the class period.  For example, the post-class

period topics in Plaintiffs' motion each relate back to the class period (Pls.' Mot. 26–28):

- **Alleged "Corrective" Disclosures:**  Each disclosure in 2013 mentioned in the

  Complaint related to alleged misstatements about oil and gas reserves *in 2012*.  *See,*

  *e.g.*, Am. Compl. ¶ 234 (describing January 2013 press releases about distributions

  "for the production period running from September through November 2012").[15]

- **March 2013 Oil Reserve Revision and October 2013 SEC Disclosures:**  The

  alleged March 15, 2013 reduction in Trust I's and II's reserve estimates was for the

  year ending December 31, *2012*.  *See, e.g.*, Am. Compl. ¶¶ 245–47.  The alleged

  October 2013 disclosures to the SEC also related to *2012* oil and gas reserves.  *See*

  Am. Compl. ¶¶ 251–52 ("In light of the additional data made available to the Trust

  during 2012, the Trust determined . . . that it was appropriate to make performance

  revisions for wells drilled in 2011 and to update its type curve for locations that were

  undeveloped as of December 31, 2011.").

- **Ward's and Grubb's Departures from SandRidge:**  Plaintiffs claim (incorrectly)

  that these departures are relevant because the reductions in SandRidge oil reserve

  estimates *announced in November 2012* purportedly caused them.  Pls.' Mot. 28.[16]

---

[15] *See also* Am. Compl. ¶¶ 237–244 (alleging that certain third-party analyst downgrades in 2013 were "a further materialization of the risks of poor oil production previously concealed by Defendants' material omissions in the Trusts' Registration Statements and Prospectuses," which were issued during the class period).

[16] Neither departure is relevant.  Ward departed "without cause" following a change in corporate control, and Grubb voluntarily resigned.  *See* Yeung Decl. Exs. 22 and 23.

Thus, as applied, SandRidge's relevance-based criteria would have resulted in the production of all non-privileged documents in each of these categories that were located in SandRidge's search: documents concerning "corrective" disclosures in 2013 about oil and gas reserves in 2012, the 2013 restatement of 2012 reserve estimates, the disclosures to the SEC in 2013 about the 2012 oil and gas reserves, and (if any exist) documents concerning Ward's and Grubb's departures that also referenced SandRidge's 2012 reduction in reserve estimates.

Plaintiffs assert that SandRidge's relevance-based criteria is "vague," untethered from the Federal Rules of Civil Procedure, and "would allow [SandRidge] to avoid producing relevant, even critical documents."  Pls.' Mot. 3.  Not true.  SandRidge has always been willing to answer any of Plaintiffs' questions about its relevance-based criteria; indeed, prior to this motion, SandRidge already confirmed that it produced non-privileged documents from 2013 concerning "SandRidge's correspondence with the SEC about [Trust I and II] oil and gas reserves during the Class Period" and "SandRidge's oil and gas reserves during the Class Period."  Yeung Decl. Ex. 18 at 2.  Plaintiffs filed their motion anyway.  The Federal Rules also do not require the production of irrelevant documents, *see* Fed. R. Civ. P. 26(b)(1), and despite SandRidge's pre-motion requests, Plaintiffs have not articulated any coherent rationale for the relevance of documents that solely relate to events and conditions that occurred in 2013.  Yeung Decl. Ex. 18 at 2.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny the Plaintiffs' motion to compel.

Dated: July 11, 2018

Respectfully Submitted,

CHRISTENSEN LAW GROUP

/s/ Thomas B. Snyder

Thomas B. Snyder, Esq., OBA #31428
Tom@christensenlawgroup.com
The Parkway Building
3401 N.W 63rd St., Ste. 600
Oklahoma City, OK 73116
(405) 232-2020

*Attorneys for James D. Bennett and Matthew K. Grubb*

COVINGTON & BURLING LLP
Mark P. Gimbel (admitted *pro hac vice*)
mgimbel@cov.com
Christopher Y. L. Yeung (admitted *pro hac vice*)
cyeung@cov.com
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000

COVINGTON & BURLING LLP
Mark P. Gimbel (admitted *pro hac vice*)
mgimbel@cov.com
Christopher Y. L. Yeung (admitted *pro hac vice*)
cyeung@cov.com
The New York Times Building
620 Eighth Avenue
New York, NY 10018-1405
(212) 841-1000

CONNER & WINTERS, LLP

/s/ Mitchell D. Blackburn

Kiran A. Phansalkar, OBA #11470
kphansalkar@cwlaw.com
Mitchell D. Blackburn, OBA #12217
mblackburn@cwlaw.com
211 North Robinson
Oklahoma City, OK 73102
(405) 272-5711

*Attorneys for Nominal Defendant SandRidge Energy, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on this 11th day of July, 2018, I caused a true and correct copy of the foregoing Memorandum of Law by SandRidge Energy, Inc., James D. Bennett, and Matthew K. Grubb in Opposition to Plaintiff's Motion to Compel, and accompanying affidavit, to be served by CM/ECF to the parties registered to the Court's CM/ECF system.

*/s/* Christopher Y. L. Yeung
Christopher Y. L. Yeung
COVINGTON & BURLING LLP