UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| DUANE & VIRGINIA LANIER TRUST, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. CIV-15-634-G |
| SANDRIDGE MISSISSIPPIAN TRUST I et al., | ) ) ) ) | |
| Defendants. | ) | |

## ORDER

The matter comes before the Court on the Motion for Partial Judgment on the Pleadings filed pursuant to Federal Rule of Civil Procedure 12(c) by defendant SandRidge Mississippian Trust I ("Trust I"). *See* Def.'s Mot. (Doc. No. 157). Lead Plaintiffs[1] have responded in opposition, *see* Pls.' Resp. (Doc. No. 165), and Trust I has replied, *see* Def.'s Reply (Doc. No. 172).

STANDARD OF REVIEW

Rule 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial." Fed. R. Civ. P. 12(c). The

---

[1] These include the Duane & Virginia Lanier Trust ("Lanier"); Ivan Nibur; Jase Luna, sometimes referred to in pleadings and papers as "Luna Jase," *see*, *e.g.*, Consol. Am. Compl. (Doc. No. 78) ¶ 35, Def.'s Mot. at 1; Matthew Willenbucher; and substituted Lead Plaintiff Deborah Rath, as agent of the Estate of Lawrence Ross, deceased, and as attorney-in-fact for Sonja Rath, Personal Representative of the Estate of Lawrence Ross, deceased ("Rath"). *See* Doc. No. 259.

Court evaluates the motion under the familiar standard for Federal Rule of Civil Procedure 12(b)(6) motions. *See Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000) (citing *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992)); *e.g.*, *Denver Health & Hosp. Auth. v. Beverage Distribs. Co., LLC*, 546 F. App'x 742, 745 (10th Cir. 2013). Accordingly, the Court "accept[s] the well-pleaded allegations of the [operative] complaint as true and construe[s] them in the light most favorable to the non-moving party." *Realmonte v. Reeves*, 169 F.3d 1280, 1283 (10th Cir. 1999) (citation omitted). The complaint need contain "only enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## SUMMARY OF THE PLEADINGS

SandRidge Energy, Inc. ("SandRidge") explored, developed, and produced natural gas and oil reserves in, among other locations, the Mississippian Formation, "a geological formation located in northern Oklahoma and south-central Kansas." Consol. Am. Compl. (Doc. No. 78) ¶ 87. "[T]o finance increased capital expenditures planned for 2011, SandRidge decided to 'monetize' certain of its existing oil and gas assets in [n]orthern Oklahoma by selling interests in those assets to the public via a royalty trust." *Id.* ¶ 4. To this end, SandRidge created Trust I and conveyed to it royalty interests consisting of a share of SandRidge's revenue from (a) existing horizontal oil and gas wells in five Oklahoma counties, collectively referred to as the "Trust I Area of Mutual Interest" ("Trust I AMI"), and (b) specific horizontal oil and gas wells to be drilled in the Trust I AMI. *Id.* To pay for these royalty interests, Trust I committed to sell common units to investors in

2

an initial public offering ("Trust I IPO") and transfer the net proceeds of that sale to SandRidge.

SandRidge thereafter decided to raise additional funds to finance its capital expenditures and, in December 2011, formed the SandRidge Mississippian Trust II ("Trust II"). *Id.* ¶ 19. SandRidge conveyed to Trust II royalty interests consisting of a share of SandRidge's revenue from (a) existing horizontal wells in nine counties in Oklahoma and Kansas, collectively referred to as the "Trust II Area of Mutual Interest" ("Trust II AMI"), (b) certain horizontal oil and gas wells to be drilled in the Trust II AMI. *Id.* As with Trust I, to compensate SandRidge for these royalty interests, Trust II committed to sell common units in an initial public offering ("Trust II IPO") and transfer those proceeds to SandRidge.

Lanier brought the instant action on June 9, 2015. *See* Compl. (Doc. No. 1). A consolidated amended complaint followed on November 11, 2016. *See* Consol. Am. Compl. In that pleading, Lanier joined with Nibur and Rath (who like Lanier had purchased Trust I units) and with Luna and Willenbucher (who like Lanier had purchased Trust II units) to bring claims on behalf of themselves and those individuals and entities that had purchased or otherwise acquired common units of (a) Trust I pursuant or traceable to the Trust I IPO, deemed effective April 5, 2011, and/or at all other times between April 5, 2011, and November 8, 2012, inclusive (the "Class Period"), *see*, *e.g.*, Consol. Am. Compl. ¶¶ 2, 3, and/or (b) Trust II pursuant or traceable to the Trust II IPO, deemed effective April 17, 2012, and/or at all other times during the Class Period, *see*, e.*g.*, *id*.

Relief was sought under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of

1995, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, promulgated thereunder. *See* 17 C.F.R. § 240.10b-5. Lead Plaintiffs also sought to hold certain defendants liable under Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77o.

The Exchange Act and Rule 10b-5 claims were asserted against Trust I and nominal defendant SandRidge[2] as well as against defendants Tom L. Ward, SandRidge's founder and then chief executive officer and chairman of SandRidge's Board of Directors, James D. Bennett, SandRidge's executive vice president and chief financial officer of both SandRidge and the two Trusts, and Matthew K. Grubb, SandRidge's president and chief operating officer of Trust I and Trust II.[3]

The Securities Act claims were asserted against both Trust I and Trust II, SandRidge, Ward, Bennett, and Grubb. Also named as defendants were Randall D. Cooley, who served as SandRidge's senior vice president–accounting, members of SandRidge's Board of Directors (Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr., and Jeffrey S. Serota), and certain entities that had underwritten the Trust offerings and/or had helped draft and disseminate prospectuses for the two offerings[4]

---

[2] As Lead Plaintiffs have advised, SandRidge is sued "as a nominal defendant solely to the extent of available insurance." Consol. Am. Compl. ¶ 38.

[3] Lead Plaintiffs' Section 20(a) claims are asserted only against the individual defendants and, therefore, are not addressed in this Order.

[4] Those entities were Raymond James & Associates, Inc., Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co., LLC), Merrill Lynch, Pierce, Fenner & Smith, Inc., RBC Capital Markets, LLC, and Citigroup Global Markets Inc.

On August 30, 2017, the Court, without objection, dismissed Lead Plaintiffs' Securities Act claims. *See* Doc. No. 129. Judgment on those claims was entered pursuant to Federal Rule of Civil Procedure 54(b) on December 5, 2017. *See* J. (Doc. No. 146). Therefore, only Lead Plaintiffs' claims under Sections 10(b) and 20(a) of the Exchange Act and under Rule 10b-5 against SandRidge, Ward, Bennett, Grubb, and Trust I remain.

## DISCUSSION

Section 10(b) provides that

> [i]t shall be unlawful for any person, directly or indirectly, . . .
>
> [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission ("SEC") may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b).[5] The term "purchase" as used in this section is statutorily defined to "include any contract to . . . purchase, or otherwise acquire." *Id*. § 78c(a)(13). Although

---

[5] Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,
>
> in connection with the purchase or sale of any security.

17 C.F.R § 240.10b-5.

5

the term "purchase" is construed broadly, "only actual purchasers . . . of securities may maintain a private civil action under [Section] 10(b) and Rule 10b-5."[6] *United States v. O'Hagan*, 521 U.S. 642, 664 (1997) (citing *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723 (1975)). As the United States Supreme Court has stated, this requirement "limits the class of plaintiffs to those who have at least dealt in the security to which the prospectus, representation, or omission relates." *Blue Chip Stamps*, 421 U.S. at 747.[7]

In the instant motion, Trust I has sought judgment in its favor on those claims asserted against it by Luna and Willenbucher because the consolidated amended complaint reflects that these two plaintiffs only purchased units of Trust II, *see* Consol. Am. Comp. ¶ 35, and therefore they lack statutory standing to pursue Section 10(b) and Rule 10b-5 claims against Trust I. Trust I has contended that because neither Luna nor Willenbucher "falls within the class of plaintiffs whom Congress has authorized to sue under [Section 10(b) and Rule 10b-5,]" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014), these plaintiffs have failed to state a cause of action under this statute and rule. *See* Def.'s Mot. at 7. Trust I has further argued that it is irrelevant "that Trust II unit

---

[6] "[T]o state a claim under Section 10(b) of the [Exchange] Act and Rule 10b-5 a plaintiff must allege: '(1) a misleading statement or omission of a material fact; (2) made in connection with the purchase or sale of securities; (3) with intent to defraud or recklessness; (4) reliance; and (5) damages.'" *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1257-58 (10th Cir. 2001) (quotation omitted).

[7] *Cf. Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 284 (1992) (O'Connor, J., concurring in part and concurring in judgment) (purchaser/seller standing limitation in Rule 10b–5 damages actions does not stem from construction of phrase "in connection with the purchase or sale of any security"; rather, it rests on relationship between Section 10(b) and other provisions of securities laws and the practical difficulties in granting standing in absence of an executed transaction).

holders[, such as Luna and Willenbucher,] relied on statements made by or through Trust I in making their Trust II purchase decisions." *Id.* at 9.

In support of its argument, Trust I has relied on *Ontario Pub. Serv. Emps. Union Pension Trust Fund v Nortel Networks Corp.*, 369 F.3d 27 (2d Cir. 2004), wherein the Second Circuit held that JDS Uniphase Corporation ("JDS") investors did not have standing to sue Nortel Networks Corporation ("Nortel Networks") for false filings and publicity regarding Nortel Networks' financial condition, even though such filings and publicity had indirectly affected JDS and even if the false publicity could have foreseeably distorted the market for JDS stock.[8] The circuit court held that "[s]tockholders do not have

---

[8] JDS and Nortel Networks were involved in a series of business relationships and, by January 2001, Nortel Networks "was JDS' largest customer, accounting for 10-15% of JDS's revenues." *Nortel*, 369 F.3d at 29. On January 16, 2001, market analysts and news agencies reported, and JDS and Nortel Networks confirmed, that Nortel Networks would be acquiring JDS's laser business in exchange for Nortel Networks "stock and a promise of increased fiber optic component purchases." *Id*. The announcement "caused the price of JDS shares to increase, as market analysts determined that this transaction would make it more likely that JDS would meet its 2001 financial projections." *Id*. The deal was completed by February 12, 2001.

In January and February 2001, Nortel Networks "publicly indicated that it saw strong demand for its fiber optics products and expected 30% growth in revenue and earnings for 2001." *Id*. JDS shareholders "claim[ed] that these assertions not only improved the value of Nortel[ ] [Networks'] stock, but that because JDS made optimistic projections for its own business based on Nortel[ ] [Networks'] claims, JDS's stock price reacted positively as well." *Id*.

Ultimately, Nortel Networks "announced that it was cutting revenue estimates for the quarter . . . and that revenue growth would be closer to 15% than 30%. Following this announcement, the value of both Nortel [Networks] and JDS shares tumbled in heavy trading." *Id*. Shareholders of JDS brought an Exchange Act claim against Nortel Networks, alleging that this company's "financial filings and press releases regarding [its] earnings . . . were materially misleading because they incorporated inaccurate accounting results and unfounded projections." *Id*.

7

standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase." *Nortel*, 369 F.3d at 34.

In *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89 (2d Cir. 2007), the Second Circuit discussed its holding in *Nortel*, clarifying:

> We recognize that *Nortel* . . . contains language that could be read to suggest that a purchaser of a security may bring a fraud action under Rule 10b-5 only against the issuer of the security purchased. *See*, *e.g.*, [*Nortel*,] 369 F.3d at 28 (suggesting that an individual lacks standing to sue a company "for making a material misstatement when the individual purchased the security of a company other than the one that made the misstatement"); *id.* at 34 ("Stockholders do not have standing to sue under Section 10(b) and Rule 10b-5 when the company whose stock they purchased is negatively impacted by the material misstatement of another company, whose stock they do not purchase."). Such a reading, however, would place beyond the reach of Rule 10b-5 false statements made by underwriters, brokers, bankers, and non-issuer sellers.
>
> That is not what *Nortel* . . . held. In *Nortel* . . . , the plaintiffs had purchased stock in JDS . . . . Plaintiffs claimed that a different company, Nortel Networks, knowingly made falsely optimistic public statements about its own financial prospects. On the basis of a business relationship between JDS . . . and Nortel Networks, the plaintiffs claimed that their purchase price for JDS . . . stock had been inflated by Nortel Networks' false statements about itself. In the particular circumstances of the case, the connection between Nortel Networks' false statements about itself and the plaintiff[s'] purchase of JDS . . . stock was too remote to sustain an action under Rule 10b-5.

*In re NYSE Specialists*, 503 F.3d at 102 (Sotomayor, J.); *see id.* (explaining that district court incorrectly read *Nortel* to mean that action under Rule 10b-5 for false statements

about security purchased by plaintiff lies only against issuer of the security or that only statements about security issuer are actionable). [9]

Luna and Willenbucher have argued that, unlike the circumstances at issue in *Nortel*, the allegations in the consolidated amended complaint show that "there was a strong causal connection between Trust I's statements and the . . . purchases of Trust II units." Pls.' Resp. at 5; *e.g.*, *id*. at 17 ("Trust I's false statements were intimately connected with Plaintiffs' purchases of Trust II units"). Luna and Willenbucher have contended that "Trust I wells drilled primarily . . . in Alfalfa, Grant and Woods [C]ounties in Oklahoma produced considerably less oil than had been forecast in the Trust I registration statement," *id*. at 6; *e.g.*, Consol. Am. Compl. ¶¶ 16, 292, and that "ongoing drilling of Trust I [w]ells demonstrated a lack of geological uniformity in Alfalfa [C]ounty, and thus indicated that the oil and gas production of new horizontal wells drilled in [that] . . . county could not be

---

[9] In a subsequent case, *Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015), the Second Circuit in a Summary Order, however, again ruled that the plaintiff, an investment fund, lacked statutory standing, after finding that "[t]here [was] . . . no relevant difference between [the investment fund] . . . and the plaintiffs in *Nortel*." *Id*. at 656 (citation omitted).

The fund had "purchased . . . stock [in LightSquared, Inc. ('LightSquared'),] based on LightSquared's 'optimistic projections' about the feasibility of its plan given defendants' alleged failure to disclose [to investors] their . . . [products'] design issues for their own business reasons," *id*. (citation omitted), and had sought to hold the defendants liable under Section 10(b) and Rule 10b-5. The fund claimed that the defendants' "'omissions [about the shortcoming of their products had] directly concerned LightSquared,'" *id*., and therefore, "there [was] . . . a direct causal link between the fraud and the investment." *Id*. (citation omitted). The Second Circuit found "just as in *Nortel* . . . , the connection between the defendants' omissions about the shortcomings of its . . . [products] and [the plaintiff's] . . . purchase of LightSquared's stock was 'too remote to sustain an action,'" *id*., under the Exchange Act.

accurately estimated with the high degree of confidence assumed in the Trust I registration statement," Pls.' Resp. at 6; *e.g.*, Consol. Am. Compl. ¶ 17.

The plaintiffs have further argued in their response that

> [s]ince most of the Trust II wells were [also] to be drilled in Alfalfa, Grant and Woods [C]ounties, disclosure of the[se] negative oil production trends experienced by Trust I wells . . . in those counties . . . would have made it far more difficult for SandRidge to consummate the planned IPO of Trust II units. Therefore, . . . to successfully consummate the planned Trust II IPO, the [d]efendants[, including Trust I,] knowingly took steps to conceal the negative oil production trends of the Trust I wells (by among other steps, accelerating the pace at which the Trust I wells were drilled, thereby artificially boosting the aggregate oil production of the Trust I [w]ells, and masking the poorer than expected oil production on a well-by-well basis).

Pls.' Resp. at 6-7.[10]

---

[10] Lead Plaintiffs' arguments are grounded in the following allegations in the consolidated amended complaint:

(1) "negative trends and developments . . . with respect to the Trust I . . . Wells resulted in the oil production of the Trust I Wells falling more steeply than anticipated, which would have caused the quarterly cash distributions to Trust I Unitholders to fall below the quarterly estimates in the Trust I Registration Statement and Prospectus. Such an adverse development would, in turn, have made it far more difficult for SandRidge to raise capital to finance its rising capital expenditures via the Trust II Offering planned for April 2012, or the sale of its Trust I Common Units. Therefore, the . . . [d]efendants knowingly took steps to conceal the falling oil production of the Trust I Wells, by accelerating the pace at which the Trust I . . . Wells were scheduled to be drilled under the Trust I Registration Statement and Prospectus. The accelerated drilling artificially boosted the aggregate oil production of the Trust I Wells, and thus masked the steeply declining oil production that the . . . [d]efendants knew was occurring." Consol. Am. Compl. ¶ 293;

(2) "At the same time, when questioned by analysts on the Trust I Conference Calls concerning ominous signs of the Trust I Wells' declining oil production, the [individual] . . . [d]efendants made false and misleading statements that sought to conceal such declines from investors." *Id.* ¶ 294;

- and -

(3) These "false and misleading statements . . . artificially inflated the prices of Trust I and Trust II, and Trust Unitholders suffered losses when the truth began to leak out

Luna and Willenbucher have argued that the relationship between Trust I and Trust II is unlike "the limited business relationship in *Nortel* that was deemed 'too remote,'" *id*. at 17 (quotation omitted), by the Second Circuit "to sustain an action under [Section 10(b) and] Rule 10b-5," *In re NYSE Specialists*, 503 F.3d at 102. They have contended that even though Trust I and Trust II may have "maintain[ed] legal independence," *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 138 (2011), the fact remains that neither Trust had "any employees, officers or directors," Consol. Am. Compl. ¶ 289; *e.g.*, *id*. ¶¶ 39, 40, but in each instance was "administered from the offices of [the same] . . . trustee, The Bank of New York Mellon Trust Company, N.A., in Austin, Texas," *id*. ¶ 39; *e.g.*, *id*. ¶ 40, and managed by SandRidge employees. The plaintiffs have claimed that "SandRidge employees (i) handled all of the Trusts' business functions (including, without limitation, collecting the production data from the Trusts' Wells underlying the financial and operational results reported in the Trusts' SEC filings), and (ii) managed the Trust Wells that generated the royalties used to pay quarterly distributions to Trust Unitholders." *Id*. ¶ 289. Lead Plaintiffs have further claimed that the individual defendants—Ward, Bennett, and Grubb—"acted as the 'de facto' officers of the Trusts, overseeing management of the Trust Wells, and served as the Trusts' public face, including handling all . . . quarterly conference calls with analysts concerning the Trusts' financial and operational results." *Id*. ¶ 290.

---

and the risks concealed by the . . . [d]efendants began to materialize, thereby causing the price of the Trust Common Units to decline." *Id*. ¶ 295.

That Trust I and Trust II respected "'formal corporate boundaries,'" Pls.' Resp. at 17 (quotation omitted), is not, according to the plaintiffs, significant. Rather, because Trust I and Trust II were both created by SandRidge, share some management and administrative services, and receive royalty interests from different wells drilled in the same geological formation, Trust I is liable for its misstatements and omissions to the extent, if any, those misstatements and omissions influenced, prompted or "were intimately connected with," *id.* at 5, 17, these plaintiffs' purchase of Trust II units.

The cases upon which Luna and Willenbucher have relied do not support their argument that they are entitled under these facts to bring suit against Trust I. Those decisions, unlike the instant case, involve securities that were either contractually or otherwise linked and entities that were not legally separate and distinct.[11] For example, in *Zelman v. JDS Uniphase Corp.*, 376 F. Supp.2d 956 (N.D. Cal. 2005), plaintiff Shirley Zelman, like the plaintiffs in *Nortel* and Luna and Willenbucher in this case, sought "to sue an entity other than the issuer of the securities purchased." *Id.* at 961. The district court found that Zelman had standing to do so, after distinguishing the Second Circuit's decision. The court wrote:

> [U]nlike the plaintiffs in *Nortel*, who purchased common stock, [Zelman] . . . . purchased debt securities issued by an investment bank. . . . [While] [b]oth common stock and debt securities are "securities" under the securities laws[,] . . . [u]nlike common stock, equity-linked debt securities are defined in redemption value by reference to the value of stock in a company other than

---

[11] *See Semerenko v. Cendant Corp.*, 223 F.3d 165 (3d Cir. 2000) (holding that plaintiffs who had purchased stock in corporation that had been target of failed merger offer could pursue prospective offeror for misstatements affecting value of acquisition offer and of plaintiffs' stock).

> the issuer of the debt securities. Misstatements by [the defendant] . . . affecting the price of [the defendant's] . . . stock bear a "direct relationship" to the value of the [equity-linked debt securities purchased by Zelman] . . . because of the way the [latter securities] . . . have been defined, even though it was not [the defendant] . . . that defined th[ose] [securities] . . . in this way.

*Id*. (citations omitted). The district court found this difference as well as other differences rendered *Nortel* distinguishable. *Accord In re Worldcom, Inc. Sec. Litig.*, No. 02 Civ.3288(DLC), 03 Civ.9499(DLC), 2004 WL 1435356 (S.D.N.Y. June 28, 2004) (finding *Nortel* distinguishable where security at issue is "a derivative instrument whose redemption value was directly tied to the value of" another security and as such its price fluctuated with the price of the other). In the case at bar, the Trust units are not contractually linked to each other and neither is a derivative instrument whose value is tied to that of the other. As the consolidated amended complaint establishes, these Trust units are independent securities sold by two different entities and publicly traded under two distinct ticker symbols. *See, e.g.*, Consol. Am. Compl. ¶¶ 255, 256.

Neither Section 10(b) nor Rule 10b-5 "expressly creates a private right of action." *Janus Capital Grp.,* 564 U.S. at 142. They only impliedly authorize a right to sue. *See, e.g.*, *id*.; *Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 13, n.9 (1971). Because "[c]oncerns with the judicial creation of a private cause of action caution against its expansion," *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 165 (2008), the Court—"consistent with the narrow dimensions," *id*. at 167, that must be given to judicially-implied rights of action—finds that Trust I is entitled to judgment on the pleadings in its favor and against Luna and Willenbucher (and similarly situated non-purchasers of Trust I units, if any) on Luna's and Willenbucher's claims against Trust I

seeking relief under the Exchange Act and Rule 10b-5. Plaintiff's allegations of a connection between the management of Trust I and Trust II are not sufficient to plausibly show a connection between Trust I's allegedly false statements about itself and Luna's and Willenbucher's purchases of Trust II units such as would allow these plaintiffs, as shareholders of one public company, to bring suit against another public company that neither issued nor sold stock to them.[12]

CONCLUSION

For the foregoing reasons, the Court

(1) GRANTS Trust I's Motion for Partial Judgment on the Pleadings (Doc. No. 157) filed on January 19, 2018; and

(2) DISMISSES Luna's and Willenbucher's claims against Trust I with prejudice.

IT IS SO ORDERED this 18th day of January, 2019.

CHARLES B. GOODWIN
United States District Judge

---

[12] In *In re: Altisource Portfolio Sols., S.A. Sec. Litig.*, 14-81156 CIV-WPD, 2015 WL 12001262 (S.D. Fla. Sept. 4, 2015), the plaintiffs purchased or otherwise acquired common stock of Altisource Portfolio Solutions, S.A. ("Altisource") and sought to hold Ocwen Financial Corporation ("Ocwen"), a mortgage servicer from which Altisource was spun-off, liable. The plaintiffs had averred that Ocwen had "made statements directly to Altisource shareholders about Altisource and the relationship between Altisource and Ocwen," and argued "that the connection between Altisource and Ocwen, as they allegedly operated as one company and were founded and run by [one individual was] . . . closer than the business relationship between Nortel [Networks] and JDS." *Id.* at *4. The district court found that the plaintiffs lacked standing, stating: "As in *Nortel*, the business relationship between the two companies, though substantial, [was] . . . not enough to confer standing, despite the statements' content covering the relationship between Altisource and Ocwen." *Id.*