## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

DUANE & VIRGINIA LANIER
TRUST, individually and on behalf of
all others similarly situated, et al.,

    Plaintiffs,

vs.

SANDRIDGE MISSISSIPPIAN
TRUST I et al.,

    Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CIV-15-634-G

## ORDER

Now before the Court is the Motion for Partial Judgment on the Pleadings filed pursuant to Federal Rule of Civil Procedure 12(c) by Defendants SandRidge Energy, Inc. ("SandRidge"),[1] Tom L. Ward, James D. Bennett, Matthew K. Grubb, and SandRidge Mississippian Trust I ("Trust I"). *See* Defs.' Mot. (Doc. No. 215). Lead Plaintiffs[2] have responded in opposition, *see* Pls.' Mem. (Doc. No. 231), and Defendants have replied, *see* Defs.' Am. Reply (Doc. No. 242).

---

[1] Lead Plaintiffs have advised that SandRidge is sued "as a nominal defendant solely to the extent of available insurance." Consol. Am. Compl. (Doc. No. 78) ¶ 38.

[2] These include Duane & Virginia Lanier Trust ("Lanier"), Ivan Nibur, Jase Luna, who is sometimes referred to in pleadings and papers as "Luna Jase," *see*, *e.g.*, Consol. Am. Compl. ¶ 35, Matthew Willenbucher, and substituted Lead Plaintiff Deborah Rath, as agent of the Estate of Lawrence Ross, deceased, and as attorney-in-fact for Sonja Rath, Personal Representative of the Estate of Lawrence Ross, deceased ("Rath").

*A. Plaintiffs' Allegations*

SandRidge explored, developed, and produced natural gas and oil reserves in, among other locations, the Mississippian Formation, "a geological formation located in northern Oklahoma and south-central Kansas." Consol. Am. Compl. ¶ 87. "[T]o finance increased capital expenditures planned for 2011, SandRidge decided to 'monetize' certain of its existing oil and gas assets in [n]orthern Oklahoma by selling interests in those assets to the public via a royalty trust." *Id*. ¶ 4. To this end, SandRidge created Trust I and conveyed to it royalty interests consisting of a share of SandRidge's revenue from (a) existing horizontal oil and gas wells in five Oklahoma counties, collectively referred to as the "Trust I Area of Mutual Interest" ("Trust I AMI"), and (b) specific horizontal oil and gas wells to be drilled in the Trust I AMI. *See id.* To pay for these royalty interests, Trust I committed to sell common units to investors in an initial public offering ("Trust I IPO") and transfer the net proceeds of that sale to SandRidge. *Id.* ¶ 5.

SandRidge thereafter decided to raise additional funds to finance its capital expenditures and in December 2011 formed the SandRidge Mississippian Trust II ("Trust II"). *Id*. ¶ 19. SandRidge conveyed to Trust II royalty interests consisting of a share of SandRidge's revenue from (a) existing horizontal wells in nine counties in Oklahoma and Kansas, collectively referred to as the "Trust II Area of Mutual Interest" ("Trust II AMI"), and (b) certain horizontal oil and gas wells to be drilled in the Trust II AMI. *Id.* As with Trust I, to compensate SandRidge for these royalty interests Trust II committed to sell

common units in an initial public offering ("Trust II IPO") and transfer those proceeds to SandRidge. *Id.* ¶ 20.

In November 2012, SandRidge made certain statements that concerned the performance of oil and gas wells in the Mississippian Formation. In a press release dated November 8, 2012, SandRidge "reported a 'net loss applicable to common stockholders of $184 million, or $0.39 per diluted share, for third quarter 2012 compared to net income available to common stockholders of $561 million, or $1.16 per diluted share, in third quarter 2011.'" *Id.* ¶ 227.

The next day, "before markets opened, SandRidge held a conference call for analysts and investors to discuss the financial results and other information in the . . . [p]ress [r]elease." *Id.* ¶ 228. During that earnings call, Defendant Ward, who was SandRidge's founder and then chief executive officer and chairman of SandRidge's Board of Directors, "disclosed that . . . SandRidge's wells in the Mississippian Formation consisted of far more gas and far [fewer] oil deposits than the market had previously been led to believe." *Id.* In response to an analyst's "concern over the drop in oil production in the Mississippian Formation," "Defendant Ward conceded that wells in the Mississippian Formation . . . were producing less oil." *Id.* ¶ 230. On that same call, Defendant Grubb, then SandRidge's president and president and chief operating officer of Trust I and Trust II, further disclosed:

> "As for the Mississippian, while the gas performance has been on target, we are seeing a steeper oil decline than we previously anticipated and have made revision to our model accordingly for 2013."

*Id.* ¶ 229.

Following these disclosures, the prices of SandRidge common stock and Mississippian Trust units dropped. SandRidge's common stock declined from a close of $6.10 per share on November 8, 2012, to a close of $5.51 per share on November 9, 2012. *See* Decl. of Mark P. Gimbel, Ex. 1 (Doc. No. 216-1) at 11, ¶ 12.[3] "[T]he price of Trust I Units declined from a close of $18.95 per [u]nit on November 8, 2012 to a close of $17.54 per [u]nit on November 9, 2012 (a 7.4% decline and a 16.5% decline from the Trust I Offering price of $21/Unit)." Consol. Am. Compl. ¶ 232. From "November 12 [to] 15, 2012, the price of Trust I Units dropped further on each trading day to close at $14.81 on November 15, 2012—an additional decline of 15.6%," resulting in a total decline of 21.8%. *Id*. "[T]he price of Trust II Units declined from $19.36 per unit on November 8, 2012 to close at $17.70 per unit on November 9, 2012 (an 8.5% decline, and a 15.7% decline from the Trust II Offering price of $21/Unit)." *Id*. ¶ 233. From "November 12 [to] 15, 2012, the price of Trust II Units dropped further on each trading day to close at $15.36 on November 15, 2012—an additional drop of 13.2%," resulting in a total decline in the price of Trust II units of 20.7%. *Id*.

B. *Procedural History of* In re Sandridge Energy, Inc. Securities Litigation*, Case No. CIV-12-1341-G*

On December 5, 2012, a complaint was filed in this Court on behalf of a putative class of investors in SandRidge common stock, asserting claims against SandRidge, Ward, Grubb, and Bennett (who was executive vice president of SandRidge and chief financial officer of both SandRidge and the two Trusts). *See Glitz v. SandRidge Energy, Inc.*, Case

---

[3] References to page numbers herein use the ECF pagination unless otherwise specified.

No. CIV-12-1341 (W.D. Okla.). Initially, no claims were asserted on behalf of Trust I or Trust II investors, and neither Trust I nor Trust II was a named defendant.

The Complaint alleged that SandRidge, together with its officers and directors, had violated federal securities laws by "disseminati[ng] . . . false and misleading statements concerning . . . [SandRidge's] business and operational status and FY 2012 financial expectations." *Glitz*, Compl. (Doc. No. 1) ¶ 1. The Complaint contended that "the truth" about defendants' conduct had "beg[un] to be revealed" on November 8, 2012, through a "publicly issued . . . letter" written by "D[i]nakar Singh, CEO of . . . TPG-Axon, which then owned 4.5% of SandRidge's stock." *Id.* ¶ 52 (emphasis and capitalization omitted). This letter discussed "SandRidge's 'disastrous performance' and over 76% decline in its stock price." *Id.* To this end, the Complaint also cited a November 8, 2012 press release, in which "Defendants [had] reported a loss of $184 million, or 39 cents per share, in the 3Q 2012, compared with a profit of $561 million, or $1.16 per share, in the 3Q 2011." *Id.* ¶ 54 (emphasis omitted). And it cited a November 9, 2012 conference call, during which "Defendant Ward [had] acknowledged that SandRidge had been overstating the value of its Mississippian assets . . . , disclosing that in reality, [SandRidge's] Mississippian formation assets consisted of far more low-margin natural gas deposits and far fewer high-margin oil deposits than the market had previously been led to believe." *Id.*

The Complaint also alleged that the defendants had made misstatements and omissions about "the extent and value of [SandRidge's] oil reserves" so that SandRidge could "monetize its interests in the Mississippian formation assets." *Id.* ¶ 66. These misstatements and omissions, said the plaintiffs, had "[a]rtificially inflat[ed] and

manipulat[ed] SandRidge's stock price," and when they "became apparent to the market on November 8, 2012, SandRidge's stock price fell precipitously." *Id.* ¶ 67.

*Glitz* was eventually consolidated with *Carbone v. SandRidge Energy, Inc.*, Case No. CIV-13-19, also pending in the Western District of Oklahoma. *See Glitz*, Order of Mar. 6, 2013 (Doc. No. 60) (West, J.). Laborers Pension Trust Fund for Northern Nevada, Construction Laborers Pension Trust of Greater St. Louis, Vladimir Galkin, and Angela Galkin, purchasers of SandRidge common stock, were appointed Lead Plaintiffs in the re-styled consolidated action. *See id.* at 2, 4. In July 2013, they amended their complaint. *See In re SandRidge Energy, Inc. Securities Litigation*, Case No. CIV-12-1341-G ("*SandRidge*"), Doc. Nos. 67, 73, 75.[4]

Named as additional plaintiffs in that pleading were Judith Greenberg, Charles Blackburn, and Ted Odell, who sought to assert claims on behalf of a putative class of purchasers of Trust I and Trust II Units. *See SandRidge* Compl. (Doc. No. 75) ¶¶ 1, 23-25. These Trust I and II Unitholders likewise alleged that Defendants' alleged misrepresentations and omissions about wells in the Mississippian Formation had artificially inflated the price of Trust I and Trust II Units. They further alleged that, "[a]s a direct result of Defendants' disclosures" on November 8 and 9, 2012, and "a

---

[4] More precisely, the Lead Plaintiffs in *SandRidge* filed a consolidated amended complaint on July 23, 2013 (Doc. No. 67), a corrected consolidated amended complaint on July 30, 2013 (Doc. No. 73), and a second corrected consolidated amended complaint on July 30, 2013 (Doc. No. 75). For ease of reference, the Court refers to the last of these documents—which is the operative pleading—as the "*SandRidge* Complaint."

materialization of the undisclosed risk of investing in . . . the SandRidge Trusts," the price of Trust I and Trust II Units "fell precipitously." *See id.* ¶¶ 329-331, 361.[5]

On May 11, 2015, the Court dismissed the claims brought by Greenberg, Blackburn, and Odell without prejudice for failure to comply with certain requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. *See SandRidge*, Order of May 11, 2015 (Doc. No. 180) (West, J.).

*C. Procedural History of Current Action, Case No. CIV-15-634-G*

On June 9, 2015, immediately after the dismissal of the claims of Greenberg, Blackburn, and Odell in *SandRidge*, Lanier brought the instant action. *See* Compl. (Doc. No. 1). A consolidated amended complaint followed on November 11, 2016. *See* Am. Compl. (Doc. No. 78).[6] In that pleading, Lanier joined with Nibur and Rath (who like Lanier had purchased Trust I units) and with Luna and Willenbucher (who also like Lanier had purchased Trust II units) to bring claims on behalf of themselves and the individuals and entities that had purchased or otherwise acquired common units of (a) Trust I pursuant or traceable to the Trust I IPO, deemed effective April 5, 2011, and/or at all other times

---

[5] The Trust I Unitholders further alleged that a November 19, 2012 analyst report on Trust I stated, "Following comments from management of SandRidge . . . regarding horizontal Mississippian well performance we are lowering our [earnings per unit] estimates and valuation range as a result of an updated type curve." *SandRidge* Compl. ¶ 332. The report further stated that based on information revealed during the conference call that "the data indicate[d] that oil production rates [were] declining at a faster than previously anticipated rate," *id.* (emphasis omitted), and as a result, SandRidge was "reducing [estimated ultimate recoveries] due to the steeper decline rate for oil" and was "updating [its] model to reflect these assumptions." *Id.*

[6] Lead Plaintiffs supplemented their consolidated amended complaint on May 1, 2017. *See* Suppl. Allegations (Doc. No. 120).

between April 5, 2011, and November 8, 2012, inclusive (the "Class Period"), *see, e.g.*, *id.* ¶¶ 2, 3; and/or (b) Trust II pursuant or traceable to the Trust II IPO, deemed effective April 17, 2012, and/or at all other times during the Class Period, *see, e.g.*, *id*.

Relief was sought under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the PSLRA, 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, promulgated thereunder. *See* 17 C.F.R. § 240.10b-5. Lead Plaintiffs also sought to hold certain defendants liable under sections 11, 12(a)(2), and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2) and 77o.

The Exchange Act and Rule 10b-5 claims were asserted against Trust I and nominal Defendant SandRidge as well as against Defendants Ward, Bennett, and Grubb. The Securities Act claims were asserted against both Trust I and Trust II, SandRidge, Ward, Bennett, and Grubb. Also named as Defendants were Randall D. Cooley, who served as SandRidge's senior vice president–accounting, members of SandRidge's Board of Directors (Jim J. Brewer, Everett R. Dobson, William A. Gilliland, Daniel W. Jordan, Roy T. Oliver, Jr., and Jeffrey S. Serota), and certain entities that had underwritten the Trusts' offerings and/or had helped draft and disseminate prospectuses for the two offerings.[7]

On August 30, 2017, the Court, without objection, dismissed Lead Plaintiffs' Securities Act claims. *See* Order of Aug. 30, 2017 (Doc. No. 129) (Miles-LaGrange, J.). Judgment on those claims was thereafter entered pursuant to Federal Rule of Civil

---

[7]Those entities were Raymond James & Associates, Inc., Morgan Stanley & Co. Incorporated (n/k/a Morgan Stanley & Co., LLC), Merrill Lynch, Pierce, Fenner & Smith, Inc., RBC Capital Markets, LLC, and Citigroup Global Markets Inc.

Procedure 54(b) on December 5, 2017.  *See* J. (Doc. No. 146) (Palk, J.).  The Court also dismissed Luna's and Willenbucher's claims against Trust I on January 18, 2019.  *See* Order of Jan. 18, 2019 (Doc. No. 282) (Goodwin, J.).  What remains are the individual claims of Lanier, Nibur, and Rath and the claims they have asserted on behalf of putative class members under section 10(b) and/or section 20(a) of the Exchange Act and under Rule 10b-5 against Defendants SandRidge, Ward, Bennett, Grubb, and Trust I.

## STANDARD OF REVIEW

Defendants originally argued in their Rule 12(c) motion that the Exchange Act claims brought by Lead Plaintiffs on behalf of the putative class members were time-barred.  Based on Lead Plaintiffs' response, Defendants have now contended that all Exchange Act claims in this action are untimely.  Thus, Defendants invoke their affirmative defense of the statute of limitations, contending that Plaintiffs' claims were asserted after expiration of the two-year limitations period set forth in 28 U.S.C. § 1658(b)(1) for Exchange Act claims.[8]

### A.  *General Rule 12(c) Standards*

Rule 12(c) permits a party to move for judgment on the pleadings "[a]fter the pleadings are closed—but early enough not to delay trial."  Fed. R. Civ. P. 12(c).  The

---

[8] 28 U.S.C. § 1658(b) provides that

> a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . . may be brought not later than the earlier of—
>
> (1) 2 years after the discovery of the facts constituting the violation; or
>
> (2) 5 years after such violation.

Court evaluates the motion under the familiar standard for Federal Rule of Civil Procedure 12(b)(6) motions. *See Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1160 (10th Cir. 2000) (citing *Mock v. T.G. & Y. Stores Co.*, 971 F.2d 522, 528 (10th Cir. 1992)); *see, e.g.*, *Denver Health & Hosp. Auth. v. Beverage Distribs. Co., LLC*, 546 F. App'x 742, 745 (10th Cir. 2013). Accordingly, the Court "accept[s] the well-pleaded allegations of the [operative] complaint as true and construe[s] them in the light most favorable to the non-moving party." *Realmonte v. Reeves*, 169 F.3d 1280, 1283 (10th Cir. 1999).

While the Court may dismiss a claim on the pleadings based on an affirmative defense[9] under Rule 12(c), it is only appropriate to do so when a plaintiff's pleadings

---

[9] Federal Rule of Civil Procedure 8(c) requires that a responsive pleading set forth certain enumerated affirmative defenses, including the statute of limitations. Generally, "a party waives its right to raise an affirmative defense at trial when the party fails to raise the defense in its pleadings," *Creative Consumer Concepts, Inc. v. Kreisler*, 563 F.3d 1070, 1076 (10th Cir. 2009); the Tenth Circuit, however, has cautioned courts to "keep in perspective that the liberal pleading rules established by the Federal Rules of Civil Procedure apply to the pleading of affirmative defenses," *id.* (internal quotation marks omitted), and to "avoid hypertechnicality in pleading requirements and focus, instead, on enforcing the actual purpose of the rule," *id.* (internal quotation marks omitted), which is

> to guarantee that the opposing party has notice of any additional issue that may be raised at trial so that he or she is prepared to properly litigate it. When a plaintiff has notice that an affirmative defense will be raised at trial, the defendant's failure to comply with Rule 8(c) does not cause the plaintiff any prejudice. And, when the failure to raise an affirmative defense does not prejudice the plaintiff, it is not error for the trial court to hear evidence on the issue.

*Id.* (internal quotation marks omitted).

Defendants SandRidge, Bennett, and Grubb raised the affirmative defense of statute of limitations in their answers to the consolidated amended complaint. *See* SandRidge's Answer (Doc. No. 137) ¶ 388; Bennett and Grubb's Answer (Doc. No. 138) at 79, ¶ 28. Ward and Trust I did not assert this affirmative defense in their responsive pleadings. *See* Ward's Answer (Doc. No. 140), at 16-20; Trust I's Answer (Doc. No. 141) at 45-48.

"admit[ ] all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1299 (10th Cir. 2018).[10] Thus, to prevail on their Rule 12(c) motion, Defendants must show that the pleadings in this case (and those matters of which the Court may take judicial notice)[11] "make clear that the right sued upon has been extinguished.'" *Solomon v. HSBC Mortg. Corp.*, 395 F. App'x 494, 497 (10th Cir. 2010) (quoting *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1041 n.4 (10th Cir. 1980)).

## B. *The two-year limitations period set forth in 28 U.S.C. § 1658(b)(1)*

Section 1658(b)(1)'s two-year limitations period "begins to run upon discovery of the facts constituting the violation." *China Agritech, Inc. v. Resh*, 138 S. Ct. 1800, 1804 (2018). The term "discovery" as used in § 1658(b)(1) was interpreted by the Supreme Court in *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633 (2010). Because the arguments in

---

Because Lead Plaintiffs have not complained that Ward's and Trust I's failure to do so has prejudiced them, the Court finds Ward and Trust I have not waived their right to assert this affirmative defense.

[10] "Rule 12(b)(6) or Rule 12(c) is a proper vehicle for dismissing a complaint that, on its face, indicates the existence of an affirmative defense such as noncompliance with the limitations period." *Guidry v. Chenega Integrated Sys., L.L.C.*, No. CIV-07-378-D, 2010 WL 11613793, at *1 (W.D. Okla. Feb. 12, 2010) (alteration and internal quotation marks omitted).

[11] *See Wei v. Univ. of Wyo. Coll. of Health Sch. Pharm.*, No. 18-8011, 2019 WL 117081, at *3 (10th Cir. Jan. 7, 2019) (finding that the district court was entitled to glean relevant date for limitations calculation by taking judicial notice of a filing in the plaintiff's earlier lawsuit); *Guidry*, 2010 WL 11613793, at *1 ("Facts subject to judicial notice, such as facts shown by the case record, may be considered without converting the [Rule 12(b)(6) or Rule 12(c)] motion to one for summary judgment").

this case implicate principles explained in *Merck*, the Court recites the relevant discussion at length.

In *Merck*, a group of investors had brought suit on November 6, 2003, against Merck & Co., Inc. and others under section 10(b), alleging that these defendants had "knowingly misrepresented the risks of heart attacks accompanying the use of Merck's pain-killing drug, Vioxx (leading to economic losses when the risks later became apparent)." *Merck*, 559 U.S. at 637-38. The district court dismissed plaintiffs' complaint as untimely, concluding that certain pre-November 2001 events "should have alerted the plaintiffs to a possibility that Merck had knowingly misrepresented material facts no later than October 9, 2001, thus placing the plaintiffs on 'inquiry notice' to look further." *Id*. at 643 (emphasis and internal quotation marks omitted);[12] *see In re Merck & Co. Sec., Derivative & "ERISA" Litig. (MDL No. 1658)*, 483 F. Supp. 2d 407 (D.N.J. 2007). Because "the plaintiffs had failed to show that they exercised reasonable due diligence but nevertheless

_____

[12] These events included:

(a) a March 2000 study conducted by Merck that "compared Vioxx with another painkiller, naproxen" and showed that while "persons taking Vioxx suffered fewer gastrointestinal side effects," "approximately 4 out of every 1,000 participants who took Vioxx suffered heart attacks, compared to only 1 per 1,000 participants who took naproxen," *Merck*, 559 U.S. at 639;

(b) a Food and Drug Administration ("FDA") "warning letter released to the public on September 21, 2001," that read in part "that, in respect to cardiovascular risks, Merck's Vioxx marketing was 'false, lacking in fair balance, or otherwise misleading,'" *id*. at 640 (internal quotation marks omitted); and

(c) Merck's response on October 9, 2001, as reported in the *New York Times,* to the FDA letter, the filing of "more products-liability lawsuits," and the drop in Merck's share price: "Merck ha[s] reexamined its own data and '[finds] no evidence that Vioxx increase[s] the risk of heart attacks,'" *id*. at 641 (internal quotation marks omitted).

were unable to discover their injuries, the [district] court took October 9, 2001, as the date that the limitations period began to run." *Merck*, 559 U.S. at 643 (internal quotation marks omitted). The Third Circuit reversed, finding "that the pre-November 2001 events, while constituting 'storm warnings,' did not suggest much by way of scienter, and consequently did not put the plaintiffs on 'inquiry notice,' requiring them to investigate further." *Id.*; *see In re Merck & Co. Sec., Deriv. & "ERISA" Litig. (MDL No. 1658)*, 543 F.3d 150, 172 (3d Cir. 2008).

In affirming the court of appeals' decision, the Supreme Court agreed "that Congress intended courts to interpret the word 'discovery' in § 1658(b)(1)" as "encompass[ing] not only to those facts the plaintiff actually knew, but also those facts a reasonably diligent plaintiff would have known." *Merck*, 559 U.S. at 646, 648. Applying that interpretation, the Supreme Court rejected Merck's argument that § 1658(b)(1) did "not require 'discovery' of scienter-related 'facts.'" *Id.* at 648. It held: "The statute says that the limitations period does not begin to run until 'discovery of the *facts constituting the violation*.' Scienter is assuredly a 'fact.'"[13] *Id.* (quoting 28 U.S.C. § 1658(b)(1)). The Court further explained:

---

[13] "Scienter consists of 'a mental state embracing intent to deceive, manipulate, or defraud,' or recklessness." *Anderson v. Spirit AeroSystems Holdings, Inc.*, 827 F.3d 1229, 1236-37 (10th Cir. 2016) (quoting *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1105 (10th Cir. 2003)). For purposes of section 10(b), "recklessness is defined as 'conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the [defendant] . . . must have been aware of it.'" *City of Phil. v. Fleming Cos., Inc.*, 264 F.3d 1245, 1260 (10th Cir. 2001) (internal quotation marks omitted).

And this "fact" of scienter "constitut[es]" an important and necessary element of a § 10(b) "violation." A plaintiff cannot recover without proving that a defendant made a material misstatement with an intent to deceive—not merely innocently or negligently. Indeed, Congress has enacted special heightened pleading requirements for the scienter element of § 10(b) fraud cases. As a result, unless a § 10(b) plaintiff can set forth facts in the complaint showing that it is "at least as likely as" not that the defendant acted with the relevant knowledge or intent, the claim will fail. It would therefore frustrate the very purpose of the discovery rule in this provision—which, after all, specifically applies only in cases "involv[ing] a claim of fraud, deceit, manipulation, or contrivance,"—if the limitations period began to run regardless of whether a plaintiff had discovered any facts suggesting scienter. So long as a defendant concealed for two years that he made a misstatement with an intent to deceive, the limitations period would expire before the plaintiff had actually "discover[ed]" the fraud.

*Id.* at 648-49 (alterations in original) (emphasis, citations, and internal quotation marks omitted).

The Supreme Court rejected Merck's next argument that, "even if 'discovery' requires facts related to scienter, facts that tend to show a materially false or misleading statement (or material omission) are ordinarily sufficient to show scienter as well." *Id*. at 649. The Supreme Court "recognize[d] that certain statements are such that, to show them false is normally to show scienter as well," but found that in section 10(b) cases "the relation of factual falsity and state of mind is more context specific. An incorrect prediction about a firm's future earnings, by itself, does not automatically tell us whether the speaker deliberately lied or just made an innocent (and therefore nonactionable) error." *Id*. at 650. Accordingly, § 1658(b)(1) "may require 'discovery' of scienter-related facts beyond the facts that show a statement (or omission) to be materially false or misleading." *Id*.

The Supreme Court also took issue with terminology used by Merck and in the courts below, including that the limitations period begins to run when plaintiffs are "on

'inquiry notice'"—that is, "the point at which a plaintiff possesses a quantum of information sufficiently suggestive of wrongdoing that he should conduct a further inquiry." *Id.* (internal quotation marks omitted). Noting § 1658(b)(1)'s express language, the Supreme Court held that a plaintiff's claim does not accrue "when a plaintiff would have *begun* investigating" but upon "the 'discovery' of" the "'facts constituting the violation.'" *Id.* at 651. It stated that "[i]f the term 'inquiry notice' refers to the point where the facts would lead a reasonably diligent plaintiff to investigate further, that point is not necessarily the point at which the plaintiff would already have discovered facts showing scienter or other 'facts constituting the violation.'" *Id.* And, similarly, the Supreme Court stated that events commonly characterized as "storm warnings" "may be useful to the extent that they identify a time when the facts would have prompted a reasonably diligent plaintiff to begin investigating." *Id.* at 653.[14]

In evaluating the timeliness of the Exchange Act claims in this case, the Court, as the Supreme Court has cautioned, must be cognizant that § 1658(b)(1)'s two-year limitations period did not begin to run (and Lead Plaintiffs' Exchange Act claims did not accrue) until, as shown by the allegations in the pleadings, Lead Plaintiffs "did in fact

---

[14] *Cf. De Vito v. Liquid Holdings Grp., Inc.*, No. CIV-15-6969 (KM) (JBC), 2018 WL 6891832, at *26 (D.N.J. Dec. 31, 2018) (explaining that while "[t]erms such as 'inquiry notice' and 'storm warnings' may be useful to the extent that they identify a time when facts would have prompted a reasonably diligent plaintiff to begin investigating,'" "such metaphors do not supply the legal standard; calling a disclosure a 'storm warning' does not trigger the statute of limitations before the plaintiff discovers or a reasonably diligent plaintiff would have discovered the facts constituting a violation" (internal quotation marks omitted)).

discover, *or* . . . a reasonably diligent plaintiff would have discovered, 'the facts constituting the violation,'"—"includ[ing] the fact of scienter"—"whichever [came] first." *Id.* at 637 (emphasis added) (quoting 28 U.S.C. § 1658(b)(1)). These "discovery principles cannot be evaded by [Lead Plaintiffs'] inaction." *De Vito*, 2018 WL 6891832, at *25. Rather, "they apply 'irrespective of whether . . . [Lead] [P]laintiff[s] undertook a reasonably diligent investigation.'" *Id*. (quoting *Pension Trust Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 275 (3d Cir. 2013)).

## DISCUSSION

According to Defendants, because Lead Plaintiffs' "own dispositive admissions" show "without exception or qualification," that "all elements of Defendants' fraudulent conduct, including scienter, were revealed to the investing public, including Plaintiffs, by November 9, 2012," the Exchange Act claims filed more than two years later, on June 9, 2015, are time-barred. Defs.' Am. Reply (Doc. No. 242) at 2, 3 (emphasis omitted).[15] Relying on the allegations in both the original complaint and the amended pleading, Defendants contend that Lead Plaintiffs knew as early as November 2012 about "the nature and extent of Defendants' fraud." Compl. ¶ 80. In particular, Defendants point to Lead

---

[15] Lead Plaintiffs have made clear in their response that they are not relying on *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), wherein the Supreme Court held among other things "that the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint." *China Agritech*, 138 S. Ct. at 1804; *see* Pls.' Mem. at 18 ("Plaintiffs' initial complaint filed on June 9, 2015 was timely under *Merck*, and Plaintiffs need not rely on *American Pipe* tolling to render their Exchange Act claims timely . . . ."); *id*. ("*American Pipe* tolling is irrelevant because as shown, under *Merck*, the two-year limit had not expired before the Plaintiffs filed their initial complaint on June 9, 2015.").

Plaintiffs' assertion that the "fraud [was] finally . . . revealed to investors and the market," "after the disclosures on November 8 and 9, 2012, came to light." *Id.*; *see also id.* ¶ 75 ("[w]hen Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of SandRidge Trusts units fell precipitously"); Consol. Am. Compl. ¶ 25 ("risks to Trust I and II Unitholders concealed by material omissions from the Trusts' registration statements . . . began to materialize on November 9, 2012, when SandRidge held a conference call"); *cf. SandRidge* Compl. (Doc. No. 1) ¶ 67 ("When Defendants' prior misrepresentations and fraudulent conduct became apparent to the market on November 8, 2012, SandRidge's stock price fell precipitously, as the prior artificial inflation came out of the stock price.").

Lead Plaintiffs respond that they had not and could not have discovered by November 2012 (or any time more than two years prior to June 9, 2015) the facts related to scienter. They contend that their Exchange Act claims "did not begin to run any earlier than July 23, 2013," the day the first consolidated amended complaint was filed in *SandRidge*. Pls.' Mem. at 11 (emphasis omitted); *see SandRidge* Consol. Am. Compl. (Doc. No. 67).[16]

---

[16] *See supra* note 4. As stated, this pleading was followed by a corrected consolidated amended complaint (Doc. No. 73), and a second corrected consolidated amended complaint (Doc. No. 75), both filed on July 30, 2013. Because Lead Plaintiffs have cited to the Court's Order dated August 27, 2015, which examined the allegations in the second corrected consolidated amended complaint (Doc. No. 75), *see SandRidge*, Order of Aug. 27, 2015 (Doc. No. 184) at 1 (West, J.) ("after review of the allegations in the corrected consolidated amended complaint, *see* Doc. 75"), the Court has referred to that pleading in considering the arguments now presented by the parties.

Lead Plaintiffs note that in *SandRidge*, the Court on August 27, 2015, found that the allegations in support of the essential element of scienter in that case—allegations filed by "sophisticated institutional investors and their experienced securities class action counsel"—were deficient. *See* Pls.' Mem. at 6, 11. According to Lead Plaintiffs, because the Court "necessarily determined that the November 2012 disclosures did not reveal scienter," Defendants cannot now claim that those same November 2012 disclosures provided Lead Plaintiffs sufficient information to trigger the two-year time limit in § 1658(b)(1). *Id*. at 13.

In the August 27, 2015 Order, the Court considered whether the allegations in *SandRidge* met the PSLRA's "heightened pleading standard" and, specifically, "satisf[ied] the scienter requirement—a mental state embracing intent to deceive, manipulate, or defraud." *SandRidge*, Order of Aug. 27, 2015, at 24 (internal quotation marks omitted). The Court found that

> "there is little in the [corrected consolidated] [a]mended [c]omplaint to support the conclusory allegation that [defendants'] . . . allegedly misleading omissions and statements were motivated by the intent to defraud or by a reckless disregard of a known 'fact that was so obviously material that [defendants Ward, Grubb, and Bennett] . . . must have been aware both of its materiality and that its nondisclosure would likely mislead investors.'" [*Weinstein v. McClendon*, 757 F.3d 1110,] 1114 [(10th Cir. 2014)]. Absent allegations that give rise to a strong inference that [defendants] . . . "knew about the '"danger of misleading buyers and sellers,"'" *Nakkhumpun[ v. Taylor*, 782 F.3d 1142,] 1149 [(10th Cir. 2015)] (quoting *Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (further quotation omitted)), or that "the danger [of misleading investors] was 'so obvious that [defendants] . . . must have been aware of it[,]'" *id*. (quotations omitted), this theory of relief fails. The allegations in the [corrected consolidated] [a]mended [c]omplaint taken as a whole together with the exhibits submitted by the parties, fail to create the necessary inference that any representations made by, or any nondisclosures of, [any defendant] . . . regarding the

production of SandRidge's wells in the Mississippian formation were made with the primary purpose of misleading shareholders or that . . . defendant[s] recklessly disregarded the likelihood that [their] . . . representations or nondisclosures regarding production would mislead SandRidge investors.

*Id.* at 28-29 (ninth and eleventh alteration in original) (footnotes omitted); *see also id*. at 22.[17]

Again, the question before the Court is *when*—as shown by the pleadings in this case—Lead Plaintiffs discovered, or a reasonably diligent plaintiff would have discovered, sufficient facts regarding Defendants' state of mind to start the two-year limitations period.[18]  Despite Defendants' arguments to the contrary, the Court finds there are no

---

[17] In the instant case, the Court determined on November 11, 2017, that Lead Plaintiffs had sufficiently pled the essential elements of their section 10(b) claims, including facts evidencing scienter as to Defendants Ward and Grubb.  *See* Order of Sept. 11, 2017 (Doc. No. 130) (Miles-LaGrange, J.) at 8.  In doing so, the Court found that the consolidated amended complaint

> specifically allege[d] that both [D]efendants Ward and Grubb attended senior management meetings concerning the oil and gas production performance of individual SandRidge wells, including the Trust Wells, after the Trust offerings, that the meetings were often led by [D]efendant Grubb, and that the declining oil production of the Trust Wells after the Trust I IPO, and the unpredictability of the performance of individual Trust I Wells after the Trust I IPO, was discussed at these weekly meetings.

*Id.* at 8-9 (citing Consol. Am. Comp. (Doc. No. 78) ¶¶ 68-73).  The Court further found that the allegations regarding Defendants Ward and Grubb's "motive further support[ed] a finding . . . [of] scienter."  *Id*. at 9 (citing Consol. Am. Compl. (Doc. No. 78) ¶¶ 299-304).  As to Defendant Bennett, the Court found that the allegations in the consolidated amended complaint failed to sufficiently allege scienter and dismissed the section 10(b) claims against him.  *See id.*

[18] In *SandRidge*, the Court made no findings regarding when the plaintiffs discovered the facts supporting their allegations of scienter, and the plaintiffs had no duty to plead the same.  *See Fernandez*, 883 F.3d at 1299 ("A plaintiff need not anticipate in the complaint an affirmative defense that may be raised by the defendant"); *Ghailani v. Sessions*, 859

allegations in Lead Plaintiffs' pleadings that definitively establish for purposes of § 1658(b)(1) when Lead Plaintiffs learned the key facts supporting their allegations of scienter.[19] Lead Plaintiffs' conclusory assertion that "the nature and extent of Defendants' fraud" was "revealed to investors and the market" "after the disclosures on November 8 and 9, 2012, came to light," Compl. ¶ 80, is not sufficient to show that Lead Plaintiffs knew—as of November 9, 2012, or any time prior to June 9, 2013—that a named defendant had acted either (i) with the intent to deceive, manipulate, or defraud Trust I Unitholders or (ii) so recklessly that his conduct "'present[ed] a danger of misleading [these] buyers or sellers that [was] either known to the defendant or [was] so obvious that the [defendant] . . . must have been aware of it.'" *Fleming Cos.*, 264 F.3d at 1260 (internal quotation marks omitted).

As to whether Defendants have shown that the pleadings establish facts that "would have prompted a reasonably diligent plaintiff to begin investigating" whether Defendants were at fault by November 2012, *Merck*, 559 U.S. at 653, the Court finds that a reasonably

---

F.3d 1295, 1306 (10th Cir. 2017) (noting that the complaint need not anticipate affirmative defenses).

[19] To find that a plaintiff had in fact discovered the key facts, the record must make clear that the plaintiff had actual notice of what it considered to be the underlying fraudulent conduct, including the defendant's scienter. *See, e.g.*, *Zarecor v. Morgan Keegan & Co.*, 801 F.3d 882, 887 (8th Cir. 2015) (plaintiffs' statement of claim in arbitration that defendant had not disclosed risky structure of securities and had "misrepresented hundreds of millions of dollars of asset-backed securities as being corporate bonds and preferred stocks" was sufficient to show facts constituting violation, including "an intent to deceive"); *FirstBank P.R., Inc. v. La Vida Merger Sub, Inc.*, 638 F.3d 37, 39 (1st Cir. 2011) (at the moment plaintiff knew of merger, "it necessarily also knew that it had not been told of the merger earlier" and that "[d]efendants [had] purposely avoided [plaintiff's] participation in the [m]erger").

diligent plaintiff who had purchased Trust I Units and who had sustained damages when the price of those units declined might have determined that inquiry into the cause of that decline was warranted. "[E]vidence that Trust I's wells were not performing as well as expected began to emerge in late 2011." Consol. Am. Compl. (Doc. No. 78) ¶ 307. During Trust I conference calls in 2011 and 2012, analysts: "raised pointed questions," *id.*; inquired about certain "ominous signs of Trust I Wells' declining oil production," *id.* ¶ 294; and "expressed concern over the drop in oil production in the Mississippian Formation," *id.* ¶ 230. And, "the truth" was further "revealed" on November 8, 2012, when investor Singh publicly issued his letter complaining about "SandRidge's 'disastrous performance.'" *SandRidge* Compl. at 24 (emphasis and capitalization omitted), ¶ 52; *see also SandRidge*, Corr. Consol. Am. Compl. (Doc. No. 75) ¶ 322. Such allegations alone, however, are not enough to establish as a matter of law when a reasonable plaintiff, diligently investigating these alleged "storm warnings," would have discovered the facts constituting the cause of action, including the fact that any named defendant acted either recklessly or with the intent to deceive, manipulate, or defraud Trust I Unitholders. *See City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 174 (2d Cir. 2011) (noting that absent actual knowledge, "the limitations period commences not when a reasonable investor would have begun investigating, but when such a reasonable investor conducting such a timely investigation would have uncovered the facts constituting a violation").

## CONCLUSION

While a court may dismiss a claim on the pleadings based on an affirmative defense under Federal Rule of Civil Procedure 12(c), it is only appropriate to do so when a plaintiff's pleadings "admit[ ] all the elements of the affirmative defense by alleging the factual basis for those elements." *Fernandez*, 883 F.3d at 1299. Because application of a limitations period is most often a fact-intensive inquiry, *see Merck*, 559 U.S. at 652 (citing *Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002) ("[A] reasonably diligent investigation . . . may consume as little as a few days or as much as a few years to get to the bottom of the matter.")), and because Defendants have not shown at this stage of the proceeding that the allegations in Lead Plaintiffs' pleadings "make clear that the right sued upon [in this case] has been extinguished,'" *Solomon*, 395 F. App'x at 497 (internal quotation marks omitted), the Court DENIES Defendants' Motion for Partial Judgment on the Pleadings (Doc. No. 215). Such denial is without prejudice should discovery reveal a basis for again challenging the timeliness of Lead Plaintiffs' Exchange Act claims.

IT IS SO ORDERED this 26th day of March, 2019.

_____
CHARLES B. GOODWIN
United States District Judge