## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DUANE & VIRGINIA LANIER** | ) | |
| **TRUST, individually and on behalf of** | ) | |
| **all others similarly situated,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Case No. CIV-15-634-G** |
| | ) | |
| **SANDRIDGE MISSISSIPPIAN** | ) | |
| **TRUST I et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ORDER

Now before the Court is a Motion for Summary Judgment (Doc. No. 360) filed by Defendant SandRidge Mississippian Trust I ("Trust I"). Lead Plaintiffs[1] have filed a Response (Doc. No. 397), to which Trust I has replied (Doc. No. 420).

### I.    Background

As has been detailed in the Court's previous orders, Lead Plaintiffs filed this action seeking relief under sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5, promulgated thereunder. *See* 17 C.F.R. § 240.10b-5. Lead Plaintiffs also brought claims under various provisions of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77k, 77*l*(a)(2), 77*o*.

On August 30, 2017, the Court dismissed all claims for relief under the Securities

---

[1] The remaining Lead Plaintiffs are the Duane & Virginia Lanier Trust ("Lanier Trust"), Ivan Nibur, and Reed Romine, individually and on behalf of all others similarly situated.

Act.  *See* Order (Doc. No. 129) (Miles-LaGrange, J.).  The Court entered judgment in the relevant defendants' favor on those claims pursuant to Federal Rule of Civil Procedure 54(b) on December 5, 2017.  *See* J. (Doc. No. 145) (Palk, J.).

On September 11, 2017, the Court denied Trust I's motion to dismiss, pursuant to Rule 12(b)(6), Lead Plaintiffs' Exchange Act claims.  *See* Order of Sept. 11, 2017 (Doc. No. 130) (Miles-LaGrange, J.).  In that same Order, the Court denied in part and granted in part the motions to dismiss filed by the three Officer Defendants—Tom L. Ward, James D. Bennett, and Matthew K. Grubb.  *See id.*

On December 30, 2022, the Court approved a class action settlement (Doc. No. 481) and entered judgment (Doc. No. 482) dismissing the Officer Defendants with prejudice.

Following these rulings, what remain for disposition are the section 10(b) and Rule 10b-5 claims (hereafter referred to as the "Section 10(b) Claim") of Lead Plaintiffs Lanier Trust, Nibur, and Romine, asserted individually and on behalf of putative class members against Trust I and against nominal defendant SandRidge Energy, Inc. ("SandRidge").  *See* Consol. Am. Compl. ¶¶ 289-344, 352-358 (Doc. No. 78); *see also* Suppl. (Doc. No. 120).[2]

## II.    Standard of Review

Summary judgment is a means of testing in advance of trial whether the available evidence would permit a reasonable jury to find in favor of the party asserting a claim.  The Court must grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

_____

[2] The section 20(a) Exchange Act claims were asserted only against the now-dismissed Officer Defendants.  *See* Consol. Am. Compl. ¶¶ 345-351.

A party that moves for summary judgment has the burden of showing that the undisputed material facts require judgment as a matter of law in its favor. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). To defeat summary judgment, the nonmovant need not convince the Court that it will prevail at trial, but it must cite sufficient evidence admissible at trial to allow a reasonable jury to find in the nonmovant's favor—i.e., to show that there is a question of material fact that must be resolved by the jury. *See Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005). The Court must then determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).

Parties may establish the existence or nonexistence of a material disputed fact by:

- citing to "depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" in the record; or

- demonstrating "that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56(c)(1)(A), (B). While the Court views the evidence and the inferences drawn from the record in the light most favorable to the nonmoving party, *see Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005), "[t]he mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant]." *Liberty Lobby*, 477 U.S. at 252.

III.    *Lead Plaintiffs' Allegations and Section 10(b) Claim*

Lead Plaintiffs allege that SandRidge explored, developed, and produced natural gas and oil reserves in, among other locations, the Mississippian Formation, "a geological formation located in northern Oklahoma and south-central Kansas."  Consol. Am. Compl. ¶ 87.  "[T]o finance increased capital expenditures planned for 2011, SandRidge decided to 'monetize' certain of its existing oil and gas assets in [n]orthern Oklahoma by selling interests in those assets to the public via a royalty trust."  *Id.* ¶ 4.  To this end, SandRidge in December 2010 formed Trust I, a Delaware statutory trust, with The Bank of New York Mellon Trust Company, N.A. ("BNY") as Trustee.  *Id.* ¶¶ 39, 95.

SandRidge conveyed to Trust I royalty interests consisting of a share of Sandridge's revenue from (a) existing horizontal oil and gas wells in five Oklahoma counties, collectively referred to as the "Trust I Area of Mutual Interest" ("Trust I AMI"), and (b) certain horizontal oil and gas wells to be drilled in the Trust I AMI.  *Id.* ¶ 4.  To compensate SandRidge for these royalty interests, Trust I committed to sell common units to investors in an initial public offering ("Trust I IPO") and transfer the net proceeds of that sale to SandRidge.  *Id.* ¶ 5.

SandRidge subsequently decided to raise additional funds to finance its capital expenditures and, in December 2011, formed the SandRidge Mississippian Trust II ("Trust II").  *Id.* ¶ 19.  SandRidge conveyed to Trust II royalty interests consisting of a share of SandRidge's revenue from (a) existing horizontal wells in nine counties in Oklahoma and Kansas, collectively referred to as the "Trust II Area of Mutual Interest" ("Trust II AMI"), and (b) certain horizontal oil and gas wells to be drilled in the Trust II AMI.  *Id.*  As with

Trust I, Trust II committed to sell common units in an initial public offering and transfer those proceeds to SandRidge.  *Id.* ¶ 20.

Following various dismissals and rulings by the Court, Lead Plaintiffs' remaining claim is that Trust I violated Section 10(b) of the Exchange Act and Rule 10b-5 "in an effort to maintain artificially high market prices for Trust I and Trust II Common Units." Consol. Am. Compl. ¶ 338.  Lead Plaintiffs bring the Section 10(b) Claim on behalf of themselves and those individuals and entities that had purchased or otherwise acquired common units of Trust I pursuant or traceable to the Trust I IPO, deemed effective April 5, 2011, and/or at all other times between April 5, 2011, and November 8, 2012, inclusive (the "Class Period").  *See* Order of Mar. 26, 2019 (Doc. No. 309) at 9; Consol. Am. Compl. ¶¶ 3, 34.

Specifically, Lead Plaintiffs allege that "Trust I Development Wells drilled after the Trust I Offering were producing considerably less oil, and considerably more gas[,] than the Trust I Producing Wells (which . . . was the opposite of the results forecast in the Trust I Registration Statement and Prospectus)" and that certain "Trust I Development Wells . . . were producing divergent proportions of gas and oil (thus demonstrating a lack of geological uniformity in Alfalfa [C]ounty[)]."  Consol. Am. Compl. ¶ 292 (emphasis omitted).  These negative trends and developments "resulted in the oil production of the Trust I Wells falling more steeply than anticipated."  *Id.* ¶ 293.  Such failing oil production "would have caused the quarterly cash distributions to Trust I Unitholders to fall below . . . quarterly estimates" and "would have made it far more difficult for SandRidge to raise capital to finance its rising capital expenditures via the Trust II Offering planned for April

2012" "or the sale of its Trust I Common Units." *Id.*

Lead Plaintiffs allege that these potential effects were "[s]trong [m]otives" for SandRidge, Trust I, and the Officer Defendants to misrepresent Trust I's performance. *Id.* at 110. Lead Plaintiffs allege that, "when questioned by analysts on the Trust I Conference Calls," Officer Defendants Ward and Grubb therefore "made false and misleading statements that sought to conceal such declines from investors." *Id.* ¶ 294; *see also* Order of Sept. 11, 2017, at 9, 12. Specifically, Lead Plaintiffs allege that Officer Defendants Ward and Grubb made false statements and material omissions regarding Trust I's operations and well production while participating in investor conference calls about Trust I preceding (and succeeding) the April 2012 Trust II offering. *See* Consol Am. Compl ¶¶ 294, 309-310 (Nov. 11, 2011 earnings call), 312-319 (Feb. 17, 2012 earnings call), 319-323 (May 11, 2012 earnings call), 324-329 (Aug. 10, 2012 earnings call); Order of Oct. 30, 2019 (Doc. No. 347) at 8-9.

IV.    *Trust I's Motion for Summary Judgment*

Lead Plaintiffs sue Trust I "as a primary participant" in the alleged violation of section 10(b) and Rule 10b-5. Consol. Am. Compl. ¶ 338. Section 10(b) prescribes that it is unlawful for "any person," in connection with the purchase or sale of a security, "[t]o use or employ . . . any manipulative or deceptive device or contrivance" in contravention of a rule of the U.S. Securities and Exchange Commission ("SEC"). 15 U.S.C. § 78j(b). The Section 10(b) Claim primarily relies upon subsection (b) of Rule 10b-5, which prohibits "mak[ing] any untrue statement of a material fact" or "omit[ting] to state a material fact necessary in order to make the statements made, in the light of the

circumstances under which they were made, not misleading," "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5(b); *see also SEC v. Zandford*, 535 U.S. 813, 816 n.1 (2002) ("The scope of Rule 10b-5 is coextensive with the coverage of § 10(b)[.]" (citation omitted)).

> To establish liability in a Section 10(b) private action,
>
> a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

*Stoneridge Inv. Partners, LLC v. Sci-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). "Section 10(b) and Rule 10b-5 can be violated by any 'person,' natural or legal, including corporations." *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 475 (9th Cir. 2015) (citing 15 U.S.C. § 78c(a)(9)).

### A. Rule 10b-5(b): False Statements and Scienter of Trust I

Trust I challenges Lead Plaintiffs' ability to prove the first and second elements of the Section 10(b) Claim. Specifically, Trust I argues that it is entitled to judgment as a matter of law because Trust I itself made no misrepresentations or omissions and no scienter can be attributed to Trust I. *See* Def.'s Mot. at 12-22; Def.'s Reply at 4-13.[3] Lead Plaintiffs dispute Trust I's position and assert that genuine fact issues preclude the grant of summary judgment to Trust I. *See* Pls.' Resp. at 14-24.

---

[3] Trust I's Motion also adopts arguments that were presented to the Court in other defendants' motions for summary judgment. *See* Def.'s Mot. at 22-24. Because the Court concludes that Trust I is entitled to summary judgment on the Trust I-specific basis outlined herein, it need not reach the alternative arguments adopted and raised by Trust I.

Relevant to the first element, "[t]o be liable," Trust I "must have 'made' the material misstatements" challenged under Rule 10b-5(b). *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141 (2011). "One 'makes' a statement by stating it." *Id.* at 142.

> For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it. Without control, a person or entity can merely suggest what to say, not "make" a statement in its own right.

*Id.*; *see also Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1225 (10th Cir. 2023). As a corporate entity, Trust I can act only through its agents and employees. *See Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 348 (1985); *Roscoe v. United States*, 134 F. App'x 226, 228 (10th Cir. 2005).

As to the scienter element, it is well established that "scienter" in this context means "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). "Recklessness, defined as conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it, can also satisfy the scienter requirement for Section 10(b)." *City of Phila. v. Fleming Cos.*, 264 F.3d 1245, 1258 (10th Cir. 2001) (internal quotation marks omitted). "Corporations . . . do not have their own state[s] of mind"; "the scienter of a corporation's agents must be imputed to it." *Smallen v. W. Union Co.*, 950 F.3d 1297, 1312 (10th Cir. 2020); *accord Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551

U.S. 308, 328 (2007).[4]

Trust I first argues that it cannot be held liable for any allegedly material misrepresentation or omission made during the conference calls by Officer Defendants Ward and Grubb (hereafter referred to as "the False Statements"). Trust I disclaims any "authority over the content of" the False Statements "and whether and how" they were "communicate[d]," as well as the necessary intent or recklessness on the part of any agent or employee of Trust I. *Janus Cap. Grp.*, 564 U.S. at 144; *see* Def.'s Mot. at 12-22. In support, Trust I relies upon the following facts, as to which there is no genuine dispute:

- In the April 12, 2011 Amended and Restated Trust Agreement filed with the SEC, Trust I was represented as "intended to be a passive entity limited to the receipt of revenues . . . and the distribution of such revenues . . . to the Trust Unitholders." Def.'s Ex. 3, Am. & Restated Tr. Agreement (Doc. No. 360-3) at 11.

- The Trust I Prospectus filed with the SEC stated that Trust I's "business and affairs" would "be managed by [BNY] as trustee." "SandRidge . . . will have no ability to manage or influence the management of the trust except through its limited voting rights as a holder of trust units." Def.'s Ex. 2, Prospectus (Doc. No. 360-2) at 7.

- Trust I is a legally distinct entity from SandRidge. *See id.* at 48; Am. & Restated Tr. Agreement at 13; Def.'s Mot. at 6, ¶ 6; Pls.' Resp. at 6, ¶ 6; *see also* 12 Del. Code § 3801(i).

- Trust I had no formal directors, officers, or employees during the Class Period. *See* Def.'s Ex. 6, Pls.' Resp. to Def.'s Reqs. Admis. (Doc. No. 360-6) at 6-7; Def.'s Ex. 7, Newell Dep. 18:6-12 (Doc. No. 360-7).

- An engineering firm was retained by SandRidge, not by Trust I, to prepare the reserve report included with the Prospectus that estimated the amount of proved reserves attributable to Trust I. *See* Prospectus at 70-71; Def.'s Mot. at 8, ¶ 12; Pls.'

---

[4] The Tenth Circuit has declined to adopt or reject the theory of "corporate scienter," whereby a plaintiff may "plead scienter against a corporate defendant without doing so for a specific individual." *Smallen*, 950 F.3d at 1314. Even assuming such a theory is viable, Lead Plaintiffs do not plead or establish liability based upon Trust I's own "dramatic" and "public" statements so as to defeat summary judgment. *See id.* at 1313-14.

Resp. at 9, ¶ 12.

- The Trustee of Trust I is not a party to this litigation, and Plaintiffs do not contend that the Trustee made any false or misleading statements or committed any act or omission giving rise to Lead Plaintiffs' claims. *See* Am. Consol. Compl. ¶¶ 36-62; Def.'s Mot. at 9 ,¶ 15; Pls.' Resp. at 9, ¶ 15.

- The Trustee of Trust I did not make or cause to be made any statements on the relevant Trust I earnings calls, had no role in drafting scripts on those calls, and was not consulted as to the information to be discussed on those calls. *See* Pls.' Resp. to Def.'s Reqs. Admis. at 5-6; Newell Dep. 30:19-24, 40:9-18, 54:23-25 (Doc. No. 360-16).

- During each of the earnings calls for Q2 2011, Q3 2011, Q4 2011, and Q1 2012, Mr. Bennett, Mr. Ward, and Mr. Grubb were identified as officers of SandRidge. *See* Def.'s Exs. 11, 12, 13, 14, Earnings Call Trs. (Doc. Nos. 360-11, -12, -13, -14).

- During each of the earnings calls for Q2 2011, Q3 2011, Q4 2011, and Q1 2012, it was stated that Trust I has no employees or officers. *See* Earnings Call Trs.

- In the press releases for the earnings calls, and during each of the earnings calls for Q2 2011, Q3 2011, Q4 2011, and Q1 2012, it was stated that SandRidge was the "sponsor" of Trust I, operating a majority of Trust I's properties. *See id.*; *see, e.g.*, Def.'s Ex. 17, Form 8-K (Doc. No. 360-17) at 5; *see also* Am. Consol. Compl. ¶¶ 149, 151.[5]

Lead Plaintiffs counter that, despite Trust I's lack of employees or officers, the False

Statements of Mr. Ward and Mr. Grubb can be imputed to Trust I because those individuals

acted with the "apparent authority" of and/or are "de facto officers" of Trust I. *See* Pls.'

Resp. at 14-24. As support for this proposition, Lead Plaintiffs primarily rely upon (i)

Trust I being (correctly) identified on the calls as "SandRidge Mississippian Trust I," (ii)

---

[5] Although Lead Plaintiffs purported to dispute certain of the material facts as to which Trust I contended no genuine dispute exists, Lead Plaintiffs' Response failed to supply a single citation as to the evidence allegedly supporting such factual disputes, in contravention of Local Civil Rule 56.1(c). The Court nonetheless has considered the entire factual record rather than deeming the facts set forth by Trust I admitted. *See* LCvR 56.1(e).

the Officer Defendants being identified as Trust I officers by the publisher of the call transcripts, and (iii) several instances during the earnings calls where the Officer Defendants' statements could be construed as being made on behalf of Trust I. *See id.* at 10-13 (citing Earnings Call Trs.). Lead Plaintiffs also note that Trust I, rather than SandRidge, issued the press releases as to the earnings calls. *See id.* at 11-12 (citing Pls.' Exs. 1-4, News Releases (Doc. Nos. 398-1, -2, -3, -4)).

### 1. Whether the Officer Defendants Were De Facto Officers of Trust I

Lead Plaintiffs first argue that, in addition to being officers of SandRidge, the Officer Defendants were "de facto officers" of Trust I and that Trust I can therefore be held liable for these individuals' making of the False Statements and for their alleged scienter in doing so. *See* Pls.' Resp. at 20-24. Lead Plaintiffs fail to cite any Tenth Circuit authority to support holding a corporate entity liable under a de facto-officer theory in the securities fraud context. Even assuming the Court may properly do so, however, a jury could not reasonably find that Mr. Ward and Mr. Grubb were de facto officers of Trust I.

Courts that have recognized instances "where an individual will be held to his fiduciary duty as a de facto officer [who] has the same fiduciary duties as a de facto director" have done so in two circumstances. *Music Grp. Mac. Com. Offshore Ltd. v. Foote*, No. 14-cv-03078, 2015 WL 3882448, at *22 (N.D. Cal. June 23, 2015).

> First, courts will recognize a de facto officer where the apparent officer assumes possession of an office *under the claim and color of an election or appointment* and actually discharges the duties of that office. *See Select Portfolio Servicing, Inc.*, 2006 WL 2691784, at *10 (citing *In re Walt Disney Deriv. Litig.*, 906 A.2d 27, 48 (Del. 2006); *South Seas Corp. v. Sablan*, 525 F. Supp. 1033, 1038 (D.N. Mariana Is. 1981)[)]. Under this path to de facto officer-ship, "the corporation must take some action that looks like a formal

appointment or election" to create a de facto officer.  *Id.*

*Id.*  There is no showing here that any Officer Defendant was appointed or elected to any Trust I office or "ha[d] some color of title" to such an office.  2 *Fletcher Cyclopedia of the Law of Corporations* § 374 (2024).

Second, a de facto officer may be recognized when an individual "has no legal authority to act . . . but . . . presents himself or herself as having that authority with the acquiescence of the involved party."  *Music Grp.*, 2015 WL 3882448, at *22 (internal quotation marks omitted).  Lead Plaintiffs advance this theory, arguing that Mr. Ward and Mr. Grubb "performed policy-making functions for Trust I."  Pls.' Resp. at 21.  Lead Plaintiffs emphasize that these Officer Defendants drafted the earnings call scripts and "relay[ed] information and answer[ed] questions about Trust I for securities analysts and Trust I investors."  *Id.* at 21-22.

As noted by Trust I, however, such activity falls far short of the level of policy-making or "total control" that courts have found supports a finding that individuals are serving as de facto officers.  *SEC v. Prince*, 942 F. Supp. 2d 108, 134 (D.D.C. 2013) ("The few cases that have found an employee to be a *de facto* officer because of their ability to make policy involved alleged 'consultants' who were actually in total control of a company.").  In addition, adopting Lead Plaintiffs' theory would be inconsistent with the policy basis for recognizing someone as a de facto officer:

> The goal of this limited exception is to protect innocent third parties during the course of transactions with corporate officers that present themselves as having authority to act.  However, courts have long held that this exception only does not create de facto officer duties or liabilities where the rights of the public are not affected, nor where all the parties interested have

knowledge that the person pretending to be an officer is not an office[r] de jure; for in such a case the reason of the rule no longer exists, and the law should not be involved for protection.

*Music Grp.*, 2015 WL 3882448, at *22 (citation and internal quotation marks omitted).

Here, during each of the four earnings calls, all participants were told that: (1) Ward, Bennett, and Grubb were officers of SandRidge Energy; and (2) Trust I had no officers or employees. These individuals were not "pretending" to be Trust I officers; rather, they specifically disclaimed the proposition that such officers existed. Even drawing all inferences in Lead Plaintiffs' favor, the record does not reasonably reflect that an Officer Defendant was exercising the powers of a Trust I officer or claiming to hold such an office. Lead Plaintiffs therefore have not shown a genuine fact issue material to the question of whether any Officer Defendant should be recognized as a de facto officer on this basis. *See Music Grp.*, 2015 WL 3882448, at *22; 2 *Fletcher*, *supra*, § 385 ("The de facto rule will not be extended to a case where a person dealing with alleged corporate officers is not misled nor induced to believe that they are dealing with legal officers, but has knowledge that the person pretending to be an officer is not a de jure officer.").

### 2.  *Whether the Officer Defendants Had Apparent Authority*

Because the Exchange Act "do[es] not contain any explicit instructions on when an employee's acts and intent are to be imputed as those of the company, courts have looked to agency principles for guidance." *In re ChinaCast*, 809 F.3d at 475.[6]  The Tenth Circuit

---

[6] "Agency" is:

the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise

has explained that "[t]he scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1106 (10th Cir. 2003); *cf. In re ChinaCast*, 809 F.3d at 476 ("Under the rule of imputation, it is 'fundamental that an employer is liable for the torts of his employee committed while acting in the scope of his employment.'" (quoting *Fields v. Synthetic Ropes, Inc.*, 215 A.2d 427, 432 (Del. 1965))).

Lead Plaintiffs seek extension of this principle, arguing that both the making of the False Statements and the alleged scienter of Mr. Ward and Mr. Grubb should be ascribed to Trust I, despite their being employees and officers of SandRidge and not of Trust I. *See* Pls.' Resp. at 15-20, 22-24. Specifically, Lead Plaintiffs argue that, "with respect to the statements that Trust I knowingly permitted them to make" on the earnings calls, Mr. Ward and Mr. Grubb were "imbu[ed] . . . with apparent authority to speak on Trust I's behalf." *Id.* at 19; *see also In re ChinaCast*, 809 F.3d at 476 ("[A] corporation is responsible . . . for a misleading statement made by an employee or other agent who has . . . apparent authority." (internal quotation marks omitted)).

Apparent authority is defined as follows:

> Apparent authority is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.

---

consents so to act.

Restatement (Third) of Agency § 1.01 (Am. Law Inst. 2006).

Restatement (Third) of Agency § 2.03.  Apparent authority does not presuppose an agency relationship and can "app[ly] to actors who appear to be agents but are not, as well as to agents who act beyond the scope of their actual authority."  *Id.* cmt.a.

The Court assumes for present purposes that the doctrine of apparent authority could potentially impose Exchange Act liability based on the False Statements made by non-employees back to the Trust I entity as principal.  *But cf. Janus*, 564 U.S. at 145-46 (declining to "disregard the corporate form" by finding that an investment advisor should be understood to make the statements of a client mutual fund).  Even so, the doctrine would not apply to do so under the factual circumstances present here.

"Apparent authority holds a principal accountable for the results of third-party beliefs about an actor's authority to act as an agent" only when the belief is (1) "traceable to a manifestation of the principal" and (2) "reasonable."  Restatement (Third) of Agency § 2.03 cmt. c.  Construed in Lead Plaintiffs' favor, a dispute lies as to whether Trust I manifested apparent authority in Mr. Ward and Mr. Grubb to act on Trust I's behalf, at least to some extent.  "A principal can be held liable for the acts of an alleged agent under an apparent authority theory if and only if the principal, by his acts or conduct, has clothed the agent with the appearance of authority."  *In re Lamey*, No. 14-13729, 2020 WL 1884189, at *2 (Bankr. N.M. Apr. 15, 2020) (internal quotation marks omitted).  While the Trustee performed acts and conducted transactions—e.g., approving and filing documents with the SEC—on behalf of Trust I, the Officer Defendants arranged and administered the earnings calls and participated in drafting SEC filings.  *See, e.g.*, Pls.' Ex. 5, Newell Dep. 26:1-12, 30:11-18, 41:8-42:1 (Doc. No. 398-5); *see also* Restatement (Third) of Agency §

15

2.03 cmt. c ("Manifestations . . . may take many forms.").

As argued by Trust I, however, an investor's belief that Mr. Ward and Mr. Grubb could "act on behalf of" Trust I would not be "reasonable" and "traceable to" any such manifestation by Trust I, as required for the doctrine of apparent authority to apply. Restatement (Third) of Agency § 2.03 cmt. a.   First, pursuant to the Administrative Services Agreement ("ASA") made between Trust I and SandRidge, SandRidge was obligated to provide administrative services to Trust I, "as may be necessary for the preparation of" required reports, in exchange for a fixed quarterly fee.  Def.'s Ex. 18, ASA § 2.01 (Doc. No. 360-18).  The ASA expressly stated:

> It is expressly acknowledged by the parties hereto that each party is an "independent contractor" and nothing in this Agreement is intended nor shall be construed to create an employer/employee, joint venture or partnership relationship, or to allow any party to exercise control or direction over the other party.  Except as required in connection with the performance of the Services, neither [SandRidge] nor any agent, employee, servant, contractor or subcontractor of [SandRidge] or any of its Affiliates shall have the authority to bind the Trust to any contract or arrangement.

*Id.* § 2.04.

The ASA "was filed with the SEC and publicly available to all investors."  Defs.' Mot. at 20.  "[A] third party has an obligation to use reasonable diligence and prudence to ascertain whether the agent is acting within the scope of its powers."  *In re Lamey*, 2020 WL 1884189, at *2 (alteration and internal quotation marks omitted); *see also DeBoer Constr., Inc. v. Reliance Ins. Co.*, 540 F.2d 486, 491 (10th Cir. 1976) ("Knowledge that an agent has limited authority defeats any right to rely on apparent authority.").

Moreover, investors were expressly informed on each call that Mr. Ward and Mr.

16

Grubb were officers of SandRidge, who was Trust I's sponsor, and that Trust I had no officers.   Given such express disclaimers, any belief by investors that the Officer Defendants were authorized to act on behalf of Trust I would not be reasonable and traceable to a manifestation to that effect by Trust I.  *See* Restatement (Third) Agency § 2.03 cmt. c (explaining that, even where an agent has actual authority, an "agent's statement to the third party denying that the agent has authority precludes the presence of apparent authority because it is not reasonable for the third party to believe the agent to be authorized"); *id.* ("A third party's reasonable understanding of the principal's conduct will reflect general business custom as well as usage that is particular to the principal's industry and prior dealings between the parties."); *see also McNutt Oil & Refin. Co. v. Mimbres Vally Bank*, 174 F.2d 311, 313 (10th Cir. 1949) (explaining that the test for whether the principal can be held liable based upon the apparent authority of the agent requires the court to consider "what powers" persons "of ordinary prudence, familiar with business practices, dealing with the agent, *without knowledge of any limitations on the agent's authority*, might reasonably believe [the agent] to have on the basis of the principal's conduct" (emphasis added)).

Because a jury could not reasonably find that investors had a "reasonable" belief that Mr. Ward and Mr. Grubb had apparent authority to make the False Statements on behalf of Trust I, Trust I is entitled to judgment as a matter of law in this respect.  *See McNutt*, 174 F.2d at 313; *Liberty Lobby*, 477 U.S. at 252; *see also Hinton Travel Inn, Inc. v. Wichita Wayne, LLC*, No. CIV-11-291-C, 2012 WL 2789873, at *3 (W.D. Okla. July 9, 2012) (explaining that "if the facts are such that no reasonable person could disagree" the

inquiry as to whether an agent has apparent authority can be made as a matter of law).

B. *Rule 10b-5(a) and (c)*

In *Lorenzo v. SEC*, the Supreme Court held that a person or entity who does not "make" statements, "but who disseminate[s] false or misleading statements to potential investors with the intent to defraud," can be found to have violated Rule 10b-5(a) and (c), as well as § 10(b). *Lorenzo*, 587 U.S. 71, 74 (2019).[7]  Citing *Lorenzo*, Lead Plaintiffs contend that, even if Trust I did not "make" the False Statements as required for liability to lie under Rule 10b-5(b), Trust I is liable under Rule 10b-5(a) and (c) for disseminating those False Statements. *See* Pls.' Resp. at 24-25.

As an initial matter, the facilitative role played by Trust I and/or its Trustee—BNY knew about and set up the earnings calls, attended one earnings call, and "participated in the review, gave final approval, and filed on behalf of Trust I all documents Trust I filed with the SEC"—varies considerably from that of the corporate officer in *Lorenzo*.  Pls.' Resp. at 13; *see Lorenzo*, 587 U.S. at 78 (noting that the investment banker sent emails to prospective investors that "he understood to contain material untruths").

More significantly, Lead Plaintiffs' inability to prove Trust I's scienter, discussed above in connection with Rule 10b-5(b), likewise precludes recovery under these separate subsections of Rule 10(b). *See Malouf v. SEC*, 933 F.3d 1248, 1261 (10th Cir. 2019)

---

[7] Rule 10b-5(a) makes it unlawful "[t]o employ any device, scheme, or artifice to defraud" "in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5(a).  Rule 10b-5(c) proscribes "engag[ing] in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."  *Id.* § 240.10b-5(c).

(noting that "[s]cienter is required to find a violation of Rule 10b-5(a)" or "Rule 10b-5(c)");
*see also Lorenzo*, 587 U.S. at 78; 15 U.S.C. § 78u-4(b)(2)(A).

    *C.  Summary*

    The factual record before the Court reflects that Trust I, which was structured as a passive trust and a separate legal entity from SandRidge, neither controlled the making of the False Statements nor acted with the requisite state of mind to create § 10(b) liability as to those statements.  There being no genuine issue for trial as to whether Trust I "made" any false statements or material omissions, or whether Trust I had the requisite scienter in connection with the False Statements, Trust I is entitled to judgment as a matter of law on the Section 10(b) Claim.

CONCLUSION

    For the reasons set forth herein, the Motion for Summary Judgment (Doc. No. 360) filed by Defendant SandRidge Mississippian Trust I is GRANTED.  A separate judgment shall be entered.

    IT IS HEREBY ORDERED that, as it is agreed by all parties that SandRidge Energy, Inc. was named as a nominal defendant "solely to the extent necessary" for Lead Plaintiffs to recover on any claims" "to the extent of available insurance," and all claims have now been dismissed or resolved in the defendants' favor, nominal defendant SandRidge Energy, Inc. is hereby DISMISSED from this action with prejudice.  Consol. Am. Compl. ¶ 38.

    IT IS FURTHER ORDERED that the Court's STAY (Doc. No. 457) of pending motions in this matter is LIFTED AND VACATED.  The remaining pending motions

(Doc. Nos. 170, 236, 245, 357, 365, 367, 368, 407) are DENIED AS MOOT.[8]

IT IS SO ORDERED this 11th day of September, 2025.

CHARLES B. GOODWIN
United States District Judge

---

[8] At the hearing and status conference of September 24, 2021, all parties agreed and represented to the Court that Trust I's request for summary judgment should be determined prior to disposition of these pending motions, including Lead Plaintiffs' Motion for Leave to File Second Amended Complaint (Doc. No. 407).